1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  JULIE L. GARLAND
   Senior Assistant Attorney General
4  JENNIFER A. NEILL
   Supervising Deputy Attorney General
5  AMANDA J. MURRAY, State Bar No. 223829
   Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 703-5741
     Fax:  (415) 703-5843
8    Email:  Amanda.Murray@doj.ca.gov

9  Attorneys for Respondent

10

11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                     SAN JOSE DIVISION

14

| | |
|---|---|
| **JESSE M. PLAZA,** | C08-1589 JF |
| Petitioner, | **ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| **BEN CURRY, Warden,** | Judge:    The Honorable Jeremy Fogel |
| Respondent. | |

20       As an Answer to the Petition for Writ of Habeas Corpus filed by inmate Jesse M. Plaza,

21  Respondent, admits, alleges, and denies that:

22       1.    Plaza is in the lawful custody of the California Department of Corrections and

23  Rehabilitation following his 1991 conviction for first degree murder.  (Pet. at i.)  Plaza is serving

24  a sentence of twenty-five years to life in prison.  (*Id.*)

25       2.    In 2007, Plaza filed a petition for writ of habeas corpus in Los Angeles County

26  Superior Court, alleging that the Board of Parole Hearings' 2006 decision denying him parole

27  violated his due process rights.  (Ex. A, Super. Ct. Pet.; Ex. B, Super. Ct. Order.)  Plaza also

28  alleged that the Board applied the statutory parole criteria in an arbitrary and capricious manner,

Answer and Supporting Memorandum of Points and Authorities                    *Plaza v. Curry*
                                                                              C08-1589 JF

1    and that he has a reasonable expectation of release based on Penal Code section 3041,

2    subdivision (a). The superior court denied the petition, finding that there was some evidence to

3    support the Board's finding that Plaza's offense was carried out in a calculated and dispassionate

4    manner, and that the motive for the crime was trivial in relation to the offense. (Ex. B at 1-2.)

5        3.    Plaza then raised the same claims in petitions to the California Court of Appeal and the

6    California Supreme Court. (Ex. C, Ct. App. Pet.; Ex. D, Ct. App. Order; Ex. E, Sup. Ct. Pet; Ex.

7    F, Sup. Ct. Order.) Both petitions were summarily denied. (Ex. D; Ex. F.)

8        4.    Respondent admits that Plaza exhausted his state court remedies regarding his claims

9    that the Board's 2006 decision violated his due process rights, that the Board applied the

10   statutory parole criteria in an arbitrary and capricious manner, and that he has a reasonable

11   expectation of release based on Penal Code section 3041, subdivision (a). Respondent denies

12   that Plaza exhausted his state court remedies regarding his claim that the Board violated his right

13   to equal protection. 28 U.S.C. § 2254(b)(1)(A); *see O'Sullivan v. Boerckel,* 526 U.S. 838, 844

14   (1999) (a state inmate must properly exhaust available state court remedies before a federal court

15   may consider granting habeas corpus relief). Respondent denies that Plaza has exhausted his

16   claims to the extent they are interpreted more broadly to encompass any systematic issues beyond

17   this claim.

18       5.    Respondent admits that the Petition is timely under 28 U.S.C. § 2244(d)(1).

19   Respondent admits that the Petition is not subject to any other procedural bar.

20       6.    Respondent denies that Plaza is entitled to federal habeas relief under 28 U.S.C. § 2254

21   because the state court decisions were not contrary to, or an unreasonable application of clearly

22   established federal law as determined by the United States Supreme Court, or based on an

23   unreasonable determination of the facts.

24       7.    Respondent denies that Plaza has a federally protected liberty interest in parole and,

25   therefore, alleges that he has not a stated a federal question invoking this court's jurisdiction.

26   The Supreme Court has not clarified the methodology for determining whether a state has created

27   a federally protected liberty interest in parole. *See Greenholtz v. Inmates of Neb. Penal & Corr.*

28   *Complex,* 442 U.S. 1, 12 (1979) (liberty interest in conditional parole release date created by

Answer and Supporting Memorandum of Points and Authorities                                    *Plaza v. Curry*
                                                                                              C08-1589 JF

1  unique structure and language of state parole statute); *Sandin v. Connor*, 515 U.S. 472, 484

2  (1995) (federal liberty interest in correctional setting created only when issue creates an "atypical

3  or significant hardship" compared with ordinary prison life); *Wilkinson v. Austin*, 545 U.S. 209,

4  229 (2005) (*Sandin* abrogated *Greenholtz's* methodology for establishing the liberty interest).

5  California's parole statute does not contain mandatory language giving rise to a protected liberty

6  interest in parole under the mandatory-language approach announced in *Greenholtz*. *In re*

7  *Dannenberg*, 34 Cal. 4th 1061, 1087 (2005) (California's parole scheme is a two-step process

8  that does not impose a mandatory duty to grant life inmates parole before a suitability finding).

9  And continued confinement under an indeterminate life sentence does not impose an "atypical or

10  significant hardship" under *Sandin* since a parole denial does not alter an inmate's sentence,

11  impose a new condition of confinement, or otherwise restrict his liberty while he serves his

12  sentence. Thus, Respondent asserts that Plaza does not have a federal liberty interest in parole

13  under either *Greenholtz* or *Sandin*. Respondent acknowledges that in *Sass v. California Board of*

14  *Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006) the Ninth Circuit held that California's parole

15  statute creates a federal liberty interest in parole under the mandatory-language analysis of

16  *Greenholtz*, but preserves the argument, which is pending en banc in *Hayward v. Marshall*, 527

17  F.3d 797 (9th Cir. 2008).

18      8.    Even if Plaza has a federal liberty interest in parole, he received all due process to

19  which he is entitled under clearly established federal law because he was provided with an

20  opportunity to be heard and a statement of reasons for the Board's decision. *Greenholtz*, 442

21  U.S. at 16.

22      9.    Respondent denies that the some-evidence test is clearly established federal law in the

23  parole context. Respondent denies that the preponderance of the evidence standard is required by

24  state law or that it is clearly established federal law in the parole context.

25      10.    Respondent denies that the Board applied the statutory parole criteria in an arbitrary

26  and capricious manner or that Plaza has a reasonable expectation of release based on Penal Code

27  section 3041, subdivision (a). Respondent alleges that Plaza fails to present a federal question

28  when he contends that the state courts improperly applied or interpreted state law. Alleged errors

Answer and Supporting Memorandum of Points and Authorities                           *Plaza  v. Curry*
                                                                                     C08-1589 JF

1  in the application of state law are not cognizable in federal habeas corpus. *Pulley v. Harris*, 465

2  U.S. 37, 41 (1984); *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1984).

3      11.   Respondent submits that an evidentiary hearing is not necessary because the claims

4  can be resolved on the existing state court record. *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th

5  Cir. 1999).

6      12.   Respondent denies that Plaza is entitled to immediate release or that if Plaza is entitled

7  to release, that he be released from prison without a parole term. Plaza's remedy is limited to the

8  process that is due, which is a new review by the Board comporting with due process. *See Benny*

9  *v. U.S. Parole Comm'n*, 295 F.3d 977, 984-85 (9th Cir. 2002) (a liberty interest in parole is

10  limited by the Board's exercise of discretion, and a due process error does not entitle an inmate

11  to a favorable parole decision).

12      13.   Plaza fails to state or establish any grounds for habeas corpus relief.

13      14.   Except as expressly admitted in this Answer, Respondent denies the allegations of the

14  Petition.

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### INTRODUCTION

3    Plaza claims that the Board's 2006 decision finding him unsuitable for parole violated his

4   due process rights.  But Plaza merely alleges a disagreement with the Board's decision, and fails

5   to establish that the state court decisions denying his due process claims were contrary to, or an

6   unreasonable application of clearly established federal law as determined by the United States

7   Supreme Court, or were based on an unreasonable determination of the facts.  Thus, there are no

8   grounds for federal habeas relief.

9

### ARGUMENT

10

### I.

11

### PLAZA HAS NOT SHOWN THAT HE IS ENTITLED TO RELIEF UNDER AEDPA.

12

13    Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) a federal court

14   may not grant a writ of habeas corpus unless the state court's adjudication was either: 1)

15   "contrary to, or involved an unreasonable application of, clearly established Federal law, as

16   determined by the Supreme Court of the United States;" or 2) "based on an unreasonable

17   determination of the facts in light of the evidence presented at the State Court proceeding."

18   28 U.S.C. § 2254(d)(1-2) (2000).  Plaza has not demonstrated that he is entitled to relief under

19   this standard.

20    **A.   Plaza Has Not Shown that the State Court Decisions Was Contrary to
            Clearly Established Federal Law.**

21

22    As a threshold matter, the Court must decide what, if any, "clearly established Federal law"

23   applies.  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).  In making this determination, the Court

24   may look only to the holdings of the United States Supreme Court governing at the time of the

25   state court's adjudication.  *Carey v. Musladin*, ___ U.S. ___, 127 S. Ct. 649, 653 (2007) (quoting

26   *Williams v. Taylor*, 529 U.S. 362 (2000)).  The only case in which the Supreme Court has

27   addressed the process due in state parole proceedings is *Greenholtz*.  *Greenholtz*, 442 U.S. 1.

28   The Supreme Court there held that due process is satisfied when the state provides an inmate an

Answer and Supporting Memorandum of Points and Authorities          *Plaza v. Curry*
                                                                     C08-1589 JF

1  opportunity to be heard and a statement of the reasons for the parole decision. *Id.* at 16. "The

2  Constitution does not require more." *Id.*[1] No other Supreme Court holdings require more at a

3  parole hearing.

4      Plaza does not contest that he received the *Greenholtz* protections. (*See generally* Pet.)

5  Because *Greenholtz* was satisfied and *Greenholtz* is the only Supreme Court authority regarding

6  an inmate's due process rights during parole proceedings, the state court decision upholding the

7  Board's decision was not contrary to clearly established federal law. Thus, the Petition should be

8  denied.

9      Although Ninth Circuit has held that the Board's decision must be supported by some

10  evidence, there is no clearly established federal law applying this standard to parole decisions.

11  The Supreme Court has held that under AEDPA a test announced in one context is not clearly

12  established federal law when applied to another context. *Wright v. Van Patten*, ___U.S.___ 128

13  S. Ct. 743, 746-47 (2008); *Schriro v. Landrigan*, ___U.S.___, 127 S. Ct. 1933 (2007); *Musladin*,

14  127 S. Ct. at 652-54; *see also, Foote v. Del Papa*, 492 F.3d 1026, 1029 (9th Cir. 2007); *Nguyen*

15  *v. Garcia*, 477 F.3d 716, 718, 727 (9th Cir. 2007); *Crater v. Galaza*, 491 F.3d 1119, 1122 (9th

16  Cir. 2007). The Supreme Court developed the some-evidence standard in the context of a prison

17  disciplinary hearing, *Superintendent v. Hill*, 472 U.S. 445, 457 (1985), which is a fundamentally

18  different context than a parole proceeding. Because the tests and standards developed by the

19  Supreme Court in one context cannot be transferred to distinguishable factual circumstances for

20  AEDPA purposes, it is not appropriate to apply the some-evidence standard of judicial review to

21  parole decisions.

22      Thus, the Ninth Circuit's application of the some-evidence standard to parole decisions is

23  improper under AEDPA. *See, e.g., Biggs v. Terhune*, 334 F.3d 910 (9th Cir. 2003); *Sass*, 461

24  F.3d at 1128; *Irons v. Carey*, 505 F.3d 846, 851 (9th Cir. 2007). Moreover, AEDPA does not

25  _____

26      1. The Supreme Court has cited *Greenholtz* approvingly for the proposition that the "level
of process due for inmates being considered for release on parole includes an opportunity to be heard

27  and notice of any adverse decision" and noted that, although *Sandin* abrogated *Greenholtz's*
methodology for establishing the liberty interest, *Greenholtz* remained "instructive for [its]

28  discussion of the appropriate level of procedural safeguards." *Austin*, 545 U.S. at 229.

1  permit relief based on circuit caselaw. *Crater*, 491 F.3d at 1123, 1126 (§ 2254(d)(1) renders

2  decisions by lower courts non-dispositive for habeas appeals); *Earp v. Ornoski*, 431 F.3d 1158,

3  1182 (9th Cir. 2005) ("Circuit court precedent is relevant only to the extent it clarifies what

4  constitutes clearly established law." . . . "Circuit precedent derived from an extension of a

5  Supreme Court decision is not clearly established federal law as determined by the Supreme

6  Court."); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000). Therefore, the Ninth

7  Circuit's use of the some-evidence standard is not clearly established federal law and is not

8  binding on this Court.

9       Moreover, Plaza has not demonstrated that the Board's reliance on its regulations to find

10  him unsuitable for parole violates his federal rights in any way. To the extent he is alleging a

11  violation of state law — such as his allegations that the Board applied California's statutory

12  parole criteria in an arbitrary and capricious manner or that he has a reasonable expectation of

13  release to parole based on Penal Code section 3041, subdivision (a) — federal habeas relief is

14  precluded. A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

15  some transgression of federal law binding on the state courts. *See Peltier v. Wright*, 15 F.3d 860,

16  861 (9th Cir. 1993). A federal writ is not available for alleged error in the interpretation or

17  application of state law. *See Estelle v. v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v.*

18  *California*, 202 F.3d 1146, 1149 (9th Cir. 2000); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th

19  Cir. 1985).

20       Even assuming Plaza alleges a federal claim, he is not entitled to federal habeas relief

21  under AEDPA. Because the Board and state courts provided Plaza with individualized

22  consideration regarding his suitability for parole, Plaza failed to prove that the Board applied

23  California's statutory parole criteria in an arbitrary and capricious manner. Moreover, there is no

24  United States Supreme Court law mandating that a release date be calculated before an inmate is

25  found suitable for parole. Thus, Plaza cannot state a claim for relief under AEDPA.

26       Similarly, Plaza's related claim that the Board's reliance on the immutable factor of his

27  commitment offense violates due process finds no support in Supreme Court precedent.

28  Although the Ninth Circuit has suggested that this might amount to an additional due process

*Plaza v. Curry*
                                                                                                C08-1589 JF

7

1    claim, *Biggs*, 334 F.3d at 917, because there is no clearly established federal law precluding

2    reliance on unchanging factors federal habeas relief is not available. 28 U.S.C. § 2254(d).

3         In sum, the only clearly established federal law setting forth the process due in the parole

4    context is *Greenholtz*. Plaza does not allege that he failed to receive these protections.

5    Therefore, Plaza has not shown that the state court decisions denying habeas relief were contrary

6    to clearly established federal law.

7         **B.    Plaza Has Not Shown that the State Courts Unreasonably**
             **Applied Clearly Established Federal Law.**

8

9         Habeas relief may only be granted based on AEDPA's unreasonable-application clause

10   where the state court identifies the correct governing legal rule from Supreme Court cases but

11   unreasonably applies it to the facts of the particular state case. *Williams*, 529 U.S. at 406. The

12   petitioner must do more than merely establish that the state court was wrong or erroneous. *Id.* at

13   410; *Lockyer*, 538 U.S. at 75. Respondent recognizes that the Ninth Circuit applies the some-

14   evidence standard as clearly established federal law, but even accepting that premise, Plaza is not

15   entitled to federal habeas relief. Indeed, the California Supreme Court has adopted *Hill*'s some-

16   evidence test as the judicial standard to be used in evaluating parole decisions, *In re Rosenkrantz*,

17   29 Cal. 4th 616 (2002), and Plaza has not shown that the state courts unreasonably applied the

18   standard.

19        Here, the superior  applied the some-evidence test and issued a reasoned decision finding

20   that Plaza's commitment offense and the trivial motive for his crime was some evidence to

21   support denying him parole. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991) (federal court

22   looks to the last reasoned state court decision as the basis for the state court judgment); (Ex. B at

23   1-2.) Although Plaza invites the Court to re examine the facts of his case and re-weigh the

24   evidence presented to the Board, there is no Supreme Court law permitting this degree of judicial

25   intrusion. Indeed, the Supreme Court has recognized the difficult and sensitive task faced by the

26   Board in evaluating the advisability of parole release. *Greenholtz*, 442 U.S. at 9 10. Thus,

27   contrary to Plaza's belief that he should be paroled based on the evidence in support of his parole

28   (*see generally*, Pet.), the Supreme Court has stated that in parole release, there is no set of facts

Answer and Supporting Memorandum of Points and Authorities                    *Plaza v. Curry*
                                                                               C08-1589 JF

1    which, if shown, mandate a decision favorable to the inmate. *Id.* Thus, Plaza has not

2    demonstrated that the state court reasonably applied the minimal some-evidence test. *Hill*, 472

3    U.S. at 457.

4          **C.     Plaza Has Not Shown that the State Court Decisions Were**
                   **Based on an Unreasonable Determination of the Facts.**

5

6         Under § 2254(d)(2), habeas corpus can not be granted unless the state courts' decisions

7    were based on an unreasonable determination of the facts in light of the evidence presented in the

8    state court. The state court's factual determinations are presumed to be correct, and the petitioner

9    has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. §

10   2254(e)(1).

11        Although Plaza alleges that the Board's decision is not supported by the evidence, he

12   does not show that the state court made factual errors. Specifically, the court found that some

13   evidence supported the Board's finding that Plaza's murder offense was carried out in a

14   calculated and dispassionate manner because there was evidence that Plaza drove slowly with his

15   headlights turned off to avoid detection by the victim and thus showed planning and a deliberate

16   intent to kill the victim. (Ex. B at p. 1.) The court also found that there was some evidence that

17   the motive for Plaza's crime was trivial in relationship to the offense because he shot the victim

18   for being a rival gang member, noting that there was no evidence that the victim had threatened

19   or harmed Plaza. (*Id.* at 2.)

20        Thus, for the foregoing reasons, Plaza has not alleged by clear and convincing evidence

21   that the factual determinations are incorrect. Plaza simply disagrees with the weight the Board

22   assigned to the evidence. This disagreement does not entitle Plaza to federal habeas relief.

23   //

24   //

25   //

26   //

27   //

28   //

1

2                                    **CONCLUSION**

3         Plaza has not demonstrated that the state court decisions denying habeas relief were

4   contrary to, or an unreasonable application of, United States Supreme Court authority, or based

5   on an unreasonable determination of the facts.  Thus, the Petition should be denied.

6         Dated:  July 2, 2008

7

8                               Respectfully submitted,

9                               EDMUND G. BROWN JR.
                                Attorney General of the State of California

10                              DANE R. GILLETTE
                                Chief Assistant Attorney General

11                              JULIE L. GARLAND
                                Senior Assistant Attorney General

12                              JENNIFER A. NEILL
                                Supervising Deputy Attorney General
13

14

15

16                              AMANDA J. MURRAY
                                Deputy Attorney General
17                              Attorneys for Respondent

18

19   20118810.wpd
     SF2008401667
20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **Plaza v. Curry**

No.:    **C08-1589 JF**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **July 2, 2008**, I served the attached

### ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS; MEMORANDUM OF POINTS AND AUTHORITIES

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Jesse M. Plaza, H-12371**
**Correctional Training Facility**
**P.O. Box 689**
**ZW-302U**
**Soledad, CA 93960-0689**
in pro per

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on July 2, 2008, at San Francisco, California.

|  |  |
|---|---|
| M.M. Argarin | _M.M. Argarin_ |
| Declarant | Signature |

20119615.wpd

# EXHIBIT A
# Part 1 of 2

MC-275

Name   JESSE PLAZA

Address   CTF CENTRAL F-338U

_____ P.O. BOX 689 _____

_____ SOLEDAD, CA 93960-0689 _____

CDC or ID Number   H-12371

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

FEB 23 2007

John A. Clarke Executive Officer/Clerk

By _____, Deputy

## SUPERIOR COURT OF CALIFORNIA

## _____ COUNTY OF LOS ANGELES _____
(Court)

PETITION FOR WRIT OF HABEAS CORPUS

| | |
|---|---|
| **JESSE PLAZA** | |
| Petitioner | No. _____ |
| vs. | *(To be supplied by the Clerk of the Court)* |
| **BEN CURRY, Warden** | |
| Respondent | |
| **Correctional Training Facility** | |

### INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 at seq.,
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

- [ ] A conviction
- [X] Parole
- [ ] A sentence
- [ ] Credits
- [ ] Jail or prison conditions
- [ ] Prison discipline
- [X] Other (specify): Illegal finding of unsuitability by the Board of Parole Hearings.

1. Your name:    Jesse Plaza

2. Where are you incarcerated?   Correctional Training Facility, Soledad, CA 93960-0689

3. Why are you in custody?   [X] Criminal Conviction    [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   First Degree Murder

   b. Penal or other code sections:   Penal Code §187

   c. Name and location of sentencing or committing court:   Los Angeles Superior Court, Norwalk, CA

   d. Case number:   VA004108

   e. Date convicted or committed:   7-20-91

   f. Date sentenced:   9-28-91

   g. Length of sentence:   25 years to life

   h. When do you expect to be released?   "unknown"

   i. Were you represented by counsel in the trial court?   [X] Yes.   [ ] No.   If yes, state the attorney's name and address:

   Stephen Garcia, Attorney at Law , address unknown

4. What was the LAST plea you entered? *(check one)*

   [XX] Not guilty   [ ] Guilty   [ ] Nolo Contendere   [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [XX] Jury   [ ] Judge without a jury   [ ] Submitted on transcript   [ ] Awaiting trial

6. GROUNDS FOR RELIEF
**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

THE NINTH CIRCUIT COURT OF APPEALS HAS FOUND THAT THE MANDATORY LANGUAGE OF P.C. 3041 (b) IMPOSES AN AFFIRMATIVE OBLIGATION BY THE CALIFORNIA BOARD OF PAROLE HEARINGS TO GRANT PAROLE , WHICH CREATES A LEGALLY COGNIZABLE LIBERTY INTEREST IN PAROLE AND A PRESUMPTION THAT PAROLE RELEASE WILL BE GRANTED. THERE IN NO EVIDENCE HAVING AN "INDICIA OF RELIABILITY" THAT PETITIONER IS A CURRENT OR UNREASONABLE RISK TO SOCIETY. THE HEARING AND DECISION BY THE CALIFORNIA PAROLE BOARD WAS ARBITRARY AND CAPRICIOUS IN VIOLATION OF PETITIONER'S STATE AND FEDERAL DUE PROCESS RIGHTS.

a.  Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

Petitioner, JESSE PLAZA, petitions for a writ of habeas corpus and by this verified petition alleges as follows:

I

Petitioner is in custody of the California Department of Corrections at the Correctional Training Facility in Soledad, California serving a term of 25 years to life following his conviction in 1991 in Los Angeles County Superior Court Case No. VA004108 wherein petitioner was convicted of first degree murder in violation of Penal Code section 187. Petitioner was received by the Department of Corrections on October 9, 1991, when his life term commenced. This petition is intended to give meaning to Petitioner, JESSE PLAZA, (hereinafter "Petitioner"), sentence of 25 years to life for 'first degree murder'. On May 1, 2006, Petitioner went before the Board of Parole Hearings for his initial parole. (Petitioner's minimum

b.  Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

1  eligible parole date is 1-25-07) for a finding of suitability, and the

2  setting of his term uniformaly. Petitioner submits that the Board of

3  Parole Hearings (hereafter "Board") regulations, California Code of

4  regulations, Title 15, section 2402(a) **DEMANDS** that the Board set a

5  release date unless Petitioner **currently** presents an unreasonable risk

6  of danger to public safety. Petitioner submits that there is nothing

7  in the Board's decision indicating the basis for that belief, which

8  Petitioner discusses and proves **infra**.

9

10  II

11  On May 1, 2006, the Board conducted petitioner's Initial Parole

12  Consideration Hearing. The Board found petitioner unsuitable and denied

13  parole for a period of two years. (Exhibit "A" 89-93) In support of its

14  findings that petitioner currently posed an unreasonable risk to society,

15  the Board found that the "offense was carried out in an especially cruel

16  and callous manner", " carried out in a calculated manner", "The motive

17  for the crime was very trivial in that it was a gang related shooting",

18  and the unsupported conclusion that petitioner has refused to take

19  responsibility for his actions. Petitioner was, however, commended for

20  programming extremely well, commended for remaining disciplinary free,

21  obtaining a positive psychological evaluation, participating in AA and

22  NA, completing two vocations and securing positive parole plan. (Exhibit

23  "A", p. 89-93). Despite all the evidence supporting a granting of parole,

24  the Board found petitioner unsuitable for a grant of parole based on

25  the commitment offense, including and unsupported conclusion that

26  petitioner tries to minimize his responsibility.

27  //

28  - 2 -

### III

Petitioner alleges that there was no evidence to support the Board's finding that he poses a current unreasonable risk if released. In fact, all current, reliable evidence presented to the Board shows that petitioner poses no risk if released, Petitioner further alleges that the Parole Board violated petitioner's statutory rights and his Fifth and Fourteenth Amendments (due process rights),when it refused to grant petitioner a parole date despite evidence supporting a finding that petitioner posed no unreasonable risk of harm. Furthermore, his continued confinement constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

### IV

Petitioner also submits the Board spoke in meaningless generalities and never specified the exact nature of Petitioner's current character that would make Petitioner a danger to society. And by **not** doing so, the Board violated Penal Code §3041, which dictates that the Board **shall normally** set a parole release date at Petitioner's Initial Hearing. Petitioner, further submits that the issue raised in this Petition are of constitutional dimension, questioning the legality of Petitioner's confinement. An indeterminately sentence prisoner must be paroled when there is **no evidence** that Petitioner is a **current** or **unreasonable** risk to society. The California Supreme Court has recognized that parole applicants' posses a "protected liberty interest under the California Due Process Clause". (In re Rosenkrantz, (2002) 29 Cal.4th 616, 660; cf. McQuillion v. Duncan (9th Cir. 2002) 306 F.3d 895, 901. It is well established that Courts may review the Board's parole decisions under

- 3 -

1    a highly deferential standard of review, and must reverse those decisions
2    if there is not **"some evidence"** in the record to support them.
3    (<u>Rosenkrantz</u>, supra 29 Cal.4th at 667; <u>In re Smith</u> (2003) 109 Cal.App.4th
4    489. Petitioner submits there is **no evidence** that Petitioner is **currently**
5    a threat to public safety.

6
7    <u>PETITIONER NOW SUBMITS THE FOLLOWING POINTS AND AUTHORITIES IN SUPPORT</u>
8    <u>OF THIS PETITION FOR WRIT OF HABEAS CORPUS</u>
9    //
10   //
11   //
12   //
13   //
14   //
15   //
16   //
17   //
18   //
19   //
20   //
21   //
22   //
23   //
24   //
25   //
26   //
27   //
28

## MEMORANDUM OF POINTS AND AUTHORITIES

**THE MURDER STATUTES TOGETHER WITH THE PAROLE STATUTES IMPOSE AN AFFIRMATIVE OBLIGATION UPON THE BOARD TO SET PAROLE DATES IN CASES LIKE THIS ONE. THE REGULATIONS IMPLEMENT THOSE STATUTES**

Under the Board's regulations, pursuant to Penal Code §3041(b), a prisoner may be found unsuitable for parole if the Board determines that the offense or a past offense and its timing is of such gravity that a longer period of incarceration is required in the interest of public safety. The determination is made based on the standards set forth by the Board's regulations. The principle guidelines in making the determination is Cal. Code. Regs. §2401 (c)-(1-6):

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured, or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrated an exceptionally callous disregard for human suffering.

//

- 5 -

(E) The motive of the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

Circumstances (1), (2), and (4) reasonably reflect the sole specified and authorized statutory exception to setting parole release dates, for the current or a past convicted offense(s). Factor (E) of Circumstances (1), however, pertaining to the motive of the crime as being inexplicable, although typically stated by the board as a factor for denying parole, is a rare circumstance, as there is almost always, as here, an explanation

- 6 -

as to why the offense occurred. Whether the motive was trivial is
another matter. As one court noted:

> "The epistemological and ethical problems involved in
> the ascertainment and evaluation of motive are among
> the reasons the law has sought to avoid the subject. As
> one authority has stated, "[hardly any part of penal
> law is more settled than that motive is irrelevant."
> (Hall, General Principles of Criminal Law (2d ed. 1960)
> at p. 88; see also Husak, **Motive and Criminal Liability
> (1989) vol. 8, No. 1, Crim. Justice Ethics 3.)"**

**The court further explained:**

> "The offense committed by most prisoners serving life
> sentences is, of course, murder. Given the high value
> our society places upon life, there is no motive for
> unlawfully taking the life of another human being that
> could not be deemed "trivial". The Legislature has
> foreclosed that approach, however, by declaring that
> murderers with life sentences must "normally" be given
> release dates as they approach their minimum eligible
> release dates. (Pen. code, §3041, subd. (a)." (**In re
> Scott,** 119 Cal.App.4th 871, 892-893.)

It is therefore questionable whether the factor has any
evidentiary value in this case. If the motive was indeed
inexplicable "A person whose motive for a criminal act can not be

explained or is unintelligible is therefore unusually
unpredictable and dangerous." (Id.) Such is not the case here.

The primary circumstance and factors considered to make the
determination, §2402(d)(1)(B) and (D), have been explained by the
courts. To qualify for the authorized exception, an offense must
be exceptionally egregious. The court of appeal characterized
this as follows:

> "**In re Van Houten** (2004) 116 Cal.App.4th 339 [10
> cal.Rptr.3d 406] illustrates the sort of gratuitous
> cruelty required. The prisoner in that case was
> involved in multiple stabbings of a woman with a knife
> and bayonet, While she was dying, the victim was made
> aware her husband was suffering a similarly gruesome
> fate. As stated by the court, "[t]hese acts of cruelty
> far exceeded the minimum necessary to stab a victim to
> death." (Id. at p. 351) Other examples of aggravated
> conduct reflecting an "exceptionally callous disregard
> for human suffering," are set forth in Board
> regulations relating to the matrix used to set base
> terms for life prisoners (§2403, subd. (b)); namely,
> "torture," as where the "[v]ictim was subjected to the
> prolonged infliction of physical pain through the use
> of non-deadly force prior to act resulting in death, "
> and "severe trauma." as where "[d]eath resulted from
> severe trauma inflicted with deadly intensity; e.g.,
> beating, clubbing, stabbing, strangulation,
> suffocation, burning, multiple wounds inflicted with a

- 8 -

weapon not resulting in immediate death or actions calculated to induce terror in the victim." (Ibid.) (**In re Scott**, supra, 119 Cal.App.4th 871, 892.)

In this case there is no evidence of gratuitous cruelty or torture such as described in the foregoing. Moreover, even in such cases, involving those exceptional factors, the Board's regulations and suggested terms indicate parole suitability after serving the indicated base terms.

Circumstances (3) of the unsuitability factors, "Unstable Social History" appears to be related to the commission of violent past offenses and gravity thereof. It is not a factor in this case.

Circumstance (5), "Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense." is not applicable in this case, and the Psychological Report does not indicate any such assessment.

Circumstance (6), "Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail." This should reasonably relate to misconduct like that which may result in rescission proceedings as is enumerated in Cal. Code Regs., tit. 15, §2451, or more properly, be punished by the provisions of Cal. Code Regs., tit. 15, §2410, which provides for "Postconviction Credit", and not used as a substitute for statutory "suitability" provisions which specify only the gravity of the current or a past offense to deny parole.

This "circumstance' is often relied upon by the Board to deny parole to indeterminately sentenced prisoners repeatedly and

for years at a time. Yet, determinately sentenced prisoners might suffer only the loss of a few months of credit, once, for the same misconduct, which they can even get restored. As such, the Board's determinations that rely on such circumstances to deny parole, particularly beyond the indicated matrix base terms, is unauthorized by Penal Code 3041, is unfair, unreasonable and constitutes unequal punishment for the same conduct. A blatant violation of Petitioner's due process rights protected by the 5th & 14th Amendments of the United States Constitution.

RELIANCE ON THE COMMITMENT OFFENSE TO DENY PAROLE AT
ALL INITIAL HEARINGS AND ALMOST ALL SUBSEQUENT HEARINGS
IS INCONSISTENT WITH STATUTORY LANGUAGE AND CONTRARY TO
SUPREME COURT AUTHORITY

The Board's reliance on the commitment offense to deny
parole at all initial hearings and almost all subsequent hearings
fails to give effect to the statutory minimum terms despite Penal
Code §3041 language that parole shall normally be granted at the
initial hearing. The Board promulgated regulations pursuant to
Penal Code §3041(a) which include standardized gravity matrices,
but routinely denies parole for the same circumstances and
factors specifying appropriate terms. (See Cal. Code Regs., tit.
15, §2400 et seq., footnotes citing implementation authority.)

Although it is presumed that the Board performs its duties
lawfully, it is hardley debatable that the Board does not
"normally" set parole release dates, as a matter of policy. And
when it does, in about 2% of cases, the Governor reverses most of
those, like here. as a matter policy, where there is no
substantial evidence to support the decision. See, for example,
In re Capistran, (2003) 107 Cal.App.4th 1297, In re Mark Smith,
(2003) 109 Cal.App.4th 489; In re Ernest Smith, (2003) 114
Cal.App.4th 343, to name a few published cases. Because of the
minimal "evidence" required under the "some evidence" standard,
most of the denials and reversals of parole withstand court
challenges. release on parole presumed by statutory language
gives rise to a substantial right, but has been disregarded. the

great majority of indeterminately sentenced prisoners have been
repeatedly denied parole, but would have been released long ago
under reasonable administration of the statutes and regulations.

> "The Court has an obligation, however, to look
> beyond the facial validity of a statute that is
> subject to possible unconstitutional administration
> since a "law though 'fair on its face and impartial
> in appearance' may be open to serious abuses in
> administration and courts may be imposed upon if the
> substantial rights of the persons charged are not
> adequately safeguarded at every stage of the
> proceeedings." Minnesota v. Probate Court (1940) 309
> U.S. 270, 277.

Although the most recent interpretation of the statute at
issue now holds that proportionality or comparision of like
offenses is not required, i.e., In re Dannenberg (2005) 34
Cal.4th 1061, the Ninth Circuit has previously stated:

> "While the interpretation gloss on the statute may bind
> this court as a matter of statutory construction, we
> are not, however, similarly bound as to the
> constitutional effect of the construction." McSherry,
> 880 F.2d at 1053" (Aponte v. Gomez, 993 F.2d 705 (9th
> Cir. 1993) (emphasis added)

This most recent interpretation of the statutes is

inconsistent with decisions and history leading up to the changes in the parole statutes, which prior decisions recognized, as previously discussed:

> "In contrast, by altering the statutory scheme and enacting the DSL, the Legislature recited specifically that it "finds and declares that the purpose of imprisonment for crime is punishment." (Pen. Code §1170, subd. (a)(1); all subsequent statutory references are to this code.) The new law provides that an inmate's "release date shall be set in manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the judicial council may issue and any sentencing information relevant to the setting of parole release dates. **The board shall establish criteria for the setting of parole release dates** and so doing shall consider the number of victims of the crime for which the prisoner is sentenced and other factors in mitigation and aggravation of the crime." (§3041, subd. (a), italics added.) The present parole guidelines were promulgated pursuant to the new act. <u>Thus, the guidelines are not mere administrative responses to the Board's internal shifting discretion but rather reflect basic legislative alterations in the underlying parole scheme." (In re Stanworth</u> (1982) 33 Cal.3d 176, 182.) (Underlining emphasis added.)

Clearly, the interpretation of the law shortly after it was changed was that the Board's discretion was limited by the legislative alterations and guidelines. The changes were clearly intended to place limits on the Board's discretion:

> "That, the Montana statute places significant limits on the Board's discretion is further demonstrated by its replacement of an earlier statute which allowed absolute discretion ..." Board of Pardons v. Allen, 482 U.S. 369.

Like with the Montana statute, in California the former Penal Code §3041 was completely changed, mandating the establishment of criteria for the normal setting of parole dates. Furthermore, Penal code §3041(b) clearly spells out why the board may require an extended period of incarceration. Because the Governor is bound by the same standards as the Board, the same would apply to the Governor. The current interpretive gloss on the parole and related statutes reverts plain statutory intent to the previous parole scheme by judicial omission of part of the whole, and violates principles of statutory construction, offending due process and ex post facto law.

THE "SOME EVIDENCE" STANDARD MUST "TEND LOGICALLY", AND BY "REASONABLE INFERENCE" TO ESTABLISH A FACT RELEVANT TO PETITIONER'S SUITABILITY FOR PAROLE.

Petitioner, denies the "some evidence" standard used by the Board satisfied the requirements under both state and federal due process. To satisfiy the "some evidence" standard of Judicial Review of the Board's ultimate decision, only a "modicum of evidence is required". **Rosenkrantz**, 29 Cal.4th at 677; **Hill, supra,** 427 U.S. at 456. However, the "some evidence" standard applies to evidentiary sufficiency and is not a substitute for other due process requirements, **Edward v. Balisok,** (1977) 520 U.S. 641, 648, such as the Board's own preponderance of material and relevant evidence. (See Cal.Code of Regualtions, tit 15, section 2000 (50)(63)(91). Thus, to determine whether the Board has fulfilled it's minimal due process procedural requirements, a reviewing Court looks not first at the decision, but the process in which it arrived at that decision. **Balisok, supra,** Ibid.

Here the Board continues to interpret the "some evidence" standard illegally. The Boards decision in this case failed to point to evidence demonstrating that Petitioner **currently** presents an unreasonable risk of danger to society - the ultimate question in determining Petitioner's suitability for parole (CCR, Tit. 15, §2403, subd. (a) For this reason, the evidence underlying the Board's decision does not tend logically and by reasonable inference, to establish a fact relevant to the inmate's suitability for parole. (**Morrall,** supra, 102 Cal.App.4th

- 15 -

at pp. 298-299). The discretion of the Board to determine parole suitability, although broad, is not absolute, and the Board's decisions must be supported by "some evidence" (**In re Powell**, (1988) 45 Cal.3d 894, 902-904; see also **Terbune v. Superior Court** (1998) 65 Cal.App.4th 864, 872-873; **In re Minnis** (1972) 7 Cal.3d 639, 646-647.

The United States Supreme Court has made it clear that the "some evidence" standard discussed in **Superintendent v. Hill** (1985) 472 U.S. 445, is only one aspect of judicial review for compliance with minimum standards of due process. The California Legislature has given the Board guidelines to follow in evaluating a parolee's eligibility for parole, mandating that the Board "shall normally" set a parole release date... "in a manner that will provide "uniform terms" for offenses of similar gravity and magnitude in respect to their threat to the public"... (Id., quoting Penal Code §3041, subd. (a).) The Board is required to "establish criteria for the setting of parole release dates." (Ibid.) However, the Board lacks discretion to promulgate regulations that are inconsistent with governing statutes, and the judicial branch has the final word on questions of legal interpretation." (Id., citing **Terbune v. Superior Court**, supra, 65 Cal.App.4th 864, 873)(emphasis added).

Petitioner asserts that the "some evidence" standard is being appplied arbitrarily by the reviewing Court's in the State of California. The Courts of California, both State and Federal, seem to have settled in for the "some evidence" standard of Judicial Review. (See, e.g., **McQuillion v Duncan**, 306 F.3d 895 (9th cir. 2002), and in **In re Rosenkrantz**, 29 Cal.4th 616 (2002).

without taking into consideration the "substantial evidence" standard which is required by reviewing courts **Consolidated Edison Co. vs NLRB**, 305 U.S. 197 (1939) (See Page 9)

The "some evidence" standard derives from the United States Supreme Court decision in **Superintendent v. Hill**, 472 U.S. 445; 105 S.Ct. 276 (1985), and is expressly a standard of "Judicial Review" for reviewing Court's, not the Board's Standard

The first California decision applying the "some evidence" standard of **Hill** was in the case of **In re Powell**, 45 Cal.3d 894 (1988). The **Powell** case was one where the Board of Prison Terms rescinded a parole grant based on a psychological report. In his petition, **Powell** argued for the "independent judgment" standard to the facts before the Board, or alternatively, the "substantial evidence" test. The People argued for the deferential "some evidence" test. **Powell** argued for the independent judgment test analogizing habeas corpus proceedings to administrative mandamus proceedings under California Code of Civil Procedure section 1094.5. That code section provides for review of administrative orders or decisions; in some cases it applies the independent judgment test while in other circumstances the substantial evidence test. If the former, and abuse of discretion is established when the Court, exercising its independent judgment determines the administrative findings are not supported by the weight of the evidence. If the latter, the Court must accept all evidence favorable to the Respondent as true and disregard any unfavorable evidence, if the evidence so viewed is sufficient as a matter of law, the order or decision must be affirmed. In rejecting **Powell's** argument, the court held that standard only

applies when an administrative decision affects a vested right. This is a pivotal point. The **Powell** Court determined that "a prison inmate has no vested right in his prospective liberty on a parole release date". (id. at 903). It cited to pre-1977 cases of **In re Fain**, 65 Cal.App.3d 376 (1976), and to **In re McLain**, 5 Cal.2d 78, 87 (1960), also cited by **Fain, supra**. However, two critical facts were not present at the time of the decision, (1) there was no liberty interest created by pre-1977 section 3041; and (2) the California Supreme Court had not defined post-1977 section 3041, as having vested a liberty interest in a parole release date, as it did later in the **Rosenkrantz** decision 29 cal.4th 616 (2002), following on the heels of **McQuillion v, Duncan**, 306 F.3d 895, 901-903 (9th cir. 2002), which interpreted Section 3041 as creating an "expectancy of release" that was a cognizable liberty interest protected by federal due process. Thus, the **Powell** Court was wrong about whether a vested right was involved, and its decision to apply the "some evidence" standard instead of the "independent judgment test" or "substantial evidence" was also wrong because it was based on an incorrect interpretation of law.

Yet, the California Supreme Court in the **Rosenkrantz** case, 29 Cal.4th 616, applied the "some evidence" standard of **Superintendent v. Hill**, 472 U.S. 445 (1985), in such language as to confuse the lower Courts as to its specific purpose. i.e., the standard of judicial review. It carried forward the "some evidence" standard originally applied in **In re Powell**, 45 Cal.3d 894 (1988). The **Rosenkrantz** Court did not make clear that the "some evidence" standard was not a standard applied by the board

itself as a standard of proof in its deliberations. It appears that the ommission by the **Rosenkrantz Court** of any articulation of what the Board's standard of evidence would be as a critical component to the deliberative process of weighing and balancing of evidence, has resulted in the Board not applying their own preponderance of relevant and material evidence standard (CCR, Title 15, Div. 2, Section 2000; (50) Good Cause (63) Material Evidence (91) Relevant Evidence), thereby rendering every decision to grant or deny parole completely standardless, and thus arbitrary and capricious.

Typically in California, the judicial standard of review of the ultimate decision of the Board of Parole Hearings denying parole to a prisoner has been the "some evidence" standard. **In re Dannenberg** (2005) 34 Cal.4th 1061; **In re Ramirez** (2001) 94 Cal.App.4th 549, 564; In re **Rosenkrantz**, [Rosenkrantz V] (2002) 29 Cal.4th 565, 616. Although both **Rosenkrantz** and **Dannenberg** thus affirmed the importance of judicial review of the board decisions, the decision's provide less than clear guidance as to the proper application of the "some evidence' standard articulated in both decisions. Of particular concern is the **Dannenberg Court's** brief discussion in dicta of the "commitment offense" factor, which can improperly be read as granting to the Board the ability to deny parole on the basis of almost any fact imaginable. As a result, there is a real risk the State will interpret the standard to assert, de facto, the power it has been expressly denied; effective immunity from meaningful judicial review of parole decision. It should be recognized, however, that

several courts are struggling to determine exactly how this standard applies. While other Court's (post **Dannenberg** & **Rosenkratz**) has held that the "some evidence" standard must apply to **current dangerousness**. While interpreting this standard the California Court of Appeals, Second Appellate District in the case of **In re WEN LEE**, (Oct. 17, 2006, B188831)(2006 DJDAR 13961) the Court held;

> ...We conclude, however, that the governor erred. The test is not whether some evidence supports the reasons the Govenor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. (Cal.Code Regs., tit. 15, §2402, subd. (a) [parole denied if prisoner "will pose an unreasonable risk of danger to society if released from prison]; see **In re Scott** (2005) 133 Cal.App.4th 573, 595 ["The commitment offense can negate suitability [for parole] only if circumstances of the crime ... rationally indicate that the offender will present an unreasonable public safety risk if released form prison"] but see **In re Lowe** (2005) 130 Cal.App.4th 1405 [suggested "some evidence" applies to the factors, not dangerousness]. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety.

In the case of **In re Elkins**, (Oct. 31, 2006, A111925) the

Court of Appeals, First Appellate District, held that;

> ..."The 'some evidence' standard is extremely deferential
> and reasonably cannot be compared to the standard of
> review involved in ... considering whether substantial
> evidence supports the findings" , nevertheless, it
> requires" ' "some indicia of reliability" ' " (**Scott II,
> supra**, 133 Cal.App.4th at p. 591, quoting **Biggs v.
> Terbune**, (9th Cir. 2003) 334 F.3d 910, 915) and "may be
> understood as meaning that suitability determinations
> must have some rational basis in fact" (**Scott II**, at p.
> 590, fn. 6).

One thing is for certain, even if a mere "some evidence"
standard is to apply in this review, that standard is only a
vehicle for the Court's review of the Board's decision, not a
standard for the Board itself to apply. The findings to support
that initial decision by the Board to deny parole, however, must
be that the record indicates the Petitioner, poses a "current"
danger to the public. That finding can not be based on such
flimsy evidence as to render it mere whim or caprice. (See **In re
Ramirez, supra**, at 564; See also **In re Powell**, (1988). To the
contrary, as set forth herein, the Board's decision must be made
under the **preponderance of evidence standard**. (Cal.Code of Reg.,
Title 15, Div. 2, section 2000 (50) Good Cause).

Petitioner denies the "some evidence" standard used By the
Board satisfied the requirements under both state and federal due

process. Petitioner asserts reliance on the Commitment offense does not satisfy the "some evidence" standard. There is no question that under **Rosenkrantz** and **Dannenberg** the statutory "commitment offense" factor is relevant, and that it may at times be enough to deny parole on its own, neither **Rosenkrantz** nor **Dannenberg** stands for the principle that the commitment offense is always enough by itself. In fact, both cases affirmatively state that reliance on the commitment offense alone might, in some circumstances, rise to the level of a due process violation. That conclusion is consistent with the concern raised by the Ninth Circuit in **Biggs v. Terbune**, that the reliance on an ever-frozen, unchanging factor - such as the commitment offense - in denying parole may in certain instances violate due process. This point was also addressed in the case of **In re Ramirez**, 94 Cal.App.4th 549, at 571 (2001), when the Court noted that reliance on the crime after 17 years in prison was arbitrary. Petitioner has been incarcerated __17__ years. While the proportionality aspects of the **Ramirez** decision were disapproved by the California Supreme court decision in **In re Danneneberg**, the entirety of **Ramirez** decision, including this aspect, was not disapproved. Therefore, the Board's reliance on the commitment offense violates due process. The predictive value of the crime after __17__ years of incarceration is zero. Furthermore, in the case of **In re Scott**, 34 Cal.Rptr.3d 905 (Cal.App.1 Dist. 2005), the Court clearly reaffirmed the rationale of the **Ramirez** Court when it declared ..."Parole is the rule rather than the exception"... Thus, the California Board of Parole Hearings continuous use of the "some evidence" standard as their proper

standard of review is inappropriate, thus, illegal. Furthermore, reviewing Courts using the "some evidence" standard violates principles of appellate review. Substantial evidence is the standard required for a reviewing Court. **Consolidated Edison Co. of New York v. NLRB**, 305 U.S. 197 (1939). It is more than a mere scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. **Chrysler v. U.S. Environment Protection Agency, C.A.,** 631 F.2d 865, 890. Under a proper analysis, the "substantial evidence" test, and not a "some evidence" review is the appropriate standard.

## ALL RELEVANT AND RELIABLE POST-CONVICTION EVIDENCE
## MUST BE GIVEN THE REQUIRED CONSIDERATION IN FAVOR
## OF PETITIONER IN LIGHT OF THE EVIDENCE PRESENTED

Petitioner submits that the Board bases its reasons for
Petitioner's continued incarceration on historical facts that can
never change, thus ignoring the uncontradicted evidence of
Petitioner's rehabilitation. Petitioner has achieved the very
goal that is hailed by our judicial and correctional systems,
coming to prison, turning his life around and committing himself
wholeheartedly to bettering himself and the world around him.
Petitioner asserts there is **no evidence** that Petitioner is
**currently** a threat to public safety. At Petitioner's hearing the
Board denied Petitioner parole using static factors, despite
overwhelming evidence showing Petitioner's rehabilitation.
Petitioner asserts he has taken every available step to improve
his life, pay his debt to society, and prepare himself for
eventual release, as it is required under penal code §3041 for
eligible prisoners serving indeterminate sentences. The Board's
reliance on the Commitment Offense as satisfying the "some
evidence" standard of review is without merit, after removing the
facts erroneously relied upon, relied exclusively upon the
Commitment Offense and failed to weigh and consider Petitioner's
remorse,, positive psychological profile, lack of future
dangerousness, and both realistic and positive parole plans
including housing, education, and employment. The Board is
required to consider all relevant information about a prisoner,
not simply his commitment offense. His "risk of danger to society

- 24 -

is to be assessed in light of all relevant information available to the panel. (Cal. Code Regs., tit. 15, §2402(b)).

Under the view of the California parole process, it is clear that the nature of the commitment offense can constitute a basis for denial only to the extent it sheds light on whether a prisoner "now poses a risk of danger to society". Relying on the offense after years in custody and clear evidence of rehabilitation becomes arbitrary. At some point along the parole consideration process, that excuse to refuse to set a parole date enlight of exemplary conduct and behavior becomes arbitrary, and the term, although initially valid, becomes disproportionate and therefore unlawful. As time passes, and as the appropriate uniform term for the offense approaches, the offense itself sheds less and less light on how a prisoner will behave on the outside. His record in prison, his mental health, his conduct and achievements, all shed more light on his readiness to rejoin society. (see **Deluna**, supra 2005 WL 268045, 6) a defendant's postcommitment institutional behavior is relevant to his suitability for parole [citing §2402, subd. (d)(9)], and has both positive and realistic parole plans (see **In re Deluna**, supra, 2005 WL 268045, 5- Stable Relationships with others favor parole (15 CCR §2402 subd. (d)(9), All these factors favor his release. There is no evidence Petitioner now poses a risk of danger to society.

The Board's reasons finding petitioner unsuitable is unreasonable and an abuse of discretion enlight of the evidence presented to the Board by petitioner and the Department of Corrections and Rehabilitation Psychological Department and Counselor.

At the hearing, Correctional Counselor I, T. Verdasoto
testified as to Petitioner's programming, and his future
residence and employment when paroled:

>  **Therapy and Self-Help Activities:** Since Plaza's
>  incarceration, he has participated in Alcoholics
>  Anonymous, Inmate Education Advisory Committee, Bible
>  Study, the Impact Program, Narcotics Anonymous, served
>  as a Deacon, and was a member of the Protestant Choir.
>
>  **Postconviction Factors:** Plaza was received CDC on
>  10/9/91 at Wasco RC and was transfered to CSP Folsom on
>  12/17/91 and was classified with Close A custody. On
>  2/22/92, Plaza was transfered to Calipatria where his
>  custody was reduced to Close B. While in Calipatria, he
>  worked in the culinary, pre-voc. and Compute
>  Programming. Plaza was again transfered to CSP-LAC on
>  2/3/94. He was classified there with Meddium A custody.
>  While at LAC, Plaza worked in the drycleaning, voc
>  electrical shop, and air cond. refrigerator and
>  heating. On 12/16/97 he was transfered to Avenal where
>  he was in Computer Programming. On 3/13/98 he was
>  transfered to CTF Soledad North Facility where he was
>  assigned to the yard crew 4/7/98 to 4/28/98, and then
>  to PIA Textiles. On 12/31/98 Plaza went to CMC East as
>  a medical transfer and returned to CTF on 3/1/99 where
>  he has remained housed. At his initial classification,

- 26 -

Close B was established. Plaza's custody was reduced to Medium A on 3/23/00 and has remained at Medium A. While at CTF Central Facility, Plaza has been assigned to wing porter, culinary, dental assistant and again culinary, where he remains assigned.

**Disciplinay History:** Plaza has reemained disciplinary free throughout his incarceration

**Residence: Plaza plans on living with his brother, Hector Plaza. Hector's address is 353 Carla Dr., Simi Valley, California 93063. His phone number is (805) 581-6323**

**Employment:** Plaza plans on working at Telair International 4175 Gardain Street, Simi Valley, CA 93063, phone (805) 578-7303.

**Assessment:** In review of Plaza's parole plans, this counselor does not foresee any problems, however, it is recommended that Plaza updates his support letters prior to his hearing. (see Exibit "B")

Dr. M. Macomber testified as to Petitioner's his current mental stability and his lack of present and future dangerous:

**Psychiatric and Medical History:** There is no

psychiatric history. There is no history of serious
accidents or head injuries or seizures. His health is
good.

**Current Mental Status/Treatment Needs:** Mr. Plaza
related in a serious, sober, and cooperative manner.
Mental status was within normal limits. He was alert
and well oriented. His thinking was rational, logical
and coherent. His speech was normal, fluent amd goal
oriented. He does speak excellent English  as well as
Spanish. Affect was appropriate. There was no evidence
of anxiety or depression. Eye contact was good. His
memory was intact. His judgment was intact. His insight
and self-awareness were good.

Mr. Plaza has spent a great deal of time in prison
trying to improve hinself. He currently is attending
Coastline College, working on his Associate of Arts
Degree. His grades are very good. Also, he has obtained
a certificate as a home inspector from professional
career institute in Georgia by correspondence. In
addition, he has completed several courses toward
self-improvement. He has completed a Prison Fellowship
Course in Parenting, Anger Management, another 12 week
anger management class, Fathers Behind Bars Activity
Group, Family Effectiveness Training and Harmony in the
Home, Anger Manangement Course, Christian Basics Class,
Teddy Bear Drive Benefiting Children in Crisis, a job

success course, Communicable Diseases, Impact Program
focusing on the victim's rights, Christian Living
Course, Laubach Literacy Tutor Program, and the
Salvation Army Bible Correspondence Course.

**Current Diagnostic Impression:**  Axis I- Drug and
alcohol use by history; Axis II- No personality
disorder; Axis III- No physical disorder; Axis IV- Life
term incarceration; Axis V- Current GAF: 95.

**Assessment of Dangerousness:** (A) In considering
potential for dangerous behavior in the institution.
Mr. Plaza has remained entirely disciplinary free. This
is commendable. This is very difficult to do. At this
time in prison, we are having frequent racial riots. It
is very difficult for a Hispanic male to disassociate
himself from this activity, which can spontaneously
occur in front of him, and if he doesn't get involved,
he will receive retaliation. In this case, remaining
disciplinary free is a very difficult and commendable
achievement. There is no evidence that he has ever been
involved in riots, possession of weapons, assaults on
others, or threats of any kind. As a result, it is
evident that his potential for dangerous behavior in
comparison to other inmates is definitely below
average.

Mr. Plaza has a chrono from Captain Guerra, in which it

was stated that he had been hand picked to work as a
communicator, working as a mediator between the two
groups in the institution that had been involved in a
riot against each other. due to his ability to mediate
between the groups and to get them to agree to non
violence towards each other, the riot that occurred at
that time was resolved peacefully, and the result was
that the institution was able to unlock everybody and
proceed with the program.

(B) In considering potential for dangerous behavior in
the community, Mr. Plaza has no prior arrests for
violence before the commitment offense. He did receive
an arrest as an adult in 1983 for spraying a one inch
diameter dot on the wall. He has remained disciplinary
free in the institution. In order to determine his risk
level on parole, the Level of Service Inventory-Revised
was administered. This is an actuarial measure that
assesses criminal history, substance abuse history,
current adjustment, and other factors to determine
current risk level. On this measure he obtained a score
of 3.6 cumulative frequency for prison inmates. This
means that if 100 men were released on parole, he would
do better on parole than 96 of them. This is a very low
risk level. As a result, he poses no more threat to
society than the average citizen in the community, and
probably less threat to society at this point in his
life.

- 30 -

(C) At the time of the offense, drugs and alcohol were a problem; however, at this point in his life this no longer is an issue. Therefore, there are no significant risk factors in this case.

**Clinician Observation/Comments/Reccomendations:** There are no mental or emotional problems in this case that would interfere with routine parole planning. Mr. Plaza has obtained vocational training in several areas. He is currently working as a meat cutter in culinary. He has skills in vocational dry cleaning, as well as in vocational air conditioning, refrigeration and heating. He also has a job offer waiting for him upon release. He has very strong family support in the community. All these factors are good indicators of positive parole success. He has maintained his marriage, and his wife continues to be supportive and involved in his life. He maintains constant contact with his three children. Due to his study of the Bible and his commitment to the Christian way of life, he no longer has the irresponsible values and lifestyle that he did prior to the commitment offense. All these factors indicate that his prognosis for successful adjustment in the community is excellent. (see Exhibit "C")

Petitioner asserts that the rehabilitative evidence submitted by Petitioner and both the life Evaluation report and Pyschological report is supportive of release contrary to the Board's specious findings. the **Biggs** court addressed the Boards illegal usage of needed therapy and other illegal reasons to justify a highly illegal denial.

> "The record in this case and the transcripts of Biggs hearing before the Board clearly show that many conclusions and factors relied on by the Board were devoid of evidentiary basis".

Petitioner submits that the record in this case is also devoid of evidentiary basis as to the Board's findings that evidence presented is not supportive of release, which violates due process. Petitioner further submits that despite the overwhelming evidence that Petitioner does not present a current risk to public safety. The Board arbitrarily found petitioner unsuitable for release. Petitioner asserts that the real reason given by the Board indicative of unsuitability is the commitment offense, and if allowed to identify the unchanging circumstances as indicative of unsuitability, this would put Petitioner in an impossible situation, where no matter what he shows in terms of positive behavior, reformation, self-help, work skills, parole plans, on just rehabilitation in general, he would never be able to overcome the unchanging facts of the crime. The only logical application of constitutional due process dictates what the Court in **Irons v. Warden**, 358 F.supp.2d 936, 947, (E.D.Cal. 2005) held,

,i.e., that any denial requires the presence of some in-prison behavior showing that the inmate **currently** presents an unreasonable risk of danger if paroled.

Here the facts of the crime have been the only real reason for denying parole. yet, those facts have never been tied to **current** behavior showing that Petitioner still presents an unreasonable risk at this time. A rule requiring the presence of in-prison adverse behavior to justify a denial based on the crime simply recognizes what the 9th Circuit in **Biggs** alluded to when it talked of the rehabilitative goals of the system, and the need to take into consideration that a person can rehabilitate themselves. This seems to be missing from the Board's current agenda and policy. This denies to Petitioner the process to which he is constitutionally due.

At this point, Petitioner has been incarcerated over __23__ years (including pre- & post-conviction credit). His programming clearly shows his full rehabilitation. In drawing the line as to when a denial becomes arbitrary, that line has definitely been crossed in this case, as the Board cannot present factual findings showing a continued risk of danger based on the rehabilitative evidence presented. To the contrary, the in-prison facts are exclusively positive.

As **Ramirez** noted (**Ramirez**, 94 Cal.App.4th at 549), the paroling authority must do more than merely commend Petitioner for the hard work done to rehabilitate himself while in prison. They must actually consider these factors "as... circumstance[s] tending to show his suitability for parole." **Ramirez** supra 94 Cal.App.4th at 571-72 [emphasis in original]. Of course, all the

Board did with petitioner's extensive accomplishments was to brush them aside with several terse lines and issue superficial compliments. Obviously, no serious consideration was ever given to Petitioner's outstanding programming. Yet, the **Biggs** rule is clear that if an inmate "continue[s] to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in parole". **Biggs v. Terhune**, supra, 334 F.3d at 916. Here, the evidence of actual rehabilitation is beyond dispute.

The Boards inability to find anything in his current programming, demeanor or psychological condition to justify a finding of current dangerousness, the Board continuously falls back on the immutable and unchanging facts, of the crime, to base its findings of unsuitability.

Again as noted above, wherever one draws the line as to when the reliance on the unchanging facts of the commitment offense becomes a violation of due process in the abstract, under the facts here after __17__ years, it clearly has passed here. Thus, the Board must do more than simply commend Petitioner for his efforts and accomplishments, and must consider them as favoring parole in evaluating suitability. **Ramirez**, supra, at 572. The Board must do this even if the factors of the commitment offense in the abstract can be said to be sufficient to deny petitioner parole.

Petitioner asserts that he has continued to be a **model** inmate, yet, continues to be deprived the benefits of his exemplary rehabilitation by the California Board of Parole

Hearings. The only real issue at a parole hearing is whether the inmate **currently** poses an unreasonable risk of danger to the public if paroled. This must be determined by an inmates post-conviction evidence of rehabilitation. petitioner has met every prerequisited condition that warrants a finding of suitability. Because there is no evidence to support a finding that Petitioner poses a current threat to public safety of any magnitude, let alone an unreasonable level of threat, the decision denying parole can not be sustained.


## CONCLUSION

The Parole Board's decision was arbitrary and capricious. Petitioner did not receive fair hearing from the Board of Parole Hearings, nor will he ever.

The Court must order Petitioner released or at the very least, direct the Board of Parole Hearings to issue a decision within ten days granting Petitioner parole, setting his term as prescribed by the Legislature and the Statutes.

Based on the foregoing reasons and the entire file herein, Petitioner submits that the hearing was a sham and a farce in violation of the intent of the Legislature when it enacted Penal Code §3041 et seq. 30 years ago.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this _15_ day of _February_ 2007, Correctional Training Facility, Soledad, Ca 93960-0689.

_____Jesse Plaza_____
Jesse Plaza, Petitioner/In Pro Per

- 35 -

PRAYER FOR RELIEF

1. Issue an Order to Show Cause on an expedited basis directing Respondent to file a Return pursuant to Rule 4.551, California Rules of Court;

2. Issue a Writ of Habeas Corpus;

3. Order Respondent to provide Petitioner with reasonable discovery;

4. Conduct an Evidentiary Hearing;

5. Declare the rights of the parties;

6. Order injunctive relief;

7. Appoint Counsel;

8. Issue an order directing Petitioner released on parole;

9. Direct Respondent to release Petitioner forthwith upon the granting of his release on parole;

10. Issue an Order directing Petitioner released on his own recognizance or on reasonable bail; and

11. Grant all other relief necessary to promote the ends of justice.

Dated: 2-15-07

Respectfully submitted

Jesse Plaza
Jesse Plaza

In Pro per

- 36 -

8. Did you appeal from the conviction, sentence, or commitment?   [XX] Yes.   [ ] No.   If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
California Court of Appeals

b. Result: _____ denied _____                    c. Date of decision: ___ unknown ___

d. Case number or citation of opinion, if known: _____ unknown _____

e. Issues raised:   (1) _____ n/a _____

(2) _____

(3) _____

f. Were you represented by counsel on appeal?   [X] Yes.   [ ] No.   If yes, state the attorney's name and address, if known:

_____ unknown _____

9. Did you seek review in the California Supreme Court?   [XX] Yes.   [ ] No.   If yes, give the following information:

a. Result: ___ denied ___                    b. Date of decision: ___ unknown ___

c. Case number or citation of opinion, if known: _____ unknown _____

d. Issues raised:   (1) _____ n/a _____

(2) _____

(3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

_____ n/a _____

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

As of May 1, 2004, Exhaustion of the Administrative Appeal Process has been eliminated. Title 15 regulations governing section 2050-2056 has been repealed.

b. Did you seek the highest level of administrative review available?   [X] Yes.   [ ] No.
*Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____ n/a _____

      (2) Nature of proceeding (for example, "habeas corpus petition"): _____

      (3) Issues raised: (a) _____

            (b) _____

      (4) Result *(Attach order or explain why unavailable)*: _____

      (5) Date of decision: _____

  b. (1) Name of court: _____ n/a _____

      (2) Nature of proceeding: _____

      (3) Issues raised: (a) _____

            (b) _____

      (4) Result *(Attach order or explain why unavailable)*: _____

      (5) Date of decision: _____

  c. *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____ n/a _____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 2-15-07

▶ *Jesse Plan*
(SIGNATURE OF PETITIONER)

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015,5)

I, ____JESSE PLAZA_____, declare:

I am over 18 years of age and I am party to this action.  I am a

resident of CORRECTIONAL TRAINING FACILITY prison, in the County

of Monterrey, State of California.  My prison address is:

        ____JESSE PLAZA____, CDCR #:__H-12371__.
        CORRECTIONAL TRAINING FACILITY
        P.O. BOX 689, CELL #: __F-338U__
        SOLEDAD, CA  93960-0689.

On ___FEB. 18, 2007___, I served the attached:

---

### PETITION FOR WRIT OF HABEAS CORPUS

---

On the parties herein by placing true and correct copies

thereof, enclosed in a sealed envelope (verified by prison

staff), with postage thereon fully paid, in the United States

Mail in a deposit box so provided at the above-named institution

in which I am presently confined.  The envelope was addressed as

follows:

LOS ANGELES SUPERIOR COURT        OFFICE OF THE ATTORNEY GENERAL
CRIMINAL COURT BUILDING          RONALD REAGAN BUILDING
210 W. Temple Street             300 S. Spring Street
Los Angeles, CA 90012            Los Angeles, CA 90099-9126

I declare under penalty of perjury under the laws of the

State of California that the foregoing is true and correct.

Executed on ___2-15-07___.

                        _Jesse Plaza_
                        Declarant

# EXHIBIT A

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number H-12371
)
JESUS PLAZA )
)
_____)

## INMATE COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 1, 2006

PANEL PRESENT:

ARCHIE JOE BIGGERS, Presiding Commissioner
ROLANDO MEJIA, Deputy Commissioner

OTHERS PRESENT:

JESUS PLAZA, Inmate
LAWRENCE MORRISON, Deputy District Attorney
KATERA E. RUTLEDGE, Attorney for Inmate

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum

**Ruby M. Dougherty, Peters Shorthand Reporting**

ii

## INDEX

| | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 16 |
| Pre-Commitment Factors | 23 |
| Post-Commitment Factors | 33 |
| Parole Plans | 48 |
| Closing Statements | 62 |
| Recess | 88 |
| Decision | 89 |
| Adjournment | 93 |
| Transcriber Certification | 94 |

--oOo--

1

P R O C E E D I N G S

1

2          **DEPUTY COMMISSIONER MEJIA:**  We're on

3    record.

4          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

5    This is initial parole consideration hearing for

6    Jesus Plaza, P-L-A-Z-A, CDC No. H-12371.  We're

7    located at the Correctional Training Facility in

8    Soledad.  Inmate was received on October 9, 1991

9    from Los Angeles County.  The life term began on

10   October 9, 1991 and the minimum eligible parole

11   date is January 25th, 2007.  The controlling

12   offense for which the inmate has been committed

13   is murder case number -- first-degree murder

14   with a weapon.  Case No. is VA004108.  That's a

15   violation on criminal code PC187.  The inmate

16   received a term of 25 years to life, with a

17   minimum eligible parole date of 1/25/07.  Now

18   this hearing's being tape-recorded and for the

19   purpose of voice-identification each of us will

20   state our first and last name, spelling our last

21   name.  When we get to you Mr. Plaza, if you

22   would please give us your CDC number after you

23   spell your last name.  I will start and move to

24   my left.  My name is Archie Joe Biggers,

25   B-I-G-G-E-R-S, and I'm a Commissioner.

26         **DEPUTY COMMISSIONER MEJIA:**  Rolando

27   Mejia, M-E-J-I-A, Deputy Commissioner.

2

1        **DEPUTY DISTRICT ATTORNEY MORRISON:**

2   Lawrence Morrison, M-O-R-R-I-S-O-N, Los Angeles

3   District Attorney.

4        **ATTORNEY RUTLEDGE:**    Katera E. Rutledge,

5   R-U-T-L-E-D-G-E, attorney for Mr. Plaza.

6        **INMATE PLAZA:**  My name is Jesus Plaza,

7   last -- CDC number is H-12371.

8   [Recording equipment malfunction, placement of

9     equipment, background noise, and volume of

10  participants resulted in indiscernible content.]

11       **PRESIDING COMMISSIONER BIGGERS:**    Okay.

12  Thanks to all of you.  Mr. Perez is there an ADA

13  statement that was passed over there to you?  Do

14  you see that?  It should have been right next

15  to--

16       **INMATE PLAZA:**    (Indiscernible).

17       **PRESIDING COMMISSIONER BIGGERS:**    -- would

18  you please read that out loud for us?

19       **INMATE PLAZA:**  "The Americans with

20           Disability Act, ADA, is a law to

21           help people with disabilities.

22           Disabilities are problems that

23           make it harder for some people to

24           see, hear, breathe, talk, walk,

25           learn, think, work, or take care

26           of themselves than it is for

27           others.  Nobody can be kept out of

3

1     public places or activities

2     because of a disability.  If you

3     have a disability you have the

4     right to ask for help to get ready

5     for your BPT hearing, get to the

6     hearing, talk, read forms and

7     papers, and understand the hearing

8     process.  BPT will look at what

9     you ask for to make sure that you

10    have a disability that is covered

11    by the ADA, and that you have

12    asked for the right kind of help.

13    If you do not get help or if you

14    don't think you got the kind of

15    help you need, ask for a BPT 1074

16    Grievance Form.  You can also get

17    help to fill it out."

18    **PRESIDING COMMISSIONER BIGGERS:**  All

19    right.  Do you understand what that means Mr.

20    Plaza?

21        **INMATE PLAZA:**  Yes, I do.

22        **PRESIDING COMMISSIONER BIGGERS:**  And what

23    does it mean in your own words please.

24        **INMATE PLAZA:**  In my own words I believe

25    it's saying if I have any disability or need

26    help during this hearing I have the right to

27    have those provided for me.

4

1          PRESIDING COMMISSIONER BIGGERS:

2    (Indiscernible) we're talking about things like

3    hearing, eye -- do you wear glasses?

4          INMATE PLAZA:  No.

5          PRESIDING COMMISSIONER BIGGERS:  Okay.

6    Do you have any hearing impairment?

7          INMATE PLAZA:  No, I don't.

8          PRESIDING COMMISSIONER BIGGERS:  And you

9    can walk without any problems?

10          INMATE PLAZA:  Yes.

11          PRESIDING COMMISSIONER BIGGERS:  Okay.

12    Have you ever been included in the Triple CMS or

13    EOP Program?

14          INMATE PLAZA:  Never.

15          PRESIDING COMMISSIONER BIGGERS:  Okay.

16    So you don't suffer from any disability that

17    would prevent you from participating in today's

18    hearing?

19          INMATE PLAZA:  Not at all.

20          PRESIDING COMMISSIONER BIGGERS:  Counsel,

21    do you feel that your client's ADA rights have

22    been met?  Ms. Rutledge?

23          ATTORNEY RUTLEDGE:  Yes, Sir.

24          PRESIDING COMMISSIONER BIGGERS:  Thank

25    you.  This hearing is being conducted pursuant

26    to Penal Code Section 3041 and 3042 and the

27    rules and regulations of the Board of Prison

5

1    Terms governing parole consideration hearings

2    for life inmates.   The purpose of today's

3    hearing is to consider the number and the nature

4    of the crimes you were committed for, your prior

5    criminal and social history, your behavior and

6    programming since your commitment.  We have had

7    the opportunity to review your Central File, and

8    you will be given the opportunity to correct or

9    clarify the record.  We will reach a decision

10   today, and find -- and inform you whether or not

11   we find you suitable for parole and the reasons

12   for our decision.  If you are found suitable for

13   parole, the length of your confinement will be

14   explained to you.  Before we go any further, I

15   want to advise you that we expect you to be

16   fully honest with us today, especially with this

17   being your initial hearing.  So in the event

18   that you don't get a date today, this here will

19   form the foundation for all future hearings.

20           INMATE PLAZA:  I (indiscernible).

21           PRESIDING COMMISSIONER BIGGERS:  Any

22   false statement you make today could have an

23   adverse effect on your ability to get a date at

24   a later time in the event that you don't get a

25   date today.  Nothing that happens here today

26   will change the findings of the Court.  We are

27   not here to retry your case.  We are here to

6

1   determine if you are suitable for parole.  Do

2   you understand that?

3          **INMATE PLAZA:**  I understand.

4          **PRESIDING COMMISSIONER BIGGERS:**  The

5   hearing will be conducted in two phases.  I will

6   discuss with you the crime you were committed

7   for, your prior criminal and social history.

8   Deputy Commissioner Mejia will talk to your

9   about parole plans, letters of support and

10  opposition, your counselor's report and your

11  psychological evaluation.  Once that is

12  concluded, both Commissioners, the District

13  Attorney, and your attorney will ask you

14  questions.  Questions from the District Attorney

15  shall be asked through the Panel and your

16  answers should be directed to the Panel.  Before

17  we recess for deliberation, the District

18  Attorney, your attorney, and you will be given

19  the opportunity to make a final statement

20  regarding your suitability, followed by

21  statements -- if we had victims, it would be --

22  (indiscernible) follow with the victims, but

23  since we don't have any we don't worry about

24  that one.  California Code of Regulations states

25  that regardless of time served a life inmate

26  shall be found unsuitable for and denied parole

27  if in the judgment of the Panel the inmate would

7

1   pose an unreasonable risk of danger to society

2   if released from prison.  You have certain

3   rights.  Those rights include the right to a

4   timely notice of this hearing, the right to

5   review your Central File.  Did you review your

6   Central File?

7          INMATE PLAZA:  Yes.

8          PRESIDING COMMISSIONER BIGGERS:  And the

9   right to present relevant documents.  Ms.

10  Rutledge, do you believe that your client's

11  rights have been met.

12         ATTORNEY RUTLEDGE:  Yes.

13         PRESIDING COMMISSIONER BIGGERS:  Okay.

14  Thank you, ma'am.  You have an additional right

15  to be heard by an impartial Panel.  Do you have

16  any objection to the Panel members?

17         INMATE PLAZA:  No, none at all.

18         PRESIDING COMMISSIONER BIGGERS:  Okay.

19  All right.  I'm going to ask Ms. Rutledge, do

20  you have any objections to the Panel

21  (indiscernible)?

22         ATTORNEY RUTLEDGE:  No, Sir.

23         PRESIDING COMMISSIONER BIGGERS:  Thank

24  you.  You will receive a written copy of our

25  tentative decision today.  That decision becomes

26  effective within 120 days.  A copy of the

27  decision and a copy of the transcript will be

8

1    sent to you, and you will have 90 days from that

2    date to appeal if you so desire.  Now, I need to

3    let you know that the Board has eliminated its

4    appeals process.  If you disagree with anything

5    that happens in today's hearing, you have the

6    right to go directly to the Court with your

7    complaint.

8         INMATE PLAZA:  I understand.

9         PRESIDING COMMISSIONER BIGGERS:  Okay,

10   thank you.  You are not required to admit your

11   offense or discuss your offense.  However, this

12   Panel does accept the findings of the Court to

13   be true.  Do you understand that?

14        INMATE PLAZA:  Yes, I (indiscernible).

15        PRESIDING COMMISSIONER BIGGERS:  Okay,

16   thank you.  I'm gonna pass a -- over to your

17   attorney and then to the District Attorney what

18   I've have marked as Exhibit One so that we can

19   make sure that we're all using -- on the same

20   set of documents.

21        DEPUTY DISTRICT ATTORNEY MORRISON:

22   District Attorney has all the documents, thank

23   you.

24        ATTORNEY RUTLEDGE:  The -- Mr. Plaza, the

25   defense has all (indiscernible).

26        PRESIDING COMMISSIONER BIGGERS:  Thank

27   you, ma'am.  Thank you, sir.  Commissioner

9

1   Mejia, is there any confidential material in the

2   file?

3          **DEPUTY COMMISSIONER MEJIA:**   No.   No

4   confidential information.

5          **PRESIDING COMMISSIONER BIGGERS:**   Okay.

6   Are any additional documents to be submitted?

7          **ATTORNEY RUTLEDGE:**   I (indiscernible) we

8   did submit --

9          **PRESIDING COMMISSIONER BIGGERS:**   And I

10  read those (indiscernible) read the statement

11  into the record, because I want to make sure it

12  he gets into the record.   I read, I think it was

13  the last two pages that had to do with matrix

14  and all the other stuff in there -- but I -- and

15  I -- but  want to get it on record, so -- to

16  make sure that it is in the transcript.

17         **ATTORNEY RUTLEDGE:**   Do you want me to

18  read it or him to do that?

19         **PRESIDING COMMISSIONER BIGGERS:**   It

20  doesn't matter, which ever you prefer.

21         **ATTORNEY RUTLEDGE:**   This was taken from

22  -- Mr. Plaza had submitted to the Board a

23  memorandum of evidence and law in support of

24  parole suitability and this is directed to the

25  Board.

26             "Introduction, the California Code

27             of Regulations Title XV Division

10

1     Two hereafter XV Section 2245,

2     states in part, 'The prisoner is

3     responsible for bringing to the

4     attention of the hearing Panel any

5     issues pertaining to his rights

6     under this article or any failure

7     to comply with these rules.  A

8     prison may waive any of these

9     rights.  Any such waiver shall be

10    documented.'  I wish to bring to

11    the attention of this Panel at

12    this time that I do have the right

13    to present this document at this

14    hearing to have it entered into

15    the record.  Moreover, the Panel

16    must --"

17  That's moot since the Panel's accepting it.  Is

18  that correct?

19      **DEPUTY COMMISSIONER MEJIA:**  Yes, it is.

20      **ATTORNEY RUTLEDGE:**  Okay.  In the third

21  paragraph, my client submits this memorandum

22  because he does not wish to intentionally or

23  unintentionally waive any of his rights under

24  the law, and that he wants that all evidence in

25  support of finding suitability be stated for the

26  records and for purposes of appeal if necessary.

27      **PRESIDING COMMISSIONER BIGGERS:**  Before

11

1    you go any further.  Normally, everything that

2    we do, that's why it's on record.  So, I just

3    want to make sure that you now understand that

4    we -- our job is to make sure that we do

5    everything under due process and we are aware of

6    everything that happens in Title XV.

7         INMATE PLAZA:  That's right.

8         PRESIDING COMMISSIONER BIGGERS:  Okay?

9    So, go ahead, ma'am, please.

10        ATTORNEY RUTLEDGE:  Moving on to the

11   memorandum incorporates the following -- relies

12   upon the Court rulings.

13        "InRe Rosencrance,

14        (indiscernible); InRe Rosencrance

15        for LA County Superior Court, Case

16        No. AH10298; InRe Caswald,

17        210DJDJR10845; InRe McWillion,

18        U.S. Court of Appeals for the 9th

19        Circuit, Case No. 0055182; InRe

20        Ramirez, 9th Circuit Court of

21        Appeals, Case No. AO092699; InRe

22        Biggs, U. S. Court of Appeals,

23        Case No. VH002016; InRe Deluna,

24        126 Appellate Court, 585; InRe

25        Low, 130 Appellate Court, 1418 --"

26        PRESIDING COMMISSIONER BIGGERS:  Excuse

27   me, what was that?  What was the -- what's the

12

1    relation of the Low case in this hearing?

2            ATTORNEY RUTLEDGE:   How are we applying

3    the Low case to this hearing?   This is being

4    presented by my client; I have not read the Low

5    case.

6            DEPUTY DISTRICT ATTORNEY MORRISON:   Well,

7    I have a -- I have a question (indiscernible) if

8    I may.   The inmate can present anything he

9    wants, but this sounds like legal arguments.

10   The inmate has an attorney -- he's gonna have an

11   attorney -- he can make whatever arguments he

12   wants if he gonna represent himself then he can

13   make legal arguments.   But he doesn't get to

14   make legal arguments and have an attorney.

15           ATTORNEY RUTLEDGE:   Yes, he does.

16   There's nothing -- sometimes he can have an

17   attorney --

18           PRESIDING COMMISSIONER BIGGERS:   Excuse

19   me.   What I'm doing right now is allowing him to

20   read his document into the file.   When we start

21   talking about the opposing statements and

22   getting into all the others, then that's when I

23   will put a stop to that.   But I want to get this

24   in the file, and I have something to say once

25   you finish.

26           ATTORNEY RUTLEDGE:   And I would -- I

27   would remind the Panel that under Title XV the

13

1   people have no standing to object to anything

2   that the inmate does.

3           **PRESIDING COMMISSIONER BIGGERS:**  Exactly.

4           **ATTORNEY RUTLEDGE:**  Thank you.  All

5   right.  So -- "InRe Shapudis, 135 Appellate

6   Forth 217 at 227; Irons versus Carey 408 F

7   Third, 1165 9th Circuit."  Now Page Two goes to

8   the commitment offense so --

9           **PRESIDING COMMISSIONER BIGGERS:**  You can

10  skip that one.  In fact, I think you can skip

11  the last three pages, I just wanted to get those

12  things on the record for you (indiscernible)

13  others because what I wanted to let you know sir

14  is that those cases are a matter of law, and you

15  can use those any times when you appeal if for

16  some reason you don't get a date.  But there are

17  a couple that you forgot to mention.  One of

18  those is Dannenberg, and we'll talk about that a

19  little later on.  I would appreciate -- I think

20  you've done a superb job of putting this package

21  together.  My only comment on that is I think

22  sometimes that you don't who -- by going in

23  there and doing certain things, there's a

24  difference between shall, will, and can't.

25          **INMATE PLAZA:**  I understand.

26          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

27  So.  All right.

14

1    **ATTORNEY RUTLEDGE:**  Can I -- there's an

2    -- I still have to lodge a couple of objections

3    whenever the Panels --

4    **PRESIDING COMMISSIONER BIGGERS:**  No

5    problem.  So those are the additional documents.

6    Now, you say you have some preliminary

7    objections?  What are they now?

8    **ATTORNEY RUTLEDGE:**  Well, our first

9    objection would be -- well, we would ask that

10   the Panel --  under 2236 my client will be

11   discussing everything but the commitment offense

12   with the Panel.  We ask that the people not be

13   allowed to refer to him not discussing the case,

14   and that again we're just reiterating that the

15   people don't have standing to object to any of

16   our statements and may not advise the Panel on

17   the law, and that would be all aside from what

18   would be in the package.

19   **DEPUTY DISTRICT ATTORNEY MORRISON:**

20   (Indiscernible) recommend that (indiscernible)

21   represents the citizen of Los Angeles, it's part

22   of public comment that we're entitled to make on

23   any subject regarding suitability for parole.

24   **ATTORNEY RUTLEDGE:**  You can during your

25   closing.  Other than that you have no standing.

26   **PRESIDING COMMISSIONER BIGGERS:**  She's

27   right about that.  You do have the right to do

15

1   that in Closing Statements (indiscernible).   He

2   can in fact though ask questions.   If your

3   client elects not to answer them that's

4   something entirely different, but he does have

5   the right to ask questions as well.

6         ATTORNEY RUTLEDGE:   Of my client,

7   correct.   Yes.   Okay.

8         PRESIDING COMMISSIONER BIGGERS:   Are

9   there any other preliminary objections?

10         ATTORNEY RUTLEDGE:   No, Sir.

11         PRESIDING COMMISSIONER BIGGERS:   Okay.   I

12   assume from what you just told me that the

13   inmate will be speaking to us about everything

14   but the crime?

15         ATTORNEY RUTLEDGE:   Yes.

16         PRESIDING COMMISSIONER BIGGERS:   Okay.

17   Would you raise your right hand please, Mr.

18   Plaza.   Do you solemnly swear or affirm that the

19   testimony you give at this hearing will be the

20   truth and nothing but the truth?

21         INMATE PLAZA:   I do.

22         PRESIDING COMMISSIONER BIGGERS:   Thank

23   you.   I'm gonna read into the record from the

24   Appellate decision the facts of the committing

25   offense.

26         "On May 26, 1990, Mr. Plaza was an

27         active member of the King Cobra

16

1        juvenile gang.  (Indiscernible)

2        Silva, S-I-L-V-A, Mr. Plaza's

3        co-arrestee was also an active

4        member of the King Cobras.

5        Patrick Littlebull,

6        L-I-T-T-L-E-B-U-L-L, the victim,

7        was a member of the Bell Garden

8        (phonetic) --" is that local --

9        **INMATE PLAZA:**  It's always been

10   miss-spelled, but it's supposed to be locos as

11   in crazy.

12        **PRESIDING COMMISSIONER BIGGERS:**  Locos.

13        **INMATE PLAZA:**  Locos.

14        **PRESIDING COMMISSIONER BIGGERS:**  Locos.

15        **INMATE PLAZA:**  Yeah.

16        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

17   "-- a rival juvenile gang.  Fifty-nine hundred

18   block of Loveless (phonetic) Street was a known

19   hangout of the Bell Garden Locos."

20        **INMATE PLAZA:**  There you go.

21        **PRESIDING COMMISSIONER BIGGERS:**  "On May

22        26, 1990 at around 10:00 p.m.

23        Rosario Quevedo, Q-U-E-V-E-D-O,

24        and her sister, Martha -- and I'll

25        spell the last name --

26        P-A-L-A-C-I-O-S, returned from

27        church with their children and

17

1    parked their car in front of their
2    apartment at 5940 Loveless Street.
3    Quevedo, Q-U-E-V-E-D-O, noticed
4    some individuals standing and
5    talking to each other on the
6    sidewalk in front of the car.  She
7    also saw a car approaching from
8    the opposite direction with its
9    lights off and stop across the
10   street.  Rosario and Palatono --
11   P-A-L-A-C-I-O-S -- then heard
12   gunshots.  Quevedo panicked and
13   drove away.  When they returned a
14   short time later, they saw the
15   victim lying face down in the
16   street in front of the apartment
17   building.  Jesus Zamora,
18   Z-A-M-O-R-A, made a pizza delivery
19   for Dominoes Pizza about 10:00
20   p.m. that evening at 5918 Loveless
21   Street.  After delivering the
22   pizza he pulled into the driveway
23   at 5918 Loveless Street to write
24   in his delivery book.  As he was
25   writing, he heard the sound of
26   gunfire and the sound of a car
27   coming rapidly in his direction.

18

1          He saw a car traveling on Loveless

2          Street without the headlights on.

3          The car passed Zamora and turned

4          the car, straddling the curve.

5          The lights of the car then came

6          on, and Zamora saw the number 33

7          on the license plate.  He also

8          noted that the car was a gray

9          Caprice.  He later related his

10         observations to Bell Garden Police

11         Officer Reuben Musquiz,

12         M-U-S-Q-U-I-Z.  Officer Musquiz

13         then broadcast a description of

14         the gray Caprice over the police

15         radio.  Around 10:50 p.m., Bell

16         Police Officer Baley Hooper,

17         H-O-O-P-E-R, observed a silver

18         Caprice with 33 on it as the last

19         two numbers on the license plate."

20  And then I'm going to skip down and say -- well,

21  let me read this in too.

22         "-- proceeded westbound on

23         Florence Avenue near the 710

24         Freeway bridge.  He radioed for

25         assistance and followed the car

26         into a driveway.  Plaza, who was

27         driving, and passenger Danny Silva

19

```
 1          exit the vehicle.  They were
 2          detained and subsequently
 3          arrested.  Brown paper bags were
 4          placed on the hands of Plaza and
 5          Silva so they -- that they -- be
 6          tested for gunshot residue.
 7          Analysis residue from a pellet in
 8          Silva's hand indicate that Plaza
 9          and Silva had either shot a gun,
10          handled a gun, or had been within
11          with two (indiscernible) feet of a
12          gun as it was fired."
13     Okay.  That's enough for the record.  And since
14     you're not gonna be talking about the crime
15     itself -- and counsel if I touch on an area that
16     you want to object to, that's fine, I need to
17     ask a couple of things though.  At one time you
18     denied your involvement.
19          INMATE PLAZA:  Yes.
20          PRESIDING COMMISSIONER BIGGERS:  Okay.
21     When did you change that?
22          INMATE PLAZA:  I'd have to say about an
23     hour into the interrogation.
24          PRESIDING COMMISSIONER BIGGERS:  An hour
25     into the interrogation?
26          INMATE PLAZA:  Yes.
27          PRESIDING COMMISSIONER BIGGERS:  Well, .I
```

20

1   was looking at the Appellate Decision and it

2   indicated -- I thought it looked like it was a

3   little bit longer than that.

4         ATTORNEY RUTLEDGE:   He maintains he was

5   the driver of the vehicle, and they never --

6   there were two people.  Both people found in the

7   car had gunshot residue.  There was a third

8   person that was never tried.

9         PRESIDING COMMISSIONER BIGGERS:   Never

10  tried, but yeah there were two.  The two that

11  had the residue was Mr. Plaza and Mr. Silva; is

12  that correct?

13        INMATE PLAZA:   That's correct.

14        PRESIDING COMMISSIONER BIGGERS:   Okay.

15  Can you tell me how you got the residue on your

16  hands?

17        INMATE PLAZA:   Yes, I handled the gun

18  after it was fired plus I was in the vicinity of

19  the shots being fired.

20        PRESIDING COMMISSIONER BIGGERS:   Within

21  two to four feet is what you're saying?

22        INMATE PLAZA:   Yes, Sir.

23        ATTORNEY RUTLEDGE:   Okay, I think we're

24  getting into the commitment offense --

25        PRESIDING COMMISSIONER BIGGERS:   Okay.

26  At one time you talked about the (indiscernible)

27  you requested it be turned to a manslaughter

21

1   (indiscernible), right?

2        INMATE PLAZA:  My lawyer did, yes.

3        PRESIDING COMMISSIONER BIGGERS:   Yes.

4   And that was shot down by the Appellate

5   Decision.  Are you still a member of that King

6   Cobra gang?

7        INMATE PLAZA:   I was never technically a

8   member, but I was an associate.   I hung around

9   with gang members, to be totally honest.  I hung

10  around with several different gang members.

11  People that I hung around with were from

12  different gangs.

13       ATTORNEY RUTLEDGE:   (Indiscernible).

14       INMATE PLAZA:  Oh, being born and raised

15  in East LA there's gangs all around.

16       PRESIDING COMMISSIONER BIGGERS:   Yeah,

17  there are -- some gangs are not as violent as

18  otters. There are some gangs that are just

19  locals that hang out, too.

20       INMATE PLAZA:  Not that I know of.

21       PRESIDING COMMISSIONER BIGGERS:   Okay.

22  Well, I'm familiar with LA.  Not all of them are

23  Bloods, Crips, or whatever names that they have.

24  You indicated that you have spent a lot of time

25  hanging around those people.  Were you aware

26  that -- well, that's getting back into the

27  crime.  Were you aware that -- the night in

22

1   question, were you in with some of those known

2   gang members?

3          INMATE PLAZA:  Yes.

4          PRESIDING COMMISSIONER BIGGERS:  Did you

5   have any idea what was going to take place?

6          ATTORNEY RUTLEDGE:  We would -- that

7   would -- sorry, I have to object to --

8          PRESIDING COMMISSIONER BIGGERS:  All

9   right.

10         ATTORNEY RUTLEDGE:  But we would accept

11  the --

12         PRESIDING COMMISSIONER BIGGERS:  Findings

13  of the

14         ATTORNEY RUTLEDGE:  -- Appellate --

15         PRESIDING COMMISSIONER BIGGERS:

16  Appellate Decision.  Okay.

17         ATTORNEY RUTLEDGE:  Yes.

18         PRESIDING COMMISSIONER BIGGERS:  All

19  right.  Then I will go and just look and see

20  what else I think is -- talking about your

21  priors.

22         DEPUTY DISTRICT ATTORNEY MORRISON:

23  Excuse me, Commissioner.  I'm sorry, I may have

24  missed it with all of this discussion.  But did

25  the Chair read the official version of the crime

26  into the --

27         PRESIDING COMMISSIONER BIGGERS:  I read

23

1   it from the Appellate Decision. Yes, it is.

2   **DEPUTY DISTRICT ATTORNEY MORRISON:**

3   Because the Appellate Decision is pretty

4   lengthy.

5   **PRESIDING COMMISSIONER BIGGERS:** Yeah,

6   and I read that in --

7   **DEPUTY DISTRICT ATTORNEY MORRISON:**

8   That's right. Okay.

9   **ATTORNEY RUTLEDGE:** It's probably why you

10  fell asleep during that part.

11  **PRESIDING COMMISSIONER BIGGERS:** All

12  right -- we're not going to have that now.

13  **ATTORNEY RUTLEDGE:** Just teasing.

14  **PRESIDING COMMISSIONER BIGGERS:** I know.

15  We're going to keep everything on the up and up

16  here. Okay. And did you have a juvenile

17  history, because when I went through this I

18  couldn't find anything. It says not available

19  to Probation Department as far as five years

20  after that. Did you have any juvenile history?

21  **INMATE PLAZA:** (Indiscernible).

22  **PRESIDING COMMISSIONER BIGGERS:** And the

23  only adult history that you had was -- you were

24  given 24 months probation for some vandalism --

25  **INMATE PLAZA:** Yes.

26  **PRESIDING COMMISSIONER BIGGERS:** What was

27  that about?

24

1          INMATE PLAZA:  I was arrested for

2    vandalizing a store -- store property.

3          PRESIDING COMMISSIONER BIGGERS:  Why did

4    you do that?

5          INMATE PLAZA:  To be honest with you, I

6    was walking down the street, I was intoxicated,

7    I seen the can sitting on the floor, I picked it

8    up, what made we think I wanted to know what

9    color it was I really am not sure today while I

10   did that, but I did spray a one-inch diameter

11   dot on the wall to see what color the can was

12   and that's what I was arrested for -- a one-inch

13   diameter dot on the wall.

14         PRESIDING COMMISSIONER BIGGERS:  And they

15   gave you two-years probation for that?

16         INMATE PLAZA:  Yes.

17         ATTORNEY RUTLEDGE:  It's usually three

18   years under the Penal Code.

19         PRESIDING COMMISSIONER BIGGERS:  Yeah,

20   but that -- there had to be some extenuating

21   circumstances as to priors --

22         DEPUTY DISTRICT ATTORNEY MORRISON:

23   Misdemeanor probation in LA County summary

24   probation is frequently two years.  Sometimes

25   for a (indiscernible) it's only one year.

26         ATTORNEY RUTLEDGE:  But under the Penal

27   Code you don't have to justify three years.  You

25

1    just give three years.

2         PRESIDING COMMISSIONER BIGGERS:  Okay,

3    well, my question to you -- was there anything

4    else that led them to give you only two years?

5         INMATE PLAZA:  I wouldn't know.

6         PRESIDING COMMISSIONER BIGGERS:  Okay.

7    Let's talk a little bit about your drug -- do

8    you have -- do you have a drug history?

9         INMATE PLAZA:  Yes, I do.

10        PRESIDING COMMISSIONER BIGGERS:  Okay.

11   And what was your drug of choice?

12        INMATE PLAZA:  Cocaine.

13        PRESIDING COMMISSIONER BIGGERS:  Cocaine.

14   And it says that you began snorting cocaine

15   three times a week at the age of 16 --

16        INMATE PLAZA:  Yes.

17        PRESIDING COMMISSIONER BIGGERS:  -- and

18   you continued use of this of -- until age 18,

19   and you stopped at age 20.

20        INMATE PLAZA:  Actually that's incorrect.

21   I never actually stopped.  I just decreased for

22   a minute, and then I just elevated up until the

23   time I was arrested.

24        PRESIDING COMMISSIONER BIGGERS:  Were you

25   -- the night you were arrested were you involved

26   in alcohol or cocaine or anything?

27        INMATE PLAZA:  Both.  Alcohol and

26

1    cocaine.

2        PRESIDING COMMISSIONER BIGGERS:    When did

3    you start using alcohol?

4        INMATE PLAZA:    I'd say age 15.

5        PRESIDING COMMISSIONER BIGGERS:    You were

6    still living at home, were you not?

7        INMATE PLAZA:    Yes, I was.

8        PRESIDING COMMISSIONER BIGGERS:    Were

9    your parents aware that you were using cocaine

10   and getting involved in drinking?

11       INMATE PLAZA:    No, not at all?

12       PRESIDING COMMISSIONER BIGGERS:    How

13   could you hide that?

14       INMATE PLAZA:    Well, my father'd been

15   gone since I was about four years old so he's

16   not in the picture.  My mother, due to trying to

17   support me and my other siblings -- she worked

18   -- usually she had -- numerous times she usually

19   had two jobs at a time.  She's work day and

20   night, so by the time she'd get home I'd already

21   be home in bed.

22       PRESIDING COMMISSIONER BIGGERS:    Okay.

23   Did you -- I'll get in your social here

24   (indiscernible) in a few minutes.  But I wanted

25   to find out were you -- let me go back.  You

26   were talking about the cocaine usage.  You

27   started using it at an early age right?

27

1      **INMATE PLAZA:** Yes.

2      **PRESIDING COMMISSIONER BIGGERS:** How did

3 you support yourself in getting that?

4      **INMATE PLAZA:** I had a job. I used to

5 work after school through the Cedar Program.

6      **PRESIDING COMMISSIONER BIGGERS:** Cocaine

7 is a fairly expensive drug, isn't it?

8      **INMATE PLAZA:** Yes, it is.

9      **PRESIDING COMMISSIONER BIGGERS:** Okay.

10 Were you buying it on the street?

11      **INMATE PLAZA:** Yes, I was.

12      **PRESIDING COMMISSIONER BIGGERS:** Costing

13 you a pretty penny to do that, wasn't it?

14      **INMATE PLAZA:** Yeah, pretty much all my

15 money.

16      **PRESIDING COMMISSIONER BIGGERS:** Okay,

17 and you still say that your parents did not know

18 that you were doing this?

19      **INMATE PLAZA:** No, they didn't.

20      **PRESIDING COMMISSIONER BIGGERS:** How

21 about alcohol? What was your drink of alcohol

22 that you liked?

23      **INMATE PLAZA:** Mainly my drink was

24 Miller.

25      **PRESIDING COMMISSIONER BIGGERS:** Miller?

26      **INMATE PLAZA:** Yes.

27      **PRESIDING COMMISSIONER BIGGERS:** And you

28

1   would take that in conjunction with?

2        INMATE PLAZA:  Well, the alcohol started

3   off as a, you know, what they call a gateway

4   drug.  It was the beginning of alcohol which led

5   me to the cocaine and that was pretty much the

6   two main -- my two main choices of alcohol and

7   drug of choice was cocaine.

8        PRESIDING COMMISSIONER BIGGERS:  Okay.

9   Under Social Factors, you were born on February

10  the 7, 1965 to Caroline and Jessie (phonetic)

11  Plaza.

12       INMATE PLAZA:  I believe there's an

13  addendum behind that -- there's a --

14       PRESIDING COMMISSIONER BIGGERS:  Yeah,

15  that said he was born on 3/7/65.

16       INMATE PLAZA:  That's correct, yes.

17       PRESIDING COMMISSIONER BIGGERS:  Then you

18  got -- the marriage took place on 5/12/84.

19  That's your marriage, right?

20       INMATE PLAZA:  Yes.

21       PRESIDING COMMISSIONER BIGGERS:  Getting

22  back to your -- you've got four brothers -- four

23  sisters and a brother?

24       INMATE PLAZA:  Yes.

25       PRESIDING COMMISSIONER BIGGERS:  Okay.

26  Are they still -- are all of them still living?

27       INMATE PLAZA:  Yes, the are.

29

1      PRESIDING COMMISSIONER BIGGERS:   Is any

2  of them incarcerated?

3      INMATE PLAZA:  No.  And also if I might

4  add, two of -- the two youngest sisters are

5  actually half-sisters.  They're from my dad's

6  second marriage.

7      PRESIDING COMMISSIONER BIGGERS:  Okay.

8  And your wife's name is --

9      INMATE PLAZA:  Guadalupe.

10     PRESIDING COMMISSIONER BIGGERS:

11  Guadalupe Falcon (phonetic)?

12     INMATE PLAZA:  Yes.

13     PRESIDING COMMISSIONER BIGGERS:  And you

14  married on 5/7/84, and you have three children.

15     INMATE PLAZA:  That should be 5/12.

16     PRESIDING COMMISSIONER BIGGERS:  You have

17  12 children?

18     INMATE PLAZA:  No, no, I'm saying the

19  date.  It should be 5/12; you said 5/7.

20     PRESIDING COMMISSIONER BIGGERS:  Five

21  seven, and it should be 5/12.

22     INMATE PLAZA:  It should be 5/12/84.

23     PRESIDING COMMISSIONER BIGGERS:  Okay.

24  We'll make sure that that gets in to your

25  official record regardless of what happens here.

26     INMATE PLAZA:  What was the question --

27  I'm sorry --

30

1    PRESIDING COMMISSIONER BIGGERS:   Do you

2  have three kids?   Three kids?

3    INMATE PLAZA:   Yes, three children.

4    PRESIDING COMMISSIONER BIGGERS:   And, in

5  going through your file I saw that there was a

6  letter from your wife and I'm sure that

7  Commissioner Mejia will get in to.   Any problems

8  with the marriage?

9    INMATE PLAZA:   I'd be lying if I said no.

10  Sure, we have problems.   But I mean nothing that

11  we haven't gotten through.

12    PRESIDING COMMISSIONER BIGGERS:   Well,

13  I'm talking about because of incarceration

14  (indiscernible).

15    INMATE PLAZA:   Oh, yeah, well sure, you

16  know.   It's been hard on her being the single

17  mother herself now.   It was hard on me not being

18  there able to support her.   When I first left, I

19  was the main source of, you know, support for

20  the house so when I first go incarcerated she

21  pretty much had to take everything on and do

22  everything on her own, you know, and she kind

23  of, you know, she felt abandoned, you know, and

24  she had every right to feel that way because she

25  had to just take over the whole household.

26    PRESIDING COMMISSIONER BIGGERS:   Did you

27  think about that when you were associating with

# EXHIBIT A
# Part 2 of 2

31

1 these known gang members? That that possibility

2 -- that that could happen?

3     INMATE PLAZA: At the time, no, because

4 my -- my thought -- my thought process wasn't on

5 responsibility. To me responsibility was, I had

6 a job, I paid the bills, I put food on the

7 table, there was a roof over their heads, they

8 had clothes on their backs. I thought that was

9 responsibility. I didn't realize that it was a

10 lot more to responsibility than that.

11     PRESIDING COMMISSIONER BIGGERS: But you

12 were still -- you still had your drug habit and

13 everything else --

14     INMATE PLAZA: And work. Yeah, I, you

15 know, I functioned, you know, to the -- to

16 everyone else I seemed to function in a normal,

17 you know, capacity, but of course it was, you

18 know, things behind the scenes that nobody knew

19 about.

20     PRESIDING COMMISSIONER BIGGERS: Okay.

21 Commissioner, do you have any questions on this

22 subject?

23     DEPUTY COMMISSIONER MEJIA: Yeah, maybe

24 about the remorse (indiscernible).

25     PRESIDING COMMISSIONER BIGGERS: Go

26 ahead.

27     DEPUTY COMMISSIONER MEJIA: How do you

32

1   feel about the man who was killed?

2       **INMATE PLAZA:**  I'm -- in the case of the

3   victim, I take full responsibly for the taking

4   of his life.  I can understand remorse.  I've

5   dealt with, you know, people dying around me in

6   the past.  It's not something that I'm new to.

7   I understand that it not only affected him but

8   it affected his family.  It affected friends of

9   his, society.  I understand that technically we

10  all -- we all have times in our lives when we

11  wish we could turn back the clock but that's not

12  possible.  But I do take full responsibility for

13  my actions.

14      **DEPUTY COMMISSIONER MEJIA:**  How do you

15  feel about the death of the victim; that's what

16  I asked you.

17      **INMATE PLAZA:**  The death of the victim?

18      **DEPUTY COMMISSIONER MEJIA:**  Yeah, the

19  human being that was killed.  How do you feel

20  about him being shot and being killed?  I know

21  all the peripheral that you said -- I

22  (indiscernible) I want (indiscernible) how do

23  you feel about him?

24      **INMATE PLAZA:**  I'm very remorseful for

25  the victim, for taking his life.  He -- I'm very

26  sorry that it happened.  It was something that

27  should not have happened.  He didn't deserve

33

1    that, and I just can't -- I mean, there are no

2    words that'll make it better or make it go away.

3         **DEPUTY COMMISSIONER MEJIA:**

4    (Indiscernible) that's it.  I really don't have

5    any questions.

6         **PRESIDING COMMISSIONER BIGGERS:**  Okay.

7    Then I'll ask you to go into the Post Conviction

8    Factors, please.

9         **DEPUTY COMMISSIONER MEJIA:**  Okay.  This

10   is your initial parole consideration hearing Mr.

11   Plaza, and your custody history is that you were

12   initially accepted to the Wasco State Prison RC

13   in 1991.  You were transferred to California

14   State Prison Folsom new facility in 1991,

15   December.  You were at Wasco in October, then

16   December in 1991 you went to the Old Folsom

17   (indiscernible).  Then 2/21/1992, you went to

18   CSP Calipatria, North and East.  February of

19   1994 you went to Lancaster, then 12/16/1997

20   Avenal State Prison.  And you went

21   (indiscernible) in 1998 of March, CTF.  You had

22   a brief period of time in CMF for medical issues

23   --

24        **INMATE PLAZA:**  Correct.

25        **DEPUTY COMMISSIONER MEJIA:**  And

26   (indiscernible) you have several jobs, and the

27   most recent job is the (indiscernible) Porter?

34

1      INMATE PLAZA:  Yes.

2      DEPUTY COMMISSIONER MEJIA:  And you have

3  an associate (indiscernible).  During your

4  incarceration you went to education

5  (indiscernible) electronics -- vocational

6  Electronics, Air Conditioning Refrigeration, Dry

7  Cleaning, Plumbing.  You were a Porter and also

8  a Teacher's Aide, Infirmary Dental Assistant.

9  And, you have a high school diploma that 1983.

10  You have a 12.0 TABE score.  (Indiscernible) you

11  have completed 32 units out of the Coastline

12  Community College?

13      INMATE PLAZA:  Yes.

14      DEPUTY COMMISSIONER MEJIA:  And, you -- I

15  see that you have really attempted to get some

16  trades -- completion of vocational trades.  You

17  have completed, I think, 19 certification units

18  when it comes to Air Conditioning and

19  Refrigeration?

20      INMATE PLAZA:  I've completed the whole

21  course.

22      DEPUTY COMMISSIONER MEJIA:  You completed

23  that whole course?

24      INMATE PLAZA:  Yes.

25      DEPUTY COMMISSIONER MEJIA:  That's a

26  problem.  I couldn't find a completion.  I saw

27  the Certificate of Completion for the -- each

35

1    unit that's a component to the Refrigeration.

2    So you do have it there?

3         **INMATE PLAZA:**  I believe --

4         **DEPUTY COMMISSIONER MEJIA:**  That would be

5    good for the record, because I -- I saw the

6    certifications units been completed

7    (indiscernible) and how about the Data

8    Processing?  I saw that you have completed 22

9    such units also?

10        **INMATE PLAZA:**  Yeah, that was not a total

11   completion --

12        **DEPUTY COMMISSIONER MEJIA:**  So,

13   Vocational Air Conditioning and Refrigeration --

14   you completed this?

15        **INMATE PLAZA:**  Yes.

16        **DEPUTY COMMISSIONER MEJIA:**  Okay.  That

17   is the documentation.

18        **ATTORNEY RUTLEDGE:**  (Indiscernible).

19        **DEPUTY COMMISSIONER MEJIA:**  You know,

20   well you said that you completed two trades but

21   I can't find them in the file.

22        **INMATE PLAZA:**  Yes, I understand the last

23   -- '95.  On one of my doc hearings -- I think

24   it's right here (indiscernible).  At one of my

25   doc hearings, the Commissioner went through my

26   paperwork and verified finding the --

27        **DEPUTY COMMISSIONER MEJIA:**  Do you have a

36

1   copy of that --

2        **INMATE PLAZA:**   -- chrono and the

3   certificate, but it is no longer in the file.

4   No, I do not have a copy.  It's no longer in the

5   file, but the Commissioner did see it at one

6   point in time.

7        **DEPUTY COMMISSIONER MEJIA:**  I saw that,

8   yeah.  The doc -- was that Patterson --

9   Commissioner Patterson?

10       **ATTORNEY RUTLEDGE:**  It looks -- Robert

11  Patterson, yeah.  It looks to be his signature.

12       **DEPUTY DISTRICT ATTORNEY MORRISON:**  This

13  (indiscernible) is that a progress hearing or

14  something?

15       **PRESIDING COMMISSIONER BIGGERS:**  No --

16  Documentation Hearing.  Before they go through

17  initial they give them (indiscernible).

18       **DEPUTY COMMISSIONER MEJIA:**  I don't see

19  any in here.  I've checked.  No, I know you

20  counted -- I counted 19 units.  I'm just

21  surprised that you have all these documents; you

22  don't have the -- I'm not saying that you're not

23  telling the truth, but you're so organized about

24  everything else.  But the most important is what

25  you have completed.  All the cert units are

26  there -- are there, and I know what you learned,

27  but the completion certificate is the most

37

1    important because that will count as a --

2         INMATE PLAZA:  I understand.

3         DEPUTY COMMISSIONER MEJIA:   -- check

4    completed.  And, I cannot depend on what the

5    Deputy Commissioner saw.  Maybe he had the

6    mistake of easing certification of it or

7    completion of it.  I look at your file, and it's

8    like I said, you've got everything else but I

9    can't see the completion.  Even on the other,

10    you know your education progress reports.

11    Nothing says (indiscernible) that you completed,

12    but I'm giving you credit for 19 certification

13    units of Air Conditioning and Refrigeration.

14    You also took some vocational Dry Cleaning,

15    which you haven't completed --

16         INMATE PLAZA:  It's also a completion.

17         DEPUTY COMMISSIONER MEJIA:  Oh, yeah?

18    What year did you complete that?

19         INMATE PLAZA:  I believe it's -- it's on

20    that same page or the one before.

21         DEPUTY COMMISSIONER MEJIA:  I guess, I

22    think you should just bring me the completion

23    chrono.

24         INMATE PLAZA:  I don't have them

25         ATTORNEY RUTLEDGE:  Four ten '95 is what

26    he has noted here, 4/10/95.

27         INMATE PLAZA:  The last time I went

38

1    through the Board that -- when Patterson went

2    through the doc hearing -- when I went through

3    the doc hearing with Patterson -- '95.  I had

4    the paperwork with me.  When I hit Avenal I lost

5    half of my property and since then I have not

6    had --

7        **DEPUTY COMMISSIONER MEJIA:**

8    (Indiscernible) contact the vocational --

9    education where you took it -- the prison where

10   you took it, and ask for a copy of the

11   completion chrono or something to prove that you

12   have completed it.  That's something you can do.

13       **ATTORNEY RUTLEDGE:**  It says the

14   Refrigeration would have been 10/1/91, so that

15   was --

16       **PRESIDING COMMISSIONER BIGGERS:**  Excuse

17   me, Commissioner Mejia.  When you went through

18   your C-file, did you not notice that those

19   things were not there?

20       **INMATE PLAZA:**  I did, but when I had seen

21   that paperwork from the Chairman the --

22   Commissioner, from the doc hearing, I thought it

23   was going to be enough since he seen it and

24   noted it on his record.

25       **PRESIDING COMMISSIONER BIGGERS:**  Yeah,

26   but (indiscernible) entirely different Panel we

27   have to go by the documentation --

39

1          INMATE PLAZA:  I understand.

2          PRESIDING COMMISSIONER BIGGERS:  So,

3   whenever you review whatever make sure that you

4   have those papers.

5          DEPUTY COMMISSIONER MEJIA:  Did you

6   complete your Vocational Plumbing?

7          INMATE PLAZA:  No, I was never in

8   plumbing.  I don't know where plumbing came

9   from.

10         DEPUTY COMMISSIONER MEJIA:  Well I have

11   your diploma that -- Mr. Plaza has been unable

12   to complete any certification units in

13   vocational plumbing due to his being house in

14   Level IV.  Student left in the plumbing class

15   long enough to be fully evaluated.

16         PRESIDING COMMISSIONER BIGGERS:  What

17   prison was that in?

18         DEPUTY COMMISSIONER MEJIA:  ASP Avenal --

19   Avenal State Prison.

20         INMATE PLAZA:  I was in Wasco for, I

21   think, three months and two weeks.  But I was

22   never in plumbing that I can remember.  Soon as

23   I got there they came out with the new law of

24   the Close Custody -- not being, you know, not

25   being able to be in that facility they

26   transferred me over here.

27         DEPUTY COMMISSIONER MEJIA:  Well, we'll

40

1   just leave it that you're claiming that you have

2   completed Air Conditioning and Refrigeration; is

3   that correct?

4         INMATE PLAZA:  Dry Cleaning, Air

5   Conditioning and Refrigeration.

6         DEPUTY COMMISSIONER MEJIA:  Dry Cleaning

7   you have completed?

8         INMATE PLAZA:  Yes.

9         DEPUTY COMMISSIONER MEJIA:  What year was

10   the dry cleaning, again?

11         INMATE PLAZA:  I believe it was '94 --

12         ATTORNEY RUTLEDGE:  The Dry cleaning was

13   -- I have completed 4/10/95, the Dry Cleaning

14   and then the Air Conditioning, 10/1/99.  What

15   was the other one?

16         DEPUTY COMMISSIONER MEJIA:  Most recent

17   (indiscernible) Home Inspection.

18         INMATE PLAZA:  I got that.

19         DEPUTY COMMISSIONER MEJIA:  Okay.  So,

20   you're saying that you completed Air

21   Conditioning and Vocational Dry Cleaning?

22         INMATE PLAZA:  Yes.

23         DEPUTY COMMISSIONER MEJIA:  And Air

24   Conditioning Refrigeration?  Anything else?

25         INMATE PLAZA:  The Home Inspection, and

26   the --

27         DEPUTY COMMISSIONER MEJIA:  I'll go

41

1  through that.  But the actual vocational trade

2  (indiscernible) because I know you took Data

3  Processing, you did --

4         INMATE PLAZA:  No, no --

5         DEPUTY COMMISSIONER MEJIA:  -- assembly

6  --

7         INMATE PLAZA:  Yeah, I was not in the

8  class --

9         DEPUTY COMMISSIONER MEJIA:  Well, these

10  are the two major ones that you're saying that

11  you completed.  Dry Cleaning, and Air

12  Conditioning and Refrigeration.

13         INMATE PLAZA:  Yes.

14         DEPUTY COMMISSIONER MEJIA:  And then you

15  did have -- completed the International

16  (indiscernible) institute course, 8/23/1994.

17         INMATE PLAZA:  That's Dry Cleaning.

18         DEPUTY COMMISSIONER MEJIA:  That's

19  connected to Dry Cleaning?

20         INMATE PLAZA:  Yes.

21         DEPUTY COMMISSIONER MEJIA:  Then you have

22  -- you been in AA since 1994?

23         INMATE PLAZA:  Ninety-three, '93, yeah

24  somewhere around there.  I don't remember the

25  exact date.

26         DEPUTY COMMISSIONER MEJIA:  But the

27  chrono I saw was for '94.

42

1      **INMATE PLAZA:**  Ninety-four.

2      **DEPUTY COMMISSIONER MEJIA:**  Okay, that's

3  fine.  And you're still going --

4      **INMATE PLAZA:**  Yes.

5      **DEPUTY COMMISSIONER MEJIA:**  -- according

6  to these last chronos, 4/1/2006.  Going to the

7  (indiscernible) Labauche Literacy Program, peer

8  education program, Christian Fellowship, courses

9  in Anger Management 2005, CLN courses, you've

10  been (indiscernible) also Christian basic

11  classes, you been involved in Teddy Bear

12  (indiscernible) Teddy Bear Drive, Softball -- I

13  see all this stuff in there.  But I'm concerned

14  about the major ones; AA, NA, Anger Management,

15  (indiscernible) Impact is good.  Impact

16  programming -- you did some peer education

17  program (indiscernible) sexually transmitted

18  diseases, Hepatitis.  You did some Bible --

19  seven-week Bible Study series Christian Living.

20  Let's see.  Anything else you want to add?

21      **ATTORNEY RUTLEDGE:**  Can I ask you,

22  Commissioner, would you -- do you have the

23  completion of AA since '94 or we don't?

24      **DEPUTY COMMISSIONER MEJIA:**  I have the

25  chronos since 1994.  What's the first one --

26      **ATTORNEY RUTLEDGE:**  Okay, I just wanted

27  to make sure we didn't need to verify --

43

1        **DEPUTY COMMISSIONER MEJIA:**  Oh, no, it's

2    good --

3        **ATTORNEY RUTLEDGE:**  Thank you.

4        **DEPUTY COMMISSIONER MEJIA:**  -- 1994,

5    group therapy in 1994 is the first documentation

6    of him going to AA.  He did make (indiscernible)

7    time positively.  He did some softball.  You

8    been going to softball, playing games and you're

9    part of the team and like I said -- anything

10   else?  Those are the major ones that I have.

11   I've (indiscernible) that you have completed.

12   No 115s and no 128(a)s.  According to the 812

13   you do have affiliation or membership in

14   Southside King Cobra.  I have no other -- other

15   than the 812 that the counselor completes every

16   year when you go to classification I have no

17   other information about him being involved in

18   any gang (indiscernible) in prison.  And, now

19   we're going to go through your psych reports.

20   Of course, there's two.  Since this is your

21   initial, we're gonna do -- I'm gonna read both

22   the -- this was done -- the first one was done

23   in July 21st, 1994, in Lancaster, by Dr. Isaac

24   (indiscernible), and the diagnosis -- Diagnostic

25   Impression at that time is Axis I, Poly

26   Substance Abuse; Axis II, Combat Disorder, group

27   kind; Axis III, to be evaluated by physicians;

44

1   Axis IV, Psycho Social Stressors, from mile to

2   moderate incarceration; Axis V, Global

3   Assessment of Functioning of 70, sentence and

4   incarceration; and according to the doctor that

5   their recommendation is --  he said at that

6   present time,

7           "In 1994 it was difficult to

8           assess the psychopathology that's

9           related to the crime.  The inmate

10          does not reveal many details due

11          to the appeal process.  However it

12          seems that he was involved in

13          behavior (indiscernible) by lack

14          of regard for others, drugs and

15          alcohol abuse.  The inmate has

16          improved while incarcerated.  He

17          made a statement 'I grew up.  I'm

18          mature.'  Quote unquote.  It's

19          also an observation of his

20          examiner.  The inmate was able to

21          express himself in a manner that

22          indicated (indiscernible)

23          increased maturity.  Living in a

24          controlled setting it is too early

25          to make any assessment.  However

26          his record indicates that he is

27          able to follow rules and

45

1          regulations and is also doing

2          above average programming.

3          (Indiscernible) recommended that

4          --"

5          [Thereupon the tape was turned over.]

6          **DEPUTY COMMISSIONER MEJIA:**   --

7    psychological report on Mr. Plaza.   "It is

8    recommended for him to continue his work

9    involving trade and other meaningful

10   activities."   Then we have the most current,

11   which is -- which is dated April 15th, 2006, by

12   Dr. Macomber, M-A-C-O-M-B-E-R, and the

13   Diagnostic Impression is Axis I, Drug and

14   Alcohol Abuse by history; Axis II, no

15   personality disorder; Axis III, no physical

16   disorder; Axis IV, Life Term Incarceration, GAF

17   of 95.   This --

18          "He does speak in excellent

19          English as well as Spanish.

20          Affect was appropriate.   There was

21          no evidence of anxiety or

22          depression.   Eye contact was good.

23          His memory was intact

24          (indiscernible) was intact.   His

25          insight and self-awareness were

26          good.   Assessment of

27          Dangerousness.   In the potential

46

1          -- the prisoner's potential for

2          dangerous behavior in the

3          institution.  Mr. Plaza has

4          remained entirely

5          disciplinary-free.  This is

6          commendable."

7     And the Causative Factors,

8          "He said that he has disassociated

9          himself from the activity of

10          Hispanic (indiscernible).  No

11          evidence that he had ever been

12          involved in riots, possession of

13          weapons, assaults and other --

14          threats of any kind.  At this time

15          in this prison we have been --

16          there has been frequent riots, and

17          it is very difficult for a

18          Hispanic male to disassociate

19          himself from this activity which

20          can spontaneously occur in front

21          of him and if he doesn't get

22          involved he will receive

23          retaliation.  In this case

24          remaining disciplinary-free is a

25          very difficult and commendable

26          achievement.  But because of his

27          being disciplinary-free

47

```
 1          (indiscernible) finds him

 2          definitely below average in

 3          comparison to other inmates.

 4          (Indiscernible) considering his

 5          dangerous behavior in the

 6          community -- potential for

 7          dangerous behavior in the

 8          community, Mr. Plaza has no prior

 9          arrest for violence before the

10          commitment offense.  He did

11          receive an arrest as an adult

12          making a (indiscernible) spraying

13          a one-inch diameter dot on the

14          wall.  He remains

15          disciplinary-free in the

16          instituting.  In order to examine

17          this prisoner's level on parole,

18          the level of (indiscernible) was

19          administered and it's indicated

20          the 12 measures that assess

21          criminal history, substance abuse

22          history, current adjustment, and

23          other factors to determine risk

24          level -- this measure he obtained

25          a score of 3.6 (indiscernible)

26          frequencies for prison for prison

27          inmates.  This means that if 100
```

48

1          men were released on parole, he

2          would be (indiscernible) better on

3          parole that 96 of them.  This is a

4          very low risk level; as a result

5          he poses no more threat to society

6          than the average citizen in the

7          community, and probably less

8          threat to society at this point in

9          his life.  At the time of his

10         offense, drugs and alcohol were a

11         problem.  However, at this point

12         in his life it is no longer an

13         issue therefore there are no

14         significant risk factors for this

15         case."

16   Any addition to my presentation, counsel, that I

17   missed -- you want to --

18         **ATTORNEY RUTLEDGE:**  Did you mention how

19   he's helped other -- he's been like a mediator

20   for other gangs?

21         **PRESIDING COMMISSIONER BIGGERS:**  Yeah, he

22   mentioned that.

23         **ATTORNEY RUTLEDGE:**  Okay (indiscernible).

24   That covers everything that we had including

25   what we submitted.

26         **PRESIDING COMMISSIONER BIGGERS:**  Okay,

27   we're going to parole plans.  Residence plans;

49

1    you're living with your brother Hector Plaza.

2    Hector's residence is 353 Carla Drive, Simi

3    Valley, California, 93063, and it's got a phone

4    number here.  Employment; Plaza plans on working

5    Italia International, 4175 Dragon Street, Simi

6    Valley California.  I saw the letter of -- that

7    documents that.  Also your brother's letter.

8    Assessment in re of Plaza's parole plans.  "This

9    counselor does not foresee any problems.

10   However, it's recommended that Plaza updates his

11   parole letters prior to this hearing."  I have

12   -- this letter's here (indiscernible) Dale Air

13   International from Nick Gillichbauer,

14   G-I-L-L-I-C-H-B- as in Boy A-U-E-R.  It's

15   indicated that he's the General Manager of the

16   organization and he's willing to give him

17   employment in the company and he will make $9.00

18   per hour as an assembler, working in assembly

19   with the basic hours of 7 o'clock to 3:30 p.m.

20   He will have (indiscernible) basic benefits of

21   medical and dental.  And there -- some of your

22   support letters now.  Jessica Plaza, dated

23   February 20, 2006, a support letter indicating

24   that -- lots of support from all the family and

25   we need to (indiscernible) his mind and heart

26   set to accomplish all the right things and not

27   wrong things, for taking time to read this

50

1    letter of support.  She (indiscernible) says

2    that she will -- Isabelle Plaza.  Your sister

3    also wrote a letter February 5, 2006.  It

4    doesn't say that you can -- yeah, it's

5    supporting your release, but -- so Jessie --

6    Jesus Plaza is some brother that you're going to

7    be staying with --

8         INMATE PLAZA:  No -- my dad is Jesus.

9         DEPUTY COMMISSIONER MEJIA:  Your dad --

10   your dad is Jesus Plaza?  There's another

11   letter, February 5, 2006.  It says that you're

12   ready to go back to society.  There is Hector

13   Plaza, November 12, 2005.  He should be granted

14   parole.  He said that you should be granted

15   parole and of course you have become a positive

16   role model for everyone.  He said that you will

17   always have a home here with his wife and

18   children, and I also plan on supporting him

19   financially with whatever it takes to help you

20   get on your feet.

21        INMATE PLAZA:  Correct.

22        DEPUTY COMMISSIONER MEJIA:

23   (Indiscernible) Ministry (indiscernible) these

24   are your aunts and uncles --

25        INMATE PLAZA:  Yes.

26        DEPUTY COMMISSIONER MEJIA:  Yolanda Plaza

27   and Arto (Phonetic) Plaza.  He's a Pastor in a

51

1   church?

2         INMATE PLAZA:  Yes, he is.

3         DEPUTY COMMISSIONER MEJIA:  They will

4   provide you counseling, and will be able to

5   provide you mentors and he's also owner of a

6   construction business and would be services --

7   if he needs employment -- if you need employment

8   he will be able to give you employment.

9         INMATE PLAZA:  He's also offering me to

10  stay in his home.  He gave me -- it's actually

11  in this other packet -- has his phone number,

12  cell number, anything you might need to ask him

13  any further questions.

14        DEPUTY COMMISSIONER MEJIA:  Helen Plaza

15  is your mother?

16        INMATE PLAZA:  Yes.

17        DEPUTY COMMISSIONER MEJIA:  And I have a

18  support letter here, asking that you should be

19  -- asking for your release.  She also said that

20  you'll have a house to come home -- when you

21  come home.  Rachel Plaza, I think is your

22  sister?

23        INMATE PLAZA:  Yes, correct.

24        DEPUTY COMMISSIONER MEJIA:

25  (Indiscernible) you have her total support,

26  either financially -- financial support.

27  Christina Plaza, this is your daughter.

52

1          INMATE PLAZA:  Yes.

2          DEPUTY COMMISSIONER MEJIA:  Asking that

3   -- how old is she?

4          INMATE PLAZA:  She is 19.

5          DEPUTY COMMISSIONER MEJIA:  Oh.  You have

6   -- she indicates that you have supported her by

7   teaching (indiscernible) classes.  Thinks you

8   should be -- she's going to college.  She's

9   looking for work to help (indiscernible) you,

10  any way possible.  And we have Guadalupe Plaza,

11  your wife?

12         INMATE PLAZA:  Yes.

13         DEPUTY COMMISSIONER MEJIA:  Another

14  support letter.  She says I will support him in

15  ever way that he needed for him to meet his

16  parole conditions.  Isaiah Plaza, your son?

17         INMATE PLAZA:  Yes.

18         DEPUTY COMMISSIONER MEJIA:  He -- how old

19  is he?

20         INMATE PLAZA:  He's ten.

21         DEPUTY COMMISSIONER MEJIA:  Ten.  And

22  there's another one, Ramona Plaza, your -- your

23  daughter, too?

24         INMATE PLAZA:  That's correct.

25         DEPUTY COMMISSIONER MEJIA:   Letter of

26  support.  Annette Gizmalla (phonetic).  That's

27  your sister?

53

1          **INMATE PLAZA:**  Yes.

2          **DEPUTY COMMISSIONER MEJIA:**  Another

3    letter of support.  She says she owns her own

4    and will provide a place for you to live, help

5    you financially and help you enter your programs

6    with counseling to help you deal with everyday

7    life's events for as long as it takes.  And

8    Alicia Desente Islanded (phonetic), who is this?

9    Oh, this is -- this looks like it's a different

10   one.  Who's Juan Jose (indiscernible)?

11         **INMATE PLAZA:**  Excuse me.

12         **ATTORNEY RUTLEDGE:**  One from Mexico?

13         **DEPUTY COMMISSIONER MEJIA:**  You have -- I

14   couldn't read this.  9805 Jessie Plaza, okay,

15   H12371 that's you.  And, for M. Espinoza -- this

16   is a friend?

17         **INMATE PLAZA:**  Yes, it is.

18         **DEPUTY COMMISSIONER MEJIA:**  Okay.  It's

19   another letter of support.  And, Chaplain

20   (indiscernible) Lindsey -- this is the Chaplain

21   here in the prison --

22         **INMATE PLAZA:**  Yes, it is.

23         **DEPUTY COMMISSIONER MEJIA:**  Okay.  Letter

24   of support and he said that you have been an

25   outstanding gentleman since his observation of

26   you since 1998.  He was appointed Music Deacon

27   in 2003.  You a musician?  You play music?

54

1          **INMATE PLAZA:**  No.  No.  I just direct

2    the choir.

3          **DEPUTY COMMISSIONER MEJIA:**  Oh.  He said

4    that you have -- he has seen phenomenal changes

5    in your life during these years and he's a

6    wonderful role model, conscious of people's

7    needs, feelings and (indiscernible).  He's truly

8    an asset to our religious program here at CTF.

9    And he highly recommends consideration of the

10   Board of Prison Terms and this gentleman has --

11   he feels that you will be an outstanding asset

12   in the community.  Nabia Anegias (phonetic),

13   cousin?

14         **INMATE PLAZA:**  Say the name again?

15         **ATTORNEY RUTLEDGE:**  Yeah, it's his

16   cousin, Nadia Anegus (phonetic).

17         **DEPUTY COMMISSIONER MEJIA:**  Nadia Anegus,

18   another support letter.

19         **ATTORNEY RUTLEDGE:**  Oh, well, you know

20   what -- it's from the Juan (indiscernible)

21   files.  Poor Juan Reevus, (indiscernible) find

22   these letters.

23         **DEPUTY COMMISSIONER MEJIA:**  Okay, Jessie

24   Plaza and that this is from an (indiscernible)

25   from Glenbrook, Philadelphia?

26         **INMATE PLAZA:**  Yes.  That's actually --

27   that's my sister --

55

1      DEPUTY COMMISSIONER MEJIA:  Your sister?

2      INMATE PLAZA:  Yes.  She married -- her

3  name changed to Guerum (phonetic) but --

4      DEPUTY COMMISSIONER MEJIA:  She said that

5  she will continue to support you after release

6  until you get back on your feet.  She also

7  offers her home.

8      INMATE PLAZA:  Yeah.

9      DEPUTY COMMISSIONER MEJIA:  Guadalupe

10  Plaza, that's your wife.  You said 2000 -- I

11  don't know what year was this one, but I read

12  (indiscernible) I know she's going to support

13  you.  January 7th, 2005, Jesus Plaza -- your

14  father.  Right?

15      INMATE PLAZA:  Yes, that's correct.

16      DEPUTY COMMISSIONER MEJIA:  Okay.  Ramona

17  Plaza --

18      INMATE PLAZA:  My daughter.

19      DEPUTY COMMISSIONER MEJIA:  Your

20  daughter.  Isaiah Plaza -- I read that.

21      PRESIDING COMMISSIONER BIGGERS:  Some of

22  them are duplicates, some are from 2005 and some

23  are 2006.

24      DEPUTY COMMISSIONER MEJIA:  Anything else

25  (indiscernible)?

26      ATTORNEY RUTLEDGE:  I think you've

27  covered every letter and more and even those

56

1    that didn't belong to us.  So, thank you.

2         **DEPUTY COMMISSIONER MEJIA:**  And let me

3    turn this back to the Commissioner.

4         **PRESIDING COMMISSIONER BIGGERS:**  Okay,

5    thank you.  I just have one question there.  I

6    see that you want to parole to your brother.

7    Why aren't you paroling back to your wife?

8         **INMATE PLAZA:**  Oh, yes, my wife moved in

9    with her sister two years ago.  Her mother'd

10   been fighting cancer.  Unfortunately her mother

11   passed away November of last year, and currently

12   she's still living with her sister.  But upon my

13   release, hopefully within the next, you know,

14   within three to six months, between the both of

15   us we'll have the money to put a first and last

16   down payment, you know, that you need for your

17   -- our own place so that we can live together.

18   But currently she's with her sister.

19        **PRESIDING COMMISSIONER BIGGERS:**  Did I

20   miss anything -- talking about the, what little

21   we could talk about the crime --

22        **ATTORNEY RUTLEDGE:**  You know, I meant to

23   point out to you -- it's up to your discretion.

24   He did provide a version in the Board Report.

25        **PRESIDING COMMISSIONER BIGGERS:**  Yeah, I

26   saw that.

27        **ATTORNEY RUTLEDGE:**  Other than that,

57

1  except for Closing Statement, we have nothing

2  else to --

3      PRESIDING COMMISSIONER BIGGERS:    To talk

4  about -- okay.  At this point then I'm gonna ask

5  the District Attorney if he has any questions

6  for the -- Mr. Plaza.

7      DEPUTY DISTRICT ATTORNEY MORRISON:    Okay.

8  Did I hear the inmate say that he accepted

9  responsibility for the crime an hour into the

10  law enforcement interview?

11      INMATE PLAZA:    Correct.

12      PRESIDING COMMISSIONER BIGGERS:    Please

13  direct your answers to (indiscernible).

14      DEPUTY DISTRICT ATTORNEY MORRISON:    Just

15  a moment, please.  So at the time of his trial,

16  the inmate accepted full responsibility for the

17  crime.

18      INMATE PLAZA:    Correct.

19      DEPUTY DISTRICT ATTORNEY MORRISON:    Thank

20  you.  I have no further questions.  Oh, wait a

21  minute.  Does the inmate know what the matrix

22  for this crime is?

23      INMATE PLAZA:    I believe it's 27, 28

24  years.

25      DEPUTY DISTRICT ATTORNEY MORRISON:    Thank

26  you.  Nothing further.

27      PRESIDING COMMISSIONER BIGGERS:    Okay,

58

1   thank you, sir.  Ms. Rutledge.

2        **ATTORNEY RUTLEDGE:**  Thank you.  In

3   looking through some of your information I came

4   across a letter that's -- I wanted to ask you

5   about this letter.  It's addressed to all family

6   members, loved ones, and friends of Patrick

7   Littlebull.  You made an attempt to submit an

8   apology letter to his family or to the District

9   Attorney?

10       **INMATE PLAZA:**  I mailed that to the

11  address indicated on the (indiscernible).

12       **ATTORNEY RUTLEDGE:**  All right.  And what

13  was -- I didn't see the -- what was the address?

14       **INMATE PLAZA:**  Is it not on the

15  letterhead of the --

16       **ATTORNEY RUTLEDGE:**  Oh, the

17  Correspondence Division in Sacramento.

18       **INMATE PLAZA:**  Yes.  Sacramento, yes.

19       **ATTORNEY RUTLEDGE:**  Okay, and that was

20  dated June 15th, 2004.  It -- I'll go ahead and

21  leave it if the Board wishes to review it, but I

22  think you wrote it on the prompting of Impact?

23       **INMATE PLAZA:**  Yes, correct.

24       **ATTORNEY RUTLEDGE:**  Anyway, I just wanted

25  to note that this letter -- he had written a

26  letter to the family, and what did you learn in

27  Impact?

59

1          **INMATE PLAZA:**  Do you want to be

2     specific, or do you want me to tell you

3     everything that I learned in Impact?

4          **ATTORNEY RUTLEDGE:**  Well, what changed

5     your life about Impact?

6          **INMATE PLAZA:**  I'd have to say the thing

7     that was a drastic blow to me more than anything

8     was there was an individual by the name of Angie

9     Torres, her son was killed in a drive-by here in

10    Salinas and I had the opportunity to sit down

11    with her and discuss with her some of the

12    specifics of my crime and in sharing with her --

13    she had not shared with me but I shared with

14    her, and upon finishing my, you know, my talk

15    with her I introduced her -- I am a facilitator

16    of Impact -- I introduced her and I went and sat

17    down with the audience in the pews and then she

18    had her opportunity to get up and give a

19    presentation, and when she gave the presentation

20    the similarities of what happened to her son was

21    just -- it was eerie because they were just so

22    close, and afterwards we had the opportunity to

23    talk and she told me, you know, that -- she

24    said, yeah you don't know what you did when you

25    were talking to me.  She says, you know, and you

26    didn't even know my story and the same for me.

27    I didn't know her story, but yet I shared with

60

1    her, and then upon learning her story it just --

2    it blew me away because I just realized what it

3    must have felt like to be on the other side.

4    Because in Impact that's one of the things that

5    we teach.  We teach victim awareness.  We teach,

6    you know, so many people are used to being on

7    the side of the crime -- on the side of, you

8    know, being the wrong one, and they never know

9    what it's like to be on the other side.  Most

10   guys come out of that program with a totally

11   different vision of crime.  A lot of them come

12   out and they say, wow, I never knew that I had

13   that impact on my victims.  So it -- it really

14   -- it had -- it gave me a greater view, you

15   know.  It wasn't just that focus on one person

16   or one individual.  It opened my understanding

17   of how many -- how great an effect it had.

18          **ATTORNEY RUTLEDGE:**  What about the people

19   in this room?  Do you think this offense affects

20   us?

21          **INMATE PLAZA:**  Oh, definitely,

22   definitely.  I believe it does because -- again,

23   speaking on the ripple effect, not only did it

24   effect him, his family, his friends or his loved

25   ones, but it effected society and I realize that

26   it all trickles down and what happens is taxes,

27   money, time spent, you know, it all, you know,

61

1   it's a ripple effect that never reaches the

2   banks of the water.

3        ATTORNEY RUTLEDGE:  All right.  And,

4   there's a statement in the Probation Report

5   that's pretty negative about you.  I mean,

6   you're in a car with gang-bangers and someone is

7   shot and killed and left to die on the street.

8   How do you go from that to the person that you

9   are today?  What happened?

10        INMATE PLAZA:  I would have to say even

11   though I chose that -- to hang around with them

12   type of people, you know, chose to be around

13   that lifestyle, in all honesty I never expected

14   to end up in prison and upon --

15        ATTORNEY RUTLEDGE:  (Indiscernible).

16        INMATE PLAZA:  -- honestly I didn't.  But

17   upon me actually making it to prison due to bad

18   choices, it was just a slap in the face, you

19   know.  It was just reality and when it hit me I

20   realized that, you know, everything that I had

21   been doing, you know, reality was what I got,

22   you know, being in prison and it wasn't

23   something that -- it just didn't sit right with

24   me, and I knew that this wasn't me, you know.  I

25   didn't -- I didn't want to -- I didn't want to

26   be in prison or be one of them persons that go

27   in and out of prison, so it was a -- it was a,

62

1    you know, it was a rude awakening.

2              **ATTORNEY RUTLEDGE:**  No further questions.

3              **PRESIDING COMMISSIONER BIGGERS:**  Okay.

4    Thank you.  At this point I'm going to ask Mr.

5    Morrison for his closing.

6              **DEPUTY DISTRICT ATTORNEY MORRISON:**  The

7    District Attorney opposes parole for this

8    outrageous heinous and premeditated, vicious

9    gang attack.  The inmate aided and abetted by

10   driving his vehicle over to the location of the

11   murder, parking it without its lights in what

12   the Appellate opinion described as almost lying

13   a wait attack.  And Mr. Littlejohn (sic) a rival

14   gang member was shot and killed.  He was not the

15   only victim.  The Bell Garden's Police Report

16   which had been submitted along with the

17   Sheriff's Homicide Report note that the

18   supplemental report Officer Winfrey,

19   W-I-N-F-R-E-Y, Bell Garden PD was staffed to the

20   home of witness Collins who found a hole in his

21   south kitchen window and an adjacent hole in the

22   wallboard next to the window.  The officer

23   observed a hole, approximately one inch in

24   diameter, in the lower portion of the south

25   kitchen window.  Glass fragments were present on

26   the interior window sill.  Another little hole

27   was present in the interior vertical portion of

63

1   the inside of the window frame, and the reason

2   this is significant is because the inmate with

3   his gang mentalities and his crime partner

4   sprayed bullets in a residential neighborhood.

5   One was recovered from victim Littlejohn which

6   was matched to the murder weapon which was found

7   secreted in the inmate's car.  The witnesses

8   which described in the reports, noted numerous

9   shots being fired and any one of those bullets

10  could have gone through the house like it did

11  Mr. Collins home and killed another innocent

12  person in their home, minding their own

13  business.  This is the kind of gang that's

14  plagued Los Angeles and all communities around

15  the state and country, senseless gang violence.

16  The motive was a retaliatory shooting because

17  the Bell Garden Locos had fired on King Cobra

18  earlier that night.  The inmate should be

19  commended; he's programmed well.  Not many

20  people come this long without a 115.  He is on

21  the way to turn his life around, as evidenced by

22  his programming.  However, the inmate still I

23  don't believe has come to grips with the crime

24  because he's still not candid with the Board.

25          ATTORNEY RUTLEDGE:  Objection.

26          PRESIDING COMMISSIONER BIGGERS:

27  (Indiscernible) statement.  Please continue.

64

1          **DEPUTY DISTRICT ATTORNEY MORRISON:**  The

2     inmate said he took responsibility into the

3     Sheriff's interview, and this was documented at

4     length in the Appellate Opinion as well as the

5     statements contained in the police report.  This

6     is in the Appellate Opinion, Page Four and Five,

7     which has not been read into the record yet.

8     "Deputy Sheriff Woods Danoff, D-A-N-O-F-F,

9     interviewed appellant on May 27th, 1990."

10          **ATTORNEY RUTLEDGE:**  We would object to

11    the reading of the police report, just because

12    it's submitted there's still not adequate

13    foundation for it to be read into the record.

14          **DEPUTY DISTRICT ATTORNEY MORRISON:**  This

15    is the Appellate Opinion summarizing the

16    evidence at trial.

17          **ATTORNEY RUTLEDGE:**  I'm sorry, I thought

18    you said a Sheriff's Report.

19          **PRESIDING COMMISSIONER BIGGERS:**  Go

20    (indiscernible).

21          **DEPUTY DISTRICT ATTORNEY MORRISON:**  Page

22    Four in the Appellate Opinion, Deputy Sheriff

23    Woods Danoff, who is one of the two LA SD

24    homicide investigators in the case who

25    interviewed the inmate.

26          "He interviewed appellant inmate

27          on May 27th, 1990.  Appellant at

65

1          first denied any knowledge of the

2          shooting, maintaining he had been

3          at a party at the time of the

4          shooting.  After being informed

5          that his car had been identified

6          as being used in the homicide and

7          that the gun had been recovered

8          from the car, appellant admitted

9          that he drove the car that was

10          used in the shooting -- "

11          **DEPUTY COMMISSIONER MEJIA:**  Excuse me --

12          **PRESIDING COMMISSIONER BIGGERS:**

13 Continue, Sir.

14          **DEPUTY DISTRICT ATTORNEY MORRISON:**  I'll

15 repeat the last sentence, since it was --

16          "After being informed that his car

17          had been identified as being used

18          in the homicide and that the gun

19          had been recovered from the car,

20          appellant admitted that he drove

21          the car that was used in the

22          shooting and (indiscernible)

23          supplied the weapon and the car.

24          Appellant claimed that the shooter

25          was named someone -- someone named

26          Oso, O-S-O, and that he neither

27          slowed the car down nor stopped

66

```
 1              the car and never turned off his
 2              headlights.  He claimed Oso later
 3              left the car and that he later
 4              picked up Silva and was giving him
 5              a ride to Silva's sister's house
 6              when they were stopped and
 7              arrested."
 8   Now, the inmate apparently is saying that's when
 9   he accepted responsibility.  I asked the inmate
10   specifically if he had accepted responsibility
11   in the testimony at his trial, and that is not
12   correct according to the Appellate report
13   summary of the inmate's testimony.  The inmate's
14   testimony, under oath, at trial was a denial.
15   The Appellate Report continues on the same page.
16              "Appellant testified he gave a
17              ride to a man named Oso who was
18              seeking to purchase cocaine.  Oso
19              told the appellant that he could
20              not use his own car because it was
21              hot.  While looking for the
22              cocaine to sell, the appellant saw
23              seven to ten men running at his
24              car.  The appellant accelerated
25              and hear Oso shout punks at the
26              men.  Oso then pulled out a
27              revolver and fired.  Appellant
```

67

1      drove away.  Appellant did not

2      know that Oso had a gun until he

3      fired it.  His car lights were not

4      turned off, and he slowed down

5      only for the purpose of finding

6      the cocaine dealer.  Oso tried to

7      hand appellant the revolver after

8      he fired it, but appellant pushed

9      it away and it fell into the part

10     of the car where the radio was

11     missing.  Appellant refused to

12     disclose the identity of Oso

13     saying he would be killed if he

14     did."

15  I submit that that is not accepting

16  responsibility for being the aider and abeter,

17  driving a fellow gang member over to the

18  location, parking with your lights out in what

19  the Appellate Court labeled almost lying in

20  wait, and allowing your crime partner to go up

21  and shoot a rival gang member motive being gang

22  retaliation, and as I had said spraying bullets

23  all around.  The defendant's testimony at trial

24  was a rejection of responsibility, a denial of a

25  commission of the file, and is absolutely not

26  what he told the Panel today that he accepted

27  responsibility in the trial.  He's basically

68

1   says, oh, I gave some dude a ride to go buy some
2   coke and then all of a sudden he pulls out a gun
3   and starts shooting somebody.  I had no idea.
4   That is not responsibility.  The inmate was
5   attempting to be exonerated of the crime.  The
6   Appellate Report Opinion goes into great length,
7   and I won't read it all, but on Page Six it
8   describes all the evidence testified by other
9   witnesses supporting of pre-meditated murder.
10              "The appellant's driving slowly
11              with his lights off, thus
12              eliminating attention to his
13              approaching car is strong evidence
14              of prior planning.  The approach
15              without lights is factually
16              similar to lying in wait and
17              illustrates a deliberate plan by
18              the occupants of the car to
19              approach to victim unnoticed so
20              that the killing could be
21              accomplished from a position of
22              surprise and advantage.  The
23              relationship between appellant and
24              the victim, each belonging to
25              rival gangs between which there
26              was bad blood provided evidence of
27              the appellant's motive for the

69

1        shooting. The manner of the

2        shooting, one person shooting and

3        another driving so as to

4        facilitate an easy and rapid

5        escape especially when coupled

6        with appellant's slow approach to

7        the scene with his lights off

8        reflects that the killing resulted

9        from a pre-conceived desire."

10  This is about as callous, cold-blooded and

11  calculated murder as you can have. The only

12  thing was the appellant apparently did not pull

13  the trigger. But he did everything short of

14  that. The psych report in 1994, said well he

15  didn't really want to go into the details of it

16  because it was still on appeal. Current psych

17  report just glosses over the apparent lack of

18  insight and says because of his good behavior he

19  is a low risk. I submit that until he

20  demonstrates more credibility with the Panel and

21  more insight into his actual role and

22  participation, he has not taken responsibility

23  for it and therefore his statements of remorse

24  and the psych report are not actually supportive

25  because they really didn't delve into it. The

26  fact that he hadn't been caught in other crimes,

27  had a minimal criminal record is commendable.

70

1    It's not really an escalating pattern of

2    violence. He did have summary probation, but

3    the inmate told the psychologist in 1994, which

4    was also kind of troubling, that he had the

5    mentality of a 15 year old. He indicated that

6    this tragic event, being convicted of murder,

7    was a quote "wake up call" --

8        ATTORNEY RUTLEDGE: Objection. It

9    doesn't say being convicted of murder.

10        PRESIDING COMMISSIONER BIGGERS: What

11    page are you on, sir?

12        DEPUTY DISTRICT ATTORNEY MORRISON: I

13    just -- it doesn't. I am commenting on his

14    psych report. He's -- the inmate indicated --

15        PRESIDING COMMISSIONER BIGGERS: Just a

16    second, sir. Okay. Let's keep this civil and

17    it's not written -- are you reading directly

18    from the psychologist's report?

19        DEPUTY DISTRICT ATTORNEY MORRISON: I

20    read it and then I made a parenthetical comment.

21        PRESIDING COMMISSIONER BIGGERS: Okay.

22    Then perhaps you should paraphrase it saying

23    your opinion. Continue.

24        DEPUTY COMMISSIONER MEJIA: What is

25    interesting is talking about that the immature

26    behavior at the time -- that's on Page One of

27    the report, and he stated I had the mentality of

71

1    a 15 year old.  The official version read

2    described a juvenile man.  The inmate was 25 at

3    the time of his crime.  This is not a youthful

4    offender, unsophisticated (indiscernible).  This

5    isn't a 15 or 16 year old gang banger.  This is

6    a 25 year old out on a mission of revenge.

7         **ATTORNEY RUTLEDGE:**  Objection.  Mission

8    of revenge?  Where's that from?  You're supposed

9    to -- excuse me.  I just want to note that the

10   DA's supposed to -- your comments are supposed

11   to be supported by documentation.

12        **PRESIDING COMMISSIONER BIGGERS:**

13   (Indiscernible).

14        **DEPUTY COMMISSIONER MEJIA:**  The Appellate

15   Decision -- talking about a retaliatory gang

16   opinion -- member for a --

17        **PRESIDING COMMISSIONER BIGGERS:**  Let's --

18   let's -- okay.  Let's -- whenever --

19        **DEPUTY DISTRICT ATTORNEY MORRISON:**  this

20   is within the range of proper comment.

21        **PRESIDING COMMISSIONER BIGGERS:**  Then Mr.

22   Morrison, if we're gonna speculate I think we

23   need to make sure that we say and we make

24   (indiscernible) in your opinion or -- I don't

25   think that we should speculate on something of

26   this nature.

27        **DEPUTY DISTRICT ATTORNEY MORRISON:**

72

1    Commissioner, excuse me, but I'm permitted to

2    make public comment.  I'm not asking you to

3    speculate.  The Appellate Decision describes --

4          **PRESIDING COMMISSIONER BIGGERS:**  I

5    understand --

6          **DEPUTY DISTRICT ATTORNEY MORRISON:**  --

7    any motivation --

8          **PRESIDING COMMISSIONER BIGGERS:**  I

9    understand that.

10          **ATTORNEY RUTLEDGE:**  From another --

11          **DEPUTY DISTRICT ATTORNEY MORRISON:**  There

12    was a rival shooting.  There was a rival

13    shooting --

14          **PRESIDING COMMISSIONER BIGGERS:**  I

15    understand that.

16          **DEPUTY DISTRICT ATTORNEY MORRISON:**  Now,

17    if the gang goes out to retaliate --

18          **PRESIDING COMMISSIONER BIGGERS:**  Then

19    that's the way you should phrase it -- that

20    based on --

21          **DEPUTY DISTRICT ATTORNEY MORRISON:**  That

22    is what gang members refer to as getting

23    revenge.

24          **PRESIDING COMMISSIONER BIGGERS:**  I

25    understand that, sir.

26          **DEPUTY DISTRICT ATTORNEY MORRISON:**  And

27    my comment is that he was out on a mission of

73

1  revenge that resulted in the death and a shot up

2  neighborhood.  And therefore, a particularly

3  egregious crime under Dannenberg, as the Chair

4  noted the case the inmate submitted, and he is

5  unsuitable for parole and we ask for a three

6  year denial.  Thank you.

7        **DEPUTY COMMISSIONER MEJIA:**  Let's --

8  before you do your -- let me just put on the

9  record that he does have the completion

10  paperwork, because it was very confusing -- you

11  had to really look at it.  He did have Air

12  Conditioning completion in October 1997.  It's

13  just confusing.  It doesn't say he completed it.

14  It says his assignment (indiscernible) and Mr.

15  Plaza has completed 15 certification units, 100%

16  of the class.  Maybe that how we --

17        **INMATE PLAZA:**  A hundred percent of what?

18        **DEPUTY COMMISSIONER MEJIA:**  Of the class.

19  I don't know what it means, sir, but it does say

20  that he has completed -- units completed.  This

21  is the Education Progress Report.  Normally they

22  put here completed completion, but it just say

23  completed some of the curriculum -- that's when

24  he was a Clerk.  And then when he became a

25  student he completed 15 certification units,

26  100% of the class.  So I would say that is

27  completion.

74

1        PRESIDING COMMISSIONER BIGGERS:  All

2   right thank you.

3        DEPUTY COMMISSIONER MEJIA:  And then

4   another one is October 28, 2000 -- October 28th

5   -- April 28th, 1995, he completed his Vocational

6   Dry Cleaning.  Another confusing chrono here.

7   We may have to look at it again.  A handwritten

8   (indiscernible) Teacher's Aide and   .

9   (indiscernible) he was a key person assisting in

10  (indiscernible) Dry Cleaning program, all areas

11  in training and development of other students.

12  He has learned all aspects of this Dry Cleaning

13  business.  And it's noted here, reason for the

14  termination, his job change -- Job change

15  completed.  So which means I would say

16  (indiscernible) in 1994, (indiscernible) 1995 he

17  has completed the Dry Cleaning business.

18        PRESIDING COMMISSIONER BIGGERS:  So

19  basically you're saying the chrono's in support

20  of completion; just don't have the --

21        DEPUTY COMMISSIONER MEJIA:  Yeah, the

22  actual completions.

23        PRESIDING COMMISSIONER BIGGERS:  The

24  actual completions.  Ms. Rutledge, closing

25  please.

26        ATTORNEY RUTLEDGE:  Thank you for

27  verifying that for us, Commissioner.  While I'd

75

1    like to go off of the suitability factors, I

2    think that's most appropriate.  We're here today

3    because we -- well you know why we're here, the

4    legislature sets an open term for a crime such

5    as this and -- meaning that there is a belief

6    that persons committed for first-degree murder

7    may at some point become suitable members of

8    society, people who have paid their debt to

9    society, bettered themselves, and we can all

10   feel reasonably safe that they're out among us.

11   Had this commitment offense been of the -- had

12   it been truly lying in wait -- which is a

13   special circumstance of first-degree murder

14   punishable by death, we may not be sitting here

15   today.  The commitment offense itself, my client

16   has taken responsibility for it.  What was said,

17   his testimony to the Court, matches what he has

18   said in earlier reports.  And, under Dannenberg,

19   specifically Dannenberg, I think is supportive

20   of when you have to -- and I know you have to

21   weigh the commitment offense but weighing that

22   in, Dannenberg says if it doesn't take more than

23   it was necessary to complete the murder.  This

24   victim was shot and died within minutes.

25   There's no evidence of mutilation, there's no --

26   there were no other targeted victims.  We found

27   a bullet -- but we don't even know if anybody

76

1    was home.  There's no evidence that there were

2    other people that were actually at harm at the

3    time of the shooting.  In moving on to my

4    client's remorse for this offense.  He has --

5    he's expressed today his remorse for this crime,

6    but I think more importantly his determination

7    to turn himself around.  Had he been such a hard

8    core gang member, he'd never had made it this

9    far.  We know that.  We know how it is to enter

10   a prison on a Level IV and what it takes to

11   survive.  And it takes a lot of determination.

12   It takes somebody who truly does realize that,

13   you know, there's a better way to live.  And, I

14   think to his, you know -- the prison Chaplain

15   (indiscernible) he doesn't write letters for

16   very many inmates.  This is the first one I've

17   seen.  And he wrote something really important

18   because I think -- I think this really says it

19   all about my client as far as remorse would go,

20   I think that that I would speculate and submit

21   that that's -- he could be programming doing

22   everything he's supposed to do and not go to

23   church.  There's got to be some -- I would

24   submit or speculate that perhaps he's got some

25   insight and a conscience to where he feels the

26   need to associate with the church.  And, there

27   was a paragraph that wasn't read during the

77

1   letters that I just wanted to say and it was

2   written by Chaplain Lindsay.  And it says,

3           "People often ask me what kind of

4           results I see in my work here in

5           the prison.  I will hold up one

6           hand showing the number five, and

7           they will say those odds aren't

8           very good since there are more

9           than 7,000 plus inmates in your

10          facility.  To which I'll reply,

11          you're right, except I look at it

12          as mining for diamonds and when

13          you find one you have some -- when

14          you find one you have something of

15          value."

16  Well, inmate Plaza is one of those diamonds.

17  You know, I'm not going to sit her and

18  regurgitate all of his accomplishments and the

19  binder he provided to the Board -- we've gone

20  over them.  In every area of programming he's

21  met -- he's met self-help, he admits his

22  substance abuse, he's been treating that

23  substance abuse, he's done Impact, he's done

24  Anger Management, he's participating in sports,

25  he has an excellent job record.  He's actually

26  got a chrono from his supervisor in Culinary

27  who's recommending him for a job, I mean,

78

1    anticipating that an employer on the outside

2    where the public has access to the restaurant

3    that he's going to present that in a public

4    place and ask for employment.  He has, you know,

5    taken other health courses and has not had a 115

6    or anything in 15 years, which is extremely

7    commendable.  And again, that more expresses, I

8    think, his insight in to literally reversing his

9    life.  He said he was leading an irresponsible

10   life at that time; however he did work and

11   support his wife and children.  Did you have one

12   child at that time or --

13        **INMATE PLAZA:**  Two.

14        **ATTORNEY RUTLEDGE:**  He had two that he

15   supported.  So he did -- it was like he said, he

16   was kind of a -- he was a dysfunctional person

17   over all, but able to maintain a job and take

18   care of his family which indicates that there

19   are pro social qualities in this man.  He's not

20   just some thug out there, you know, blowing

21   people away.  He has a very stable social

22   history as far as being with his family, being

23   married.  He's still married to the same woman;

24   still has three children.  Appreciates the

25   impetus he put on her when he entered the

26   institution and forced her into being a single

27   parent.  He's got letters from his children that

79

1    he's attempting to father from prison, cousins,

2    other assortment of persons, and also he has at

3    least two job offers.  One from Mr. Rentaria

4    (phonetic) and then one from his previous

5    employer -- was it --

6        INMATE PLAZA:  Yes.

7        ATTORNEY RUTLEDGE:   -- where he worked.

8    He had a good job record there before he entered

9    the institution.  And aside from all the great

10   things he's done which I think all point to

11   suitability and the fact that he has expressed

12   his remorse and does, by his actions not just

13   his comments, have insight into how much trouble

14   he created with this offense and saw what he

15   needed to do to turn it around.  But I think we

16   do -- I think oftentimes in these types of cases

17   there's the white elephant in the room, which is

18   time.  This is his first hearing and it's almost

19   a given that nobody gets paroled their first

20   hearing.  I think the jargon is always he needs

21   to maintain his gains or you point to the

22   commitment offense, but I think that the

23   suitability --

24       DEPUTY COMMISSIONER MEJIA:   -- hold it.

25   [Thereupon the tape was changed to Tape Two.]

26       DEPUTY COMMISSIONER MEJIA:  Okay, go

27   ahead, continue.  Second side, second set of

80

1    tapes for Mr. Plaza.

2         **ATTORNEY RUTLEDGE:**   I do believe that

3    this man meets every single suitability factor.

4    He has completed his programming -- I mean, he

5    remains active in his programming and he's done

6    all those things necessary to show us that he's

7    serious about release and I think the only

8    question that would linger would be time,

9    because often we don't see people paroled by

10   their first hearing but I would say this man is

11   one of the few cases that we see where he's

12   suitable at his first hearing.  He's suitable.

13   He's prepared to enter the outside.  He's got a

14   plan and the information he submitted to the

15   Board wherein he's going to -- exactly what he's

16   going to do when he walks out the doors.  I

17   would just ask this Board -- I know it's a

18   difficult job for you and I know you've gotta

19   consider the person paying their debt to society

20   because that's part of our justice system, but I

21   would ask you to -- to give this man a different

22   look as somebody who is suitable, who has served

23   enough years according to what the Legislature

24   said and please grant him a parole date, or if

25   you find him suitable set a term for him today.

26   Thank you.

27         **PRESIDING COMMISSIONER BIGGERS:**   Thank

81

1  you, very much, Ms. Rutledge.  Now Mr. Plaza you

2  have the opportunity to tell this Panel why you

3  feel that you are suitable for parole.

4      INMATE PLAZA:  Sorry.  A little nervous.

5  I believe first of all if I could I'd like to --

6  I'd like to explain a couple of things.  One

7  thing that I have heard a lot of times being

8  incarcerated that I didn't know 16 years ago --

9  I had no knowledge of what personal disorders

10  were because I was so caught up in my drug and

11  alcohol habit.  I didn't look at -- I didn't

12  look at things as I should have, not normally

13  anyways.  I realize that being anti social at

14  the time, you know, had me do things that any

15  normal personal would not do.  It wasn't due --

16  I'm not making excuses.  I never say that, you

17  know, some people do -- but I don't say that the

18  drugs or the alcohol committed the crime.  I

19  understand that I was the one that made the

20  choice, and I take full responsibility for that.

21  But I do -- I also want to say that being anti

22  social, you know, my problems started at about

23  15 years old, basically.  Fifteen years old, I

24  hit high school started hanging out with the

25  wrong crowd.  Running with the guys, you know,

26  that I shouldn't have -- had no business hanging

27  around.  But because they all were in the same

82

1    predicament, whether they were raised by a

2    single parent or, you know, were also seeking

3    some kind of, you know, some kind of family.

4    Some kind of acceptance.  And, being that I was

5    in that same category looking for acceptance,

6    like I said earlier, I chose to hang around with

7    people that had a lot of similarities to me.

8    And because I chose to hang around with those

9    people I was around things that, you know, I

10   shouldn't have been around and drugs and alcohol

11   became my biggest problem.  And I understand

12   that, you know, again a personal disorder border

13   line, I crossed a lot of border lines but laws

14   specifically because by purchasing drugs and

15   alcohol I was naturally breaking laws, you know,

16   to purchase these products.  Again, you know,

17   narcissistic because I hung around with this

18   group I kind of got the feeling that I was, you

19   know, I should have respect or I should have

20   things coming just because of who I was or who I

21   hung around with.  But upon coming to prison I

22   can honestly say that the very first thing that

23   helped me out was being incarcerated, of course,

24   but going to AA.  When I first went to AA I

25   started realizing when I got to Step Four

26   especially because you have to take that moral

27   inventory, I started realizing and seeing

83

1   things. And the sponsor at that time he taught
2   us to look at things and to -- and to just, you
3   know, call them what they are. If you're lying,
4   then you're a liar. If you're stealing, then
5   you're a thief. If you're doing -- whatever the
6   circumstances might be. And so I did that, and
7   I started looking at things and, you know, to be
8   honest initially it was ugly and I -- some
9   things you know you kinda don't want to accept
10  because you want to think that, you know, you're
11  not like that or you're better than that. I
12  never wanted to accept to that, you know, that I
13  had these problems, you know, because I thought,
14  you know, hey I'm normal. There's nothing
15  different about me than the next guy. But upon
16  learning these things I started working on
17  making that change, changing my life. AA led me
18  to church. When I started going to church again
19  that was a big help because the church started
20  helping me again look at myself, and get an
21  understanding. And, once I started to get that
22  understanding I really began to make more
23  change. And, as time went on -- I mean, I
24  always got something out of the self-help
25  groups. Every group had at least something to
26  offer but as I went along I started learning, I
27  started getting the insight of my crime of

84

1    myself and I started realizing as well the

2    severity of my crime, you know, that it wasn't

3    just, you know, something that happened, you

4    know.  It was way deeper than that.  So, I

5    started looking into these things.  Upon looking

6    into these things and really getting that

7    understanding, Impact -- like I said earlier,

8    the Impact was a great help to me.  I started

9    learning different things from Impact as well.

10   Started getting a different perspective and

11   getting more of a panoramic vision on life, you

12   know, on everything that I'm involved in.  What

13   I do.  It was a Captain who -- Captain Gega

14   (phonetic), Unit Three Captain, she was the one

15   who kind of, you know, gave me that opportunity

16   as well to get into doing more than just the

17   average guy that was in there.  So, I started,

18   you know, working with her.  Working with her

19   you see the problems in the paperwork.  I was

20   able when that riot broke out in the wing

21   between the Nationals and the Bull Dogs, which

22   is two different groups that are here -- even

23   though I'm not a part of any of the groups I

24   have a rapport because now people see me and

25   they know that I'm the opposite of them.  I'm

26   constantly talking to people, trying to

27   encourage them to be their own man, to make

85

1   their decisions, to not follow that peer

2   pressure and the crowd and do those things.   And

3   so they -- they tell me, you know, they see

4   integrity in me, and it's something that you

5   don't see in just everybody or anybody.   So

6   having that has helped me a lot.   I believe that

7   through them programs -- you also -- there was

8   another letter in the packet.   It was from

9   Victory Out Reach out of here in San Jose.   They

10  have a program also.   Not just here in San Jose.

11  They have it in every County.   It doesn't

12  matter.   I talked to Ed Morales who's the

13  Director there.   He says it doesn't matter what

14  County you go to, they have a program that's

15  called Cease Fire and because of the education

16  and the insight that I've gotten through the

17  program he's told me, wherever you go, I want to

18  use you because you can get to these people.

19  You can reach out and talk to these people so

20  that there's never -- again there doesn't' have

21  to be another Mr. Littlebull.   There doesn't

22  have to be somebody in my position, you know.

23  So that's what I look to do now, is to stop them

24  kind of things.   Deter people, you know, doing

25  them kind of things.   I know it's in the

26  Appellate version as well, even though no one

27  read it here today, but you know that upon my

86

1   reaching the County Jail, you know, I was

2   approached.  Because, see, I was not -- I was

3   not an active member but I hung around with the

4   crowd.  So I was approached in the County Jail

5   and, you know, was threatened.  That was the

6   County Jail.  Upon reaching prison -- and it

7   actually turned out to be one of the biggest

8   favors they could do for me.  I was approached

9   in prison, and they told me, you're on your own.

10  You don't run with us.  We don't claim you.  You

11  don't claim us.  Which was like I said, the

12  biggest favor they could have done for me at

13  that time.  Because that was -- that was what

14  got me started as well to make that change and

15  not continue to try to pursue that road that I

16  was on prior to that point.  So, being that I

17  was excommunicated -- it was good for me,

18  because then, even though they told me you're on

19  your own, and I know that in here not just

20  anybody can be out on their own.  You usually

21  have to find a crowd or find a race or, you

22  know, someone.  You usually gotta, you know,

23  hang out with somebody.  But I was able to do

24  it.  I was able to go on my own.  And I started

25  to take the attitude too that, you know what,

26  I'm not gonna pay attention what other people

27  say.  I don't care what, you know, what they say

1    or do because I want to be that person that I

2    know I can be.  And even my own mother told me

3    that one time on visit six, seven years ago.

4    She said, you know, you've turned into that man

5    that I always wanted you to grow up to be, you

6    know.  I understand that today I have an

7    opportunity to get out, come before you, and to

8    put all these things in practice.  As my

9    attorney said, not just talk the talk but walk

10   the walk.  And, I have things in place.  I have

11   things, you know, set up where I can go and be a

12   part of society and I can go and make a

13   difference and hopefully like I said before get

14   at, you know, not just youngsters, anybody.

15   Whether they're young or old, and be able to

16   share with them and explain to them, you know,

17   educate them.  You know, I'm all for

18   intervention.  Intervention is good.  But,

19   prevention is even better.  You know,

20   intervention the problem's already there.  But

21   prevention, the problems' not there yet or

22   hasn't got to that point where, you know, it's

23   too the extreme.  So, I hope that today, you

24   know, the Panel would surely take a look and

25   consider me because I believe with the things

26   that I have, with all the support system that I

27   have, with the plans and the goals that I have

88

1    -- and it's not something that I did all my

2    life, but I do have plans and goals.  And I

3    believe those plans and goals that I have now

4    are going to be the things that help me to

5    succeed, and I have no problem with any kind of

6    parole to the extreme conditions.  Testing, you

7    know.  Whatever I need to do.  I have no problem

8    whatsoever.  And so I -- I just ask if, you

9    know, you Panel members today would consider me

10   as being suitable and I thank you and I do want

11   also would like to say that this packet here was

12   not a personal attack on you.  It was not meant

13   to be, you know, in any way personal.  I do have

14   to say it's my first one and being unfamiliar I

15   did allow other people to kind of give me a

16   little helping hand, and if there was anything

17   that, you know, was not necessary or was an

18   overkill it was not done intentionally and once

19   my final statement because I want to make sure

20   that you know is that, again, I take full

21   responsibility for the taking of the life of Mr.

22   Littlebull and I thank you.

23          PRESIDING COMMISSIONER BIGGERS:  We will

24   recess at this point.

25                    R E C E S S

26                    --oOo--

27

89

1          **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3          **DEPUTY COMMISSIONER MEJIA:**  We're back on

4    record for our decision -- on tape.

5          **PRESIDING COMMISSIONER BIGGERS:**  Let the

6    record reflect that everyone that was in the

7    room prior to us recessing for deliberations are

8    now back in the room.  The Panel has reviewed

9    all information received from the public and

10   relied on the following circumstances in

11   concluding the prisoner is not suitable for

12   parole and would pose an unreasonable risk of

13   danger to society or a threat to public safety

14   if released from prison.  The offense was

15   carried out in an especially cruel and callous

16   manner in that this was a drive-by shooting

17   where a Mr. Patrick Littlebull, the victim, was

18   shot and killed as a retaliatory type crime

19   based on what was in the Appellate Decision.

20   This offense was carried out in a calculated

21   manner, and I'll read from the -- that the --

22   decision that Mr. Plaza was

23          "-- driving slowly with his lights

24          out thus eliminating attention to

25          his approaching car was strong

26          evidence of prior planning.  The

27   **JESUS PLAZA  H-12371 DECISION PAGE 1    05/01/06**

90

1       approach without lights is

2       factually similar to lying in

3       waiting and illustrates a

4       deliberate plan by the occupants

5       of the car to approach to victim

6       unnoticed so that the killing

7       could be accomplished from a

8       position of surprise and

9       advantage."

10  The motive for the crime was very trivial in

11  that it was a gang related shooting, and these

12  conclusions was drawn from the Statement of

13  Facts from the Appellate Decision.  You have no

14  -- your criminal record was of no significance

15  to us because you had very little if any.  You

16  have programmed extremely well.  You should be

17  commended for no disciplinary actions.  Your

18  psychiatric evaluation was favorable.  Your

19  parole plans were favorable.  Your 3042 response

20  from the District Attorney was opposed to your

21  -- a finding of parole suitability, and you have

22  numerous letters of support.  The Panel

23  struggled with this for quite some time,

24  basically because of a couple things that I will

25  go over with you right now.  First of all, the

26  signs of remorse for the victim.  You say you

27  **JESUS PLAZA   H-12371 DECISION PAGE 2      05/01/06**

91

1    take full responsibility for the crime, but when

2    Deputy Commissioner Mejia started talking to you

3    about the crime and what you took from the

4    victim, you went off and you started talking

5    about collateral effects of the families and all

6    the others but you never mentioned about the

7    victim. You need to -- and with that, that

8    gives us an indication that you really haven't

9    taken -- you're minimizing your involvement in

10   the crime by not knowing exactly what happened

11   to the victim. You need to get that out. We

12   -- as I said, we talked about it for quite some

13   time because we just feel that you're not --

14   it's -- you're just taking responsibility for

15   the crime is superficial, and we need to get

16   genuine remorse. So, the big thing is remorse

17   for the victim. We also feel that your gains

18   are recent, as illustrated by when we talked to

19   your earlier and the District Attorney even

20   brought this up and I went back and went over

21   the Appellate Decision as well as the sentencing

22   thing for -- you indicated initially that you

23   were not involved with the shooting. Then you

24   say you were when they told you about your

25   vehicle, and that's when you mentioned about the

26   gun. They found the gun within (indiscernible).

27   JESUS PLAZA  H-12371 DECISION PAGE 3    05/01/06

92

1   We note that you are doing extremely well

2   programming, but we just feel that you need to

3   have more time.  You should be commended for

4   your program that you have been involved with,

5   your Vocational Dry Cleaning, your Air

6   Conditioner Refrigerator, AA and NA, and the

7   Impact and Anger Management courses that you are

8   working with right now.  In a separate decision,

9   the hearing Panel thought it's not reasonable to

10  expect that parole will be granted in a hearing

11  in the following two years.  Again, the crime

12  itself was just especially cruel and callous in

13  that you (indiscernible) on an individual who

14  was vulnerable.  He didn't have a weapon; he's

15  walking down the street, and you and your

16  co-defendant shot him.  And, we realize that you

17  only drive the vehicle, but the mere fact that

18  you were there with your lights off is a strong

19  indication that you knew what was going to take

20  place.  The -- and the motive for the crime as

21  we talked about earlier, was very trivial in

22  that this was a gang retaliation.  All

23  indications point to this was a gang

24  retaliation.  Once you've become -- once you've

25  come to grips with what transpired, allow

26  yourself to not minimize the involvement of what

27  **JESUS PLAZA   H-12371 DECISION PAGE 4      05/01/06**

93

1    think you'll be okay, because you're definitely

2    on the road to getting a date.  But you've got

3    to take that remorse to the victim, you can't

4    generalize.  You said I take full

5    responsibility.  You got to take it from not the

6    family.  You've got to take responsibility for

7    Patrick.

8          INMATE PLAZA:  I understand.

9          PRESIDING COMMISSIONER BIGGERS:  Mr.

10   Mejia?

11         DEPUTY COMMISSIONER MEJIA:  No further

12   comments from me.

13         PRESIDING COMMISSIONER BIGGERS:  Okay.

14   Good luck to you.  That concludes the hearing.

15   The time is now ten minutes to --

16

17

18

19

20

21

22

23   PAROLE DENIED TWO YEARS              AUG 2 9 2006

24   THIS DECISION WILL BE FINAL ON:_____

25   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   JESUS PLAZA  H-12371 DECISION PAGE 5    05/01/06

94

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, RUBY M. DOUGHERTY, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total TWO in number and cover a total of pages numbered 1 - 93, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING for JESUS PLAZA, CDC NO. H-12371, on MAY 1, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated MAY 30, 2006, at Sacramento, California.

RUBY M. DOUGHERTY
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT  B

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR
ADDENDUM


PLAZA, JESUS                                                          H12371

This addendum is being submitted as a correction to some inaccuracies that were found in the
Board Report for Plaza's Initial Parole Consideration Hearing.


On Page 2 of the report under Aggravating Circumstances: it says use of weapon: Gun, 9mm.
That information was taken from the POR pg. 2. In the Court Transcripts for the Court of
Appeal of the State of California Second Appellate District Division Two Page 3, it states that a
.38 revolver was found in a hollow space underneath the dashboard of the suspects. A ballistic
test indicated that an expended bullet found at the scene on Loveland Street was fired from the
gun that was recovered.

Under the Preconviction Factors: C. Personal Factors: The Board Report states that Plaza was
born 2/7/65 to Caroline and Jessie Plaza. This should be corrected as follows: Plaza was born
3/7/65 to Caroline and Jesus Plaza. Plaza also said that his marriage took place on 5/12/84 and
not 5/7/84.

Postconviction Factors: Should read as follows; Plaza was received CDC on 10/9/91 at Wasco
RC and was transferred to CSP Folsom on 12/17/91 and was classified with Close A custody.
On 2/21/92, Plaza was transferred to Calipatria where his custody was reduced to Close B.
While at Calipatria, he worked in the culinary, pre-voc. and Computer Programming. Plaza was
again transferred to CSP-LAC on 2/3/94. He was classified there with Medium A custody.
While at LAC, Plaza worked in the drycleaning, voc electrical shop, and air cond. refrigerator
and heating. On 12/16/97 he was transferred to Avenal where he was in Computer
Programming. On 3/13/98 he was transferred to CTF Soledad North Facility where he was
assigned to the yard crew 4/7/98 to 4/28/98, and then to PIA Textiles. On 12/31/98 Plaza went to
CMC East as a medical transfer and returned to CTF on 3/1/99 where he has remained housed.
At his initial classification, Close B custody was established. Plaza's custody was reduced to
Medium A on 3/23/00 and has remained at Medium A. While at CTF Central Facility, Plaza has
been assigned to wing porter, culinary, dental assistant and again culinary, where he remains
assigned.

## Inmate Copy

Sent to Inmate on __11/29/05__

.PLAZA                    H12371                    CTF-SOLEDAD

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
2006 CALENDAR

2

_J. Verdesoto_     11-16-05

T. Verdesoto          Date
Correctional Counselor I


_D. Carnazzo_ CCII 11-16-05

D. Carnazzo          Date
Correctional Counselor II


_I. Guerra_ FC(A) 11-16-05

I. Guerra          Date
Facility Captain


_D. S. Levorse_ C&PR 11-18-05

D. S. Levorse          Date
Classification and Parole Representative


PLAZA          H12371          CTF-SOLEDAD

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR

PLAZA, JESUS                                                H12371

I.      COMMITMENT FACTORS:

A.      Life Crime: Murder 1st, (PC 187), Los Angeles County Case #VA004108.
        Sentenced: 25 years to Life. Weapon: Gun. MEPD: 1/25/07. Received in
        CDC: October 9, 1991. Victim: Patrick Littlebull, age: unknown.

   1.   Summary of Crime: The defendant, Jesus Plaza, and another subject
        were seen driving a vehicle near the victim, Patrick Littlebull. A witness
        heard a series of shots and saw the victim Patrick collapse onto the floor.
        Officers arrived at the scene of a residential street in Bell Gardens and
        found Patrick lying on the floor in a puddle of blood. Paramedics arrived
        shortly after and pronounced him dead at the scene. Victim's autopsy
        indicated that his death resulted from a single gunshot wound to the right
        lateral side of his chest.

        Several witnesses gave officers information about the suspects vehicle,
        and approximately 1 hour later, police saw the vehicle and detained the
        defendant along with a second suspect. Officers observed a .9mm casing
        on the floor board of the vehicle in front of the passenger. Both Plaza and
        his companion were arrested and later evaluated for evidence of gunshot
        residue. (Source: POR pg 2, 3 &4).

   2.   Prisoner's Version: First and foremost to each family member and friend
        of Mr. Littlebull. Knowing that there are no special, no specific, nor any
        amount of words that could right the wrong I did. Nor can any words
        equal or be greater than the crime in a good way, I wholeheartedly
        apologize yet due to multiple counseling programs and self help programs
        that I have seeked out throughout my incarceration. I've gained
        knowledge and an understanding of my crime and true remorse, and so I
        take full responsibility for my choices and actions in the commitment of
        this crime and also stipulate to the P.O.R. as being true and accurate.

   3.   Aggravating/Mitigating Circumstances:

        a.    Aggravating Factors:

INMATE COPY

SENT TO I/M ON ___ 9/22/05

LIFE PRISONER EVALUATI   REPORT
PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR

2

    ❖ Victim was particularly vulnerable.
    ❖ Prisoner had opportunity to cease but continued with crime.
    ❖ Murder was senseless and served no purpose in completing the crime.
    ❖ Use of weapon: Gun, .9mm.
    ❖ Nature of crime exhibited viciousness, cruelty or callousness.

      b.   **Mitigating Factors:**

         ❖ Prisoner has minimal or no history of criminal behavior.

**B.**   **Multiple Crime(s):** N/A.

    1.   **Summary of Crime:** NA.

    2.   **Prisoner's Version:** NA

## II.   PRECONVICTION FACTORS:

**A.**   **Juvenile Record:** None noted in Central File.

**B.**   **Adult Convictions and Arrests:**

    ❖ 07/16/83 PC 594 (a) Vandalism.
    ❖ 09/17/83 PC 187 Attempted Murder (no disposition).
    ❖ 04/02/84 PC 594 Malicious Mischief/Vandalism.

**C.**   **Personal Factors:** Plaza was born 2/7/65 to Caroline and Jessie Plaza. He has four sisters and a brother. Plaza graduated from high school 5/17/83 from Vail High in Montebello, CA, and then married Guadalupe Falcon on 5/7/84 and they have three children, Ramona, and Justina, and Izaiah.

## III.   POSTCONVICTION FACTORS:

**A.**   **Special Programming/Accommodations:** N/A.

**B.**   **Custody History:** Plaza was received CDC on 10/9/91 at Wasco RC and was transferred to CSP Folsom on 12/17/91 and was classified with Close A custody. On 2/21/92 Plaza was transferred to Calipatria where his custody was reduced to Close B. While at Calipatria, he worked in the culinary and pre-voc. Plaza was again transferred to CSP LAC on 2/3/94. He was classified there with Medium A custody. While at LAC, Plaza worked in the dry cleaning and voc electrical shop. On 12/16/97 he was transferred to Avenal, and on 3/13/98 he was transferred to

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR

3

CTF Soledad. While at CTF, Plaza was assigned to PIA Textiles. On 12/31/98 Plaza went to CMC-E as a medical transfer and returned to CTF on 3/1/99 where he has remained housed. At his initial classification, Close B custody was established. Plaza's custody was reduced to Medium A on 3/23/00 and has remained at Medium A. While at CTF, Plaza has been assigned as a porter, a dental assistant and has worked in the culinary.

C.    **Therapy and Self-Help Activities:**  Since Plaza's incarceration, he has participated in Alcoholics Anonymous, Inmate Education Advisory Committee, Bible Study, the Impact Program, Narcotics Anonymous, served as a Deacon, and was a member of the Protestant Choir. Refer to Post Conviction Progress Reports for more details.

D.    **Disciplinary History:**  Plaza has remained disciplinary free throughout his incarceration.

E.    **Other:** N/A.

## IV.    FUTURE PLANS:

A.    **Residence:**  Plaza plans on living with his brother, Hector Plaza. Hector's address is 353 Carla Dr. Simi Valley, California 93063. His phone number is (805) 581-6323

B.    **Employment:**  Plaza plans on working at Telair International 4175 Gardain Street, Simi Valley, CA 93063, phone #(805) 578-7303.

C.    **Assessment:**  In review of Plaza's parole plans, this counselor does not foresee any problems, however, it is recommended that Plaza updates his support letters prior to his hearing.

## V.    USINS STATUS: NA.

## VI.    SUMMARY:

A.    Prior to release the prisoner could benefit from:

1.    Continuing to be disciplinary free.
2.    Participation in self-help and therapy programs.
3.    Upgrading vocationally and educationally.

PLAZA, JESUS                    H12371                    CTF-SOLEDAD                    DEC/2005

LIFE PRISONER EVALUATI___REPORT
PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR

4

B.  This report is based upon an interview with the prisoner on 9/1/05 lasting approximately 1 hour(s) and a complete review of the Central File lasting 3 hours(s).

C.  Per the Olson Decision, Plaza was afforded an opportunity to examine his Central File on 9/1/05, Plaza did examined his Central File. (Refer to CDC 128-B dated 9/1/05 in the General Chrono Section of the Central File.)

D.  No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

PLAZA, JESUS                H12371                    CTF-SOLEDAD              DEC/2005

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR

5

_T. Verdesoto_                    _9-20-05_
T. Verdesoto                      Date
Correctional Counselor I


_J. Soares_                       _9/21/05_
J. Soares                         Date
Correctional Counselor II


_A. Guerra_                       _9/21/05_
A. Guerra                         Date
Facility Captain


_D. S. Levorse  C&PR_  _9-22-05_
D. S. Levorse                     Date
Classification and Parole Representative


PLAZA, JESUS          H12371          CTF-SOLEDAD          DEC/2005

# EXHIBIT C

**MENTAL HEALTH EVALUATION FOR
THE BOARD OF PRISON HEARINGS
May, 2006 Lifer Calendar**


**CORRECTIONAL TRAINING FACILITY SOLEDAD
APRIL, 2006**


| | |
|---|---|
| **NAME:** | **PLAZA, JESUS** |
| **CDC#:** | **H-12371** |
| **DOB:** | **3/7/65** |
| **OFFENSE:** | **PC 187 MURDER, FIRST DEGREE** |
| **DATE OF OFFENSE:** | **5/26/90** |
| **SENTENCE:** | **25 YEARS TO LIFE** |
| **EVALUATION DATE:** | **4/16/06** |
| **MEPD:** | **1/25/07** |


### I.   IDENTIFYING INFORMATION:

Mr. Jesus Plaza is a 41 year old, first term, Hispanic, married male from Los
Angeles County. He is an active Christian. He has served 16 years on his
sentence.

### SOURCES OF INFORMATION:

This report is based upon a single 90 minute interview, plus review of the central
and medical files.

### II.   DEVELOPMENTAL HISTORY:

When questioned about prenatal and perinatal issues, he stated that he was born at
General Hospital, and his birth was normal. He progressed through
developmental milestones in a normal manner. He is the second of four children.
There is no history of cruelty to animals, enuresis or arson. He was never abused
as a child, either sexually, physically or emotionally. He did have accidents as a
child. One time he fell off of a pipe, injuring his leg on a fish tank. At the age of
eleven he was involved in a car accident and injured his left knee which had
recently been fixed through surgery.

PLAZA, JESUS
H-12371
4/15/06
PAGE 2


### III.   EDUCATION:

He attended public school and graduated from Vail High School in Montebello.
He was never suspended or expelled. He has continued his education by
attending college classes. He is attending Coastline Junior College at this time by
correspondence, working towards his AA degree. He has 15 more credits until he
gets his AA degree.

### IV.   FAMILY HISTORY:

Mr. Plaza's biological parents separated when he was about four years of age. He
was raised primarily by his mother and maternal grandparents. His mother is
currently employed by St. Francis Hospital, and his father worked for years as a
mechanic and an auto body repairman. He is now 66 years of age and has retired.
He has one older sister that works for General Electric in Pennsylvania, a younger
sister who is mainly retarded who lives with his mother, and one younger brother
who is married and working as a sales manager of a container corporation. There
is no family history of mental illness, of drug abuse, of alcoholism, or of legal
problems.

### V.   PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Mr. Plaza is heterosexual. There is no history of high risk behavior or of
problems.

### VI.   MARITAL HISTORY:

He has been married one time. He was married on 5/12/84 to Guadalupe who
lives in Whittier. There are three children. Ramona, 21 years of age, is working
as a R.N. at St. Francis Hospital. Justina is 19 and is attending Cerritos College.
Isaiah is 10 years of age. His marriage is intact, and his wife is supportive. He
indicated that he has a very close relationship with his wife and children. They
keep in close contact by correspondence, phone calls and several visits a year.

### VII.   MILITARY HISTORY:

There is no military history.

PLAZA, JESUS
H-12371
4/15/06
PAGE 3


## VIII.  EMPLOYMENT/INCOME HISTORY:

Right after he graduated from high school at the age of 18, he went to work for
Century Plastics, where he worked for 4 ½ years. This company made fiberglass
products for airplanes. He was the lead man there. In 1987, he went next door to
work for Century Arrow doing the same kind of work. These two companies are
owned by the same people. One year before the commitment offense, he began
working for an asbestos abatement company as a laborer.

In the institution, he has obtained several trades. He has completed Vocational
Dry Cleaning, Vocational Air Conditioning, Refrigeration and Heating,
Vocational Meat Cutter, and he also has completed a correspondence course as a
home inspector. Currently he is working as a meat cutter in culinary.


## IX.  SUBSTANCE ABUSE HISTORY:

Mr. Plaza stated that he did have an alcohol and drug problem from the ages of 15
to 25. He would drink alcohol primarily on weekends, because he had to work
during the week. He smoked some marijuana. He also snorted cocaine about
three times a week at the age of 16. At the age of 20, he began using cocaine
every other day. He attends Alcoholics Anonymous and Narcotics Anonymous.
He attends as often as he can, and he has been going steadily to these programs
for the last 13 or 14 years.


## X.  PSYCHIATRIC AND MEDICAL HISTORY:

There is no psychiatric history. There is no history of serious hospitalizations,
other than his surgery on his left knee. There is no history of serious accidents or
of head injuries or seizures. His health is good.


## XI.  PLANS IF GRANTED RELEASE:

Mr. Plaza plans to return to his old employer in Simi Valley. He also will be able
to live with his brother in that area. He will be compliant with all parole rules and
regulations. He does have strong family support in the community. The
prognosis for successful community living in this case is excellent.

PLAZA, JESUS
H-12371
4/15/06
PAGE 4

## CLINICAL ASSESSMENT

### XII.   CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Plaza related in a serious, sober, and cooperative manner. Mental status was within normal limits. He was alert and well oriented. His thinking was rational, logical and coherent. His speech was normal, fluent and goal oriented. He does speak excellent English as well as Spanish. Affect was appropriate. There was no evidence of anxiety or depression. Eye contact was good. His memory was intact. His judgment was intact. His insight and self-awareness were good.

Mr. Plaza has spent a great deal of time in prison trying to improve himself. He currently is attending Coastline College, working on his Associate of Arts degree. His grades are very good. Also, he has obtained a certificate as a home inspector from a professional career development institute in Georgia by correspondence. In addition, he has completed several courses towards self-improvement. He has completed a Prison Fellowship Course in Parenting, Anger Management, another 12 week anger management class, Fathers Behind Bars Activity Group, Family Effectiveness Training and Harmony in the Home, Anger Management Course, Christian Basics Class, Teddy Bear Drive Benefiting Children in Crisis, a job success course, Communicable Diseases, Impact Program focusing on the victim's rights, Christian Living Course, Laubach Literacy Tutor Program, and the Salvation Army Bible Correspondence Course.

### CURRENT DIAGNOSTIC IMPRESSION

Axis I:      Drug and alcohol use by history
Axis II:     No personality disorder
Axis III:    No physical disorder
Axis IV:     Life term incarceration
Axis V:      Current GAF: 95

### XIII.   REVIEW OF LIFE CRIME

Mr. Plaza discussed the details of the commitment offense. He accepts full responsibility for this offense. He feels very badly that the victim died. He is fully aware that the victim's family has suffered greatly at the loss of their father and husband. The fact that gunshots were fired was a total surprise to Mr. Plaza. He had no idea that this was going to happen, and there certainly was no intent on his part. He is very aware of the repercussions of this offense. Even today his wife, children and mother are being watched and approached about this situation

PLAZA, JESUS
H-12371
4/15/06
PAGE 5

by gang members. He is very concerned about their welfare. All of these
situations are a result of the commitment offense. Needless to say Mr. Plaza feels
deep feelings of sorrow, remorse and grief over this situation.

At the time of the commitment offense, Mr. Plaza had been using cocaine and
alcohol. His judgment at that time was impaired by his use of these substances.
At the time of the commitment offense he was actually under the influence.
However, after 16 years there is no evidence of any involvement in drugs or in
alcohol. He has continuously attended Alcoholics Anonymous and Narcotics
Anonymous over the years. Since he has become Christian, he has strong values
against the use of drugs or alcohol at this time in his life. He is certainly familiar
with the destructive effects of this involvement. As a result, he has determined to
never become involved in drugs or alcohol again in his life. This information is
of historical importance only because it is not currently a diagnostic problem.

## XIV. ASSESSMENT OF DANGEROUSNESS

A. In considering potential for dangerous behavior in the institution, Mr.
Plaza has remained entirely disciplinary free. This is commendable. This
is very difficult to do. At this time at this prison, we are having frequent
racial riots. It is very difficult for a Hispanic male to disassociate himself
from this activity, which can spontaneously occur in front of him, and if
he doesn't get involved, he will receive retaliation. In this case, remaining
disciplinary free is a very difficult and commendable achievement. There
is no evidence that he has ever been involved in riots, possession of
weapons, assaults on others, or threats of any kind. As a result, it is
evident that his potential for dangerous behavior in comparison to other
inmates is definitely below average.

Mr. Plaza has a chrono from Captain Guerra, in which it was stated that he
had been hand picked to work as a communicator, working as a mediator
between the two groups in the institution that had been involved in a riot
against each other. Due to his ability to mediate between the groups and
to get them to agree to non violence towards each other, the riot that
occurred at that time was resolved peacefully, and the result was that the
institution was able to unlock everybody and proceed with the program.

B. In considering potential for dangerous behavior in the community, Mr.
Plaza has no prior arrests for violence before the commitment offense. He
did receive an arrest as an adult in 1983 for spraying a one inch diameter
dot on the wall. He has remained disciplinary free in the institution. In
order to determine his risk level on parole, the Level of Service Inventory-

PLAZA, JESUS
H-12371
4/15/06
PAGE 6

Revised was administered. This is an actuarial measure that assesses criminal history, substance abuse history, current adjustment, and other factors to determine current risk level. On this measure he obtained a score of 3.6 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better on parole than 96 of them. This is a very low risk level. As a result, he poses no more threat to society than the average citizen in the community, and probably less threat to society at this point in his life.

C. At the time of the offense, drugs and alcohol were a problem; however, at this point in his life this is no longer an issue. Therefore, there are no significant risk factors in this case.

## XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with routine parole planning. Mr. Plaza has obtained vocational training in several areas. He is currently working as a meat cutter in culinary. He has skills in vocational dry cleaning, as well as in vocational air conditioning, refrigeration and heating. He also has a job offer waiting for him upon his release. He has very strong family support in the community. All of these factors are good indicators of positive parole success. He has maintained his marriage, and his wife continues to be supportive and involved in his life. He maintains constant contact with his three children. Due to his study of the Bible and his commitment to the Christian way of life, he no longer has the irresponsible values and lifestyle that he did prior to the commitment offense. All of these factors indicate that his prognosis for successful adjustment in the community is excellent.

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. ZIKA, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

D:     4/15/06
T:     4/19/06

# EXHIBIT B

FILED
LOS ANGELES SUPERIOR COURT

SEP 18 2007

JOHN A. CLARKE, CLERK

BY____*Joseph M. Pulido*____
DEPUTY

1

2

3

4

5

6

7

8                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                         **FOR THE COUNTY OF LOS ANGELES**

10

11    In re                              )    Case No.: BH004502
                                         )
12    JESSE PLAZA,                       )    ORDER RE: PETITION FOR WRIT OF
                                         )    HABEAS CORPUS
13                    Petitioner,        )
                                         )
14    On Habeas Corpus                   )
                                         )
15                                       )
                                         )
16    ─────────────────────────────────)

17          The Court has read and considered the Petition for Writ of Habeas Corpus filed on

18    February 23, 2007 by the Petitioner.  Having independently reviewed the record, giving

19    deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters,

20    the Court concludes that the record contains "some evidence" to support the determination that

21    the Petitioner presents an unreasonable risk of danger to society and is, therefore, not suitable for

22    release on parole.  See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616,

23    667.

24          The Petitioner was received in the Department of Corrections on October 9, 1991 after a

25    conviction for murder in the first degree with a firearm.  He was sentenced to 25 years to life.

26    His minimum parole eligibility date was January 25, 2007.  The record reflects that on May 26,

27    1990, the Petitioner was driving with fellow gang members on a street known to be the territory

28    of a rival gang.  The Petitioner drove slowly, with the headlights turned off, as he approached a

dmi (KEE)                                    1

the victim, a rival gang member, who was standing in front of a house. As the Petitioner drove by, his accomplice fired several shots at the victim. The victim was shot and killed. The Petitioner then sped away. A witness saw who heard the gunshots and saw the Petitioner's car speed away called the police and the Petitioner and his accomplices were pulled over and arrested.

The Board found the Petitioner unsuitable for parole after his first parole consideration hearing held on August 29, 2006. The Petitioner was denied parole for two years. The Board concluded that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision primarily upon his commitment offense.

The Court finds that there is some evidence to support the Board's finding that the Petitioner's offense was carried out in a calculated and dispassionate manner. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(B). The Petitioner drove slowly with his headlights turned off, so as to avoid detection as he approached the victim. This demonstrates that the shooting was planned and that the Petitioner was deliberately driving toward the victim for that purpose. Additionally, the Petitioner's accomplice was armed with a gun for the purpose of shooting the victim. Regardless of whether the Petitioner himself shot the victim, he was acting in concert with his accomplice and, therefore, the shooting is imputed to him.

The Court also finds that there is some evidence to support the Board's finding that the Petitioner's motive was very trivial in relation to the offense. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(B). The Petitioner and his accomplice shot the victim merely because he was a rival gang member. There is no evidence that the victim had threatened or harmed the Petitioner in any way. Gang rivalry is a very trivial motive for killing a man.

Additionally, the Court finds that the Board did not err in denying the Petitioner parole for a period of two years. The Board must articulate reasons that justify a postponement, but those reasons need not be completely different from those justifying the denial of parole. See *In re Jackson* (1985) 39 Cal.3d 464, 479. The Board indicated that the Petitioner was denied parole for two years because his commitment offense was calculated and dispassionate and against a

1  particularly vulnerable victim; his motive was trivial; and he failed to show adequate remorse for

2  the victim. These reasons were sufficient to justify a two-year denial.

3          Accordingly, the petition is denied.

4

5

6  Dated:  9/6/05

7                                    STEVEN VAN SICKLEN
                                     Judge of the Superior Court
8  The clerk to give notice.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

dmi (KEE)                        3

1   Send copy of order to:
    Department of Justice -- State of California
2   Office of the Attorney General
    300 S. Spring St.
3   Los Angeles, CA 90099-9126

4   Petitioner

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

dmi  (KEE)                     4

| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES** | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA  90012 | FILED<br>LOS ANGELES SUPERIOR COURT<br>SEP 0 7 2007<br>JOHN A. CLARKE, CLERK<br>BY _____<br>DEPUTY<br>Joseph M. Pulido |
| PLAINTIFF/PETITIONER:<br><br>JESSE PLAZA | |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004502 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

- [ ] Order Extending Time
- [ ] Order to Show Cause
- [ ] Order for Informal Response
- [ ] Order for Supplemental Pleading

- [x] Order re: Writ of Habeas Corpus
- [ ] Order
- [ ] Order re:
- [ ] Copy of Petition for Writ of Habeas Corpus for the Attorney General

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to the cause.  I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

September 7, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____ , Clerk
        Joseph M. Pulido

Jesse Plaza
H-12371
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689

Department of Justice- State of California
Office of the Attorney General
300 South Spring Street
Los Angeles, California 90013

# EXHIBIT C
# Part 1 of 2

MC–275

Name    JESSE PLAZA

Address    CTF CENTRAL F-338U

P.O. BOX 689

SOLEDAD, CA 93960-0689

CDC or ID Number    H-12371

## COURT OF APPEALS

### SECOND APPELLATE DISTRICT
(Court)

PETITION FOR WRIT OF HABEAS CORPUS

JESSE PLAZA,
Petitioner

vs.

BEN CURRY, Warden,
Respondent
Correctional Training Facility

No. _____
(To be supplied by the Clerk of the Court)

### INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court [as amended effective January 1, 2007]. Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved for Optional Use
Judicial Council of California
MC-275 [Rev. January 1, 2007]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 8.380
www.courtinfo.ca.gov
American LegalNet, Inc.
www.FormsWorkflow.com

This petition concerns:

[ ] A conviction          [X] Parole

[ ] A sentence           [ ] Credits

[ ] Jail or prison conditions    [ ] Prison discipline

[X] Other (specify): Illegal finding of unsuitability by the Board of Parole Hearings.

1. Your name:  Jesse Plaza

2. Where are you incarcerated?  Correctional Training Facility, Soledad, CA 93960-0689

3. Why are you in custody?  [X] Criminal Conviction  [ ] Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

First Degree Murder

b. Penal or other code sections:  Penal Code §187

c. Name and location of sentencing or committing court:  Los Angeles Superior Court, Norwalk, CA

d. Case number:  VA004108

e. Date convicted or committed:  7-20-91

f. Date sentenced:  9-28-91

g. Length of sentence:  25 years to life

h. When do you expect to be released?  "unknown"

i. Were you represented by counsel in the trial court?  [X] Yes.  [ ] No.  If yes, state the attorney's name and address:

Stephen Garcia, Attorney at Law , address unknown

4. What was the LAST plea you entered? *(check one)*

[XX] Not guilty  [ ] Guilty  [ ] Nolo Contendere  [ ] Other:

5. If you pleaded not guilty, what kind of trial did you have?

[XX] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

THE NINTH CIRCUIT COURT OF APPEALS HAS FOUND THAT THE MANDATORY LANGUAGE OF P.C. 3041 (b) IMPOSES AN AFFIRMATIVE OBLIGATION BY THE CALIFORNIA BOARD OF PAROLE HEARINGS TO GRANT PAROLE , WHICH CREATES A LEGALLY COGNIZABLE LIBERTY INTEREST IN PAROLE AND A PRESUMPTION THAT PAROLE RELEASE WILL BE GRANTED. THERE IN NO EVIDENCE HAVING AN "INDICIA OF RELIABILITY" THAT PETITIONER IS A CURRENT OR UNREASONABLE RISK TO SOCIETY. THE HEARING AND DECISION BY THE CALIFORNIA PAROLE BOARD WAS ARBITRARY AND CAPRICIOUS IN VIOLATION OF PETITIONER'S STATE AND FEDERAL DUE PROCESS RIGHTS.

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly what to violate your rights at what time *(when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

Petitioner, JESSE PLAZA, petitions for a writ of habeas corpus and by this verified petition alleges as follows:

I

Petitioner is in custody of the California Department of Corrections at the Correctional Training Facility in Soledad, California serving a term of 25 years to life following his conviction in 1991 in Los Angeles County Superior Court Case No. VA004108 wherein petitioner was convicted of first degree murder in violation of Penal Code section 187. Petitioner was received by the Department of Corrections on October 9, 1991, when his life term commenced. This petition is intended to give meaning to Petitioner, JESSE PLAZA, (hereinafter "Petitioner"), sentence of 25 years to life for 'first degree murder'. On May 1, 2006, Petitioner went before the Board of Parole Hearings for his initial parole. (Petitioner's minimum

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

1    eligible parole date is 1-25-07) for a finding of suitability, and the

2    setting of his term uniformaly. Petitioner submits that the Board of

3    Parole Hearings (hereafter "Board") regulations, California Code of

4    regulations, Title 15, section 2402(a) DEMANDS that the Board set a

5    release date unless Petitioner currently presents an unreasonable risk

6    of danger to public safety. Petitioner submits that there is nothing

7    in the Board's decision indicating the basis for that belief, which

8    Petitioner discusses and proves infra.

9

10                                  II

11       On May 1, 2006, the Board conducted petitioner's Initial Parole

12   Consideration Hearing. The Board found petitioner unsuitable and denied

13   parole for a period of two years. (Exhibit "A" 89-93) In support of its

14   findings that petitioner currently posed an unreasonable risk to society,

15   the Board found that the "offense was carried out in an especially cruel

16   and callous manner", " carried out in a calculated manner", "The motive

17   for the crime was very trivial in that it was a gang related shooting",

18   and the unsupported conclusion that petitioner has refused to take

19   responsibility for his actions. Petitioner was, however, commended for

20   programming extremely well, commended for remaining disciplinary free,

21   obtaining a positive psychological evaluation, participating in AA and

22   NA, completing two vocations and securing positive parole plan. (Exhibit

23   "A", p. 89-93). Despite all the evidence supporting a granting of parole,

24   the Board found petitioner unsuitable for a grant of parole based on

25   the commitment offense, including and unsupported conclusion that

26   petitioner tries to minimize his responsibility.

27   //

28                                 - 2 -

III

Petitioner alleges that there was no evidence to support the Board's finding that he poses a current unreasonable risk if released. In fact, all current, reliable evidence presented to the Board shows that petitioner poses no risk if released, Petitioner further alleges that the Parole Board violated petitioner's statutory rights and his Fifth and Fourteenth Amendments (due process rights), when it refused to grant petitioner a parole date despite evidence supporting a finding that petitioner posed no unreasonable risk of harm. Furthermore, his continued confinement constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

IV

Petitioner also submits the Board spoke in meaningless generalities and never specified the exact nature of Petitioner's current character that would make Petitioner a danger to society. And by not doing so, the Board violated Penal Code §3041, which dictates that the Board shall normally set a parole release date at Petitioner's Initial Hearing. Petitioner, further submits that the issue raised in this Petition are of constitutional dimension, questioning the legality of Petitioner's confinement. An indeterminately sentence prisoner must be paroled when there is no evidence that Petitioner is a current or unreasonable risk to society. The California Supreme Court has recognized that parole applicants' posses a "protected liberty interest under the California Due Process Clause". (In re Rosenkrantz, (2002) 29 Cal.4th 616, 660; cf. McQuillion v. Duncan (9th Cir. 2002) 306 F.3d 895, 901. It is well established that Courts may review the Board's parole decisions under

1    a highly deferential standard of review, and must reverse those decisions

2    if there is not "some evidence" in the record to support them.

3    (<u>Rosenkrantz</u>, supra 29 Cal.4th at 667; <u>In re Smith</u> (2003) 109 Cal.App.4th

4    489. Petitioner submits there is no evidence that Petitioner is currently

5    a threat to public safety.

6

7    <u>PETITIONER NOW SUBMITS THE FOLLOWING POINTS AND AUTHORITIES IN SUPPORT</u>

8    <u>OF THIS PETITION FOR WRIT OF HABEAS CORPUS</u>

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28

# MEMORANDUM OF POINTS AND AUTHORITIES

**THE MURDER STATUTES TOGETHER WITH THE PAROLE STATUTES IMPOSE AN AFFIRMATIVE OBLIGATION UPON THE BOARD TO SET PAROLE DATES IN CASES LIKE THIS ONE. THE REGULATIONS IMPLEMENT THOSE STATUTES**

Under the Board's regulations, pursuant to Penal Code §3041(b), a prisoner may be found unsuitable for parole if the Board determines that the offense or a past offense and its timing is of such gravity that a longer period of incarceration is required in the interest of public safety. The determination is made based on the standards set forth by the Board's regulations. The principle guidelines in making the determination is Cal. Code. Regs. §2401 (c)-(1-6):

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured, or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrated an exceptionally callous disregard for human suffering.

//

- 5 -

(E) The motive of the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

Circumstances (1), (2), and (4) reasonably reflect the sole specified and authorized statutory exception to setting parole release dates, for the current or a past convicted offense(s). Factor (E) of Circumstances (1), however, pertaining to the motive of the crime as being inexplicable, although typically stated by the board as a factor for denying parole, is a rare circumstance, as there is almost always, as here, an explanation

as to why the offense occurred. Whether the motive was trivial is another matter. As one court noted:

> "The epistemological and ethical problems involved in the ascertainment and evaluation of motive are among the reasons the law has sought to avoid the subject. As one authority has stated, "[hardly any part of penal law is more settled than that motive is irrelevant." (Hall, General Principles of Criminal Law (2d ed. 1960) at p. 88; see also Husak, **Motive and Criminal Liability** (1989) **vol. 8, No. 1, Crim. Justice Ethics 3.**)"

**The court further explained:**

> "The offense committed by most prisoners serving life sentences is, of course, murder. Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not be deemed "trivial". The Legislature has foreclosed that approach, however, by declaring that murderers with life sentences must "normally" be given release dates as they approach their minimum eligible release dates. (Pen. code, §3041, subd. (a)." (**In re Scott**, 119 Cal.App.4th 871, 892-893.)

It is therefore questionable whether the factor has any evidentiary value in this case. If the motive was indeed inexplicable "A person whose motive for a criminal act can not be

explained or is unintelligible is therefore unusually
unpredictable and dangerous." (Id.) Such is not the case here.

The primary circumstance and factors considered to make the
determination, §2402(d)(1)(B) and (D), have been explained by the
courts. To qualify for the authorized exception, an offense must
be exceptionally egregious. The court of appeal characterized
this as follows:

> "In re Van Houten (2004) 116 Cal.App.4th 339 [10
> cal.Rptr.3d 406] illustrates the sort of gratutious
> cruelty required. The prisoner in that case was
> involved in multiple stabbings of a woman with a knife
> and bayonet, While she was dying, the victim was made
> aware her husband was suffering a similarly gruesome
> fate. As stated by the court, "[t]hese acts of cruelty
> far exceeded the minimum necessary to stab a victim to
> death." (Id. at p. 351) Other examples of aggravated
> conduct reflecting an "exceptionally callous disregard
> for human suffering," are set forth in Board
> regulations relating to the matrix used to set base
> terms for life prisoners (§2403, subd. (b)); namely,
> "torture," as where the "[v]ictim was subjected to the
> prolonged infliction of physical pain through the use
> of non-deadly force prior to act resulting in death, "
> and "severe trauma." as where "[d]eath resulted from
> severe trauma inflicted with deadly  intensity; e.g.,
> beating, clubbing; stabbing, strangulation,
> suffocation, burning, multiple wounds inflicted with a

weapon not resulting in immediate death or actions
calculated to induce terror in the victim." (Ibid.) (**In
re Scott**, supra, 119 Cal.App.4th 871, 892.)

In this case there is no evidence of gratuitous cruelty or
torture such as described in the foregoing. Moreover, even in
such cases, involving those exceptional factors, the Board's
regulations and suggested terms indicate parole suitability after
serving the indicated base terms.

Circumstances (3) of the unsuitability factors, "Unstable
Social History" appears to be related to the commission of
violent past offenses and gravity thereof. It is not a factor in
this case.

Circumstance (5), "Psychological Factors. The prisoner has a
lengthy history of severe mental problems related to the
offense." is not applicable in this case, and the Psychological
Report does not indicate any such assessment.

Circumstance (6), "Institutional Behavior. The prisoner has
engaged in serious misconduct in prison or jail." This should
reasonably relate to misconduct like that which may result in
rescission proceedings as is enumerated in Cal. Code Regs., tit.
15, §2451, or more properly, be punished by the provisions of
Cal. Code Regs., tit. 15, §2410, which provides for
"Postconviction Credit", and not used as a substitute for
statutory "suitability" provisions which specify only the gravity
of the current or a past offense to deny parole.

This "circumstance' is often relied upon by the Board to
deny parole to indeterminately sentenced prisoners repeatedly and

for years at a time. Yet, determinately sentenced prisoners might suffer only the loss of a few months of credit, once, for the same misconduct, which they can even get restored. As such, the Board's determinations that rely on such circumstances to deny parole, particularly beyond the indicated matrix base terms, is unauthorized by Penal Code 3041, is unfair, unreasonable and constitutes unequal punishment for the same conduct. A blatant violation of Petitioner's due process rights protected by the 5th & 14th Amendments of the United States Constitution.

RELIANCE ON THE COMMITMENT OFFENSE TO DENY PAROLE AT
ALL INITIAL HEARINGS AND ALMOST ALL SUBSEQUENT HEARINGS
IS INCONSISTENT WITH STATUTORY LANGUAGE AND CONTRARY TO
SUPREME COURT AUTHORITY


The Board's reliance on the commitment offense to deny
parole at all initial hearings and almost all subsequent hearings
fails to give effect to the statutory minimum terms despite Penal
Code §3041 language that parole shall normally be granted at the
initial hearing. The Board promulgated regulations pursuant to
Penal Code §3041(a) which include standardized gravity matrices,
but routinely denies parole for the same circumstances and
factors specifying appropriate terms. (See Cal. Code Regs., tit.
15, §2400 et seq., footnotes citing implementation authority.)

Although it is presumed that the Board performs its duties
lawfully, it is hardley debatable that the Board does not
"normally" set parole release dates, as a matter of policy. And
when it does, in about 2% of cases, the Governor reverses most of
those, like here. as a matter policy, where there is no
substantial evidence to support the decision. See, for example,
In re Capistran, (2003) 107 Cal.App.4th 1297, In re Mark Smith,
(2003) 109 Cal.App.4th 489; In re Ernest Smith, (2003) 114
Cal.App.4th 343, to name a few published cases. Because of the
minimal "evidence" required under the "some evidence" standard,
most of the denials and reversals of parole withstand court
challenges. release on parole presumed by statutory language
gives rise to a substantial right, but has been disregarded. the

great majority of indeterminately sentenced prisoners have been
repeatedly denied parole, but would have been released long ago
under reasonable administration of the statutes and regulations.

>"The Court has an obligation, however, to look
>beyond the facial validity of a statute that is
>subject to possible unconstitutional administration
>since a "law though 'fair on its face and impartial
>in appearance' may be open to serious abuses in
>administration and courts may be imposed upon if the
>substantial rights of the persons charged are not
>adequately safeguarded at every stage of the
>proceeedings." Minnesota v. Probate Court (1940) 309
>U.S. 270, 277.

Although the most recent interpretation of the statute at
issue now holds that proportionality or comparision of like
offenses is not required, i.e., In re Dannenberg (2005) 34
Cal.4th 1061, the Ninth Circuit has previously stated:

>"While the interpretation gloss on the statute may bind
>this court as a matter of statutory construction, we
>are not, however, similarly bound as to the
>constitutional effect of the construction." McSherry,
>880 F.2d at 1053" (Aponte v. Gomez, 993 F.2d 705 (9th
>Cir. 1993) (emphasis added)

This most recent interpretation of the statutes is

inconsistent with decisions and history leading up to the changes
in the parole statutes, which prior decisions recognized, as
previously discussed:

> "In contrast, by altering the statutory scheme and
> enacting the DSL, the Legislature recited specifically
> that it "finds and declares that the purpose of
> imprisonment for crime is punishment." (Pen. Code
> §1170, subd. (a)(1); all subsequent statutory
> references are to this code.) The new law provides that
> an inmate's "release date shall be set in manner that
> will provide uniform terms for offenses of similar
> gravity and magnitude in respect to their threat to the
> public, and that will comply with the sentencing rules
> that the judicial council may issue and any sentencing
> information relevant to the setting of parole release
> dates. **The board shall establish criteria for the
> setting of parole release dates** and so doing shall
> consider the number of victims of the crime for which
> the prisoner is sentenced and other factors in
> mitigation and aggravation of the crime." (§3041, subd.
> (a), italics added.) The present parole guidelines were
> promulgated pursuant to the new act. Thus, the
> guidelines are not mere administrative responses to the
> ~~Board's internal shifting discretion but rather reflect~~
> basic legislative alterations in the underlying parole
> scheme." (In re Stanworth (1982) 33 Cal.3d 176, 182.)
> (Underlining emphasis added.)

Clearly, the interpretation of the law shortly after it was changed was that the Board's discretion was limited by the legislative alterations and guidelines. The changes were clearly intended to place limits on the Board's discretion:

> "That, the Montana statute places significant limits on the Board's discretion is further demonstrated by its replacement of an earlier statute which allowed absolute discretion ..." <u>Board of Pardons v. Allen</u>, 482 U.S. 369.

Like with the Montana statute, in California the former Penal Code §3041 was completely changed, mandating the establishment of criteria for the <u>normal setting of parole dates.</u> Furthermore, Penal code §3041(b) clearly spells out why the board may require an extended period of incarceration. Because the Governor is bound by the same standards as the Board, the same would apply to the Governor. The current interpretive gloss on the parole and related statutes reverts plain statutory intent to the previous parole scheme by judicial omission of part of the whole, and violates principles of statutory construction, offending due process and ex post facto law.

THE "SOME EVIDENCE" STANDARD MUST "TEND LOGICALLY", AND BY "REASONABLE INFERENCE" TO ESTABLISH A FACT RELEVANT TO PETITIONER'S SUITABILITY FOR PAROLE.

Petitioner, denies the "some evidence" standard used by the Board satisfied the requirements under both state and federal due process. To satisfiy the "some evidence" standard of Judicial Review of the Board's ultimate decision, only a "modicum of evidence is required". **Rosenkrantz,** 29 Cal.4th at 677; **Hill, supra,** 427 U.S. at 456. However, the "some evidence" standard applies to evidentiary sufficiency and is not a substitute for other due process requirements, **Edward v. Balisok,** (1977) 520 U.S. 641, 648, such as the Board's own preponderance of material and relevant evidence. (See Cal.Code of Regualtions, tit 15, section 2000 (50)(63)(91). Thus, to determine whether the Board has fulfilled it's minimal due process procedural requirements, a reviewing Court looks not first at the decision, but the process in which it arrived at that decision. **Balisok, supra,** Ibid.

Here the Board continues to interpret the "some evidence" standard illegally. The Boards decision in this case failed to point to evidence demonstrating that Petitioner **currently** presents an unreasonable risk of danger to society - the ultimate question in determining Petitioner's suitability for parole (CCR, Tit. 15, §2403, subd. (a) For this reason, the evidence underlying the Board's decision does not tend logically and by reasonable inference, to establish a fact relevant to the inmate's suitability for parole. (Morrall, supra, 102 Cal.App.4th

at pp. 298-299). The discretion of the Board to determine parole suitability, although broad, is not absolute, and the Board's decisions must be supported by "some evidence" (In re Powell, (1988) 45 Cal.3d 894, 902-904; see also **Terbune v. Superior Court** (1998) 65 Cal.App.4th 864, 872-873; **In re Minnis** (1972) 7 Cal.3d 639, 646-647.

The United States Supreme Court has made it clear that the "some evidence" standard discussed in **Superintendent v. Hill** (1985) 472 U.S. 445, is only one aspect of judicial review for compliance with minimum standards of due process. The California Legislature has given the Board guidelines to follow in evaluating a parolee's eligibility for parole, mandating that the Board "shall normally" set a parole release date... "in a manner that will provide "uniform terms" for offenses of similar gravity and magnitude in respect to their threat to the public"... (Id., quoting Penal Code §3041, subd. (a).) The Board is required to "establish criteria for the setting of parole release dates." (Ibid.) However, the Board lacks discretion to promulgate regulations that are inconsistent with governing statutes, and the judicial branch has the final word on questions of legal interpretation." (Id., citing **Terbune v. Superior Court**, supra, 65 Cal.App.4th 864, 873)(emphasis added).

Petitioner asserts that the "some evidence" standard is being appplied arbitrarily by the reviewing Court's in the State of California. The Courts of California, both State and Federal, seem to have settled in for the "some evidence" standard of Judicial Review. (See, e.g., McQuillion v Duncan, 306 F.3d 895 (9th cir. 2002), and in **In re Rosenkrantz**, 29 Cal.4th 616 (2002).

without taking into consideration the "substantial evidence" standard which is required by reviewing courts **Consolidated Edison Co. vs NLRB**, 305 U.S. 197 (1939) (See Page 9)

The "some evidence" standard derives from the United States Supreme Court decision in **Superintendent v. Hill**, 472 U.S. 445; 105 S.Ct. 276 (1985), and is expressly a standard of "Judicial Review" for reviewing Court's, not the Board's Standard

The first California decision applying the "some evidence" standard of **Hill** was in the case of **In re Powell**, 45 Cal.3d 894 (1988). The **Powell** case was one where the Board of Prison Terms rescinded a parole grant based on a psychological report. In his petition, **Powell** argued for the "independent judgment" standard to the facts before the Board, or alternatively, the "substantial evidence" test. The People argued for the deferential "some evidence" test. **Powell** argued for the independent judgment test analogizing habeas corpus proceedings to administrative mandamus proceedings under California Code of Civil Procedure section 1094.5. That code section provides for review of administrative orders or decisions; in some cases it applies the independent judgment test while in other circumstances the substantial evidence test. If the former, and abuse of discretion is established when the Court, exercising its independent judgment determines the administrative findings are not supported by the weight of the evidence. If the latter, the Court must accept all evidence favorable to the Respondent as true and disregard any unfavorable evidence, if the evidence so viewed is sufficient as a matter of law, the order or decision must be affirmed. In rejecting **Powell's** argument, the court held that standard only

applies when an administrative decision affects a vested right. This is a pivotal point. The **Powell** Court determined that "a prison inmate has no vested right in his prospective liberty on a parole release date". (id. at 903). It cited to pre-1977 cases of **In re Fain**, 65 Cal.App.3d 376 (1976), and to **In re McLain**, 5 Cal.2d 78, 87 (1960), also cited by **Fain, supra**. However, two critical facts were not present at the time of the decision, (1) there was no liberty interest created by pre-1977 section 3041; and (2) the California Supreme Court had not defined post-1977 section 3041, as having vested a liberty interest in a parole release date, as it did later in the **Rosenkrantz** decision 29 cal.4th 616 (2002), following on the heels of **McQuillion v, Duncan**, 306 F.3d 895, 901-903 (9th cir. 2002), which interpreted Section 3041 as creating an "expectancy of release" that was a cognizable liberty interest protected by federal due process. Thus, the **Powell** Court was wrong about whether a vested right was involved, and its decision to apply the "some evidence" standard instead of the "independent judgment test" or "substantial evidence" was also wrong because it was based on an incorrect interpretation of law.

Yet, the California Supreme Court in the **Rosenkrantz** case, 29 Cal.4th 616, applied the "some evidence" standard of **Superintendent v. Hill**, 472 U.S. 445 (1985), in such language as to confuse the lower Courts as to its specific purpose. i.e., the standard of judicial review. It carried forward the "some evidence" standard originally applied in **In re Powell**, 45 Cal.3d 894 (1988). The Rosenkrantz Court did not make clear that the "some evidence" standard was not a standard applied by the board

itself as a standard of proof in its deliberations. It appears that the ommission by the **Rosenkrantz Court** of any articulation of what the Board's standard of evidence would be as a critical component to the deliberative process of weighing and balancing of evidence, has resulted in the Board not applying their own preponderance of relevant and material evidence standard (CCR, Title 15, Div. 2, Section 2000; (50) Good Cause (63) Material Evidence (91) Relevant Evidence), thereby rendering every decision to grant or deny parole completely standardless, and thus arbitrary and capricious.

Typically in California, the judicial standard of review of the ultimate decision of the Board of Parole Hearings denying parole to a prisoner has been the "some evidence" standard. **In re Dannenberg** (2005) 34 Cal.4th 1061; **In re Ramirez** (2001) 94 Cal.App.4th 549, 564; In re **Rosenkrantz**, [Rosenkrantz V] (2002) 29 Cal.4th 565, 616. Although both **Rosenkrantz** and **Dannenberg** thus affirmed the importance of judicial review of the board decisions, the decision's provide less than clear guidance as to the proper application of the "some evidence' standard articulated in both decisions. Of particular concern is the **Dannenberg Court's** brief discussion in dicta of the "commitment offense" factor, which can improperly be read as granting to the Board the ability to deny parole on the basis of almost any fact imaginable. As a result, there is a real risk the State will interpret the standard to assert, de facto, the power it has been expressly denied; effective immunity from meaningful judicial review of parole decision. It should be recognized, however, that

several courts are struggling to determine exactly how this standard applies. While other Court's (post **Dannenberg & Rosenkratz**) has held that the "some evidence" standard must apply to **current dangerousness.** While interpreting this standard the California Court of Appeals, Second Appellate District in the case of **In re WEN LEE,** (Oct. 17, 2006, B188831)(2006 DJDAR 13961) the Court held;

> ......We conclude, however, that the governor erred. The
> test is not whether some evidence supports the reasons
> the Govenor cites for denying parole, but whether some
> evidence indicates a parolee's release unreasonably
> endangers public safety. (Cal.Code Regs., tit. 15,
> §2402, subd. (a) [parole denied if prisoner "will pose
> an unreasonable risk of danger to society if released
> from prison]; see **In re Scott** (2005) 133 Cal.App.4th
> 573, 595 ["The commitment offense can negate
> suitability [for parole] only if circumstances of the
> crime ... rationally indicate that the offender will
> present an unreasonable public safety risk if released
> form prison"] but see **In re Lowe** (2005) 130 Cal.App.4th
> 1405 [suggested "some evidence" applies to the factors,
> not dangerousness]. Some evidence of the existence of a
> particular factor does not necessarily equate to some
> ~~evidence the parolee's release unreasonably endangers~~
> public safety.

In the case of **In re Elkins,** (Oct. 31, 2006, A111925) the

Court of Appeals, First Appellate District, held that;

> ..."The 'some evidence' standard is extremely deferential and reasonably cannot be compared to the standard of review involved in ... considering whether substantial evidence supports the findings" , nevertheless, it requires" ' "some indicia of reliability" ' " (**Scott II, supra**, 133 Cal.App.4th at p. 591, quoting **Biggs v. Terbune**, (9th Cir. 2003) 334 F.3d 910, 915) and "may be understood as meaning that suitability determinations must have some rational basis in fact" (**Scott II**, at p. 590, fn. 6).

One thing is for certain, even if a mere "some evidence" standard is to apply in this review, that standard is only a vehicle for the Court's review of the Board's decision, not a standard for the Board itself to apply. The findings to support that initial decision by the Board to deny parole, however, must be that the record indicates the Petitioner, poses a "current" danger to the public. That finding can not be based on such flimsy evidence as to render it mere whim or caprice. (See **In re Ramirez, supra**, at 564; See also **In re Powell**, (1988). To the contrary, as set forth herein, the Board's decision must be made under the <u>preponderance of evidence standard</u>. (Cal.Code of Reg., Title 15, Div. 2, section 2000 (50) Good Cause).

Petitioner denies the "some evidence" standard used By the Board satisfied the requirements under both state and federal due

process. Petitioner asserts reliance on the Commitment offense does not satisfy the "some evidence" standard. There is no question that under **Rosenkrantz** and **Dannenberg** the statutory "commitment offense" factor is relevant, and that it may at times be enough to deny parole on its own, neither **Rosenkrantz** nor **Dannenberg** stands for the principle that the commitment offense is always enough by itself. In fact, both cases affirmatively state that reliance on the commitment offense alone might, in some circumstances, rise to the level of a due process violation. That conclusion is consistent with the concern raised by the Ninth Circuit in **Biggs v. Terbune**, that the reliance on an ever-frozen, unchanging factor - such as the commitment offense - in denying parole may in certain instances violate due process. This point was also addressed in the case of **In re Ramirez**, 94 Cal.App.4th 549, at 571 (2001), when the Court noted that reliance on the crime after 17 years in prison was arbitrary. Petitioner has been incarcerated  17  years. While the proportionality aspects of the **Ramirez** decision were disapproved by the California Supreme court decision in **In re Danneneberg**, the entirety of **Ramirez** decision, including this aspect, was not disapproved. Therefore, the Board's reliance on the commitment offense violates due process. The predictive value of the crime after  17  years of incarceration is zero. Furthermore, in the case of **In re Scott**, 34 Cal.Rptr.3d 905 (Cal.App.1 Dist. 2005), ~~the Court clearly reaffirmed the rationale of the Ramirez Court~~ when it declared ..."Parole is the rule rather than the exception"... Thus, the California Board of Parole Hearings continuous use of the "some evidence" standard as their proper

standard of review is inappropriate, thus, illegal. Furthermore, reviewing Courts using the "some evidence" standard violates principles of appellate review. Substantial evidence is the standard required for a reviewing Court. **Consolidated Edison Co. of New York v. NLRB**, 305 U.S. 197 (1939). It is more than a mere scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. **Chrysler v. U.S. Environment Protection Agency**, C.A., 631 F.2d 865, 890. Under a proper analysis, the "substantial evidence" test, and not a "some evidence" review is the appropriate standard.

## ALL RELEVANT AND RELIABLE POST-CONVICTION EVIDENCE
## MUST BE GIVEN THE REQUIRED CONSIDERATION IN FAVOR
## OF PETITIONER IN LIGHT OF THE EVIDENCE PRESENTED

Petitioner submits that the Board bases its reasons for Petitioner's continued incarceration on historical facts that can never change, thus ignoring the uncontradicted evidence of Petitioner's rehabilitation. Petitioner has achieved the very goal that is hailed by our judicial and correctional systems, coming to prison, turning his life around and committing himself wholeheartedly to bettering himself and the world around him. Petitioner asserts there is no evidence that Petitioner is currently a threat to public safety. At Petitioner's hearing the Board denied Petitioner parole using static factors, despite overwhelming evidence showing Petitioner's rehabilitation. Petitioner asserts he has taken every available step to improve his life, pay his debt to society, and prepare himself for eventual release, as it is required under penal code §3041 for eligible prisoners serving indeterminate sentences. The Board's reliance on the Commitment Offense as satisfying the "some evidence" standard of review is without merit, after removing the facts erroneously relied upon, relied exclusively upon the Commitment Offense and failed to weigh and consider Petitioner's remorse,, positive psychological profile, lack of future dangerousness, and both realistic and positive parole plans including housing, education, and employment. The Board is required to consider all relevant information about a prisoner, not simply his commitment offense. His "risk of danger to society

is to be assessed in light of all relevant information available to the panel. (Cal. Code Regs., tit. 15, §2402(b)).

Under the view of the California parole process, it is clear that the nature of the commitment offense can constitute a basis for denial only to the extent it sheds light on whether a prisoner "now poses a risk of danger to society". Relying on the offense after years in custody and clear evidence of rehabilitation becomes arbitrary. At some point along the parole consideration process, that excuse to refuse to set a parole date enlight of exemplary conduct and behavior becomes arbitrary, and the term, although initially valid, becomes disproportionate and therefore unlawful. As time passes, and as the appropriate uniform term for the offense approaches, the offense itself sheds less and less light on how a prisoner will behave on the outside. His record in prison, his mental health, his conduct and achievements, all shed more light on his readiness to rejoin society. (see **Deluna**, supra 2005 WL 268045, 6) a defendant's postcommitment institutional behavior is relevant to his suitability for parole [citing §2402, subd. (d)(9)], and has both positive and realistic parole plans (see **In re Deluna**, supra, 2005 WL 268045, 5- Stable Relationships with others favor parole (15 CCR §2402 subd. (d)(9), All these factors favor his release. There is no evidence Petitioner now poses a risk of danger to society.

The Board's reasons finding petitioner unsuitable is unreasonable and an abuse of discretion enlight of the evidence presented to the Board by petitioner and the Department of Corrections and Rehabilitation Psychological Department and Counselor.

At the hearing, Correctional Counselor I, T. Verdasoto testified as to Petitioner's programming, and his future residence and employment when paroled:

**Therapy and Self-Help Activities:** Since Plaza's incarceration, he has participated in Alcoholics Anonymous, Inmate Education Advisory Committee, Bible Study, the Impact Program, Narcotics Anonymous, served as a Deacon, and was a member of the Protestant Choir.

**Postconviction Factors:** Plaza was received CDC on 10/9/91 at Wasco RC and was transfered to CSP Folsom on 12/17/91 and was classified with Close A custody. On 2/22/92, Plaza was transfered to Calipatria where his custody was reduced to Close B. While in Calipatria, he worked in the culinary, pre-voc. and Compute Programming. Plaza was again transfered to CSP-LAC on 2/3/94. He was classified there with Meddium A custody. While at LAC, Plaza worked in the drycleaning, voc electrical shop, and air cond. refrigerator and heating. On 12/16/97 he was transfered to Avenal where he was in Computer Programming. On 3/13/98 he was transferred to CTF Soledad North Facility where he was assigned to the yard crew 4/7/98 to 4/28/98, and then to PIA Textiles. On 12/31/98 Plaza went to CMC East as a medical transfer and returned to CTF on 3/1/99 where he has remained housed. At his initial classification,

Close B was established. Plaza's custody was reduced to
Medium A on 3/23/00 and has remained at Medium A. While
at CTF Central Facility, Plaza has been assigned to
wing porter, culinary, dental assistant and again
culinary, where he remains assigned.

**Disciplinay History:** Plaza has reemained disciplinary
free throughout his incarceration

**Residence:** Plaza plans on living with his brother,
Hector Plaza. Hector's address is 353 Carla Dr., Simi
Valley, California 93063. His phone number is (805)
581-6323

**Employment:** Plaza plans on working at Telair
International 4175 Gardain Street, Simi Valley, CA
93063, phone (805) 578-7303.

**Assessment:** In review of Plaza's parole plans, this
counselor does not foresee any problems, however, it is
recommended that Plaza updates his support letters
prior to his hearing. (see Exibit "B")

Dr. M. Macomber testified as to Petitioner's his current
mental stability and his lack of present and future dangerous:

**Psychiatric and Medical History:** There is no

psychiatric history. There is no history of serious
accidents or head injuries or seizures. His health is
good.

**Current Mental Status/Treatment Needs:** Mr. Plaza
related in a serious, sober. and cooperative manner.
Mental status was within normal limits. He was alert
and well oriented. His thinking was rational, logical
and coherent. His speech was normal, fluent amd goal
oriented. He does speak excellent English . as well as
Spanish. Affect was appropriate. There was no evidence
of anxiety or depression. Eye contact was good. His
memory was intact. His judgment was intact. His insight
and self-awareness were good.

Mr. Plaza has spent a great deal of time in prison
trying to improve himself. He currently is attending
Coastline College, working on his Associate of Arts
Degree. His grades are very good. Also, he has obtained
a certificate as a home inspector from professional
career institute in Georgia by correspondence. In
addition, he has completed several courses toward
self-improvement. He has completed a Prison Fellowship
Course in Parenting, Anger Management, another 12 week
anger management class, Fathers Behind Bars Activity
Group, Family Effectiveness Training and Harmony in the.
Home, Anger Manangement Course, Christian Basics Class,
Teddy Bear Drive Benefiting Children in Crisis, a job

success course, Communicable Diseases, Impact Program
focusing on the victim's rights, Christian Living
Course, Laubach Literacy Tutor Program, and the
Salvation Army Bible Correspondence Course.

**Current Diagnostic Impression:**  Axis I- Drug and
alcohol use by history; Axis II- No personality
disorder; Axis III- No physical disorder; Axis IV- Life
term incarceration; Axis V- Current GAF: 95.

**Assessment of Dangerousness:** (A) In considering
potential for dangerous behavior in the institution.
Mr. Plaza has remained entirely disciplinary free. This
is commendable. This is very difficult to do. At this
time in prison, we are having frequent racial riots. It
is very difficult for a Hispanic male to disassociate
himself from this activity, which can spontaneously
occur in front of him, and if he doesn't get involved,
he will receive retaliation. In this case, remaining
disciplinary free is a very difficult and commendable
achievement. There is no evidence that he has ever been
involved in riots, possession of weapons, assaults on
others, or threats of any kind. As a result, it is
evident that his potential for dangerous behavior in
comparison to other inmates is definitely below
average.

Mr. Plaza has a chrono from Captain Guerra, in which it

was stated that he had been hand picked to work as a communicator, working as a mediator between the two groups in the institution that had been involved in a riot against esch other. due to his ability to mediate between the groups and to get them to agree to non violence towards each other, the riot that occurred at that time was resolved peacefully, and the result was that the institution was able to unlock everybody and proceed with the program.

(B) In considering potential for dangerous behavior in the community, Mr. Plaza has no prior arrests for violence before the commitment offense. He did receive an arrest as an adult in 1983 for spraying a one inch diameter dot on the wall. He has remained disciplinary free in the institution. In order to determine his risk level on parole, the Level of Service Inventory-Revised was administered. This is an actuarial measure that assesses criminal history, substance abuse history, current adjustment, and other factors to determine current risk level. On this measure he obtained a score of 3.6 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better on parole than 96 of them. This is a very low risk level. As a result, he poses no more threat to society than the average citizen in the community, and probably less threat to society at this point in his life.

(C) At the time of the offense, drugs and alcohol were a problem; however, at this point in his life this no longer is an issue. Therefore, there are no significant risk factors in this case.

**Clinician Observation/Comments/Reccomendations:** There are no mental or emotional problems in this case that would interfere with routine parole planning. Mr. Plaza has obtained vocational training in several areas. He is currently working as a meat cutter in culinary. He has skills in vocational dry cleaning, as well as in vocational air conditioning, refrigeration and heating. He also has a job offer waiting for him upon release. He has very strong family support in the community. All these factors are good indicators of positive parole success. He has maintained his marriage, and his wife continues to be supportive and involved in his life. He maintains constant contact with his three children. Due to his study of the Bible and his commitment to the Christian way of life, he no longer has the irresponsible values and lifestyle that he did prior to the commitment offense. All these factors indicate that his prognosis for successful adjustment in the community is excellent. (see Exhibit "C")

Petitioner asserts that the rehabilitative evidence submitted by Petitioner and both the life Evaluation report and Pyschological report is supportive of release contrary to the Board's specious findings. the **Biggs** court addressed the Boards illegal usage of needed therapy and other illegal reasons to justify a highly illegal denial.

> "The record in this case and the transcripts of Biggs hearing. before the Board clearly show that many conclusions and factors relied on by the Board were devoid of evidentiary basis".

Petitioner submits that the record in this case is also devoid of evidentiary basis as to the Board's findings that evidence presented is not supportive of release, which violates due process. Petitioner further submits that despite the overwhelming evidence that Petitioner does not present a current risk to public safety. The Board arbitrarily found petitioner unsuitable for release. Petitioner asserts that the real reason given by the Board indicative of unsuitability is the commitment offense, and if allowed to identify the unchanging circumstances as indicative of unsuitability, this would put Petitioner in an impossible situation, where no matter what he shows in terms of positive behavior, reformation, self-help, work skills, parole plans, or just rehabilitation in general, he would never be able to overcome the unchanging facts of the crime. The only logical application of constitutional due process dictates what the Court in **Irons v. Warden**, 358 F.supp.2d 936, 947, (E.D.Cal. 2005) held,

,i.e., that any denial requires the presence of some in-prison
behavior showing that the inmate **currently** presents an
unreasonable risk of danger if paroled.

Here the facts of the crime have been the only real reason
for denying parole. yet, those facts have never been tied to
**current** behavior showing that Petitioner still presents an
unreasonable risk at this time. A rule requiring the presence of
in-prison adverse behavior to justify a denial based on the crime
simply recognizes what the 9th Circuit in **Biggs** alluded to when
it talked of the rehabilitative goals of the system, and the need
to take into consideration that a person can rehabilitate
themselves. This seems to be missing from the Board's current
agenda and policy. This denies to Petitioner the process to which
he is constitutionally due.

At this point, Petitioner has been incarcerated over __23__
years (including pre- & post-conviction credit). His programming
clearly shows his full rehabilitation. In drawing the line as to
when a denial becomes arbitrary, that line has definitely been
crossed in this case, as the Board cannot present factual
findings showing a continued risk of danger based on the
rehabilitative evidence presented. To the contrary, the in-prison
facts are exclusively positive.

As **Ramirez** noted (**Ramirez**, 94 Cal.App.4th at 549),  the
paroling authority must do more than merely commend Petitioner
~~for the hard work done to rehabilitate himself while in prison.~~
They must actually consider these factors "as... circumstance[s]
tending to show his suitability for parole." **Ramirez** supra 94
Cal.App.4th  at 571-72 [emphasis in original]. Of course, all the

Board did with petitioner's extensive accomplishments was to
brush them aside with several terse lines and issue superficial
compliments. Obviously, no serious consideration was ever given
to Petitioner's outstanding programming. Yet, the **Biggs** rule is
clear that if an inmate "continue[s] to demonstrate exemplary
behavior and evidence of rehabilitation, denying him a parole
date simply because of the nature of [his] offense and prior
conduct would raise serious questions involving his liberty
interest in parole". **Biggs v. Terhune**, supra, 334 F.3d at 916.
Here, the evidence of actual rehabilitation is beyond dispute.

The Boards inability to find anything in his current
programming, demeanor or psychological condition to justify a
finding of current dangerousness, the Board continuously falls
back on the immutable and unchanging facts, of the crime, to base
its findings of unsuitability.

Again as noted above, wherever one draws the line as to when
the reliance on the unchanging facts of the commitment offense
becomes a violation of due process in the abstract, under the
facts here after ___17___ years, it clearly has passed here. Thus,
the Board must do more than simply commend Petitioner for his
efforts and accomplishments, and must consider them as favoring
parole in evaluating suitability. **Ramirez**, supra, at 572. The
Board must do this even if the factors of the commitment offense
in the abstract can be said to be sufficient to deny petitioner
parole.

Petitioner asserts that he has continued to be a **model**
inmate, yet, continues to be deprived the benefits of his
exemplary rehabilitation by the California Board of Parole

Hearings. The only real issue at a parole hearing is whether the inmate **currently** poses an unreasonable risk of danger to the public if paroled. This must be determined by an inmates post-conviction evidence of rehabilitation. petitioner has met every prerequisited condition that warrants a finding of suitability. Because there is no evidence to support a finding that Petitioner poses a current threat to public safety of any magnitude, let alone an unreasonable level of threat, the decision denying parole can not be sustained.

### CONCLUSION

The Parole Board's decision was arbitrary and capricious. Petitioner did not receive fair hearing from the Board of Parole Hearings, nor will he ever.

The Court must order Petitioner released or at the very least, direct the Board of Parole Hearings to issue a decision within ten days granting Petitioner parole, setting his term as prescribed by the Legislature and the Statutes.

Based on the foregoing reasons and the entire file herein, Petitioner submits that the hearing was a sham and a farce in violation of the intent of the Legislature when it enacted Penal Code §3041 et seq. 30 years ago.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this _____ day of _____ 2007, Correctional Training Facility, Soledad, Ca 93960-0689.

_____
Jesse Plaza, Petitioner In Pro Per

### PRAYER FOR RELIEF

1. Issue an Order to Show Cause on an expedited basis directing Respondent to file a Return pursuant to Rule 4.551, California Rules of Court;

2. Issue a Writ of Habeas Corpus;

3. Order Respondent to provide Petitioner with reasonable discovery;

4. Conduct an Evidentiary Hearing;

5. Declare the rights of the parties;

6. Order injunctive relief;

7. Appoint Counsel;

8. Issue an order directing Petitioner released on parole;

9. Direct Respondent to release Petitioner forthwith upon the granting of his release on parole;

10. Issue an Order directing Petitioner released on his own recognizance or on reasonable bail; and

11. Grant all other relief necessary to promote the ends of justice.

Dated: OCT. 1, 2007

Respectfully submitted

_Jesse Plaza_
Jesse Plaza

In Pro per

8. Did you appeal from the conviction, sentence, or commitment?   [XX] Yes.   ☐ No.   If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
   
   California Court of Appeals

   b. Result: _____ denied _____   c. Date of decision: _____ unknown

   d. Case number or citation of opinion, if known: _____ unknown

   e. Issues raised:  (1) _____ n/a

       (2) _____

       (3) _____

   f. Were you represented by counsel on appeal?   [X] Yes.   ☐ No.   If yes, state the attorney's name and address, if known:

   unknown

9. Did you seek review in the California Supreme Court?   [XX] Yes.   ☐ No.   If yes, give the following information:

   a. Result: _____ denied   b. Date of decision: _____ unknown

   c. Case number or citation of opinion, if known: _____ unknown

   d. Issues raised:  (1) _____ n/a

       (2) _____

       (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

    n/a

11. Administrative Review:

    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

    As of May 1, 2004, Exhaustion of the Administrative Appeal Process has been

    elimanated. Title 15 regulations governing section 2050-2056 has been repealed.

    b. Did you seek the highest level of administrative review available?   [x] Yes.   ☐ No.

    *Attach documents that show you have exhausted your administrative remedies.*

PETITION FOR WRIT OF HABEAS CORPUS

MC-275 [Rev. January 1, 1999]

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  [X] Yes. If yes, continue with number 13.  [ ] No. If no, skip to number 15.

MC-275

13. a. (1) Name of court:  SUPERIOR COURT , COUNTY OF LOS ANGELES

   (2) Nature of proceeding (for example, "habeas corpus petition"):  HABEAS CORPUS

   (3) Issues raised: (a)  ILLEGAL FINDING OF UNSUITABILITY BY THE BOARD OF PAROLE HEARINGS.

      (b)

   (4) Result (Attach order or explain why unavailable):  DENIED (ATTACHED HERETO AS EXHIBIT "D")

   (5) Date of decision:  SEPTEMBER 6, 2007

   b. (1) Name of court:  N/A

   (2) Nature of proceeding:

   (3) Issues raised: (a)

      (b)

   (4) Result (Attach order or explain why unavailable):

   (5) Date of decision:

   c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

   N/A

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

   NO DELAYS

16. Are you presently represented by counsel?  [ ] Yes.  [X] No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?  [ ] Yes.  [XX] No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

   THIS COURT HAS JURISDICTION

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date:  OCT. 1, 2007

_Jesse Place_
(SIGNATURE OF PETITIONER)

MC-275 [Rev. January 1, 2007]      PETITION FOR WRIT OF HABEAS CORPUS      Page 6 of 6

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015,5)

I, _____Jesse Plaza_____, declare:

I am over 18 years of age and I am party to this action.  I am a
resident of CORRECTIONAL TRAINING FACILITY prison, in the County
of Monterrey, State of California.  My prison address is:

       _____Jesse Plaza_____, CDCR #: H-12371_____
       CORRECTIONAL TRAINING FACILITY
       P.O. BOX 689, CELL #: _F-338U_____
       SOLEDAD, CA  93960-0689.

    On ___OCT 1, 2007_____, I served the attached:

---

PETITION FOR WRIT OF HABEAS CORPUS

---

on the parties herein by placing true and correct copies
thereof, enclosed in a sealed envelope (verified by prison
staff), with postage thereon fully paid, in the United States
Mail in a deposit box so provided at the above-named institution
in which I am presently confined.  The envelope was addressed as
follows:

COURT OF APPEALS
SECOND APPELLATE DISTRICT
300 S. Spring Street
Second Floor, North Tower
Los Angeles, CA 90013-1204

OFFICE OF THE ATTORNEY GENERAL
RONALD REAGAN BUILDING
300 S. Spring Street
Los Angels, CA 90099-9126

    I declare under penalty of perjury under the laws of the
State of California that the foregoing is true and correct.
Executed on __OCT. 1, 2007__.

                            _____Jesse Plaza_____
                    Declarant

1   Jesse Plaza
    H12371 - F338U
2   P.O. Box 689
3   Soledad, CA. 93960

4

5

6                   IN THE COURT OF APPEALS
                 SECOND APPELLATE DISTRICT

7
    Jesse Plaza                   No:
8             Petitioner,         Super. Ct:      BH004502

9        vs.

10                                EXHIBITS IN SUPPORT OF PETITION
                                  AND MEMORANDUM OF POINTS AND
11  Ben Curry, et al.,            AUTHORITIES
              Respondent.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                  1

# EXHIBIT A

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )            CDC Number H-12371
)
JESUS PLAZA )
)
_____)

**INMATE COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 1, 2006


PANEL PRESENT:

ARCHIE JOE BIGGERS, Presiding Commissioner
ROLANDO MEJIA, Deputy Commissioner


OTHERS PRESENT:

JESUS PLAZA, Inmate
LAWRENCE MORRISON, Deputy District Attorney
KATERA E. RUTLEDGE, Attorney for Inmate


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No    See Review of Hearing
_____  Yes   Transcript Memorandum


Ruby M. Dougherty, Peters Shorthand Reporting

ii

## INDEX

                                                                PAGE

Proceedings.................................................. 1

Case Factors................................................ 16

Pre-Commitment Factors...................................... 23

Post-Commitment Factors..................................... 33

Parole Plans................................................ 48

Closing Statements.......................................... 62

Recess...................................................... 88

Decision.................................................... 89

Adjournment................................................. 93

Transcriber Certification................................... 94

--oOo--

1

1          P R O C E E D I N G S

2          DEPUTY COMMISSIONER MEJIA:  We're on

3     record.

4          PRESIDING COMMISSIONER BIGGERS:  Okay.

5     This is initial parole consideration hearing for

6     Jesus Plaza, P-L-A-Z-A, CDC No. H-12371.  We're

7     located at the Correctional Training Facility in

8     Soledad.  Inmate was received on October 9, 1991

9     from Los Angeles County.  The life term began on

10    October 9, 1991 and the minimum eligible parole

11    date is January 25th, 2007.  The controlling

12    offense for which the inmate has been committed

13    is murder case number -- first-degree murder

14    with a weapon.  Case No. is VA004108.  That's a

15    violation on criminal code PC187.  The inmate

16    received a term of 25 years to life, with a

17    minimum eligible parole date of 1/25/07.  Now

18    this hearing's being tape-recorded and for the

19    purpose of voice-identification each of us will

20    state our first and last name, spelling our last

21    name.  When we get to you Mr. Plaza, if you

22    would please give us your CDC number after you

23    spell your last name.  I will start and move to

24    my left.  My name is Archie Joe Biggers,

25    B-I-G-G-E-R-S, and I'm a Commissioner.

26         DEPUTY COMMISSIONER MEJIA:  Rolando

27    Mejia, M-E-J-I-A, Deputy Commissioner.

2

1          DEPUTY DISTRICT ATTORNEY MORRISON:

2     Lawrence Morrison, M-O-R-R-I-S-O-N, Los Angeles

3     District Attorney.

4          ATTORNEY RUTLEDGE:  Katera E. Rutledge,

5     R-U-T-L-E-D-G-E, attorney for Mr. Plaza.

6          INMATE PLAZA:  My name is Jesus Plaza,

7     last -- CDC number is H-12371.

8     [Recording equipment malfunction, placement of

9         equipment, background noise, and volume of

10    participants resulted in indiscernible content.]

11         PRESIDING COMMISSIONER BIGGERS:  Okay.

12    Thanks to all of you.  Mr. Perez is there an ADA

13    statement that was passed over there to you?  Do

14    you see that?  It should have been right next

15    to--

16         INMATE PLAZA:  (Indiscernible).

17         PRESIDING COMMISSIONER BIGGERS:  -- would

18    you please read that out loud for us?

19         INMATE PLAZA:  "The Americans with

20         Disability Act, ADA, is a law to

21         help people with disabilities.

22         Disabilities are problems that

23         make it harder for some people to

24         see, hear, breathe, talk, walk,

25         learn, think, work, or take care

26         of themselves than it is for

27         others.  Nobody can be kept out of

3

1     public places or activities

2     because of a disability. If you

3     have a disability you have the

4     right to ask for help to get ready

5     for your BPT hearing, get to the

6     hearing, talk, read forms and

7     papers, and understand the hearing

8     process. BPT will look at what

9     you ask for to make sure that you

10    have a disability that is covered

11    by the ADA, and that you have

12    asked for the right kind of help.

13    If you do not get help or if you

14    don't think you got the kind of

15    help you need, ask for a BPT 1074

16    Grievance Form. You can also get

17    help to fill it out."

18    PRESIDING COMMISSIONER BIGGERS: All

19    right. Do you understand what that means Mr.

20    Plaza?

21    INMATE PLAZA: Yes, I do.

22    PRESIDING COMMISSIONER BIGGERS: And what

23    does it mean in your own words please.

24    INMATE PLAZA: In my own words I believe

25    it's saying if I have any disability or need

26    help during this hearing I have the right to

27    have those provided for me.

4

1          PRESIDING COMMISSIONER BIGGERS:

2  (Indiscernible) we're talking about things like

3  hearing, eye -- do you wear glasses?

4          INMATE PLAZA:  No.

5          PRESIDING COMMISSIONER BIGGERS:  Okay.

6  Do you have any hearing impairment?

7          INMATE PLAZA:  No, I don't.

8          PRESIDING COMMISSIONER BIGGERS:  And you

9  can walk without any problems?

10          INMATE PLAZA:  Yes.

11          PRESIDING COMMISSIONER BIGGERS:  Okay.

12  Have you ever been included in the Triple CMS or

13  EOP Program?

14          INMATE PLAZA:  Never.

15          PRESIDING COMMISSIONER BIGGERS:  Okay.

16  So you don't suffer from any disability that

17  would prevent you from participating in today's

18  hearing?

19          INMATE PLAZA:  Not at all.

20          PRESIDING COMMISSIONER BIGGERS:  Counsel,

21  do you feel that your client's ADA rights have

22  been met?  Ms. Rutledge?

23          ATTORNEY RUTLEDGE:  Yes, Sir.

24          PRESIDING COMMISSIONER BIGGERS:  Thank

25  you.  This hearing is being conducted pursuant

26  to Penal Code Section 3041 and 3042 and the

27  rules and regulations of the Board of Prison

5

1  Terms governing parole consideration hearings

2  for life inmates.  The purpose of today's

3  hearing is to consider the number and the nature

4  of the crimes you were committed for, your prior

5  criminal and social history, your behavior and

6  programming since your commitment.  We have had

7  the opportunity to review your Central File, and

8  you will be given the opportunity to correct or

9  clarify the record.  We will reach a decision

10  today, and find -- and inform you whether or not

11  we find you suitable for parole and the reasons

12  for our decision.  If you are found suitable for

13  parole, the length of your confinement will be

14  explained to you.  Before we go any further, I

15  want to advise you that we expect you to be

16  fully honest with us today, especially with this

17  being your initial hearing.  So in the event

18  that you don't get a date today, this here will

19  form the foundation for all future hearings.

20      INMATE PLAZA:  I (indiscernible).

21      PRESIDING COMMISSIONER BIGGERS:  Any

22  false statement you make today could have an

23  adverse effect on your ability to get a date at

24  a later time in the event that you don't get a

25  date today.  Nothing that happens here today

26  will change the findings of the Court.  We are

27  not here to retry your case.  We are here to

6

1  determine if you are suitable for parole.  Do

2  you understand that?

3       INMATE PLAZA:  I understand.

4       PRESIDING COMMISSIONER BIGGERS:  The

5  hearing will be conducted in two phases.  I will

6  discuss with you the crime you were committed

7  for, your prior criminal and social history.

8  Deputy Commissioner Mejia will talk to your

9  about parole plans, letters of support and

10  opposition, your counselor's report and your

11  psychological evaluation.  Once that is

12  concluded, both Commissioners, the District

13  Attorney, and your attorney will ask you

14  questions.  Questions from the District Attorney

15  shall be asked through the Panel and your

16  answers should be directed to the Panel.  Before

17  we recess for deliberation, the District

18  Attorney, your attorney, and you will be given

19  the opportunity to make a final statement

20  regarding your suitability, followed by

21  statements -- if we had victims, it would be --

22  (indiscernible) follow with the victims, but

23  since we don't have any we don't worry about

24  that one.  California Code of Regulations states

25  that regardless of time served a life inmate

26  shall be found unsuitable for and denied parole

27  if in the judgment of the Panel the inmate would

7

1  pose an unreasonable risk of danger to society

2  if released from prison. You have certain

3  rights. Those rights include the right to a

4  timely notice of this hearing, the right to

5  review your Central File. Did you review your

6  Central File?

7          INMATE PLAZA:  Yes.

8          PRESIDING COMMISSIONER BIGGERS:  And the

9  right to present relevant documents. Ms.

10  Rutledge, do you believe that your client's

11  rights have been met.

12          ATTORNEY RUTLEDGE:  Yes.

13          PRESIDING COMMISSIONER BIGGERS:  Okay.

14  Thank you, ma"am. You have an additional right

15  to be heard by an impartial Panel. Do you have

16  any objection to the Panel members?

17          INMATE PLAZA:  No, none at all.

18          PRESIDING COMMISSIONER BIGGERS:  Okay.

19  All right. I'm going to ask Ms. Rutledge, do

20  you have any objections to the Panel

21  (indiscernible)?

22.          ATTORNEY RUTLEDGE:  No, Sir.

23          PRESIDING COMMISSIONER BIGGERS:  Thank

24  you. You will receive a written copy of our

25  tentative decision today. That decision becomes

26  effective within 120 days. A copy of the

27  decision and a copy of the transcript will be

8

1  sent to you, and you will have 90 days from that

2  date to appeal if you so desire. Now, I need to

3  let you know that the Board has eliminated its

4  appeals process. If you disagree with anything

5  that happens in today's hearing, you have the

6  right to go directly to the Court with your

7  complaint.

8          INMATE PLAZA:  I understand.

9          PRESIDING COMMISSIONER BIGGERS:  Okay,

10  thank you. You are not required to admit your

11  offense or discuss your offense. However, this

12  Panel does accept the findings of the Court to

13  be true. Do you understand that?

14          INMATE PLAZA:  Yes, I (indiscernible).

15          PRESIDING COMMISSIONER BIGGERS:  Okay,

16  thank you. I'm gonna pass a -- over to your

17  attorney and then to the District Attorney what

18  I've have marked as Exhibit One so that we can

19  make sure that we're all using -- on the same

20  set of documents.

21          DEPUTY DISTRICT ATTORNEY MORRISON:

22  District Attorney has all the documents, thank

23  you.

24          ATTORNEY RUTLEDGE:  The -- Mr. Plaza, the

25  defense has all (indiscernible).

26          PRESIDING COMMISSIONER BIGGERS:  Thank

27  you, ma'am. Thank you, sir. Commissioner

9

1  Mejia, is there any confidential material in the

2  file?

3        DEPUTY COMMISSIONER MEJIA:  No.  No

4  confidential information.

5        PRESIDING COMMISSIONER BIGGERS:  Okay.

6  Are any additional documents to be submitted?

7        ATTORNEY RUTLEDGE:  I (indiscernible) we

8  did submit --

9        PRESIDING COMMISSIONER BIGGERS:  And I

10  read those (indiscernible) read the statement

11  into the record, because I want to make sure it

12  he gets into the record.  I read, I think it was

13  the last two pages that had to do with matrix

14  and all the other stuff in there -- but I -- and

15  I -- but  want to get it on record, so -- to

16  make sure that it is in the transcript.

17        ATTORNEY RUTLEDGE:  Do you want me to

18  read it or him to do that?

19        PRESIDING COMMISSIONER BIGGERS:  It

20  doesn't matter, which ever you prefer.

21        ATTORNEY RUTLEDGE:  This was taken from

22  -- Mr. Plaza had submitted to the Board a

23  memorandum of evidence and law in support of

24  parole suitability and this is directed to the

25  Board.

26        "Introduction, the California Code

27        of Regulations Title XV Division

10

1    Two hereafter XV Section 2245,

2    states in part, 'The prisoner is

3    responsible for bringing to the

4    attention of the hearing Panel any

5    issues pertaining to his rights

6    under this article or any failure

7    to comply with these rules.  A

8    prison may waive any of these

9    rights.  Any such waiver shall be

10    documented.'  I wish to bring to

11    the attention of this Panel at

12    this time that I do have the right

13    to present this document at this

14    hearing to have it entered into

15    the record.  Moreover, the Panel

16    must --"

17    That's moot since the Panel's accepting it.  Is

18    that correct?

19        DEPUTY COMMISSIONER MEJIA:  Yes, it is.

20        ATTORNEY RUTLEDGE:  Okay.  In the third

21    paragraph, my client submits this memorandum

22    because he does not wish to intentionally or

23    unintentionally waive any of his rights under

24    the law, and that he wants that all evidence in

25    support of finding suitability be stated for the

26    records and for purposes of appeal if necessary.

27        PRESIDING COMMISSIONER BIGGERS:  Before

11

1    you go any further.  Normally, everything that

2    we do, that's why it's on record.  So, I just

3    want to make sure that you now understand that

4    we -- our job is to make sure that we do

5    everything under due process and we are aware of

6    everything that happens in Title XV.

7          INMATE PLAZA:  That's right.

8          PRESIDING COMMISSIONER BIGGERS:  Okay?

9    So, go ahead, ma'am, please.

10         ATTORNEY RUTLEDGE:  Moving on to the

11   memorandum incorporates the following -- relies

12   upon the Court rulings.

13         "InRe Rosencrance,

14         (indiscernible); InRe Rosencrance

15         for LA County Superior Court, Case

16         No. AH10298; InRe Caswald,

17         210DJDJR10845; InRe McWillion,

18         U.S. Court of Appeals for the 9th

19         Circuit, Case No. 0055182; InRe

20         Ramirez, 9th Circuit Court of

21         Appeals, Case No. AO092699; InRe

22         Biggs, U. S. Court of Appeals,

23         Case No. VH002016; InRe Deluna,

24         126 Appellate Court, 585; InRe

25         Low, 130 Appellate Court, 1418 --"

26         PRESIDING COMMISSIONER BIGGERS:  Excuse

27   me, what was that?  What was the -- what's the

12

1    relation of the Low case in this hearing?

2         ATTORNEY RUTLEDGE:  How are we applying

3    the Low case to this hearing?  This is being

4    presented by my client; I have not read the Low

5    case.

6         DEPUTY DISTRICT ATTORNEY MORRISON:  Well,

7    I have a -- I have a question (indiscernible) if

8    I may.  The inmate can present anything he

9    wants, but this sounds like legal arguments.

10   The inmate has an attorney -- he's gonna have an

11   attorney -- he can make whatever arguments he

12   wants if he gonna represent himself then he can

13   make legal arguments.  But he doesn't get to

14   make legal arguments and have an attorney.

15        ATTORNEY RUTLEDGE:  Yes, he does.

16   There's nothing -- sometimes he can have an

17   attorney --

18        PRESIDING COMMISSIONER BIGGERS:  Excuse

19   me.  What I'm doing right now is allowing him to

20   read his document into the file.  When we start

21   talking about the opposing statements and

22   getting into all the others, then that's when I

23   will put a stop to that.  But I want to get this

24   in the file, and I have something to say once

25   you finish.

26        ATTORNEY RUTLEDGE:  And I would -- I

27   would remind the Panel that under Title XV the

13

1  people have no standing to object to anything

2  that the inmate does.

3      PRESIDING COMMISSIONER BIGGERS:  Exactly.

4      ATTORNEY RUTLEDGE:  Thank you.  All

5  right.  So -- "InRe Shapudis, 135 Appellate

6  Forth 217 at 227; Irons versus Carey 408 F

7  Third, 1165 9th Circuit."  Now Page Two goes to

8  the commitment offense so --

9      PRESIDING COMMISSIONER BIGGERS:  You can

10  skip that one.  In fact, I think you can skip

11  the last three pages, I just wanted to get those

12  things on the record for you (indiscernible)

13  others because what I wanted to let you know sir

14  is that those cases are a matter of law, and you

15  can use those any times when you appeal if for

16  some reason you don't get a date.  But there are

17  a couple that you forgot to mention.  One of

18  those is Dannenberg, and we'll talk about that a

19  little later on.  I would appreciate -- I think

20  you've done a superb job of putting this package

21  together.  My only comment on that is I think

22  sometimes that you don't who -- by going in

23  there and doing certain things, there's a

24  difference between shall, will, and can't.

25      INMATE PLAZA:  I understand.

26      PRESIDING COMMISSIONER BIGGERS:  Okay.

27  So.  All right.

14

1          ATTORNEY RUTLEDGE:  Can I -- there's an

2    -- I still have to lodge a couple of objections

3    whenever the Panels --

4          PRESIDING COMMISSIONER BIGGERS:  No

5    problem.  So those are the additional documents.

6    Now, you say you have some preliminary

7    objections?  What are they now?

8          ATTORNEY RUTLEDGE:  Well, our first

9    objection would be -- well, we would ask that

10   the Panel --  under 2236 my client will be

11   discussing everything but the commitment offense

12   with the Panel.  We ask that the people not be

13   allowed to refer to him not discussing the case,

14   and that again we're just reiterating that the

15   people don't have standing to object to any of

16   our statements and may not advise the Panel on

17   the law, and that would be all aside from what

18   would be in the package.

19         DEPUTY DISTRICT ATTORNEY MORRISON:

20   (Indiscernible) recommend that (indiscernible)

21   represents the citizen of Los Angeles, it's part

22   of public comment that we're entitled to make on

23   any subject regarding suitability for parole.

24         ATTORNEY RUTLEDGE:  You can during your

25   closing.  Other than that you have no standing.

26         PRESIDING COMMISSIONER BIGGERS:  She's

27   right about that.  You do have the right to do

15

1   that in Closing Statements (indiscernible).  He

2   can in fact though ask questions.  If your

3   client elects not to answer them that's

4   something entirely different, but he does have

5   the right to ask questions as well.

6         ATTORNEY RUTLEDGE:  Of my client,

7   correct.  Yes.  Okay.

8         PRESIDING COMMISSIONER BIGGERS:  Are

9   there any other preliminary objections?

10         ATTORNEY RUTLEDGE:  No, Sir.

11         PRESIDING COMMISSIONER BIGGERS:  Okay.  I

12   assume from what you just told me that the

13   inmate will be speaking to us about everything

14   but the crime?

15         ATTORNEY RUTLEDGE:  Yes.

16         PRESIDING COMMISSIONER BIGGERS:  Okay.

17   Would you raise your right hand please, Mr.

18   Plaza.  Do you solemnly swear or affirm that the

19   testimony you give at this hearing will be the

20   truth and nothing but the truth?

21         INMATE PLAZA:  I do.

22         PRESIDING COMMISSIONER BIGGERS:  Thank

23   you.  I'm gonna read into the record from the

24   Appellate decision the facts of the committing

25   offense.

26         "On May 26, 1990, Mr. Plaza was an

27         active member of the King Cobra

16

1          juvenile gang.  (Indiscernible)

2          Silva, S-I-L-V-A, Mr. Plaza's

3          co-arrestee was also an active

4          member of the King Cobras.

5          Patrick Littlebull,

6          L-I-T-T-L-E-B-U-L-L, the victim,

7          was a member of the Bell Garden

8          (phonetic) --" is that local --

9          INMATE PLAZA:  It's always been

10   miss-spelled, but it's supposed to be locos as

11   in crazy.

12          PRESIDING COMMISSIONER BIGGERS:  Locos.

13          INMATE PLAZA:  Locos.

14          PRESIDING COMMISSIONER BIGGERS:  Locos.

15          INMATE PLAZA:  Yeah.

16          PRESIDING COMMISSIONER BIGGERS:  Okay.

17   "-- a rival juvenile gang.  Fifty-nine hundred

18   block of Loveless (phonetic) Street was a known

19   hangout of the Bell Garden Locos."

20          INMATE PLAZA:  There you go.

21          PRESIDING COMMISSIONER BIGGERS:  "On May

22          26, 1990 at around 10:00 p.m.

23          Rosario Quevedo, Q-U-E-V-E-D-O,

24          and her sister, Martha -- and I'll

25          spell the last name --

26          P-A-L-A-C-I-O-S, returned from

27          church with their children and

17

```
 1        parked their car in front of their
 2        apartment at 5940 Loveless Street.
 3        Quevedo, Q-U-E-V-E-D-O, noticed
 4        some individuals standing and
 5        talking to each other on the
 6        sidewalk in front of the car. She
 7        also saw a car approaching from
 8        the opposite direction with its
 9        lights off and stop across the
10        street. Rosario and Palatono --
11        P-A-L-A-C-I-O-S -- then heard
12        gunshots. Quevedo panicked and
13        drove away. When they returned a
14        short time later, they saw the
15        victim lying face down in the
16        street in front of the apartment
17        building. Jesus Zamora,
18        Z-A-M-O-R-A, made a pizza delivery
19        for Dominoes Pizza about 10:00
20        p.m. that evening at 5918 Loveless
21        Street. After delivering the
22        pizza he pulled into the driveway
23        at 5918 Loveless Street to write
24        in his delivery book. As he was
25        writing, he heard the sound of
26        gunfire and the sound of a car
27        coming rapidly in his direction.
```

18

```
 1        He saw a car traveling on Loveless
 2        Street without the headlights on.
 3        The car passed Zamora and turned
 4        the car, straddling the curve.
 5        The lights of the car then came
 6        on, and Zamora saw the number 33
 7        on the license plate.  He also
 8        noted that the car was a gray
 9        Caprice.  He later related his
10        observations to Bell Garden Police
11        Officer Reuben Musquiz,
12        M-U-S-Q-U-I-Z.  Officer Musquiz
13        then broadcast a description of
14        the gray Caprice over the police
15        radio.  Around 10:50 p.m., Bell
16        Police Officer Baley Hooper,
17        H-O-O-P-E-R, observed a silver
18        Caprice with 33 on it as the last
19        two numbers on the license plate."
20   And then I'm going to skip down and say -- well,
21   let me read this in too.
22        "-- proceeded westbound on
23        Florence Avenue near the 710
24        Freeway bridge.  He radioed for
25        assistance and followed the car
26        into a driveway.  Plaza, who was
27        driving, and passenger Danny Silva
```

19

```
 1         exit the vehicle.  They were
 2         detained and subsequently
 3         arrested.  Brown paper bags were
 4         placed on the hands of Plaza and
 5         Silva so they -- that they -- be
 6         tested for gunshot residue.
 7         Analysis residue from a pellet in
 8         Silva's hand indicate that Plaza
 9         and Silva had either shot a gun,
10         handled a gun, or had been within
11         with two (indiscernible) feet of a
12         gun as it was fired."
13    Okay.  That's enough for the record.  And since
14    you're not gonna be talking about the crime
15    itself -- and counsel if I touch on an area that
16    you want to object to, that's fine, I need to
17    ask a couple of things though.  At one time you
18    denied your involvement.
19         INMATE PLAZA:  Yes.
20         PRESIDING COMMISSIONER BIGGERS:  Okay.
21    When did you change that?
22         INMATE PLAZA:  I'd have to say about an
23    hour into the interrogation.
24         PRESIDING COMMISSIONER BIGGERS:  An hour
25    into the interrogation?
26         INMATE PLAZA:  Yes.
27         PRESIDING COMMISSIONER BIGGERS:  Well, I
```

20

1   was looking at the Appellate Decision and it

2   indicated -- I thought it looked like it was a

3   little bit longer than that.

4       ATTORNEY RUTLEDGE:  He maintains he was

5   the driver of the vehicle, and they never --

6   there were two people.  Both people found in the

7   car had gunshot residue.  There was a third

8   person that was never tried.

9       PRESIDING COMMISSIONER BIGGERS:  Never

10  tried, but yeah there were two.  The two that

11  had the residue was Mr. Plaza and Mr. Silva; is

12  that correct?

13      INMATE PLAZA:  That's correct.

14      PRESIDING COMMISSIONER BIGGERS:  Okay.

15  Can you tell me how you got the residue on your

16  hands?

17      INMATE PLAZA:  Yes, I handled the gun

18  after it was fired plus I was in the vicinity of

19  the shots being fired.

20      PRESIDING COMMISSIONER BIGGERS:  Within

21  two to four feet is what you're saying?

22      INMATE PLAZA:  Yes, Sir.

23      ATTORNEY RUTLEDGE:  Okay, I think we're

24  getting into the commitment offense --

25      PRESIDING COMMISSIONER BIGGERS:  Okay.

26  At one time you talked about the (indiscernible)

27  you requested it be turned to a manslaughter

21

1    (indiscernible), right?

2    INMATE PLAZA: My lawyer did, yes.

3    PRESIDING COMMISSIONER BIGGERS:  Yes.

4    And that was shot down by the Appellate

5    Decision.  Are you still a member of that King

6    Cobra gang?

7    INMATE PLAZA:  I was never technically a

8    member, but I was an associate.  I hung around

9    with gang members, to be totally honest.  I hung

10   around with several different gang members.

11   People that I hung around with were from

12   different gangs.

13   ATTORNEY RUTLEDGE:  (Indiscernible).

14   INMATE PLAZA:  Oh, being born and raised

15   in East LA there's gangs all around.

16   PRESIDING COMMISSIONER BIGGERS:  Yeah,

17   there are -- some gangs are not as violent as

18   otters.  There are some gangs that are just

19   locals that hang out, too.

20   INMATE PLAZA:  Not that I know of.

21   PRESIDING COMMISSIONER BIGGERS:  Okay.

22   Well, I'm familiar with LA.  Not all of them are

23   Bloods, Crips, or whatever names that they have.

24   You indicated that you have spent a lot of time

25   hanging around those people.  Were you aware

26   that -- well, that's getting back into the

27   crime.  Were you aware that -- the night in

22

1    question, were you in with some of those known

2    gang members?

3            INMATE PLAZA:  Yes.

4            PRESIDING COMMISSIONER BIGGERS:  Did you

5    have any idea what was going to take place?

6            ATTORNEY RUTLEDGE:  We would -- that

7    would -- sorry, I have to object to --

8            PRESIDING COMMISSIONER BIGGERS:  All

9    right.

10           ATTORNEY RUTLEDGE:  But we would accept

11   the --

12           PRESIDING COMMISSIONER BIGGERS:  Findings

13   of the

14           ATTORNEY RUTLEDGE:  -- Appellate --

15           PRESIDING COMMISSIONER BIGGERS:

16   Appellate Decision.  Okay.

17           ATTORNEY RUTLEDGE:  Yes.

18           PRESIDING COMMISSIONER BIGGERS:  All

19   right.  Then I will go and just look and see

20   what else I think is -- talking about your

21   priors.

22           DEPUTY DISTRICT ATTORNEY MORRISON:

23   Excuse me, Commissioner.  I'm sorry, I may have

24   missed it with all of this discussion.  But did

25   the Chair read the official version of the crime

26   into the --

27           PRESIDING COMMISSIONER BIGGERS:  I read

23

1    it from the Appellate Decision.  Yes, it is.

2        DEPUTY DISTRICT ATTORNEY MORRISON:

3    Because the Appellate Decision is pretty

4    lengthy.

5        PRESIDING COMMISSIONER BIGGERS:  Yeah,

6    and I read that in --

7        DEPUTY DISTRICT ATTORNEY MORRISON:

8    That's right.  Okay.

9        ATTORNEY RUTLEDGE:  It's probably why you

10   fell asleep during that part.

11       PRESIDING COMMISSIONER BIGGERS:  All

12   right -- we're not going to have that now.

13       ATTORNEY RUTLEDGE:  Just teasing.

14       PRESIDING COMMISSIONER BIGGERS:  I know.

15   We're going to keep everything on the up and up

16   here.  Okay.  And did you have a juvenile

17   history, because when I went through this I

18   couldn't find anything.  It says not available

19   to Probation Department as far as five years

20   after that.  Did you have any juvenile history?

21       INMATE PLAZA:  (Indiscernible).

22       PRESIDING COMMISSIONER BIGGERS:  And the

23   only adult history that you had was -- you were

24   ~~given 24 months probation for some vandalism --~~

25       INMATE PLAZA:  Yes.

26       PRESIDING COMMISSIONER BIGGERS:  What was

27   that about?

24

1          INMATE PLAZA:  I was arrested for

2   vandalizing a store -- store property.

3          PRESIDING COMMISSIONER BIGGERS:  Why did

4   you do that?

5          INMATE PLAZA:  To be honest with you, I

6   was walking down the street, I was intoxicated,

7   I seen the can sitting on the floor, I picked it

8   up, what made we think I wanted to know what

9   color it was I really am not sure today while I

10  did that, but I did spray a one-inch diameter

11  dot on the wall to see what color the can was

12  and that's what I was arrested for -- a one-inch

13  diameter dot on the wall.

14          PRESIDING COMMISSIONER BIGGERS:  And they

15  gave you two-years probation for that?

16          INMATE PLAZA:  Yes.

17          ATTORNEY RUTLEDGE:  It's usually three

18  years under the Penal Code.

19          PRESIDING COMMISSIONER BIGGERS:  Yeah,

20  but that -- there had to be some extenuating

21  circumstances as to priors --

22          DEPUTY DISTRICT ATTORNEY MORRISON:

23  Misdemeanor probation in LA County summary

24  probation is frequently two years.  Sometimes

25  for a (indiscernible) it's only one year.

26          ATTORNEY RUTLEDGE:  But under the Penal

27  Code you don't have to justify three years.  You

25

1   just give three years.

2          PRESIDING COMMISSIONER BIGGERS:   Okay,

3   well, my question to you -- was there anything

4   else that led them to give you only two years?

5          INMATE PLAZA:  I wouldn't know.

6          PRESIDING COMMISSIONER BIGGERS:   Okay.

7   Let's talk a little bit about your drug -- do

8   you have -- do you have a drug history?

9          INMATE PLAZA:  Yes, I do.

10          PRESIDING COMMISSIONER BIGGERS:   Okay.

11   And what was your drug of choice?

12          INMATE PLAZA:  Cocaine.

13          PRESIDING COMMISSIONER BIGGERS:   Cocaine.

14   And it says that you began snorting cocaine

15   three times a week at the age of 16 --

16          INMATE PLAZA:  Yes.

17          PRESIDING COMMISSIONER BIGGERS:   -- and

18   you continued use of this of -- until age 18,

19   and you stopped at age 20.

20          INMATE PLAZA:  Actually that's incorrect.

21   I never actually stopped.  I just decreased for

22   a minute, and then I just elevated up until the

23   time I was arrested.

24          PRESIDING COMMISSIONER BIGGERS:  Were you

25   -- the night you were arrested were you involved

26   in alcohol or cocaine or anything?

27          INMATE PLAZA:  Both.  Alcohol and

26

1  cocaine.

2    PRESIDING COMMISSIONER BIGGERS:  When did

3  you start using alcohol?

4    INMATE PLAZA:  I'd say age 15.

5    PRESIDING COMMISSIONER BIGGERS:  You were

6  still living at home, were you not?

7    INMATE PLAZA:  Yes, I was.

8    PRESIDING COMMISSIONER BIGGERS:  Were

9  your parents aware that you were using cocaine

10  and getting involved in drinking?

11    INMATE PLAZA:  No, not at all?

12    PRESIDING COMMISSIONER BIGGERS:  How

13  could you hide that?

14    INMATE PLAZA:  Well, my father'd been

15  gone since I was about four years old so he's

16  not in the picture.  My mother, due to trying to

17  support me and my other siblings -- she worked

18  -- usually she had -- numerous times she usually

19  had two jobs at a time.  She's work day and

20  night, so by the time she'd get home I'd already

21  be home in bed.

22    PRESIDING COMMISSIONER BIGGERS:  Okay.

23  Did you -- I'll get in your social here

24  (indiscernible) in a few minutes.  But I wanted

25  to find out were you -- let me go back.  You

26  were talking about the cocaine usage.  You

27  started using it at an early age right?

27

1        INMATE PLAZA:  Yes.

2        PRESIDING COMMISSIONER BIGGERS:  How did

3    you support yourself in getting that?

4        INMATE PLAZA:  I had a job.  I used to

5    work after school through the Cedar Program.

6        PRESIDING COMMISSIONER BIGGERS:  Cocaine

7    is a fairly expensive drug, isn't it?

8        INMATE PLAZA:  Yes, it is.

9        PRESIDING COMMISSIONER BIGGERS:  Okay.

10   Were you buying it on the street?

11       INMATE PLAZA:  Yes, I was.

12       PRESIDING COMMISSIONER BIGGERS:  Costing

13   you a pretty penny to do that, wasn't it?

14       INMATE PLAZA:  Yeah, pretty much all my

15   money.

16       PRESIDING COMMISSIONER BIGGERS:  Okay,

17   and you still say that your parents did not know

18   that you were doing this?

19       INMATE PLAZA:  No, they didn't.

20       PRESIDING COMMISSIONER BIGGERS:  How

21   about alcohol?  What was your drink of alcohol

22   that you liked?

23       INMATE PLAZA:  Mainly my drink was

24   Miller.

25       PRESIDING COMMISSIONER BIGGERS:  Miller?

26       INMATE PLAZA:  Yes.

27       PRESIDING COMMISSIONER BIGGERS:  And you

28

1    would take that in conjunction with?

2        INMATE PLAZA:  Well, the alcohol started

3    off as a, you know, what they call a gateway

4    drug.  It was the beginning of alcohol which led

5    me to the cocaine and that was pretty much the

6    two main -- my two main choices of alcohol and

7    drug of choice was cocaine.

8        PRESIDING COMMISSIONER BIGGERS:  Okay.

9    Under Social Factors, you were born on February

10   the 7, 1965 to Caroline and Jessie (phonetic)

11   Plaza.

12       INMATE PLAZA:  I believe there's an

13   addendum behind that -- there's a --

14       PRESIDING COMMISSIONER BIGGERS:  Yeah,

15   that said he was born on 3/7/65.

16       INMATE PLAZA:  That's correct, yes.

17       PRESIDING COMMISSIONER BIGGERS:  Then you

18   got -- the marriage took place on 5/12/84.

19   That's your marriage, right?

20       INMATE PLAZA:  Yes.

21       PRESIDING COMMISSIONER BIGGERS:  Getting

22   back to your -- you've got four brothers -- four

23   sisters and a brother?

24       INMATE PLAZA:  Yes.

25       PRESIDING COMMISSIONER BIGGERS:  Okay.

26   Are they still -- are all of them still living?

27       INMATE PLAZA:  Yes, the are.

29

1        PRESIDING COMMISSIONER BIGGERS:  Is any

2    of them incarcerated?

3        INMATE PLAZA:  No.  And also if I might

4    add, two of -- the two youngest sisters are

5    actually half-sisters.  They're from my dad's

6    second marriage.

7        PRESIDING COMMISSIONER BIGGERS:  Okay.

8    And your wife's name is --

9        INMATE PLAZA:  Guadalupe.

10       PRESIDING COMMISSIONER BIGGERS:

11   Guadalupe Falcon (phonetic)?

12       INMATE PLAZA:  Yes.

13       PRESIDING COMMISSIONER BIGGERS:  And you

14   married on 5/7/84, and you have three children.

15       INMATE PLAZA:  That should be 5/12.

16       PRESIDING COMMISSIONER BIGGERS:  You have

17   12 children?

18       INMATE PLAZA:  No, no, I'm saying the

19   date.  It should be 5/12; you said 5/7.

20       PRESIDING COMMISSIONER BIGGERS:  Five

21   seven, and it should be 5/12.

22       INMATE PLAZA:  It should be 5/12/84.

23       PRESIDING COMMISSIONER BIGGERS:  Okay.

24   We'll make sure that that gets in to your

25   official record regardless of what happens here.

26       INMATE PLAZA:  What was the question --

27   I'm sorry --

30

1      PRESIDING COMMISSIONER BIGGERS:  Do you

2  have three kids?  Three kids?

3      INMATE PLAZA:  Yes, three children.

4      PRESIDING COMMISSIONER BIGGERS:  And, in

5  going through your file I saw that there was a

6  letter from your wife and I'm sure that

7  Commissioner Mejia will get in to.  Any problems

8  with the marriage?

9      INMATE PLAZA:  I'd be lying if I said no.

10 Sure, we have problems.  But I mean nothing that

11 we haven't gotten through.

12     PRESIDING COMMISSIONER BIGGERS:  Well,

13 I'm talking about because of incarceration

14 (indiscernible).

15     INMATE PLAZA:  Oh, yeah, well sure, you

16 know.  It's been hard on her being the single

17 mother herself now.  It was hard on me not being

18 there able to support her.  When I first left, I

19 was the main source of, you know, support for

20 the house so when I first go incarcerated she

21 pretty much had to take everything on and do

22 everything on her own, you know, and she kind

23 of, you know, she felt abandoned, you know, and

24 she had every right to feel that way because she

25 had to just take over the whole household.

26     PRESIDING COMMISSIONER BIGGERS:  Did you

27 think about that when you were associating with

31

1    these known gang members?  That that possibility

2    -- that that could happen?

3        INMATE PLAZA:  At the time, no, because

4    my -- my thought -- my thought process wasn't on

5    responsibility.  To me responsibility was, I had

6    a job, I paid the bills, I put food on the

7    table, there was a roof over their heads, they

8    had clothes on their backs.  I thought that was

9    responsibility.  I didn't realize that it was a

10   lot more to responsibility than that.

11       PRESIDING COMMISSIONER BIGGERS:  But you

12   were still -- you still had your drug habit and

13   everything else --

14       INMATE PLAZA:  And work.  Yeah, I, you

15   know, I functioned, you know, to the -- to

16   everyone else I seemed to function in a normal,

17   you know, capacity, but of course it was, you

18   know, things behind the scenes that nobody knew

19   about.

20       PRESIDING COMMISSIONER BIGGERS:  Okay.

21   Commissioner, do you have any questions on this

22   subject?

23       DEPUTY COMMISSIONER MEJIA:  Yeah, maybe

24   about the remorse (indiscernible).

25       PRESIDING COMMISSIONER BIGGERS:  Go

26   ahead.

27       DEPUTY COMMISSIONER MEJIA:  How do you

32

1    feel about the man who was killed?

2        INMATE PLAZA:  I'm -- in the case of the

3    victim, I take full responsibly for the taking

4    of his life.  I can understand remorse.  I've

5    dealt with, you know, people dying around me in

6    the past.  It's not something that I'm new to.

7    I understand that it not only affected him but

8    it affected his family.  It affected friends of

9    his, society.  I understand that technically we

10   all -- we all have times in our lives when we

11   wish we could turn back the clock but that's not

12   possible.  But I do take full responsibility for

13   my actions.

14       DEPUTY COMMISSIONER MEJIA:  How do you

15   feel about the death of the victim; that's what

16   I asked you.

17       INMATE PLAZA:  The death of the victim?

18       DEPUTY COMMISSIONER MEJIA:  Yeah, the

19   human being that was killed.  How do you feel

20   about him being shot and being killed?  I know

21   all the peripheral that you said -- I

22   (indiscernible) I want (indiscernible) how do

23   you feel about him?

24       INMATE PLAZA:  I'm very remorseful for

25   the victim, for taking his life.  He -- I'm very

26   sorry that it happened.  It was something that

27   should not have happened.  He didn't deserve

33

1  that, and I just can't -- I mean, there are no

2  words that'll make it better or make it go away.

3        DEPUTY COMMISSIONER MEJIA:

4  (Indiscernible) that's it.  I really don't have

5  any questions.

6        PRESIDING COMMISSIONER BIGGERS:  Okay.

7  Then I'll ask you to go into the Post Conviction

8  Factors, please.

9        DEPUTY COMMISSIONER MEJIA:  Okay.  This

10  is your initial parole consideration hearing Mr.

11  Plaza, and your custody history is that you were

12  initially accepted to the Wasco State Prison RC

13  in 1991.  You were transferred to California

14  State Prison Folsom new facility in 1991,

15  December.  You were at Wasco in October, then

16  December in 1991 you went to the Old Folsom

17  (indiscernible).  Then 2/21/1992, you went to

18  CSP Calipatria, North and East.  February of

19  1994 you went to Lancaster, then 12/16/1997

20  Avenal State Prison.  And you went

21  (indiscernible) in 1998 of March, CTF.  You had

22  a brief period of time in CMF for medical issues

23  --

24        INMATE PLAZA:  Correct.

25        DEPUTY COMMISSIONER MEJIA:  And

26  (indiscernible) you have several jobs, and the

27  most recent job is the (indiscernible) Porter?

34

1          INMATE PLAZA:  Yes.

2          DEPUTY COMMISSIONER MEJIA:  And you have

3    an associate (indiscernible).  During your

4    incarceration you went to education

5    (indiscernible) electronics -- vocational

6    Electronics, Air Conditioning Refrigeration, Dry

7    Cleaning, Plumbing.  You were a Porter and also

8    a Teacher's Aide, Infirmary Dental Assistant.

9    And, you have a high school diploma that 1983.

10   You have a 12.0 TABE score.  (Indiscernible) you

11   have completed 32 units out of the Coastline

12   Community College?

13         INMATE PLAZA:  Yes.

14         DEPUTY COMMISSIONER MEJIA:  And, you -- I

15   see that you have really attempted to get some

16   trades -- completion of vocational trades.  You

17   have completed, I think, 19 certification units

18   when it comes to Air Conditioning and

19   Refrigeration?

20         INMATE PLAZA:  I've completed the whole

21   course.

22         DEPUTY COMMISSIONER MEJIA:  You completed

23   that whole course?

24         INMATE PLAZA:  Yes.

25         DEPUTY COMMISSIONER MEJIA:  That's a

26   problem.  I couldn't find a completion.  I saw

27   the Certificate of Completion for the -- each

35

1  unit that's a component to the Refrigeration.

2  So you do have it there?

3      INMATE PLAZA:  I believe --

4      DEPUTY COMMISSIONER MEJIA:  That would be

5  good for the record, because I -- I saw the

6  certifications units been completed

7  (indiscernible) and how about the Data

8  Processing?  I saw that you have completed 22

9  such units also?

10      INMATE PLAZA:  Yeah, that was not a total

11  completion --

12      DEPUTY COMMISSIONER MEJIA:  So,

13  Vocational Air Conditioning and Refrigeration --

14  you completed this?

15      INMATE PLAZA:  Yes.

16      DEPUTY COMMISSIONER MEJIA:  Okay.  That

17  is the documentation.

18      ATTORNEY RUTLEDGE:  (Indiscernible).

19      DEPUTY COMMISSIONER MEJIA:  You know,

20  well you said that you completed two trades but

21  I can't find them in the file.

22      INMATE PLAZA:  Yes, I understand the last

23  -- '95.  On one of my doc hearings -- I think

24  it's right here (indiscernible).  At one of my

25  doc hearings, the Commissioner went through my

26  paperwork and verified finding the --

27      DEPUTY COMMISSIONER MEJIA:  Do you have a

# EXHIBIT C
# Part 2 of 2

36

1  copy of that --

2       INMATE PLAZA:  -- chrono and the

3  certificate, but it is no longer in the file.

4  No, I do not have a copy.  It's no longer in the

5  file, but the Commissioner did see it at one

6  point in time.

7       DEPUTY COMMISSIONER MEJIA:  I saw that,

8  yeah.  The doc -- was that Patterson --

9  Commissioner Patterson?

10      ATTORNEY RUTLEDGE:  It looks -- Robert

11 Patterson, yeah.  It looks to be his signature.

12      DEPUTY DISTRICT ATTORNEY MORRISON:  This

13 (indiscernible) is that a progress hearing or

14 something?

15      PRESIDING COMMISSIONER BIGGERS:  No --

16 Documentation Hearing.  Before they go through

17 initial they give them (indiscernible).

18      DEPUTY COMMISSIONER MEJIA:  I don't see

19 any in here.  I've checked.  No, I know you

20 counted -- I counted 19 units.  I'm just

21 surprised that you have all these documents; you

22 don't have the -- I'm not saying that you're not

23 telling the truth, but you're so organized about

24 everything else.  But the most important is what

25 you have completed.  All the cert units are

26 there -- are there, and I know what you learned,

27 but the completion certificate is the most

37

1   important because that will count as a --

2          INMATE PLAZA:  I understand.

3          DEPUTY COMMISSIONER MEJIA:  -- check

4   completed.  And, I cannot depend on what the

5   Deputy Commissioner saw.  Maybe he had the

6   mistake of easing certification of it or

7   completion of it.  I look at your file, and it's

8   like I said, you've got everything else but I

9   can't see the completion.  Even on the other,

10  you know your education progress reports.

11  Nothing says (indiscernible) that you completed,

12  but I'm giving you credit for 19 certification

13  units of Air Conditioning and Refrigeration.

14  You also took some vocational Dry Cleaning,

15  which you haven't completed --

16         INMATE PLAZA:  It's also a completion.

17         DEPUTY COMMISSIONER MEJIA:  Oh, yeah?

18  What year did you complete that?

19         INMATE PLAZA:  I believe it's -- it's on

20  that same page or the one before.

21         DEPUTY COMMISSIONER MEJIA:  I guess, I

22  think you should just bring me the completion

23  chrono.

24         INMATE PLAZA:  I don't have them

25         ATTORNEY RUTLEDGE:  Four ten '95 is what

26  he has noted here, 4/10/95.

27         INMATE PLAZA:  The last time I went

38

1    through the Board that -- when Patterson went

2    through the doc hearing -- when I went through

3    the doc hearing with Patterson -- '95.  I had

4    the paperwork with me.  When I hit Avenal I lost

5    half of my property and since then I have not

6    had --

7            DEPUTY COMMISSIONER MEJIA:

8    (Indiscernible) contact the vocational --

9    education where you took it -- the prison where

10   you took it, and ask for a copy of the

11   completion chrono or something to prove that you

12   have completed it.  That's something you can do.

13           ATTORNEY RUTLEDGE:  It says the

14   Refrigeration would have been 10/1/91, so that

15   was --

16           PRESIDING COMMISSIONER BIGGERS:  Excuse

17   me, Commissioner Mejia.  When you went through

18   your C-file, did you not notice that those

19   things were not there?

20           INMATE PLAZA:  I did, but when I had seen

21   that paperwork from the Chairman the --

22   Commissioner, from the doc hearing, I thought it

23   was going to be enough since he seen it and

24   noted it on his record.

25           PRESIDING COMMISSIONER BIGGERS:  Yeah,

26   but (indiscernible) entirely different Panel we

27   have to go by the documentation --

39

1          INMATE PLAZA:  I understand.

2          PRESIDING COMMISSIONER BIGGERS:   So,

3    whenever you review whatever make sure that you

4    have those papers.

5          DEPUTY COMMISSIONER MEJIA:  Did you

6    complete your Vocational Plumbing?

7          INMATE PLAZA:  No, I was never in

8    plumbing.  I don't know where plumbing came

9    from.

10          DEPUTY COMMISSIONER MEJIA:  Well I have

11    your diploma that -- Mr. Plaza has been unable

12    to complete any certification units in

13    vocational plumbing due to his being house in

14    Level IV.  Student left in the plumbing class

15    long enough to be fully evaluated.

16          PRESIDING COMMISSIONER BIGGERS:  What

17    prison was that in?

18          DEPUTY COMMISSIONER MEJIA:  ASP Avenal --

19    Avenal State Prison.

20          INMATE PLAZA:  I was in Wasco for, I

21    think, three months and two weeks.  But I was

22    never in plumbing that I can remember.  Soon as

23    I got there they came out with the new law of

24    the Close Custody  not being, you know, not

25    being able to be in that facility they

26    transferred me over here.

27          DEPUTY COMMISSIONER MEJIA:  Well, we'll

40

1  just leave it that you're claiming that you have

2  completed Air Conditioning and Refrigeration; is

3  that correct?

4       INMATE PLAZA:  Dry Cleaning, Air

5  Conditioning and Refrigeration.

6       DEPUTY COMMISSIONER MEJIA:  Dry Cleaning

7  you have completed?

8       INMATE PLAZA:  Yes.

9       DEPUTY COMMISSIONER MEJIA:  What year was

10  the dry cleaning, again?

11       INMATE PLAZA:  I believe it was '94 --

12       ATTORNEY RUTLEDGE:  The Dry cleaning was

13  -- I have completed 4/10/95, the Dry Cleaning

14  and then the Air Conditioning, 10/1/99.  What

15  was the other one?

16       DEPUTY COMMISSIONER MEJIA:  Most recent

17  (indiscernible) Home Inspection.

18       INMATE PLAZA:  I got that.

19       DEPUTY COMMISSIONER MEJIA:  Okay.  So,

20  you're saying that you completed Air

21  Conditioning and Vocational Dry Cleaning?

22       INMATE PLAZA:  Yes.

23       DEPUTY COMMISSIONER MEJIA:  And Air

24  Conditioning Refrigeration?  Anything else?

25       INMATE PLAZA:  The Home Inspection, and

26  the --

27       DEPUTY COMMISSIONER MEJIA:  I'll go

41

1  through that.  But the actual vocational trade

2  (indiscernible) because I know you took Data

3  Processing, you did --

4          INMATE PLAZA:  No, no --

5          DEPUTY COMMISSIONER MEJIA:  -- assembly

6  --

7          INMATE PLAZA:  Yeah, I was not in the

8  class --

9          DEPUTY COMMISSIONER MEJIA:  Well, these

10  are the two major ones that you're saying that

11  you completed.  Dry Cleaning, and Air

12  Conditioning and Refrigeration.

13          INMATE PLAZA:  Yes.

14          DEPUTY COMMISSIONER MEJIA:  And then you

15  did have -- completed the International

16  (indiscernible) institute course, 8/23/1994.

17          INMATE PLAZA:  That's Dry Cleaning.

18          DEPUTY COMMISSIONER MEJIA:  That's

19  connected to Dry Cleaning?

20          INMATE PLAZA:  Yes.

21          DEPUTY COMMISSIONER MEJIA:  Then you have

22  -- you been in AA since 1994?

23          INMATE PLAZA:  Ninety-three, '93, yeah

24  somewhere around there.  I don't remember the

25  exact date.

26          DEPUTY COMMISSIONER MEJIA:  But the

27  chrono I saw was for '94.

42

1        INMATE PLAZA:  Ninety-four.

2        DEPUTY COMMISSIONER MEJIA:  Okay, that's

3    fine.  And you're still going --

4        INMATE PLAZA:  Yes.

5        DEPUTY COMMISSIONER MEJIA:  -- according

6    to these last chronos, 4/1/2006.  Going to the

7    (indiscernible) Labauche Literacy Program, peer

8    education program, Christian Fellowship, courses

9    in Anger Management 2005, CLN courses, you've

10   been (indiscernible) also Christian basic

11   classes, you been involved in Teddy Bear

12   (indiscernible) Teddy Bear Drive, Softball -- I

13   see all this stuff in there.  But I'm concerned

14   about the major ones; AA, NA, Anger Management,

15   (indiscernible) Impact is good.  Impact

16   programming -- you did some peer education

17   program (indiscernible) sexually transmitted

18   diseases, Hepatitis.  You did some Bible --

19   seven-week Bible Study series Christian Living.

20   Let's see.  Anything else you want to add?

21       ATTORNEY RUTLEDGE:  Can I ask you,

22   Commissioner, would you -- do you have the

23   completion of AA since '94 or we don't?

24       DEPUTY COMMISSIONER MEJIA:  I have the

25   chronos since 1994.  What's the first one --

26       ATTORNEY RUTLEDGE:  Okay, I just wanted

27   to make sure we didn't need to verify --

43

1        DEPUTY COMMISSIONER MEJIA:  Oh, no, it's

2    good --

3        ATTORNEY RUTLEDGE:  Thank you.

4        DEPUTY COMMISSIONER MEJIA:  -- 1994,

5    group therapy in 1994 is the first documentation

6    of him going to AA.  He did make (indiscernible)

7    time positively.  He did some softball.  You

8    been going to softball, playing games and you're

9    part of the team and like I said -- anything

10   else?  Those are the major ones that I have.

11   I've (indiscernible) that you have completed.

12   No 115s and no 128(a)s.  According to the 812

13   you do have affiliation or membership in

14   Southside King Cobra.  I have no other -- other

15   than the 812 that the counselor completes every

16   year when you go to classification I have no

17   other information about him being involved in

18   any gang (indiscernible) in prison,  And, now

19   we're going to go through your psych reports.

20   Of course, there's two.  Since this is your

21   initial, we're gonna do -- I'm gonna read both

22   the -- this was done -- the first one was done

23   in July 21st, 1994, in Lancaster, by Dr. Isaac

24   (indiscernible), and the diagnosis -- Diagnostic

25   Impression at that time is Axis I, Poly

26   Substance Abuse; Axis II, Combat Disorder, group

27   kind; Axis III, to be evaluated by physicians;

44

 1   Axis IV, Psycho Social Stressors, from mile to

 2   moderate incarceration; Axis V, Global

 3   Assessment of Functioning of 70, sentence and

 4   incarceration; and according to the doctor that

 5   their recommendation is -- he said at that

 6   present time,

 7        "In 1994 it was difficult to

 8        assess the psychopathology that's

 9        related to the crime.  The inmate

10        does not reveal many details due

11        to the appeal process.  However it

12        seems that he was involved in

13        behavior (indiscernible) by lack

14        of regard for others, drugs and

15        alcohol abuse.  The inmate has

16        improved while incarcerated.  He

17        made a statement 'I grew up.  I'm

18        mature.'  Quote unquote.  It's

19        also an observation of his

20        examiner.  The inmate was able to

21        express himself in a manner that

22        indicated (indiscernible)

23        increased maturity.  Living in a

24        controlled setting it is too early

25        to make any assessment.  However

26        his record indicates that he is

27        able to follow rules and

45

1        regulations and is also doing

2        above average programming.

3        (Indiscernible) recommended that

4        --"

5        [Thereupon the tape was turned over.]

6        `DEPUTY COMMISSIONER MEJIA:   --

7    psychological report on Mr. Plaza.   "It is

8    recommended for him to continue his work

9    involving trade and other meaningful

10   activities."   Then we have the most current,

11   which is -- which is dated April 15th, 2006, by

12   Dr. Macomber, M-A-C-O-M-B-E-R, and the

13   Diagnostic Impression is Axis I, Drug and

14   Alcohol Abuse by history; Axis II, no

15   personality disorder; Axis III, no physical

16   disorder; Axis IV, Life Term Incarceration, GAF

17   of 95.   This --

18        "He does speak in excellent

19        English as well as Spanish.

20        Affect was appropriate.   There was

21        no evidence of anxiety or

22        depression.   Eye contact was good.

23        His memory was intact

24        (indiscernible) was intact.   His

25        insight and self-awareness were

26        good.   Assessment of

27        Dangerousness.   In the potential

46

```
 1        -- the prisoner's potential for
 2        dangerous behavior in the
 3        institution.  Mr. Plaza has
 4        remained entirely
 5        disciplinary-free.  This is
 6        commendable."
 7   And the Causative Factors,
 8        "He said that he has disassociated
 9        himself from the activity of
10        Hispanic (indiscernible).  No
11        evidence that he had ever been
12        involved in riots, possession of
13        weapons, assaults and other --
14        threats of any kind.  At this time
15        in this prison we have been --
16        there has been frequent riots, and
17        it is very difficult for a
18        Hispanic male to disassociate
19        himself from this activity which
20        can spontaneously occur in front
21        of him and if he doesn't get
22        involved he will receive
23        retaliation.  In this case
24        remaining disciplinary-free is a
25        very difficult and commendable
26        achievement.  But because of his
27        being disciplinary-free
```

47

| | |
|---|---|
| 1 | (indiscernible) finds him |
| 2 | definitely below average in |
| 3 | comparison to other inmates. |
| 4 | (Indiscernible) considering his |
| 5 | dangerous behavior in the |
| 6 | community -- potential for |
| 7 | dangerous behavior in the |
| 8 | community, Mr. Plaza has no prior |
| 9 | arrest for violence before the |
| 10 | commitment offense.  He did |
| 11 | receive an arrest as an adult |
| 12 | making a (indiscernible) spraying |
| 13 | a one-inch diameter dot on the |
| 14 | wall.  He remains |
| 15 | disciplinary-free in the |
| 16 | instituting.  In order to examine |
| 17 | this prisoner's level on parole, |
| 18 | the level of (indiscernible) was |
| 19 | administered and it's indicated |
| 20 | the 12 measures that assess |
| 21 | criminal history, substance abuse |
| 22 | history, current adjustment, and |
| 23 | other factors to determine risk |
| 24 | level -- this measure he obtained |
| 25 | a score of 3.6 (indiscernible) |
| 26 | frequencies for prison for prison |
| 27 | inmates.  This means that if 100 |

48

1       men were released on parole, he

2       would be (indiscernible) better on

3       parole that 96 of them.  This is a

4       very low risk level; as a result

5       he poses no more threat to society

6       than the average citizen in the

7       community, and probably less

8       threat to society at this point in

9       his life.  At the time of his

10      offense, drugs and alcohol were a

11      problem.  However, at this point

12      in his life it is no longer an

13      issue therefore there are no

14      significant risk factors for this

15      case."

16 Any addition to my presentation, counsel, that I

17 missed -- you want to --

18      ATTORNEY RUTLEDGE:  Did you mention how

19 he's helped other -- he's been like a mediator

20 for other gangs?

21      PRESIDING COMMISSIONER BIGGERS:  Yeah, he

22 mentioned that.

23      ATTORNEY RUTLEDGE:  Okay (indiscernible).

24 That covers everything that we had including

25 what we submitted.

26      PRESIDING COMMISSIONER BIGGERS:  Okay,

27 we're going to parole plans.  Residence plans;

49

1    you're living with your brother Hector Plaza.

2    Hector's residence is 353 Carla Drive, Simi

3    Valley, California, 93063, and it's got a phone

4    number here.  Employment; Plaza plans on working

5    Italia International, 4175 Dragon Street, Simi

6    Valley California.  I saw the letter of -- that

7    documents that.  Also your brother's letter.

8    Assessment in re of Plaza's parole plans.  "This

9    counselor does not foresee any problems.

10   However, it's recommended that Plaza updates his

11   parole letters prior to this hearing."  I have

12   -- this letter's here (indiscernible) Dale Air

13   International from Nick Gillichbauer,

14   G-I-L-L-I-C-H-B- as in Boy A-U-E-R.  It's

15   indicated that he's the General Manager of the

16   organization and he's willing to give him

17   employment in the company and he will make $9.00

18   per hour as an assembler, working in assembly

19   with the basic hours of 7 o'clock to 3:30 p.m.

20   He will have (indiscernible) basic benefits of

21   medical and dental.  And there -- some of your

22   support letters now.  Jessica Plaza, dated

23   February 20, 2006, a support letter indicating

24   that -- lots of support from all the family and

25   we need to (indiscernible) his mind and heart

26   set to accomplish all the right things and not

27   wrong things, for taking time to read this

50

1    letter of support.  She (indiscernible) says

2    that she will -- Isabelle Plaza.  Your sister

3    also wrote a letter February 5, 2006.  It

4    doesn't say that you can -- yeah, it's

5    supporting your release, but -- so Jessie --

6    Jesus Plaza is some brother that you're going to

7    be staying with --

8              INMATE PLAZA:  No -- my dad is Jesus.

9              DEPUTY COMMISSIONER MEJIA:  Your dad --

10   your dad is Jesus Plaza?  There's another

11   letter, February 5, 2006.  It says that you're

12   ready to go back to society.  There is Hector

13   Plaza, November 12, 2005.  He should be granted

14   parole.  He said that you should be granted

15   parole and of course you have become a positive

16   role model for everyone.  He said that you will

17   always have a home here with his wife and

18   children, and I also plan on supporting him

19   financially with whatever it takes to help you

20   get on your feet.

21             INMATE PLAZA:  Correct.

22             DEPUTY COMMISSIONER MEJIA:

23   (Indiscernible) Ministry (indiscernible) these

24   are your aunts and uncles --

25             INMATE PLAZA:  Yes.

26             DEPUTY COMMISSIONER MEJIA:  Yolanda Plaza

27   and Arto (Phonetic) Plaza.  He's a Pastor in a

51

1  church?

2       INMATE PLAZA:  Yes, he is.

3       DEPUTY COMMISSIONER MEJIA:  They will

4  provide you counseling, and will be able to

5  provide you mentors and he's also owner of a

6  construction business and would be services --

7  if he needs employment -- if you need employment

8  he will be able to give you employment.

9       INMATE PLAZA:  He's also offering me to

10  stay in his home.  He gave me -- it's actually

11  in this other packet -- has his phone number,

12  cell number, anything you might need to ask him

13  any further questions.

14       DEPUTY COMMISSIONER MEJIA:  Helen Plaza

15  is your mother?

16       INMATE PLAZA:  Yes.

17       DEPUTY COMMISSIONER MEJIA:  And I have a

18  support letter here, asking that you should be

19  -- asking for your release.  She also said that

20  you'll have a house to come home -- when you

21  come home.  Rachel Plaza, I think is your

22  sister?

23       INMATE PLAZA:  Yes, correct.

24       DEPUTY COMMISSIONER MEJIA:

25  (Indiscernible) you have her total support,

26  either financially -- financial support.

27  Christina Plaza, this is your daughter.

52

1            INMATE PLAZA:  Yes.

2            DEPUTY COMMISSIONER MEJIA:  Asking that

3    -- how old is she?

4            INMATE PLAZA:  She is 19.

5            DEPUTY COMMISSIONER MEJIA:  Oh.  You have

6    -- she indicates that you have supported her by

7    teaching (indiscernible) classes.  Thinks you

8    should be -- she's going to college.  She's

9    looking for work to help (indiscernible) you,

10   any way possible.  And we have Guadalupe Plaza,

11   your wife?

12           INMATE PLAZA:  Yes.

13           DEPUTY COMMISSIONER MEJIA:  Another

14   support letter.  She says I will support him in

15   ever way that he needed for him to meet his

16   parole conditions.  Isaiah Plaza, your son?

17           INMATE PLAZA:  Yes.

18           DEPUTY COMMISSIONER MEJIA:  He -- how old

19   is he?

20           INMATE PLAZA:  He's ten.

21           DEPUTY COMMISSIONER MEJIA:  Ten.  And

22   there's another one, Ramona Plaza, your -- your

23   daughter, too?

24           INMATE PLAZA:  That's correct.

25           DEPUTY COMMISSIONER MEJIA:  Letter of

26   support.  Annette Gizmalla (phonetic).  That's

27   your sister?

53

1        INMATE PLAZA:  Yes.

2        DEPUTY COMMISSIONER MEJIA:  Another

3   letter of support.  She says she owns her own

4   and will provide a place for you to live, help

5   you financially and help you enter your programs

6   with counseling to help you deal with everyday

7   life's events for as long as it takes.  And

8   Alicia Desente Islanded (phonetic), who is this?

9   Oh, this is -- this looks like it's a different

10  one.  Who's Juan Jose (indiscernible)?

11       INMATE PLAZA:  Excuse me.

12       ATTORNEY RUTLEDGE:  One from Mexico?

13       DEPUTY COMMISSIONER MEJIA:  You have -- I

14  couldn't read this.  9805 Jessie Plaza, okay,

15  H12371 that's you.  And, for M. Espinoza -- this

16  is a friend?

17       INMATE PLAZA:  Yes, it is.

18       DEPUTY COMMISSIONER MEJIA:  Okay.  It's

19  another letter of support.  And, Chaplain

20  (indiscernible) Lindsey -- this is the Chaplain

21  here in the prison --

22       INMATE PLAZA:  Yes, it is.

23       DEPUTY COMMISSIONER MEJIA:  Okay.  Letter

24  of support and he said that you have been an

25  outstanding gentleman since his observation of

26  you since 1998.  He was appointed Music Deacon

27  in 2003.  You a musician?  You play music?

54

1          INMATE PLAZA:  No.  No.  I just direct

2     the choir.

3          DEPUTY COMMISSIONER MEJIA:  Oh.  He said

4     that you have -- he has seen phenomenal changes

5     in your life during these years and he's a

6     wonderful role model, conscious of people's

7     needs, feelings and (indiscernible).  He's truly

8     an asset to our religious program here at CTF.

9     And he highly recommends consideration of the

10    Board of Prison Terms and this gentleman has --

11    he feels that you will be an outstanding asset

12    in the community.  Nabia Anegias (phonetic),

13    cousin?

14          INMATE PLAZA:  Say the name again?

15      .     ATTORNEY RUTLEDGE:  Yeah, it's his

16    cousin, Nadia Anegus (phonetic).

17          DEPUTY COMMISSIONER MEJIA:  Nadia Anegus,

18    another support letter.

19          ATTORNEY RUTLEDGE:  Oh, well, you know

20    what -- it's from the Juan (indiscernible)

21    files.  Poor Juan Reevus, (indiscernible) find

22    these letters.

23          DEPUTY COMMISSIONER MEJIA:  Okay, Jessie

24    Plaza and that this is from an (indiscernible)

25    from Glenbrook, Philadelphia?

26          INMATE PLAZA:  Yes.  That's actually --

27    that's my sister --

55

1          DEPUTY COMMISSIONER MEJIA:  Your sister?

2          INMATE PLAZA:  Yes.  She married -- her

3    name changed to Guerum (phonetic) but --

4          DEPUTY COMMISSIONER MEJIA:  She said that

5    she will continue to support you after release

6    until you get back on your feet.  She also

7    offers her home.

8          INMATE PLAZA:  Yeah.

9          DEPUTY COMMISSIONER MEJIA:  Guadalupe

10   Plaza, that's your wife.  You said 2000 -- I

11   don't know what year was this one, but I read

12   (indiscernible) I know she's going to support

13   you.  January 7th, 2005, Jesus Plaza -- your

14   father.  Right?

15         INMATE PLAZA:  Yes, that's correct.

16         DEPUTY COMMISSIONER MEJIA:  Okay.  Ramona

17   Plaza --

18         INMATE PLAZA:  My daughter.

19         DEPUTY COMMISSIONER MEJIA:  Your

20   daughter.  Isaiah Plaza -- I read that.

21         PRESIDING COMMISSIONER BIGGERS:  Some of

22   them are duplicates, some are from 2005 and some

23   are 2006.

24         DEPUTY COMMISSIONER MEJIA:  Anything else

25   (indiscernible)?

26         ATTORNEY RUTLEDGE:  I think you've

27   covered every letter and more and even those

56

1    that didn't belong to us.  So, thank you.

2         DEPUTY COMMISSIONER MEJIA:  And let me

3    turn this back to the Commissioner.

4         PRESIDING COMMISSIONER BIGGERS:  Okay,

5    thank you.  I just have one question there.  I

6    see that you want to parole to your brother.

7    Why aren't you paroling back to your wife?

8         INMATE PLAZA:  Oh, yes, my wife moved in

9    with her sister two years ago.  Her mother'd

10   been fighting cancer.  Unfortunately her mother

11   passed away November of last year, and currently

12   she's still living with her sister.  But upon my

13   release, hopefully within the next, you know,

14   within three to six months, between the both of

15   us we'll have the money to put a first and last

16   down payment, you know, that you need for your

17   -- our own place so that we can live together.

18   But currently she's with her sister.

19        PRESIDING COMMISSIONER BIGGERS:  Did I

20   miss anything -- talking about the, what little

21   we could talk about the crime --

22        ATTORNEY RUTLEDGE:  You know, I meant to

23   point out to you -- it's up to your discretion.

24   He did provide a version in the Board Report.

25        PRESIDING COMMISSIONER BIGGERS:  Yeah, I

26   saw that.

27        ATTORNEY RUTLEDGE:  Other than that,

57

1    except for Closing Statement, we have nothing

2    else to --

3         PRESIDING COMMISSIONER BIGGERS:    To talk

4    about -- okay.  At this point then I'm gonna ask

5    the District Attorney if he has any questions

6    for the -- Mr. Plaza.

7         DEPUTY DISTRICT ATTORNEY MORRISON:    Okay.

8    Did I hear the inmate say that he accepted

9    responsibility for the crime an hour into the

10   law enforcement interview?

11        INMATE PLAZA:    Correct.

12        PRESIDING COMMISSIONER BIGGERS:    Please

13   direct your answers to (indiscernible).

14        DEPUTY DISTRICT ATTORNEY MORRISON:    Just

15   a moment, please.  So at the time of his trial,

16   the inmate accepted full responsibility for the

17   crime.

18        INMATE PLAZA:    Correct.

19        DEPUTY DISTRICT ATTORNEY MORRISON:    Thank

20   you.  I have no further questions.  Oh, wait a

21   minute.  Does the inmate know what the matrix

22   for this crime is?

23        INMATE PLAZA:    I believe it's 27, 28

24   years.

25        DEPUTY DISTRICT ATTORNEY MORRISON:    Thank

26   you.  Nothing further.

27        PRESIDING COMMISSIONER BIGGERS:    Okay,

58

1  thank you, sir.  Ms. Rutledge.

2        ATTORNEY RUTLEDGE:  Thank you.  In

3  looking through some of your information I came

4  across a letter that's -- I wanted to ask you

5  about this letter.  It's addressed to all family

6  members, loved ones, and friends of Patrick

7  Littlebull.  You made an attempt to submit an

8  apology letter to his family or to the District

9  Attorney?

10        INMATE PLAZA:  I mailed that to the

11  address indicated on the (indiscernible).

12        ATTORNEY RUTLEDGE:  All right.  And what

13  was -- I didn't see the -- what was the address?

14        INMATE PLAZA:  Is it not on the

15  letterhead of the --

16        ATTORNEY RUTLEDGE:  Oh, the

17  Correspondence Division in Sacramento.

18        INMATE PLAZA:  Yes.  Sacramento, yes.

19        ATTORNEY RUTLEDGE:  Okay, and that was

20  dated June 15th, 2004.  It -- I'll go ahead and

21  leave it if the Board wishes to review it, but I

22  think you wrote it on the prompting of Impact?

23        INMATE PLAZA:  Yes, correct.

24        ATTORNEY RUTLEDGE:  Anyway, I just wanted

25  to note that this letter -- he had written a

26  letter to the family, and what did you learn in

27  Impact?

59

1      INMATE PLAZA:  Do you want to be

2  specific, or do you want me to tell you

3  everything that I learned in Impact?

4      ATTORNEY RUTLEDGE:  Well, what changed

5  your life about Impact?

6      INMATE PLAZA:  I'd have to say the thing

7  that was a drastic blow to me more than anything

8  was there was an individual by the name of Angie

9  Torres, her son was killed in a drive-by here in

10  Salinas and I had the opportunity to sit down

11  with her and discuss with her some of the

12  specifics of my crime and in sharing with her --

13  she had not shared with me but I shared with

14  her, and upon finishing my, you know, my talk

15  with her I introduced her -- I am a facilitator

16  of Impact -- I introduced her and I went and sat

17  down with the audience in the pews and then she

18  had her opportunity to get up and give a

19  presentation, and when she gave the presentation

20  the similarities of what happened to her son was

21  just -- it was eerie because they were just so

22  close, and afterwards we had the opportunity to

23  talk and she told me, you know, that -- she

24  said, yeah you don't know what you did when you

25  were talking to me.  She says, you know, and you

26  didn't even know my story and the same for me.

27  I didn't know her story, but yet I shared with

. 60

1    her, and then upon learning her story it just --

2    it blew me away because I just realized what it

3    must have felt like to be on the other side.

4    Because in Impact that's one of the things that

5    we teach.  We teach victim awareness.  We teach,

6    you know, so many people are used to being on

7    the side of the crime -- on the side of, you

8    know, being the wrong one, and they never know

9    what it's like to be on the other side.  Most

10   guys come out of that program with a totally

11   different vision of crime.  A lot of them come

12   out and they say, wow, I never knew that I had

13   that impact on my victims.  So it -- it really

14   -- it had -- it gave me a greater view, you

15   know.  It wasn't just that focus on one person

16   or one individual.  It opened my understanding

17   of how many -- how great an effect it had.

18        ATTORNEY RUTLEDGE:  What about the people

19   in this room?  Do you think this offense affects

20   us?

21        INMATE PLAZA:  Oh, definitely,

22   definitely.  I believe it does because -- again,

23   speaking on the ripple effect, not only did it

24   effect him, his family, his friends or his loved

25   ones, but it effected society and I realize that

26   it all trickles down and what happens is taxes,

27   money, time spent, you know, it all, you know,

61

1  it's a ripple effect that never reaches the

2  banks of the water.

3      ATTORNEY RUTLEDGE:  All right.  And,

4  there's a statement in the Probation Report

5  that's pretty negative about you.  I mean,

6  you're in a car with gang-bangers and someone is

7  shot and killed and left to die on the street.

8  How do you go from that to the person that you

9  are today?  What happened?

10     INMATE PLAZA:  I would have to say even

11 though I chose that -- to hang around with them

12 type of people, you know, chose to be around

13 that lifestyle, in all honesty I never expected

14 to end up in prison and upon --

15     ATTORNEY RUTLEDGE:  (Indiscernible).

16     INMATE PLAZA:  -- honestly I didn't.  But

17 upon me actually making it to prison due to bad

18 choices, it was just a slap in the face, you

19 know.  It was just reality and when it hit me I

20 realized that, you know, everything that I had

21 been doing, you know, reality was what I got,

22 you know, being in prison and it wasn't

23 something that -- it just didn't sit right with

24 me, and I knew that this wasn't me, you know.  I

25 didn't -- I didn't want to -- I didn't want to

26 be in prison or be one of them persons that go

27 in and out of prison, so it was a -- it was a,

62

1    you know, it was a rude awakening.

2         ATTORNEY RUTLEDGE:  No further questions.

3         PRESIDING COMMISSIONER BIGGERS:  Okay.

4    Thank you.  At this point I'm going to ask Mr.

5    Morrison for his closing.

6         DEPUTY DISTRICT ATTORNEY MORRISON:  The

7    District Attorney opposes parole for this

8    outrageous heinous and premeditated, vicious

9    gang attack.  The inmate aided and abetted by

10   driving his vehicle over to the location of the

11   murder, parking it without its lights in what

12   the Appellate opinion described as almost lying

13   a wait attack.  And Mr. Littlejohn (sic) a rival

14   gang member was shot and killed.  He was not the

15   only victim.  The Bell Garden's Police Report

16   which had been submitted along with the

17   Sheriff's Homicide Report note that the

18   supplemental report Officer Winfrey,

19   W-I-N-F-R-E-Y, Bell Garden PD was staffed to the

20   home of witness Collins who found a hole in his

21   south kitchen window and an adjacent hole in the

22   wallboard next to the window.  The officer

23   observed a hole, approximately one inch in

24   diameter, in the lower portion of the south

25   kitchen window.  Glass fragments were present on

26   the interior window sill.  Another little hole

27   was present in the interior vertical portion of

63

1   the inside of the window frame, and the reason

2   this is significant is because the inmate with

3   his gang mentalities and his crime partner

4   sprayed bullets in a residential neighborhood.

5   One was recovered from victim Littlejohn which

6   was matched to the murder weapon which was found

7   secreted in the inmate's car.  The witnesses

8   which described in the reports, noted numerous

9   shots being fired and any one of those bullets

10   could have gone through the house like it did

11   Mr. Collins home and killed another innocent

12   person in their home, minding their own

13   business.  This is the kind of gang that's

14   plagued Los Angeles and all communities around

15   the state and country, senseless gang violence.

16   The motive was a retaliatory shooting because

17   the Bell Garden Locos had fired on King Cobra

18   earlier that night.  The inmate should be

19   commended; he's programmed well.  Not many

20   people come this long without a 115.  He is on

21   the way to turn his life around, as evidenced by

22   his programming.  However, the inmate still I

23   don't believe has come to grips with the crime

24   because he's still not candid with the Board.

25           ATTORNEY RUTLEDGE:  Objection.

26           PRESIDING COMMISSIONER BIGGERS:

27   (Indiscernible) statement.  Please continue.

64

```
 1            DEPUTY DISTRICT ATTORNEY MORRISON:   The

 2     inmate said he took responsibility into the

 3     Sheriff's interview, and this was documented at

 4     length in the Appellate Opinion as well as the

 5     statements contained in the police report.   This

 6     is in the Appellate Opinion, Page Four and Five,

 7     which has not been read into the record yet.

 8     "Deputy Sheriff Woods Danoff, D-A-N-O-F-F,

 9     interviewed appellant on May 27th, 1990."

10            ATTORNEY RUTLEDGE:   We would object to

11     the reading of the police report, just because

12     it's submitted there's still not adequate

13     foundation for it to be read into the record.

14            DEPUTY DISTRICT ATTORNEY MORRISON:   This

15     is the Appellate Opinion summarizing the

16     evidence at trial.

17            ATTORNEY RUTLEDGE:   I'm sorry, I thought

18     you said a Sheriff's Report.

19            PRESIDING COMMISSIONER BIGGERS:   Go

20     (indiscernible).

21            DEPUTY DISTRICT ATTORNEY MORRISON:   Page

22     Four in the Appellate Opinion, Deputy Sheriff

23     Woods Danoff, who is one of the two LA SD

24     homicide investigators in the case who

25     interviewed the inmate.

26            "He interviewed appellant inmate

27            on May 27th, 1990.  Appellant at
```

65

```
 1          first denied any knowledge of the
 2          shooting, maintaining he had been
 3          at a party at the time of the
 4          shooting.  After being informed
 5          that his car had been identified
 6          as being used in the homicide and
 7          that the gun had been recovered
 8          from the car, appellant admitted
 9          that he drove the car that was
10          used in the shooting -- "
11          DEPUTY COMMISSIONER MEJIA:  Excuse me --
12          PRESIDING COMMISSIONER BIGGERS:
13  Continue, Sir.
14          DEPUTY DISTRICT ATTORNEY MORRISON:   I'll
15  repeat the last sentence, since it was --
16          "After being informed that his car
17          had been identified as being used
18          in the homicide and that the gun
19          had been recovered from the car,
20          appellant admitted that he drove
21          the car that was used in the
22          shooting and (indiscernible)
23          supplied the weapon and the car.
24          Appellant claimed that the shooter
25          was named someone -- someone named
26          Oso, O-S-O, and that he neither
27          slowed the car down nor stopped
```

66

```
 1          the car and never turned off his
 2          headlights.  He claimed Oso later
 3          left the car and that he later
 4          picked up Silva and was giving him
 5          a ride to Silva's sister's house
 6          when they were stopped and
 7          arrested."
 8  Now, the inmate apparently is saying that's when
 9  he accepted responsibility.  I asked the inmate
10  specifically if he had accepted responsibility
11  in the testimony at his trial, and that is not
12  correct according to the Appellate report
13  summary of the inmate's testimony.  The inmate's
14  testimony, under oath, at trial was a denial.
15  The Appellate Report continues on the same page.
16          "Appellant testified he gave a
17          ride to a man named Oso who was
18          seeking to purchase cocaine.  Oso
19          told the appellant that he could
20          not use his own car because it was
21          hot.  While looking for the
22          cocaine to sell, the appellant saw
23          seven to ten men running at his
24          car.  The appellant accelerated
25          and hear Oso shout punks at the
26          men.  Oso then pulled out a
27          revolver and fired.  Appellant
```

67

1          drove away.  Appellant did not

2          know that Oso had a gun until he

3          fired it.  His car lights were not

4          turned off, and he slowed down

5          only for the purpose of finding

6          the cocaine dealer.  Oso tried to

7          hand appellant the revolver after

8          he fired it, but appellant pushed

9          it away and it fell into the part

10         of the car where the radio was

11         missing.  Appellant refused to

12         disclose the identity of Oso

13         saying he would be killed if he

14         did."

15    I submit that that is not accepting

16    responsibility for being the aider and abeter,

17    driving a fellow gang member over to the

18    location, parking with your lights out in what

19    the Appellate Court labeled almost lying in

20    wait, and allowing your crime partner to go up

21    and shoot a rival gang member motive being gang

22    retaliation, and as I had said spraying bullets

23    all around.  The defendant's testimony at trial

24    was a rejection of responsibility, a denial of a

25    commission of the file, and is absolutely not

26    what he told the Panel today that he accepted

27    responsibility in the trial.  He's basically

68

1    says, oh, I gave some dude a ride to go buy some

2    coke and then all of a sudden he pulls out a gun

3    and starts shooting somebody.  I had no idea.

4    That is not responsibility.  The inmate was

5    attempting to be exonerated of the crime.  The

6    Appellate Report Opinion goes into great length,

7    and I won't read it all, but on Page Six it

8    describes all the evidence testified by other

9    witnesses supporting of pre-meditated murder.

10          "The appellant's driving slowly

11          with his lights off, thus

12          eliminating attention to his

13          approaching car is strong evidence

14          of prior planning.  The approach

15          without lights is factually

16          similar to lying in wait and

17          illustrates a deliberate plan by

18          the occupants of the car to

19          approach to victim unnoticed so

20          that the killing could be

21          accomplished from a position of

22          surprise and advantage.  The

23          relationship between appellant and

24          the victim, each belonging to

25          rival gangs between which there

26          was bad blood provided evidence of

27          the appellant's motive for the

69

```
 1          shooting.   The manner of the
```
---
```
 2          shooting, one person shooting and

 3          another driving so as to

 4          facilitate an easy and rapid

 5          escape especially when coupled

 6          with appellant's slow approach to

 7          the scene with his lights off

 8          reflects that the killing resulted

 9          from a pre-conceived desire."

10   This is about as callous, cold-blooded and

11   calculated murder as you can have.  The only

12   thing was the appellant apparently did not pull

13   the trigger.  But he did everything short of

14   that.  The psych report in 1994, said well he

15   didn't really want to go into the details of it

16   because it was still on appeal.  Current psych

17   report just glosses over the apparent lack of

18   insight and says because of his good behavior he

19   is a low risk.  I submit that until he

20   demonstrates more credibility with the Panel and

21   more insight into his actual role and

22   participation, he has not taken responsibility

23   for it and therefore his statements of remorse
```
---
```
24   and the psych report are not actually supportive

25   because they really didn't delve into it.  The

26   fact that he hadn't been caught in other crimes,

27   had a minimal criminal record is commendable.
```

70

1  It's not really an escalating pattern of

2  violence. He did have summary probation, but

3  the inmate told the psychologist in 1994, which

4  was also kind of troubling, that he had the

5  mentality of a 15 year old. He indicated that

6  this tragic event, being convicted of murder,

7  was a quote "wake up call" --

8      ATTORNEY RUTLEDGE:  Objection. It

9  doesn't say being convicted of murder.

10      PRESIDING COMMISSIONER BIGGERS:  What

11  page are you on, sir?

12      DEPUTY DISTRICT ATTORNEY MORRISON:  I

13  just -- it doesn't. I am commenting on his

14  psych report. He's -- the inmate indicated --

15      PRESIDING COMMISSIONER BIGGERS:  Just a

16  second, sir. Okay. Let's keep this civil and

17  it's not written -- are you reading directly

18  from the psychologist's report?

19      DEPUTY DISTRICT ATTORNEY MORRISON:  I

20  read it and then I made a parenthetical comment.

21      PRESIDING COMMISSIONER BIGGERS:  Okay.

22  Then perhaps you should paraphrase it saying

23  your opinion. Continue.

24      DEPUTY COMMISSIONER MEJIA:  What is

25  interesting is talking about that the immature

26  behavior at the time -- that's on Page One of

27  the report, and he stated I had the mentality of

71

1   a 15 year old.  The official version read

2   described a juvenile man.  The inmate was 25 at

3   the time of his crime.  This is not a youthful

4   offender, unsophisticated (indiscernible).  This

5   isn't a 15 or 16 year old gang banger.  This is

6   a 25 year old out on a mission of revenge.

7           ATTORNEY RUTLEDGE:  Objection.  Mission

8   of revenge?  Where's that from?  You're supposed

9   to -- excuse me.  I just want to note that the

10  DA's supposed to -- your comments are supposed

11  to be supported by documentation.

12          PRESIDING COMMISSIONER BIGGERS:

13  (Indiscernible).

14          DEPUTY COMMISSIONER MEJIA:  The Appellate

15  Decision -- talking about a retaliatory gang

16  opinion -- member for a --

17          PRESIDING COMMISSIONER BIGGERS:  Let's --

18  let's -- okay.  Let's -- whenever --

19          DEPUTY DISTRICT ATTORNEY MORRISON:  this

20  is within the range of proper comment.

21          PRESIDING COMMISSIONER BIGGERS:  Then Mr.

22  Morrison, if we're gonna speculate I think we

23  need to make sure that we say and we make

24  (indiscernible) in your opinion or -- I don't

25  think that we should speculate on something of

26  this nature.

27          DEPUTY DISTRICT ATTORNEY MORRISON:

72

1   Commissioner, excuse me, but I'm permitted to

2   make public comment.  I'm not asking you to

3   speculate.  The Appellate Decision describes --

4        PRESIDING COMMISSIONER BIGGERS:  I

5   understand --

6        DEPUTY DISTRICT ATTORNEY MORRISON:  --

7   any motivation --

8        PRESIDING COMMISSIONER BIGGERS:  I

9   understand that.

10       ATTORNEY RUTLEDGE:  From another --

11       DEPUTY DISTRICT ATTORNEY MORRISON:  There

12  was a rival shooting.  There was a rival

13  shooting --

14       PRESIDING COMMISSIONER BIGGERS:  I

15  understand that.

16       DEPUTY DISTRICT ATTORNEY MORRISON:  Now,

17  if the gang goes out to retaliate --

18       PRESIDING COMMISSIONER BIGGERS:  Then

19  that's the way you should phrase it -- that

20  based on --

21       DEPUTY DISTRICT ATTORNEY MORRISON:  That

22  is what gang members refer to as getting

23  revenge.

24       PRESIDING COMMISSIONER BIGGERS:  I

25  understand that, sir.

26       DEPUTY DISTRICT ATTORNEY MORRISON:  And

27  my comment is that he was out on a mission of

73

1  revenge that resulted in the death and a shot up

2  neighborhood.  And therefore, a particularly

3  egregious crime under Dannenberg, as the Chair

4  noted the case the inmate submitted, and he is

5  unsuitable for parole and we ask for a three

6  year denial.  Thank you.

7         DEPUTY COMMISSIONER MEJIA:  Let's --

8  before you do your -- let me just put on the

9  record that he does have the completion

10  paperwork, because it was very confusing -- you

11  had to really look at it.  He did have Air

12  Conditioning completion in October 1997.  It's

13  just confusing.  It doesn't say he completed it.

14  It says his assignment (indiscernible) and Mr.

15  Plaza has completed 15 certification units, 100%

16  of the class.  Maybe that how we --

17         INMATE PLAZA:  A hundred percent of what?

18         DEPUTY COMMISSIONER MEJIA:  Of the class.

19  I don't know what it means, sir, but it does say

20  that he has completed -- units completed.  This

21  is the Education Progress Report.  Normally they

22  put here completed completion, but it just say

23  completed some of the curriculum -- that's when

24  he was a Clerk.  And then when he became a

25  student he completed 15 certification units,

26  100% of the class.  So I would say that is

27  completion.

74

1          PRESIDING COMMISSIONER BIGGERS:   All

2   right thank you.

3          DEPUTY COMMISSIONER MEJIA:   And then

4   another one is October 28, 2000 -- October 28th

5   -- April 28th, 1995, he completed his Vocational

6   Dry Cleaning.  Another confusing chrono here.

7   We may have to look at it again.  A handwritten

8   (indiscernible) Teacher's Aide and

9   (indiscernible) he was a key person assisting in

10  (indiscernible) Dry Cleaning program, all areas

11  in training and development of other students.

12  He has learned all aspects of this Dry Cleaning

13  business.  And it's noted here, reason for the

14  termination, his job change -- Job change

15  completed.  So which means I would say

16  (indiscernible) in 1994, (indiscernible) 1995 he

17  has completed the Dry Cleaning business.

18          PRESIDING COMMISSIONER BIGGERS:   So

19  basically you're saying the chrono's in support

20  of completion; just don't have the --

21          DEPUTY COMMISSIONER MEJIA:   Yeah, the

22  actual completions.

23          PRESIDING COMMISSIONER BIGGERS:   The

24  actual completions.  Ms. Rutledge, closing

25  please.

26          ATTORNEY RUTLEDGE:   Thank you for

27  verifying that for us, Commissioner.  While I'd

75

1   like to go off of the suitability factors, I

2   think that's most appropriate.  We're here today

3   because we -- well you know why we're here, the

4   legislature sets an open term for a crime such

5   as this and -- meaning that there is a belief

6   that persons committed for first-degree murder

7   may at some point become suitable members of

8   society, people who have paid their debt to

9   society, bettered themselves, and we can all

10  feel reasonably safe that they're out among us.

11  Had this commitment offense been of the -- had

12  it been truly lying in wait -- which is a

13  special circumstance of first-degree murder

14  punishable by death, we may not be sitting here

15  today.  The commitment offense itself, my client

16  has taken responsibility for it.  What was said,

17  his testimony to the Court, matches what he has

18  said in earlier reports.  And, under Dannenberg,

19  specifically Dannenberg, I think is supportive

20  of when you have to -- and I know you have to

21  weigh the commitment offense but weighing that

22  in, Dannenberg says if it doesn't take more than

23  it was necessary to complete the murder.  This

24  victim was shot and died within minutes.

25  There's no evidence of mutilation, there's no --

26  there were no other targeted victims.  We found

27  a bullet -- but we don't even know if anybody

76

1   was home: There's no evidence that there were

2   other people that were actually at harm at the

3   time of the shooting. In moving on to my

4   client's remorse for this offense. He has --

5   he's expressed today his remorse for this crime,

6   but I think more importantly his determination

7   to turn himself around. Had he been such a hard

8   core gang member, he'd never had made it this

9   far. We know that: We know how it is to enter

10  a prison on a Level IV and what it takes to

11  survive. And it takes a lot of determination.

12  It takes somebody who truly does realize that,

13  you know, there's a better way to live. And, I

14  think to his, you know -- the prison Chaplain

15  (indiscernible) he doesn't write letters for

16  very many inmates. This is the first one I've

17  seen. And he wrote something really important

18  because I think -- I think this really says it

19  all about my client as far as remorse would go,

20  I think that that I would speculate and submit

21  that that's -- he could be programming doing

22  everything he's supposed to do and not go to

23  church. There's got to be some -- I would

24  submit or speculate that perhaps he's got some

25  insight and a conscience to where he feels the

26  need to associate with the church. And, there

27  was a paragraph that wasn't read during the

77

1    letters that I just wanted to say and it was
2    written by Chaplain Lindsay. And it says,
3          "People often ask me what kind of
4          results I see in my work here in
5          the prison. I will hold up one
6          hand showing the number five, and
7          they will say those odds aren't
8          very good since there are more
9          than 7,000 plus inmates in your
10         facility. To which I'll reply,
11         you're right, except I look at it
12         as mining for diamonds and when
13         you find one you have some -- when
14         you find one you have something of
15         value."
16   Well, inmate Plaza is one of those diamonds.
17   You know, I'm not going to sit her and
18   regurgitate all of his accomplishments and the
19   binder he provided to the Board -- we've gone
20   over them. In every area of programming he's
21   met -- he's met self-help, he admits his
22   substance abuse, he's been treating that
23   substance abuse, he's done Impact, he's done
24   Anger Management, he's participating in sports,
25   he has an excellent job record. He's actually
26   got a chrono from his supervisor in Culinary
27   who's recommending him for a job, I mean,

78

1    anticipating that an employer on the outside

2    where the public has access to the restaurant

3    that he's going to present that in a public

4    place and ask for employment. He has, you know,

5    taken other health courses and has not had a 115

6    or anything in 15 years, which is extremely

7    commendable. And again, that more expresses, I

8    think, his insight in to literally reversing his

9    life. He said he was leading an irresponsible

10   life at that time; however he did work and

11   support his wife and children. Did you have one

12   child at that time or --

13        INMATE PLAZA:  Two.

14        ATTORNEY RUTLEDGE:  He had two that he

15   supported. So he did -- it was like he said, he

16   was kind of a -- he was a dysfunctional person

17   over all, but able to maintain a job and take

18   care of his family which indicates that there

19   are pro social qualities in this man. He's not

20   just some thug out there, you know, blowing

21   people away. He has a very stable social

22   history as far as being with his family, being

23   married. He's still married to the same woman;

24   still has three children. Appreciates the

25   impetus he put on her when he entered the

26   institution and forced her into being a single

27   parent. He's got letters from his children that

79

1    he's attempting to father from prison, cousins,

2    other assortment of persons, and also he has at

3    least two job offers.  One from Mr. Rentaria

4    (phonetic) and then one from his previous

5    employer -- was it --

6           INMATE PLAZA:  Yes.

7           ATTORNEY RUTLEDGE:   -- where he worked.

8    He had a good job record there before he entered

9    the institution.  And aside from all the great

10   things he's done which I think all point to

11   suitability and the fact that he has expressed

12   his remorse and does, by his actions not just

13   his comments, have insight into how much trouble

14   he created with this offense and saw what he

15   needed to do to turn it around.  But I think we

16   do -- I think oftentimes in these types of cases

17   there's the white elephant in the room, which is

18   time.  This is his first hearing and it's almost

19   a given that nobody gets paroled their first

20   hearing.  I think the jargon is always he needs

21   to maintain his gains or you point to the

22   commitment offense, but I think that the

23   suitability --

24          DEPUTY COMMISSIONER MEJIA:   -- hold it.

25   [Thereupon the tape was changed to Tape Two.]

26          DEPUTY COMMISSIONER MEJIA:  Okay, go

27   ahead, continue.  Second side, second set of

80

1    tapes for Mr. Plaza.

2         **ATTORNEY RUTLEDGE:**  I do believe that

3    this man meets every single suitability factor.

4    He has completed his programming -- I mean, he

5    remains active in his programming and he's done

6    all those things necessary to show us that he's

7    serious about release and I think the only

8    question that would linger would be time,

9    because often we don't see people paroled by

10   their first hearing but I would say this man is

11   one of the few cases that we see where he's

12   suitable at his first hearing.  He's suitable.

13   He's prepared to enter the outside.  He's got a

14   plan and the information he submitted to the

15   Board wherein he's going to -- exactly what he's

16   going to do when he walks out the doors.  I

17   would just ask this Board -- I know it's a

18   difficult job for you and I know you've gotta

19   consider the person paying their debt to society

20   because that's part of our justice system, but I

21   would ask you to -- to give this man a different

22   look as somebody who is suitable, who has served

23   enough years according to what the Legislature

24   said and please grant him a parole date, or if

25   you find him suitable set a term for him today.

26   Thank you.

27         **PRESIDING COMMISSIONER BIGGERS:**  Thank

81

1  you, very much, Ms. Rutledge.  Now Mr. Plaza you

2  have the opportunity to tell this Panel why you

3  feel that you are suitable for parole.

4      INMATE PLAZA:  Sorry.  A little nervous.

5  I believe first of all if I could I'd like to --

6  I'd like to explain a couple of things.  One

7  thing that I have heard a lot of times being

8  incarcerated that I didn't know 16 years ago --

9  I had no knowledge of what personal disorders

10  were because I was so caught up in my drug and

11  alcohol habit.  I didn't look at -- I didn't

12  look at things as I should have, not normally

13  anyways.  I realize that being anti social at

14  the time, you know, had me do things that any

15  normal personal would not do.  It wasn't due --

16  I'm not making excuses.  I never say that, you

17  know, some people do -- but I don't say that the

18  drugs or the alcohol committed the crime.  I

19  understand that I was the one that made the

20  choice, and I take full responsibility for that.

21  But I do -- I also want to say that being anti

22  social, you know, my problems started at about

23  15 years old, basically.  Fifteen years old, I

24  hit high school started hanging out with the

25  wrong crowd.  Running with the guys, you know,

26  that I shouldn't have -- had no business hanging

27  around.  But because they all were in the same

82

1  predicament, whether they were raised by a

2  single parent or, you know, were also seeking

3  some kind of, you know, some kind of family.

4  Some kind of acceptance. And, being that I was

5  in that same category looking for acceptance,

6  like I said earlier, I chose to hang around with

7  people that had a lot of similarities to me.

8  And because I chose to hang around with those

9  people I was around things that, you know, I

10  shouldn't have been around and drugs and alcohol

11  became my biggest problem. And I understand

12  that, you know, again a personal disorder border

13  line, I crossed a lot of border lines but laws

14  specifically because by purchasing drugs and

15  alcohol I was naturally breaking laws, you know,

16  to purchase these products. Again, you know,

17  narcissistic because I hung around with this

18  group I kind of got the feeling that I was, you

19  know, I should have respect or I should have

20  things coming just because of who I was or who I

21  hung around with. But upon coming to prison I

22  can honestly say that the very first thing that

23  helped me out was being incarcerated, of course,

24  but going to AA. When I first went to AA I

25  started realizing when I got to Step Four

26  especially because you have to take that moral

27  inventory, I started realizing and seeing

83

1    things.  And the sponsor at that time he taught

2    us to look at things and to -- and to just, you

3    know, call them what they are.  If you're lying,

4    then you're a liar.  If you're stealing, then

5    you're a thief.  If you're doing -- whatever the

6    circumstances might be.  And so I did that, and

7    I started looking at things and, you know, to be

8    honest initially it was ugly and I -- some

9    things you know you kinda don't want to accept

10   because you want to think that, you know, you're

11   not like that or you're better than that.  I

12   never wanted to accept to that, you know, that I

13   had these problems, you know, because I thought,

14   you know, hey I'm normal.  There's nothing

15   different about me than the next guy.  But upon

16   learning these things I started working on

17   making that change, changing my life.  AA led me

18   to church.  When I started going to church again

19   that was a big help because the church started

20   helping me again look at myself, and get an

21   understanding.  And, once I started to get that

22   understanding I really began to make more

23   change.  And, as time went on -- I mean, I

24   always got something out of the self-help

25   groups.  Every group had at least something to

26   offer but as I went along I started learning, I

27   started getting the insight of my crime of

84

1   myself and I started realizing as well the

2   severity of my crime, you know, that it wasn't

3   just, you know, something that happened, you

4   know. It was way deeper than that. So, I

5   started looking into these things. Upon looking

6   into these things and really getting that

7   understanding, Impact -- like I said earlier,

8   the Impact was a great help to me. I started

9   learning different things from Impact as well.

10  Started getting a different perspective and

11  getting more of a panoramic vision on life, you

12  know, on everything that I'm involved in. What

13  I do. It was a Captain who -- Captain Gega

14  (phonetic), Unit Three Captain, she was the one

15  who kind of, you know, gave me that opportunity

16  as well to get into doing more than just the

17  average guy that was in there. So, I started,

18  you know, working with her. Working with her

19  you see the problems in the paperwork. I was

20  able when that riot broke out in the wing

21  between the Nationals and the Bull Dogs, which

22  is two different groups that are here -- even

23  though I'm not a part of any of the groups I

24  have a rapport because now people see me and

25  they know that I'm the opposite of them. I'm

26  constantly talking to people, trying to

27  encourage them to be their own man, to make

85

1    their decisions, to not follow that peer

2    pressure and the crowd and do those things. And

3    so they -- they tell me, you know, they see

4    integrity in me, and it's something that you

5    don't see in just everybody or anybody.  So

6    having that has helped me a lot.  I believe that

7    through them programs -- you also -- there was

8    another letter in the packet.  It was from

9    Victory Out Reach out of here in San Jose.  They

10   have a program also.  Not just here in San Jose.

11   They have it in every County.  It doesn't

12   matter.  I talked to Ed Morales who's the

13   Director there.  He says it doesn't matter what

14   County you go to, they have a program that's

15   called Cease Fire and because of the education

16   and the insight that I've gotten through the

17   program he's told me, wherever you go, I want to

18   use you because you can get to these people.

19   You can reach out and talk to these people so

20   that there's never -- again there doesn't' have

21   to be another Mr. Littlebull.  There doesn't

22   have to be somebody in my position, you know.

23   So that's what I look to do now, is to stop them

24   kind of things.  Deter people, you know, doing

25   them kind of things.  I know it's in the

26   Appellate version as well, even though no one

27   read it here today, but you know that upon my

86

1   reaching the County Jail, you know, I was
2   approached. Because, see, I was not -- I was
3   not an active member but I hung around with the
4   crowd. So I was approached in the County Jail
5   and, you know, was threatened. That was the
6   County Jail. Upon reaching prison -- and it
7   actually turned out to be one of the biggest
8   favors they could do for me. I was approached
9   in prison, and they told me, you're on your own.
10  You don't run with us. We don't claim you. You
11  don't claim us. Which was like I said, the
12  biggest favor they could have done for me at
13  that time. Because that was -- that was what
14  got me started as well to make that change and
15  not continue to try to pursue that road that I
16  was on prior to that point. So, being that I
17  was excommunicated -- it was good for me,
18  because then, even though they told me you're on
19  your own, and I know that in here not just
20  anybody can be out on their own. You usually
21  have to find a crowd or find a race or, you
22  know, someone. You usually gotta, you know,
23  hang out with somebody. But I was able to do
24  it. I was able to go on my own. And I started
25  to take the attitude too that, you know what,
26  I'm not gonna pay attention what other people
27  say. I don't care what, you know, what they say

87

1  or do because I want to be that person that I

2  know I can be. And even my own mother told me

3  that one time on visit six, seven years ago.

4  She said, you know, you've turned into that man

5  that I always wanted you to grow up to be, you

6  know. I understand that today I have an

7  opportunity to get out, come before you, and to

8  put all these things in practice. As my

9  attorney said, not just talk the talk but walk

10  the walk. And, I have things in place. I have

11  things, you know, set up where I can go and be a

12  part of society and I can go and make a

13  difference and hopefully like I said before get

14  at, you know, not just youngsters, anybody.

15  Whether they're young or old, and be able to

16  share with them and explain to them, you know,

17  educate them. You know, I'm all for

18  intervention. Intervention is good. But,

19  prevention is even better. You know,

20  intervention the problem's already there. But

21  prevention, the problems' not there yet or

22  hasn't got to that point where, you know, it's

23  too the extreme. So, I hope that today, you

24  know, the Panel would surely take a look and

25  consider me because I believe with the things

26  that I have, with all the support system that I

27  have, with the plans and the goals that I have

88

1   -- and it's not something that I did all my

2   life, but I do have plans and goals. And I

3   believe those plans and goals that I have now

4   are going to be the things that help me to

5   succeed, and I have no problem with any kind of

6   parole to the extreme conditions. Testing, you

7   know. Whatever I need to do. I have no problem

8   whatsoever. And so I -- I just ask if, you

9   know, you Panel members today would consider me

10  as being suitable and I thank you and I do want

11  also would like to say that this packet here was

12  not a personal attack on you. It was not meant

13  to be, you know, in any way personal. I do have

14  to say it's my first one and being unfamiliar I

15  did allow other people to kind of give me a

16  little helping hand, and if there was anything

17  that, you know, was not necessary or was an

18  overkill it was not done intentionally and once

19  my final statement because I want to make sure

20  that you know is that, again, I take full

21  responsibility for the taking of the life of Mr.

22  Littlebull and I thank you.

23      PRESIDING COMMISSIONER BIGGERS:   We will

24  recess at this point.

25              R E C E S S

26              --oOo--    ,

27

89

1            CALIFORNIA BOARD OF PAROLE HEARINGS

2 ------------------------- D E C I S I O N -------------------------

3            DEPUTY COMMISSIONER MEJIA:  We're back on

4    record for our decision -- on tape.

5            PRESIDING COMMISSIONER BIGGERS:  Let the

6    record reflect that everyone that was in the

7    room prior to us recessing for deliberations are

8    now back in the room.  The Panel has reviewed

9    all information received from the public and

10   relied on the following circumstances in

11   concluding the prisoner is not suitable for

12   parole and would pose an unreasonable risk of

13   danger to society or a threat to public safety

14   if released from prison.  The offense was

15   carried out in an especially cruel and callous

16   manner in that this was a drive-by shooting

17   where a Mr. Patrick Littlebull, the victim, was

18   shot and killed as a retaliatory type crime

19   based on what was in the Appellate Decision.

20   This offense was carried out in a calculated

21   manner, and I'll read from the -- that the --

22   decision that Mr. Plaza was

23            "-- driving slowly with his lights

24            out thus eliminating attention to

25            his approaching car was strong

26            evidence of prior planning.  The

27   JESUS PLAZA  H-12371 DECISION PAGE 1     05/01/06

90

1    approach without lights is

2    factually similar to lying in

3    waiting and illustrates a

4    deliberate plan by the occupants

5    of the car to approach to victim

6    unnoticed so that the killing

7    could be accomplished from a

8    position of surprise and

9    advantage."

10   The motive for the crime was very trivial in

11   that it was a gang related shooting, and these

12   conclusions was drawn from the Statement of

13   Facts from the Appellate Decision.  You have no

14   -- your criminal record was of no significance

15   to us because you had very little if any.  You

16   have programmed extremely well.  You should be

17   commended for no disciplinary actions.  Your

18   psychiatric evaluation was favorable.  Your

19   parole plans were favorable.  Your 3042 response

20   from the District Attorney was opposed to your

21   -- a finding of parole suitability, and you have

22   numerous letters of support.  The Panel

23   struggled with this for quite some time,

24   basically because of a couple things that I will

25   go over with you right now.  First of all, the

26   signs of remorse for the victim.  You say you

27   JESUS PLAZA   H-12371 DECISION PAGE 2     05/01/06

91

1  take full responsibility for the crime, but when

2  Deputy Commissioner Mejia started talking to you

3  about the crime and what you took from the

4  victim, you went off and you started talking

5  about collateral effects of the families and all

6  the others but you never mentioned about the

7  victim. You need to -- and with that, that

8  gives us an indication that you really haven't

9  taken -- you're minimizing your involvement in

10  the crime by not knowing exactly what happened

11  to the victim. You need to get that out. We

12  -- as I said, we talked about it for quite some

13  time because we just feel that you're not --

14  it's -- you're just taking responsibility for

15  the crime is superficial, and we need to get

16  genuine remorse. So, the big thing is remorse

17  for the victim. We also feel that your gains

18  are recent, as illustrated by when we talked to

19  your earlier and the District Attorney even

20  brought this up and I went back and went over

21  the Appellate Decision as well as the sentencing

22  thing for -- you indicated initially that you

23  were not involved with the shooting. Then you

24  say you were when they told you about your

25  vehicle, and that's when you mentioned about the

26  gun. They found the gun within (indiscernible).

27  JESUS PLAZA  H-12371 DECISION PAGE 3    05/01/06

92

1   We note that you are doing extremely well

2   programming, but we just feel that you need to

3   have more time.  You should be commended for

4   your program that you have been involved with,

5   your Vocational Dry Cleaning, your Air

6   Conditioner Refrigerator, AA and NA, and the

7   Impact and Anger Management courses that you are

8   working with right now.  In a separate decision,

9   the hearing Panel thought it's not reasonable to

10  expect that parole will be granted in a hearing

11  in the following two years.  Again, the crime

12  itself was just especially cruel and callous in

13  that you (indiscernible) on an individual who

14  was vulnerable.  He didn't have a weapon; he's

15  walking down the street, and you and your

16  co-defendant shot him.  And, we realize that you

17  only drive the vehicle, but the mere fact that

18  you were there with your lights off is a strong

19  indication that you knew what was going to take

20  place.  The -- and the motive for the crime as

21  we talked about earlier, was very trivial in

22  that this was a gang retaliation.  All

23  indications point to this was a gang

24  retaliation.  Once you've become -- once you've

25  come to grips with what transpired, allow

26  yourself to not minimize the involvement of what

27  JESUS PLAZA  H-12371 DECISION PAGE 4    05/01/06

93

1    think you'll be okay, because you're definitely

2    on the road to getting a date. But you've got

3    to take that remorse to the victim, you can't

4    generalize. You said I take full

5    responsibility. You got to take it from not the

6    family. You've got to take responsibility for

7    Patrick.

8        INMATE PLAZA: I understand.

9        PRESIDING COMMISSIONER BIGGERS: Mr.

10   Mejia?

11       DEPUTY COMMISSIONER MEJIA: No further

12   comments from me.

13       PRESIDING COMMISSIONER BIGGERS: Okay.

14   Good luck to you. That concludes the hearing.

15   The time is now ten minutes to --

16

17

18

19

20

21

22

23   PAROLE DENIED TWO YEARS                AUG 2 9 2006

24   THIS DECISION WILL BE FINAL ON:

25   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   JESUS PLAZA  H-12371 DECISION PAGE 5    05/01/06

94

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, RUBY M. DOUGHERTY, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total TWO in number and cover a total of pages numbered 1 - 93, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING for JESUS PLAZA, CDC NO. H-12371, on MAY 1, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated MAY 30, 2006, at Sacramento, California.

RUBY M. DOUGHERTY
TRANSCRIBER
PETERS SHORTHAND REPORTING

# EXHIBIT  B

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR
ADDENDUM

PLAZA, JESUS                                                    H12371

This addendum is being submitted as a correction to some inaccuracies that were found in the Board Report for Plaza's Initial Parole Consideration Hearing.

On Page 2 of the report under Aggravating Circumstances: it says use of weapon: Gun, 9mm. That information was taken from the POR pg. 2. In the Court Transcripts for the Court of Appeal of the State of California Second Appellate District Division Two Page 3, it states that a .38 revolver was found in a hollow space underneath the dashboard of the suspects. A ballistic test indicated that an expended bullet found at the scene on Loveland Street was fired from the gun that was recovered.

Under the Preconviction Factors: C. Personal Factors: The Board Report states that Plaza was born 2/7/65 to Caroline and Jessie Plaza. This should be corrected as follows: Plaza was born 3/7/65 to Caroline and Jesus Plaza. Plaza also said that his marriage took place on 5/12/84 and not 5/7/84.

Postconviction Factors: Should read as follows; Plaza was received CDC on 10/9/91 at Wasco RC and was transferred to CSP Folsom on 12/17/91 and was classified with Close A custody. On 2/21/92, Plaza was transferred to Calipatria where his custody was reduced to Close B. While at Calipatria, he worked in the culinary, pre-voc. and Computer Programming. Plaza was again transferred to CSP-LAC on 2/3/94. He was classified there with Medium A custody. While at LAC, Plaza worked in the drycleaning, voc electrical shop, and air cond. refrigerator and heating. On 12/16/97 he was transferred to Avenal where he was in Computer Programming. On 3/13/98 he was transferred to CTF Soledad North Facility where he was assigned to the yard crew 4/7/98 to 4/28/98, and then to PIA Textiles. On 12/31/98 Plaza went to CMC East as a medical transfer and returned to CTF on 3/1/99 where he has remained housed. At his initial classification, Close B custody was established. Plaza's custody was reduced to Medium A on 3/23/00 and has remained at Medium A. While at CTF Central Facility, Plaza has been assigned to wing porter, culinary, dental assistant and again culinary, where he remains assigned.

**Inmate Copy**                    Sent to inmate on  11/29/05

LIFE PRISONER EVALUAT    REPORT
PAROLE CONSIDERATION HEARING
2006 CALENDAR

2

_T. Verdesoto_    11-16-05
T. Verdesoto                          Date
Correctional Counselor I

_D. Carnazzo_  C.CII  11-16-05
D. Carnazzo                          Date
Correctional Counselor II

_I. Guerra_  FC(A)  11-16-05
I. Guerra                            Date
Facility Captain

_D. S. Levorse_  C&PR  11-18-05
D. S. Levorse                        Date
Classification and Parole Representative

PLAZA              H12371              CTF-SOLEDAD

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR

PLAZA, JESUS                                                          H12371

I.    COMMITMENT FACTORS:

A.    **Life Crime:** Murder 1st, (PC 187), Los Angeles County Case #VA004108..
Sentenced: 25 years to Life. Weapon: Gun. MEPD: 1/25/07. Received in
CDC: October 9, 1991. Victim: Patrick Littlebull, age: unknown.

1.    **Summary of Crime:** The defendant, Jesus Plaza, and another subject
were seen driving a vehicle near the victim, Patrick Littlebull. A witness
heard a series of shots and saw the victim Patrick collapse onto the floor.
Officers arrived at the scene of a residential street in Bell Gardens and
found Patrick lying on the floor in a puddle of blood. Paramedics arrived
shortly after and pronounced him dead at the scene. Victim's autopsy
indicated that his death resulted from a single gunshot wound to the right
lateral side of his chest.

Several witnesses gave officers information about the suspects vehicle,
and approximately 1 hour later, police saw the vehicle and detained the
defendant along with a second suspect. Officers observed a .9mm casing
on the floor board of the vehicle in front of the passenger. Both Plaza and
his companion were arrested and later evaluated for evidence of gunshot
residue. (Source: POR pg 2, 3 &4).

2.    **Prisoner's Version:** First and foremost to each family member and friend
of Mr. Littlebull. Knowing that there are no special, no specific, nor any
amount of words that could right the wrong I did. Nor can any words
equal or be greater than the crime in a good way, I wholeheartedly
apologize yet due to multiple counseling programs and self help programs
that I have seeked out throughout my incarceration. I've gained
knowledge and an understanding of my crime and true remorse, and so I
take full responsibility for my choices and actions in the commitment of
this crime and also stipulate to the P.O.R. as being true and accurate.

3.    Aggravating/Mitigating Circumstances:

a.    Aggravating Factors:

INMATE COPY

SENT TO I/M ON  9/22/05

PLAZA, JESUS          H12371          CTF-SOLEDAD          DEC/2005

LIFE PRISONER EVALUAT    REPORT
PAROLE CONSIDERATION HEARING                                    2
DECEMBER 2005 CALENDAR

> ❖ Victim was particularly vulnerable.
> ❖ Prisoner had opportunity to cease but continued with crime.
> ❖ Murder was senseless and served no purpose in completing the crime.
> ❖ Use of weapon: Gun, .9mm.
> ❖ Nature of crime exhibited viciousness, cruelty or callousness.

      b.    Mitigating Factors:

> ❖ Prisoner has minimal or no history of criminal behavior.

B.    Multiple Crime(s): N/A.

    1.    Summary of Crime: NA.

    2.    Prisoner's Version: NA

II.    PRECONVICTION FACTORS:

A.    Juvenile Record: None noted in Central File.

B.    Adult Convictions and Arrests:

> ❖ 07/16/83 PC 594 (a) Vandalism.
> ❖ 09/17/83 PC 187 Attempted Murder (no disposition).
> ❖ 04/02/84 PC 594 Malicious Mischief/Vandalism.

C.    Personal Factors: Plaza was born 2/7/65 to Caroline and Jessie Plaza. He has four sisters and a brother. Plaza graduated from high school 5/17/83 from Vail High in Montebello, CA, and then married Guadalupe Falcon on 5/7/84 and they have three children, Ramona, and Justina, and Izaiah.

III.    POSTCONVICTION FACTORS:

A.    Special Programming/Accommodations: N/A.

B.    Custody History: Plaza was received CDC on 10/9/91 at Wasco RC and was transferred to CSP Folsom on 12/17/91 and was classified with Close A custody. On 2/21/92 Plaza was transferred to Calipatria where his custody was reduced to Close B. While at Calipatria, he worked in the culinary and pre-voc. Plaza was again transferred to CSP LAC on 2/3/94. He was classified there with Medium A custody. While at LAC, Plaza worked in the dry cleaning and voc electrical shop. On 12/16/97 he was transferred to Avenal, and on 3/13/98 he was transferred to

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR

3

CTF Soledad.  While at CTF, Plaza was assigned to PIA Textiles.  On 12/31/98 Plaza went to CMC-E as a medical transfer and returned to CTF on 3/1/99 where he has remained housed.  At his initial classification, Close B custody was established.  Plaza's custody was reduced to Medium A on 3/23/00 and has remained at Medium A.  While at CTF, Plaza has been assigned as a porter, a dental assistant and has worked in the culinary.

C.     Therapy and Self-Help Activities:  Since Plaza's incarceration, he has participated in Alcoholics Anonymous, Inmate Education Advisory Committee, Bible Study, the Impact Program, Narcotics Anonymous, served as a Deacon, and was a member of the Protestant Choir.  Refer to Post Conviction Progress Reports for more details.

D.     Disciplinary History:  Plaza has remained disciplinary free throughout his incarceration.

E.     Other:  N/A.

IV.    FUTURE PLANS:

A.     Residence:  Plaza plans on living with his brother, Hector Plaza.  Hector's address is 353 Carla Dr. Simi Valley, California 93063.  His phone number is (805) 581-6323

B.     Employment:  Plaza plans on working at Telair International 4175 Gardain Street, Simi Valley, CA 93063, phone #(805) 578-7303.

C.     Assessment:  In review of Plaza's parole plans, this counselor does not foresee any problems, however, it is recommended that Plaza updates his support letters prior to his hearing.

V.     USINS STATUS:  NA.

VI.    SUMMARY:

A.     Prior to release the prisoner could benefit from:

1.     Continuing to be disciplinary free.
2.     Participation in self-help and therapy programs.
3.     Upgrading vocationally and educationally.

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR

4

B.   This report is based upon an interview with the prisoner on 9/1/05 lasting approximately 1 hour(s) and a complete review of the Central File lasting 3 hours(s).

C.   Per the Olson Decision, Plaza was afforded an opportunity to examine his Central File on 9/1/05, Plaza did examined his Central File. (Refer to CDC 128-B dated 9/1/05 in the General Chrono Section of the Central File.)

D.   No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

PLAZA, JESUS                H12371                CTF-SOLEDAD          DEC/2005

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR

5

_(signature)_     9-20-05
T. Verdesoto                    Date
Correctional Counselor I

_(signature)_     9/21/05
J. Soares                       Date
Correctional Counselor II

_(signature)_     9/21/05
A. Guerra                       Date
Facility Captain

_(signature)_ CPR 9-22-05
D. S. Levorse                   Date
Classification and Parole Representative

PLAZA, JESUS          H12371          CTF-SOLEDAD          DEC/2005

# EXHIBIT  C

*1/M copy*

MENTAL HEALTH EVALUATION FOR
THE BOARD OF PRISON HEARINGS
May, 2006 Lifer Calendar


CORRECTIONAL TRAINING FACILITY SOLEDAD
APRIL, 2006


| | |
|---|---|
| NAME: | PLAZA, JESUS |
| CDC#: | H-12371 |
| DOB: | 3/7/65 |
| OFFENSE: | PC 187 MURDER, FIRST DEGREE |
| DATE OF OFFENSE: | 5/26/90 |
| SENTENCE: | 25 YEARS TO LIFE |
| EVALUATION DATE: | 4/16/06 |
| MEPD: | 1/25/07 |


I.    IDENTIFYING INFORMATION:

Mr. Jesus Plaza is a 41 year old, first term, Hispanic, married male from Los
Angeles County. He is an active Christian. He has served 16 years on his
sentence.

SOURCES OF INFORMATION:

This report is based upon a single 90 minute interview, plus review of the central
and medical files.

II.    DEVELOPMENTAL HISTORY:

When questioned about prenatal and perinatal issues, he stated that he was born at
General Hospital, and his birth was normal. He progressed through
developmental milestones in a normal manner. He is the second of four children.
There is no history of cruelty to animals, enuresis or arson. He was never abused
as a child, either sexually, physically or emotionally. He did have accidents as a
child. One time he fell off of a pipe, injuring his leg on a fish tank. At the age of
eleven he was involved in a car accident and injured his left knee which had
recently been fixed through surgery.

PLAZA, JESUS
H-12371
4/15/06
PAGE 2

**III.    EDUCATION:**

He attended public school and graduated from Vail High School in Montebello.
He was never suspended or expelled. He has continued his education by
attending college classes. He is attending Coastline Junior College at this time by
correspondence, working towards his AA degree. He has 15 more credits until he
gets his AA degree.

**IV.    FAMILY HISTORY:**

Mr. Plaza's biological parents separated when he was about four years of age. He
was raised primarily by his mother and maternal grandparents. His mother is
currently employed by St. Francis Hospital, and his father worked for years as a
mechanic and an auto body repairman. He is now 66 years of age and has retired.
He has one older sister that works for General Electric in Pennsylvania, a younger
sister who is mainly retarded who lives with his mother, and one younger brother
who is married and working as a sales manager of a container corporation. There
is no family history of mental illness, of drug abuse, of alcoholism, or of legal
problems.

**V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**

Mr. Plaza is heterosexual. There is no history of high risk behavior or of
problems.

**VI.    MARITAL HISTORY:**

He has been married one time. He was married on 5/12/84 to Guadalupe who
lives in Whittier. There are three children. Ramona, 21 years of age, is working
as a R.N. at St. Francis Hospital. Justina is 19 and is attending Cerritos College.
Isaiah is 10 years of age. His marriage is intact, and his wife is supportive. He
indicated that he has a very close relationship with his wife and children. They
keep in close contact by correspondence, phone calls and several visits a year.

**VII.    MILITARY HISTORY:**

There is no military history.

PLAZA, JESUS
H-12371
4/15/06
PAGE 3

VIII.   **EMPLOYMENT/INCOME HISTORY:**

Right after he graduated from high school at the age of 18, he went to work for Century Plastics, where he worked for 4 ½ years. This company made fiberglass products for airplanes. He was the lead man there. In 1987, he went next door to work for Century Arrow doing the same kind of work. These two companies are owned by the same people. One year before the commitment offense, he began working for an asbestos abatement company as a laborer.

In the institution, he has obtained several trades. He has completed Vocational Dry Cleaning, Vocational Air Conditioning, Refrigeration and Heating, Vocational Meat Cutter, and he also has completed a correspondence course as a home inspector. Currently he is working as a meat cutter in culinary.

IX.   **SUBSTANCE ABUSE HISTORY:**

Mr. Plaza stated that he did have an alcohol and drug problem from the ages of 15 to 25. He would drink alcohol primarily on weekends, because he had to work during the week. He smoked some marijuana. He also snorted cocaine about three times a week at the age of 16. At the age of 20, he began using cocaine every other day. He attends Alcoholics Anonymous and Narcotics Anonymous. He attends as often as he can, and he has been going steadily to these programs for the last 13 or 14 years.

X.   **PSYCHIATRIC AND MEDICAL HISTORY:**

There is no psychiatric history. There is no history of serious hospitalizations, other than his surgery on his left knee. There is no history of serious accidents or of head injuries or seizures. His health is good.

XI.   **PLANS IF GRANTED RELEASE:**

Mr. Plaza plans to return to his old employer in Simi Valley. He also will be able to live with his brother in that area. He will be compliant with all parole rules and regulations. He does have strong family support in the community. The prognosis for successful community living in this case is excellent.

Plaza              H-12371              CTF-Soledad              4/15/06

PLAZA, JESUS
H-12371
4/15/06
PAGE 4

---

## CLINICAL ASSESSMENT

### XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Plaza related in a serious, sober, and cooperative manner. Mental status was within normal limits. He was alert and well oriented. His thinking was rational, logical and coherent. His speech was normal, fluent and goal oriented. He does speak excellent English as well as Spanish. Affect was appropriate. There was no evidence of anxiety or depression. Eye contact was good. His memory was intact. His judgment was intact. His insight and self-awareness were good.

Mr. Plaza has spent a great deal of time in prison trying to improve himself. He currently is attending Coastline College, working on his Associate of Arts degree. His grades are very good. Also, he has obtained a certificate as a home inspector from a professional career development institute in Georgia by correspondence. In addition, he has completed several courses towards self-improvement. He has completed a Prison Fellowship Course in Parenting, Anger Management, another 12 week anger management class, Fathers Behind Bars Activity Group, Family Effectiveness Training and Harmony in the Home, Anger Management Course, Christian Basics Class, Teddy Bear Drive Benefiting Children in Crisis, a job success course, Communicable Diseases, Impact Program focusing on the victim's rights, Christian Living Course, Laubach Literacy Tutor Program, and the Salvation Army Bible Correspondence Course.

### CURRENT DIAGNOSTIC IMPRESSION

Axis I:      Drug and alcohol use by history
Axis II:     No personality disorder
Axis III:    No physical disorder
Axis IV:     Life term incarceration
Axis V:      Current GAF: 95

### XIII.    REVIEW OF LIFE CRIME

Mr. Plaza discussed the details of the commitment offense. He accepts full responsibility for this offense. He feels very badly that the victim died. He is fully aware that the victim's family has suffered greatly at the loss of their father and husband. The fact that gunshots were fired was a total surprise to Mr. Plaza. He had no idea that this was going to happen, and there certainly was no intent on his part. He is very aware of the repercussions of this offense. Even today his wife, children and mother are being watched and approached about this situation

PLAZA, JESUS
H-12371
4/15/06
PAGE 5

by gang members. He is very concerned about their welfare. All of these situations are a result of the commitment offense. Needless to say Mr. Plaza feels deep feelings of sorrow, remorse and grief over this situation.

At the time of the commitment offense, Mr. Plaza had been using cocaine and alcohol. His judgment at that time was impaired by his use of these substances. At the time of the commitment offense he was actually under the influence. However, after 16 years there is no evidence of any involvement in drugs or in alcohol. He has continuously attended Alcoholics Anonymous and Narcotics Anonymous over the years. Since he has become Christian, he has strong values against the use of drugs or alcohol at this time in his life. He is certainly familiar with the destructive effects of this involvement. As a result, he has determined to never become involved in drugs or alcohol again in his life. This information is of historical importance only because it is not currently a diagnostic problem.

XIV. ASSESSMENT OF DANGEROUSNESS

A. In considering potential for dangerous behavior in the institution, Mr. Plaza has remained entirely disciplinary free. This is commendable. This is very difficult to do. At this time at this prison, we are having frequent racial riots. It is very difficult for a Hispanic male to disassociate himself from this activity, which can spontaneously occur in front of him, and if he doesn't get involved, he will receive retaliation. In this case, remaining disciplinary free is a very difficult and commendable achievement. There is no evidence that he has ever been involved in riots, possession of weapons, assaults on others, or threats of any kind. As a result, it is evident that his potential for dangerous behavior in comparison to other inmates is definitely below average.

Mr. Plaza has a chrono from Captain Guerra, in which it was stated that he had been hand picked to work as a communicator, working as a mediator between the two groups in the institution that had been involved in a riot against each other. Due to his ability to mediate between the groups and to get them to agree to non violence towards each other, the riot that occurred at that time was resolved peacefully, and the result was that the institution was able to unlock everybody and proceed with the program.

B. In considering potential for dangerous behavior in the community, Mr. Plaza has no prior arrests for violence before the commitment offense. He did receive an arrest as an adult in 1983 for spraying a one inch diameter dot on the wall. He has remained disciplinary free in the institution. In order to determine his risk level on parole, the Level of Service Inventory-

PLAZA, JESUS
H-12371
4/15/06
PAGE 6

Revised was administered. This is an actuarial measure that assesses criminal history, substance abuse history, current adjustment, and other factors to determine current risk level. On this measure he obtained a score of 3.6 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better on parole than 96 of them. This is a very low risk level. As a result, he poses no more threat to society than the average citizen in the community, and probably less threat to society at this point in his life.

C. At the time of the offense, drugs and alcohol were a problem; however, at this point in his life this is no longer an issue. Therefore, there are no significant risk factors in this case.

XV. **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS**

There are no mental or emotional problems in this case that would interfere with routine parole planning. Mr. Plaza has obtained vocational training in several areas. He is currently working as a meat cutter in culinary. He has skills in vocational dry cleaning, as well as in vocational air conditioning, refrigeration and heating. He also has a job offer waiting for him upon his release. He has very strong family support in the community. All of these factors are good indicators of positive parole success. He has maintained his marriage, and his wife continues to be supportive and involved in his life. He maintains constant contact with his three children. Due to his study of the Bible and his commitment to the Christian way of life, he no longer has the irresponsible values and lifestyle that he did prior to the commitment offense. All of these factors indicate that his prognosis for successful adjustment in the community is excellent.

*M. Macomber, PhD*

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

*B. Zika, Ph.D.*

B. ZIKA, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

D:    4/15/06
T:    4/19/06

Plaza            H-12371            CTF-Soledad            4/15/06

# EXHIBIT  D

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

Date:     SEPTEMBER 6, 2007

Honorable: STEVEN R. VAN SICKLEN      Judge   JOSEPH M. PULIDO                    Deputy Clerk
          NONE                       Bailiff  NONE                                Reporter

| | (Parties and Counsel checked if present) |
|---|---|
| BH004502 <br> In re, <br> JESSE PLAZA, <br>         Petitioner, <br><br> On Habeas Corpus | Counsel for Petitioner: <br><br><br> Counsel for Respondent: |

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered the Petition for Writ of Habeas Corpus filed on February 23, 2007 by the Petitioner. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the determination that the Petitioner presents an unreasonable risk of danger to society and is, therefore, not suitable for release on parole. See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667.

The Petitioner was received in the Department of Corrections on October 9, 1991 after a conviction for murder in the first degree with a firearm. He was sentenced to 25 years to life. His minimum parole eligibility date was January 25, 2007. The record reflects that on May 26, 1990, the Petitioner was driving with fellow gang members on a street known to be the territory of a rival gang. The Petitioner drove slowly, with the headlights turned off, as he approached the victim, a rival gang member, who was standing in front of a house. As the Petitioner drove by, his accomplice fired several shots at the victim. The victim was shot and killed. The Petitioner then sped away. A witness heard the gunshots and saw the Petitioner's car speed away called the police and the Petitioner and his accomplices were pulled over and arrested.

The Board found the Petitioner unsuitable for parole after his first parole consideration hearing held on August 29, 2006. The Petitioner was denied parole for two years. The Board concluded that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision primarily upon his commitment offense.

The Court finds that there is some evidence to support the Board's finding that the Petitioner's offense was carried out in a calculated and dispassionate manner. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(B). The Petitioner drove slowly with his headlights turned off, so as to avoid detection as he approached the victim. This demonstrates that the shooting was planned and that the Petitioner was deliberately driving toward the victim for that purpose. Additionally, the Petitioner's accomplice was armed with a gun for the purpose of shooting the victim. Regardless of whether the Petitioner himself shot the victim, he was acting in concert with his accomplice and, therefore, the shooting is imputed to him.

1

| Minutes Entered |
|---|
| 09-06-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | |
|---|---|
| Date: SEPTEMBER 6, 2007 | |
| Honorable: STEVEN R. VAN SICKLEN | Judge JOSEPH M. PULIDO Deputy Clerk |
| NONE | Bailiff NONE Reporter |

(Parties and Counsel checked if present)

| | |
|---|---|
| BH004502<br>In re,<br>JESSE PLAZA,<br>        Petitioner,<br><br>On Habeas Corpus | Counsel for Petitioner:<br><br><br>Counsel for Respondent: |

The Court also finds that there is some evidence to support the Board's finding that the Petitioner's motive was very trivial in relation to the offense. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(B). The Petitioner and his accomplice shot the victim merely because he was a rival gang member. There is no evidence that the victim had threatened or harmed the Petitioner in any way. Gang rivalry is a very trivial motive for killing a man.

Additionally, the Court finds that the Board did not err in denying the Petitioner parole for a period of two years. The Board must articulate reasons that justify a postponement, but those reasons need not be completely different from those justifying the denial of parole. See *In re Jackson* (1985) 39 Cal.3d 464, 479. The Board indicated that the Petitioner was denied parole for two years because his commitment offense was calculated and dispassionate and against a particularly vulnerable victim; his motive was trivial; and he failed to show adequate remorse for the victim. These reasons were sufficient to justify a two-year denial.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Jesse Plaza
H-12371
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689

Department of Justice- State of California
Office of the Attorney General
300 South Spring Street
Los Angeles, California 90013

2

| |
|---|
| Minutes Entered<br>09-06-07<br>County Clerk |

<table>
<tr><td colspan="2">

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:
   Clara Shortridge Foltz Criminal Justice Center
   210 West Temple Street
   Los Angeles, CA  90012

PLAINTIFF/PETITIONER:

   JESSE PLAZA

</td><td>

Reserved for Clerk's File Stamp

**CONFORMED COPY**

SEP 0 7 2007

LOS ANGELES
SUPERIOR COURT

Joseph M. Pulido

</td></tr>
<tr><td>

**CLERK'S CERTIFICATE OF MAILING**
CCP, § 1013(a)
Cal. Rules of Court, rule 2(a)(1)

</td><td>

CASE NUMBER:

BH004502

</td></tr>
</table>

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time              ☒ Order re: Writ of Habeas Corpus
☐ Order to Show Cause              ☐ Order
☐ Order for Informal Response      ☐ Order re:
☐ Order for Supplemental Pleading   ☐ Copy of Petition for Writ of Habeas Corpus for the
                                             Attorney General

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to the cause.  I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

September 7, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _Joseph M. Pulido_ , Clerk
         Joseph M. Pulido

Jesse Plaza
H-12371
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689

Department of Justice- State of California
Office of the Attorney General
300 South Spring Street
Los Angeles, California 90013

DOCKETING

# EXHIBIT D

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JESSE PLAZA,<br><br>    On Habeas Corpus. | B202665<br><br>(Super. Ct. No. VA004108)<br><br>**ORDER** |

THE COURT:

The court has read and considered the petition for writ of habeas corpus filed October 9, 2007. The petition is summarily denied.

COURT OF APPEAL - SECOND DIST.

F I L E D

NOV 8 - 2007

JOSEPH A. LANE _____ Clerk

J. GUZMAN _____ Deputy Clerk

BOREN, P.J.                    ASHMANN-GERST, J.                    CHAVEZ, J.

# EXHIBIT E
# Part 1 of 2

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

JESSE PLAZA,

      Petitioner,

        v.

BEN CURRY, Warden,
Correctional Training Facility,

      Respondent.

# S 158421

Case No. _____

Los Angeles County
Superior Court
Case No. __VA004108__

Court of Appeals,
Second Appellate
District, Division
Two.
Case No. __B202665__

SUPREME COURT
**FILED**
NOV 2 1 2007
Frederick K. Ohlrich Clerk

_____
Deputy

PETITION FOR REVIEW

JESSE PLAZA
CDC No. #H-12371
CTF Central F-338U
P.O. Box 689
Soledad, CA 93960-0689

Petitioner In Pro Per

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

JESSE PLAZA,           )

              Petitioner,    )

                    )

          v.           )

BEN CURRY, Warden,     )
Correctional Training Facility,   )

          Respondent.   )

Case No. _____

Los Angeles County
Superior Court
Case No. VA004108

Court of Appeals,
Second Appellate District
Division Two.
Case No. B202665

## PETITION FOR REVIEW

TO THE HONORABLE RONALD M. GEORGE, CHIEF JUSTICE, AND TO THE HONORABLE ASSOCIATE JUSTICES OF THE SUPREME COURT OF CALIFORNIA

Petitioner, JESSE PLAZA, petitions this court for review following the decision of the Court of Appeals, Second Appellate District, Division Two, filed in that court on October 9, 2007, and denied in that same court on November 8, 2007. A copy of the postcard denial is attached hereto a Exhibit "A". Petitioner did not receive notice of this denial until November 13, 2007, also see Exhibit "A".

## Question(s) Presented

1) Is the Board of Parole Hearings violating the Petitioner's State and Federal Due Process Rights when parole suitability determinations are not supported by "some evidence", and was the "some evidence" standard correctly applied in this case?

- i -

2) Can the California Parole Board continuously deny parole to a prisoner based on the gravity, i.e., seriousness of their commitment offense, after they have served a Penal Code ß3041(a) / CCR 15 ß2403(c) uniform term equal to the gravity of their crime, when the prisoner has met all prerequisite conditions to be found suitable for release and no-longer poses a threat to public safety?

3) Was the Board's unsuitability determination supported by evidence that would bring Petitioner's case within the terms of Penal Code ß3041(b)?

4) Was the Board's reasoning for denial an abuse of discretion?

## NECESSITY FOR REVIEW

A granting of review and resolution of these issues by this Court are necessary to secure uniformity of decision and to settle important questions of law. Courts may review the parole decisions of the Board of Parole hearings for abuse of discretion. (In re Ramirez, supra, 94 Cal.App.4th at 561-64. Accord In re Rosenkrantz, (2002) 29 Cal.4th 616, 625-26, 656-57). The Board's discretion is abused by factual findings that are not supported by "some evidence". (Id. at 563). The Board's discretion is also abused by decisions that are arbitrary and capricious in the sense that they are not based upon the applicable legal standards.

> The courts may properly determine whether the Board's handling of parole applications is consistent with the parole policies established by the Legislature... While courts must give great weight to the Board's interpretation of the parole statutes and regulations, final responsibility for interpreting the law rest with the courts.

(In re Ramirez, supra, 94 Cal.App.4th at 564, citations omitted.)

- ii -

1    Furthermore, petitioner respectfully submits that reviewing the

2    cases of In re Ramirez, (2002) 94 Cal.App.4th 549; and Biggs v. Terhune,

3    (9th Cir. 2003) 334 F.3d 910, together demonstrates the lack of uniformity

4    in applications of the due process standard and that the decision in

5    the instant case conflicts with the announced Federal Due Process standard

6    delineated in Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910. This case

7    also provides this Court with the opportunity to redefine the meaning

8    of the "particularly egregious" standard found in In re Ramirez, (2001)

9    94 Cal.App.4th 549 and In re Rosenkrantz, (2002) 29 Cal.4th 616.

10    In summary, Petitioner respectfully submits that in this case "some

11    evidence" having an indicia of reliability does not support each of the

12    Board's findings a required by the United States Constitution, Fifth

13    and Fourteenth Amendments, the California Constitution Article I, section

14    15, and Biggs v. Terhune, (9th Cir. 2003) 334 F.2d 910, in not doing

15    so, the Board continues to violate Petitioner's State and Federal

16    Constitutional Rights to Due Process.

17

18                                   INTRODUCTION

19    On May 1, 2006, Petitioner appeared before the Board of Parole

20    Hearings for parole consideration and was found unsuitable for parole

21    based in the unchanging factors, the circumstance of his offense. He

22    received a two year denial. Petitioner filed in the Los Angeles County

23    Superior Court a Petition for Writ of Habeas Corpus challenging the

24    Board's decision to deny Petitioner a release date. On September 6, 2007,

25    that petition was denied by the Honorable Steven R. Van Sicklin (Case

26    No. ¢BH004502) On October 9, 2007, Petitioner filed in the Court of

27    Appeal, Second Appellate District, Division Two, challenging the Board's

28    decision denying him parole. On November 8, 2007, that petition was also

1  denied by the Court of Appeal, Second Appellate District, Division Two.

2  (Case No. ¢B202665). Petitioner now submits the instant petition seeking

3  review by this Honorable Court.....

4

5

6

7                              – See attached petition –

8  //

9  //

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28

                                – iv –

6.  GROUNDS FOR RELIEF

Ground 1:  State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

THE NINTH CIRCUIT COURT OF APPEALS HAS FOUND THAT THE MANDATORY LANGUAGE OF P.C. 3041 (b) IMPOSES AN AFFIRMATIVE OBLIGATION BY THE CALIFORNIA BOARD OF PAROLE HEARINGS TO GRANT PAROLE , WHICH CREATES A LEGALLY COGNIZABLE LIBERTY INTEREST IN PAROLE AND A PRESUMPTION THAT PAROLE RELEASE WILL BE GRANTED. THERE IN NO EVIDENCE HAVING AN "INDICIA OF RELIABILITY" THAT PETITIONER IS A CURRENT OR UNREASONABLE RISK TO SOCIETY. THE HEARING AND DECISION BY THE CALIFORNIA PAROLE BOARD WAS ARBITRARY AND CAPRICIOUS IN VIOLATION OF PETITIONER'S STATE AND FEDERAL DUE PROCESS RIGHTS.

a.  Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly *what* to violate your rights at what time *(when)* or place. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

Petitioner, JESSE PLAZA, petitions for a writ of habeas corpus and by this verified petition alleges as follows:

I

Petitioner is in custody of the California Department of Corrections at the Correctional Training Facility in Soledad, California serving a term of 25 years to life following his conviction in 1991 in Los Angeles County Superior Court Case No. VA004108 wherein petitioner was convicted of first degree murder in violation of Penal Code section 187. Petitioner was received by the Department of Corrections on October 9, 1991, when his life term commenced. This petition is intended to give meaning to Petitioner, JESSE PLAZA, (hereinafter "Petitioner"), sentence of 25 years to life for 'first degree murder'. On May 1, 2006, Petitioner went before the Board of Parole Hearings for his initial parole. (Petitioner's minimum

b.  Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

1  eligible parole date is 1-25-07) for a finding of suitability, and the

2  setting of his term uniformaly. Petitioner submits that the Board of

3  Parole Hearings (hereafter "Board") regulations, California Code of

4  regulations, Title 15, section 2402(a) DEMANDS that the Board set a

5  release date unless Petitioner currently presents an unreasonable risk

6  of danger to public safety. Petitioner submits that there is nothing

7  in the Board's decision indicating the basis for that belief, which

8  Petitioner discusses and proves infra.

9

10                              II

11      On May 1, 2006, the Board conducted petitioner's Initial Parole

12  Consideration Hearing. The Board found petitioner unsuitable and denied

13  parole for a period of two years. (Exhibit "A" 89-93) In support of its

14  findings that petitioner currently posed an unreasonable risk to society,

15  the Board found that the "offense was carried out in an especially cruel

16  and callous manner", " carried out in a calculated manner", "The motive

17  for the crime was very trivial in that it was a gang related shooting",

18  and the unsupported conclusion that petitioner has refused to take

19  responsibility for his actions. Petitioner was, however, commended for

20  programming extremely well, commended for remaining disciplinary free,

21  obtaining a positive psychological evaluation, participating in AA and

22  NA, completing two vocations and securing positive parole plan. (Exhibit

23  "A", p. 89-93). Despite all the evidence supporting a granting of parole,

24  the Board found petitioner unsuitable for a grant of parole based on

25  the commitment offense, including and unsupported conclusion that

26  petitioner tries to minimize his responsibility.

27  //

28                            - 2 -

III

Petitioner alleges that there was no evidence to support the Board's finding that he poses a current unreasonable risk if released. In fact, all current, reliable evidence presented to the Board shows that petitioner poses no risk if released, Petitioner further alleges that the Parole Board violated petitioner's statutory rights and his Fifth and Fourteenth Amendments (due process rights), when it refused to grant petitioner a parole date despite evidence supporting a finding that petitioner posed no unreasonable risk of harm. Furthermore, his continued confinement constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

IV

Petitioner also submits the Board spoke in meaningless generalities and never specified the exact nature of Petitioner's current character that would make Petitioner a danger to society. And by not doing so, the Board violated Penal Code §3041, which dictates that the Board shall normally set a parole release date at Petitioner's Initial Hearing. Petitioner, further submits that the issue raised in this Petition are of constitutional dimension, questioning the legality of Petitioner's confinement. An indeterminately sentence prisoner must be paroled when there is no evidence that Petitioner is a current or unreasonable risk to society. The California Supreme Court has recognized that parole applicants' posses a "protected liberty interest under the California Due Process Clause". (In re Rosenkrantz, (2002) 29 Cal.4th 616, 660; cf. McQuillion v. Duncan (9th Cir. 2002) 306 F.3d 895, 901. It is well established that Courts may review the Board's parole decisions under

1  a highly deferential standard of review, and must reverse those decisions

2  if there is not "some evidence" in the record to support them.

3  (Rosenkrantz, supra 29 Cal.4th at 667; In re Smith (2003) 109 Cal.App.4th

4  489. Petitioner submits there is no evidence that Petitioner is currently

5  a threat to public safety.

6

7  PETITIONER NOW SUBMITS THE FOLLOWING POINTS AND AUTHORITIES IN SUPPORT

8       OF THIS PETITION FOR WRIT OF HABEAS CORPUS

9   //

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28

# MEMORANDUM OF POINTS AND AUTHORITIES

**THE MURDER STATUTES TOGETHER WITH THE PAROLE STATUTES IMPOSE AN AFFIRMATIVE OBLIGATION UPON THE BOARD TO SET PAROLE DATES IN CASES LIKE THIS ONE. THE REGULATIONS IMPLEMENT THOSE STATUTES**

Under the Board's regulations, pursuant to Penal Code §3041(b), a prisoner may be found unsuitable for parole if the Board determines that the offense or a past offense and its timing is of such gravity that a longer period of incarceration is required in the interest of public safety. The determination is made based on the standards set forth by the Board's regulations. The principle guidelines in making the determination is Cal. Code. Regs. §2401 (c)-(1-6):

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured, or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrated an exceptionally callous disregard for human suffering.

//

(E) The motive of the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

Circumstances (1), (2), and (4) reasonably reflect the sole specified and authorized statutory exception to setting parole release dates, for the current or a past convicted offense(s). Factor (E) of Circumstances (1), however, pertaining to the motive of the crime as being inexplicable, although typically stated by the board as a factor for denying parole, is a rare circumstance, as there is almost always, as here, an explanation

as to why the offense occurred. Whether the motive was trivial is
another matter. As one court noted:

> "The epistemological and ethical problems involved in
> the ascertainment and evaluation of motive are among
> the reasons the law has sought to avoid the subject. As
> one authority has stated, "[hardly any part of penal
> law is more settled than that motive is irrelevant."
> (Hall, General Principles of Criminal Law (2d ed. 1960)
> at p. 88; see also Husak, **Motive and Criminal Liability**
> (1989) **vol. 8, No. 1, Crim. Justice Ethics 3.)"**

The court further explained:

> "The offense committed by most prisoners serving life
> sentences is, of course, murder. Given the high value
> our society places upon life, there is no motive for
> unlawfully taking the life of another human being that
> could not be deemed "trivial". The Legislature has
> foreclosed that approach, however, by declaring that
> murderers with life sentences must "normally" be given
> release dates as they approach their minimum eligible
> release dates. (Pen. code, §3041, subd. (a)." (**In re
> Scott**, 119 Cal.App.4th 871, 892-893.)

It is therefore questionable whether the factor has any
evidentiary value in this case. If the motive was indeed
inexplicable "A person whose motive for a criminal act can not be

- 7 -

explained or is unintelligible is therefore unusually unpredictable and dangerous." (Id.) Such is not the case here.

The primary circumstance and factors considered to make the determination, §2402(d)(1)(B) and (D), have been explained by the courts. To qualify for the authorized exception, an offense must be exceptionally egregious. The court of appeal characterized this as follows:

> "In re Van Houten (2004) 116 Cal.App.4th 339 [10 cal.Rptr.3d 406] illustrates the sort of gratutious cruelty required. The prisoner in that case was involved in multiple stabbings of a woman with a knife and bayonet, While she was dying, the victim was made aware her husband was suffering a similarly gruesome fate. As stated by the court, "[t]hese acts of cruelty far exceeded the minimum necessary to stab a victim to death." (Id. at p. 351) Other examples of aggravated conduct reflecting an "exceptionally callous disregard for human suffering," are set forth in Board regulations relating to the matrix used to set base terms for life prisoners (§2403, subd. (b)); namely, "torture," as where the "[v]ictim was subjected to the prolonged infliction of physical pain through the use of non-deadly force prior to act resulting in death, " and "severe trauma." as where "[d]eath resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a

weapon not resulting in immediate death or actions

calculated to induce terror in the victim." (Ibid.) (**In**

**re Scott**, supra, 119 Cal.App.4th 871, 892.)


In this case there is no evidence of gratuitous cruelty or

torture such as described in the foregoing. Moreover, even in

such cases, involving those exceptional factors, the Board's

regulations and suggested terms indicate parole suitability after

serving the indicated base terms.

Circumstances (3) of the unsuitability factors, "Unstable

Social History" appears to be related to the commission of

violent past offenses and gravity thereof. It is not a factor in

this case.

Circumstance (5), "Psychological Factors. The prisoner has a

lengthy history of severe mental problems related to the

offense." is not applicable in this case, and the Psychological

Report does not indicate any such assessment.

Circumstance (6), "Institutional Behavior. The prisoner has

engaged in serious misconduct in prison or jail." This should

reasonably relate to misconduct like that which may result in

rescission proceedings as is enumerated in Cal. Code Regs., tit.

15, §2451, or more properly, be punished by the provisions of

Cal. Code Regs., tit. 15, §2410, which provides for

"Postconviction Credit", and not used as a substitute for

statutory "suitability" provisions which specify only the gravity

of the current or a past offense to deny parole.

This "circumstance' is often relied upon by the Board to

deny parole to indeterminately sentenced prisoners repeatedly and

for years at a time. Yet, determinately sentenced prisoners might suffer only the loss of a few months of credit, once, for the same misconduct, which they can even get restored. As such, the Board's determinations that rely on such circumstances to deny parole, particularly beyond the indicated matrix base terms, is unauthorized by Penal Code 3041, is unfair, unreasonable and constitutes unequal punishment for the same conduct. A blatant violation of Petitioner's due process rights protected by the 5th & 14th Amendments of the United States Constitution.

RELIANCE ON THE COMMITMENT OFFENSE TO DENY PAROLE AT
ALL INITIAL HEARINGS AND ALMOST ALL SUBSEQUENT HEARINGS
IS INCONSISTENT WITH STATUTORY LANGUAGE AND CONTRARY TO
SUPREME COURT AUTHORITY

The Board's reliance on the commitment offense to deny
parole at all initial hearings and almost all subsequent hearings
fails to give effect to the statutory minimum terms despite Penal
Code §3041 language that parole shall normally be granted at the
initial hearing. The Board promulgated regulations pursuant to
Penal Code §3041(a) which include standardized gravity matrices,
but routinely denies parole for the same circumstances and
factors specifying appropriate terms. (See Cal. Code Regs., tit.
15, §2400 et seq., footnotes citing implementation authority.)

Although it is presumed that the Board performs its duties
lawfully, it is hardley debatable that the Board does not
"normally" set parole release dates, as a matter of policy. And
when it does, in about 2% of cases, the Governor reverses most of
those, like here. as a matter policy, where there is no
substantial evidence to support the decision. See, for example,
In re Capistran, (2003) 107 Cal.App.4th 1297, In re Mark Smith,
(2003) 109 Cal.App.4th 489;  In re Ernest Smith, (2003)  114
Cal.App.4th 343, to name a few published cases. Because of the
minimal "evidence" required under the "some evidence" standard,
most of the denials and reversals of parole withstand court
challenges. release on parole presumed by statutory language
gives rise to a substantial right, but has been disregarded. the

great majority of indeterminately sentenced prisoners have been
repeatedly denied parole, but would have been released long ago
under reasonable administration of the statutes and regulations.

> "The Court has an obligation, however, to look
> beyond the facial validity of a statute that is
> subject to possible unconstitutional administration
> since a "law though 'fair on its face and impartial
> in appearance' may be open to serious abuses in
> administration and courts may be imposed upon if the
> substantial rights of the persons charged are not
> adequately safeguarded at every stage of the
> proceeedings." Minnesota v. Probate Court (1940) 309
> U.S. 270, 277.

Although the most recent interpretation of the statute at
issue now holds that proportionality or comparision of like
offenses is not required, i.e., In re Dannenberg (2005) 34
Cal.4th 1061, the Ninth Circuit has previously stated:

> "While the interpretation gloss on the statute may bind
> this court as a matter of statutory construction, we
> are not, however, similarly bound as to the
> constitutional effect of the construction." McSherry,
> 880 F.2d at 1053" (Aponte v. Gomez, 993 F.2d 705 (9th
> Cir. 1993) (emphasis added).

This most recent interpretation of the statutes is

inconsistent with decisions and history leading up to the changes
in the parole statutes, which prior decisions recognized, as
previously discussed:

> "In contrast, by altering the statutory scheme and
> enacting the DSL, the Legislature recited specifically
> that it "finds and declares that the purpose of
> imprisonment for crime is punishment." (Pen. Code
> §1170, subd. (a)(1); all subsequent statutory
> references are to this code.) The new law provides that
> an inmate's "release date shall be set in manner that
> will provide uniform terms for offenses of similar
> gravity and magnitude in respect to their threat to the
> public, and that will comply with the sentencing rules
> that the judicial council may issue and any sentencing
> information relevant to the setting of parole release
> dates. The board shall establish criteria for the
> setting of parole release dates and so doing shall
> consider the number of victims of the crime for which
> the prisoner is sentenced and other factors in
> mitigation and aggravation of the crime." (§3041, subd.
> (a), italics added.) The present parole guidelines were
> promulgated pursuant to the new act. Thus, the
> guidelines are not mere administrative responses to the
> Board's internal shifting discretion but rather reflect
> basic legislative alterations in the underlying parole
> scheme." (In re Stanworth (1982) 33 Cal.3d 176, 182.)
> (Underlining emphasis added.)

- 13 -

Clearly, the interpretation of the law shortly after it was changed was that the Board's discretion was limited by the legislative alterations and guidelines. The changes were clearly intended to place limits on the Board's discretion:

> "That, the Montana statute places significant limits on the Board's discretion is further demonstrated by its replacement of an earlier statute which allowed absolute discretion ..." <u>Board of Pardons v. Allen</u>, 482 U.S. 369.

Like with the Montana statute, in California the former Penal Code §3041 was completely changed, mandating the establishment of criteria for the <u>normal setting of parole dates.</u> Furthermore, Penal code §3041(b) clearly spells out why the board may require an extended period of incarceration. Because the Governor is bound by the same standards as the Board, the same would apply to the Governor. The current interpretive gloss on the parole and related statutes reverts plain statutory intent to the previous parole scheme by judicial omission of part of the whole, and violates principles of statutory construction, offending due process and ex post facto law.

THE "SOME EVIDENCE" STANDARD MUST "TEND LOGICALLY", AND BY "REASONABLE INFERENCE" TO ESTABLISH A FACT RELEVANT TO PETITIONER'S SUITABILITY FOR PAROLE.

Petitioner, denies the "some evidence" standard used by the Board satisfied the requirements under both state and federal due process. To satisfiy the "some evidence" standard of Judicial Review of the Board's ultimate decision, only a "modicum of evidence is required". Rosenkrantz, 29 Cal.4th at 677; Hill, supra, 427 U.S. at 456. However, the "some evidence" standard applies to evidentiary sufficiency and is not a substitute for other due process requirements; Edward v. Balisok, (1977) 520 U.S. 641, 648, such as the Board's own preponderance of material and relevant evidence. (See Cal.Code of Regualtions, tit 15, section 2000 (50)(63)(91). Thus, to determine whether the Board has fulfilled it's minimal due process procedural requirements, a reviewing Court looks not first at the decision, but the process in which it arrived at that decision. Balisok, supra, Ibid.

Here the Board continues to interpret the "some evidence" standard illegally. The Boards decision in this case failed to point to evidence demonstrating that Petitioner currently presents an unreasonable risk of danger to society - the ultimate question in determining Petitioner's suitability for parole (CCR, Tit. 15, §2403, subd. (a) For this reason, the evidence underlying the Board's decision does not tend logically and by reasonable inference, to establish a fact relevant to the inmate's suitability for parole. (Morrall, supra, 102 Cal.App.4th

- 15 -

at pp. 298-299). The discretion of the Board to determine parole suitability, although broad, is not absolute, and the Board's decisions must be supported by "some evidence" (In re Powell, (1988) 45 Cal.3d 894, 902-904; see also Terbune v. Superior Court (1998) 65 Cal.App.4th 864, 872-873; In re Minnis (1972) 7 Cal.3d 639, 646-647.

The United States Supreme Court has made it clear that the "some evidence" standard discussed in Superintendent v. Hill (1985) 472 U.S. 445, is only one aspect of judicial review for compliance with minimum standards of due process. The California Legislature has given the Board guidelines to follow in evaluating a parolee's eligibility for parole, mandating that the Board "shall normally" set a parole release date..."in a manner that will provide "uniform terms" for offenses of similar gravity and magnitude in respect to their threat to the public"... (Id., quoting Penal Code §3041, subd. (a).) The Board is required to "establish criteria for the setting of parole release dates." (Ibid.) However, the Board lacks discretion to promulgate regulations that are inconsistent with governing statutes, and the judicial branch has the final word on questions of legal interpretation." (Id., citing Terbune v. Superior Court, supra, 65 Cal.App.4th 864, 873)(emphasis added).

Petitioner asserts that the "some evidence" standard is being appplied arbitrarily by the reviewing Court's in the State of California. The Courts of California, both State and Federal, seem to have settled in for the "some evidence" standard of Judicial Review. (See, e.g., McQuillion v Duncan, 306 F.3d 895 (9th cir. 2002), and in In re Rosenkrantz, 29 Cal.4th 616 (2002).

without taking into consideration the "substantial evidence" standard which is required by reviewing courts Consolidated Edison Co. vs NLRB, 305 U.S. 197 (1939) (See Page 9)

The "some evidence" standard derives from the United States Supreme Court decision in Superintendent v. Hill, 472 U.S. 445; 105 S.Ct. 276 (1985), and is expressly a standard of "Judicial Review" for reviewing Court's, not the Board's Standard

The first California decision applying the "some evidence" standard of Hill was in the case of In re Powell, 45 Cal.3d 894 (1988). The Powell case was one where the Board of Prison Terms rescinded a parole grant based on a psychological report. In his petition, Powell argued for the "independent judgment" standard to the facts before the Board, or alternatively, the "substantial evidence" test. The People argued for the deferential "some evidence" test. Powell argued for the independent judgment test analogizing habeas corpus proceedings to administrative mandamus proceedings under California Code of Civil Procedure section 1094.5. That code section provides for review of administrative orders or decisions; in some cases it applies the independent judgment test while in other circumstances the substantial evidence test. If the former, and abuse of discretion is established when the Court, exercising its independent judgment determines the administrative findings are not supported by the weight of the evidence. If the latter, the Court must accept all evidence favorable to the Respondent as true and disregard any unfavorable evidence, if the evidence so viewed is sufficient as a matter of law, the order or decision must be affirmed. In rejecting Powell's argument, the court held that standard only

applies when an administrative decision affects a vested right. This is a pivotal point. The Powell Court determined that "a prison inmate has no vested right in his prospective liberty on a parole release date". (id. at 903). It cited to pre-1977 cases of **In re. Fain,** 65 Cal.App.3d 376 (1976), and to **In re McLain,** 5 Cal.2d 78, 87 (1960), also cited by **Fain, supra.** However, two critical facts were not present at the time of the decision, (1) there was no liberty interest created by pre-1977 section 3041; and (2) the California Supreme Court had not defined post-1977 section 3041, as having vested a liberty interest in a parole release date, as it did later in the Rosenkrantz decision 29 cal.4th 616 (2002), following on the heels of McQuillion v, **Duncan,** 306 F.3d 895, 901-903 (9th cir. 2002), which interpreted Section 3041 as creating an "expectancy of release" that was a cognizable liberty interest protected by federal due process. Thus, the Powell Court was wrong about whether a vested right was involved, and its decision to apply the "some evidence" standard instead of the "independent judgment test" or "substantial evidence" was also wrong because it was based on an incorrect interpretation of law.

Yet, the California Supreme Court in the Rosenkrantz case, 29 Cal.4th 616, applied the "some evidence" standard of **Superintendent v. Hill,** 472 U.S. 445 (1985), in such language as to confuse the lower Courts as to its specific purpose. i.e., the standard of judicial review. It carried forward the "some evidence" standard originally applied in **In re Powell,** 45 Cal.3d 894 (1988). The Rosenkrantz Court did not make clear that the "some evidence" standard was not a standard applied by the board

itself as a standard of proof in its deliberations. It appears that the ommission by the Rosenkrantz Court of any articulation of what the Board's standard of evidence would be as a critical component to the deliberative process of weighing and balancing of evidence, has resulted in the Board not applying their own preponderance of relevant and material evidence standard (CCR, Title 15, · Div. 2, Section 2000; (50) Good Cause (63) Material Evidence (91) Relevant Evidence), thereby rendering every decision to grant or deny parole completely standardless, and thus arbitrary and capricious.

Typically in California, the judicial standard of review of the ultimate decision of the Board of Parole Hearings denying parole to a prisoner has been the "some evidence" standard. In re **Dannenberg** (2005) 34 Cal.4th 1061; **In re Ramirez** (2001) 94 Cal.App.4th 549, 564; In re **Rosenkrantz**, [Rosenkrantz V] (2002) 29 Cal.4th 565, 616. Although both **Rosenkrantz** and **Dannenberg** thus affirmed the importance of judicial review of the board decisions, the decision's provide less than clear guidance as to the proper application of the "some evidence' standard articulated in both decisions. Of particular concern is the **Dannenberg** Court's brief discussion in dicta of the "commitment offense" factor, which can improperly be read as granting to the Board the ability to deny parole on the basis of almost any fact imaginable. As a result, there is a real risk the State will interpret the standard to assert, de facto, the power it has been expressly denied; effective immunity from meaningful judicial review of parole decision. It should be recognized, however, that

several courts are struggling to determine exactly how this standard applies. While other Court's (post **Dannenberg** & **Rosenkratz**) has held that the "some evidence" standard must apply to **current dangerousness**. While interpreting this standard the California Court of Appeals, Second Appellate District in the case of In re **WEN LEE**, (Oct. 17, 2006, B188831)(2006 DJDAR 13961) the Court held;

> ...We conclude, however, that the governor erred. The test is not whether some evidence supports the reasons the Govenor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. (Cal.Code Regs., tit. 15, §2402, subd. (a) [parole denied if prisoner "will pose an unreasonable risk of danger to society if released from prison]; see **In re Scott** (2005) 133 Cal.App.4th 573, 595 ["The commitment offense can negate suitability [for parole] only if circumstances of the crime ... rationally indicate that the offender will present an unreasonable public safety risk if released form prison"] but see **In re Lowe** (2005) 130 Cal.App.4th 1405 [suggested "some evidence" applies to the factors, not dangerousness]. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety.

In the case of In re **Elkins**, (Oct. 31, 2006, A111925) the

- 20 -

Court of Appeals, First Appellate District, held that;

> ..."The 'some evidence' standard is extremely deferential
> and reasonably cannot be compared to the standard of
> review involved in ... considering whether substantial
> evidence supports the findings" , nevertheless, it
> requires" ' "some indicia of reliability" ' " (Scott II,
> supra, 133 Cal.App.4th at p. 591, quoting Biggs v.
> Terbune, (9th Cir. 2003) 334 F.3d 910, 915) and "may be
> understood as meaning that suitability determinations
> must have some rational basis in fact" (Scott II, at p.
> 590, fn. 6).

One thing is for certain, even if a mere "some evidence"
standard is to apply in this review, that standard is only a
vehicle for the Court's review of the Board's decision, not a
standard for the Board itself to apply. The findings to support
that initial decision by the Board to deny parole, however, must
be that the record indicates the Petitioner, poses a "current"
danger to the public. That finding can not be based on such
flimsy evidence as to render it mere whim or caprice. (See In re
Ramirez, supra, at 564; See also In re Powell, (1988). To the
contrary, as set forth herein, the Board's decision must be made
under the preponderance of evidence standard. (Cal.Code of Reg.,
Title 15, Div. 2, section 2000 (50) Good Cause).

Petitioner denies the "some evidence" standard used By the
Board satisfied the requirements under both state and federal due

process. Petitioner asserts reliance on the Commitment offense does not satisfy the "some evidence" standard. There is no question that under Rosenkrantz and Dannenberg the statutory "commitment offense" factor is relevant, and that it may at times be enough to deny parole on its own, neither Rosenkrantz nor Dannenberg stands for the principle that the commitment offense is always enough by itself. In fact, both cases affirmatively state that reliance on the commitment offense alone might, in some circumstances, rise to the level of a due process violation. That conclusion is consistent with the concern raised by the Ninth Circuit in Biggs v. Terhune, that the reliance on an ever-frozen, unchanging factor - such as the commitment offense - in denying parole may in certain instances violate due process. This point was also addressed in the case of In re Ramirez, 94 Cal.App.4th 549, at 571 (2001), when the Court noted that reliance on the crime after 17 years in prison was arbitrary. Petitioner has been incarcerated 17 years. While the proportionality aspects of the Ramirez decision were disapproved by the California Supreme court decision in In re Danneneberg, the entirety of Ramirez decision, including this aspect, was not disapproved. Therefore, the Board's reliance on the commitment offense violates due process. The predictive value of the crime after 17 years of incarceration is zero. Furthermore, in the case of In re Scott, 34 Cal.Rptr.3d 905 (Cal.App.1 Dist. 2005), the Court clearly reaffirmed the rationale of the Ramirez Court when it declared ..."Parole is the rule rather than the exception"... Thus, the California Board of Parole Hearings continuous use of the "some evidence" standard as their proper

standard of review is inappropriate, thus, illegal. Furthermore, reviewing Courts using the "some evidence" standard violates principles of appellate review. Substantial evidence is the standard required for a reviewing Court. **Consolidated Edison Co. of New York v. NLRB**, 305 U.S. 197 (1939). It is more than a mere scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. **Chrysler v. U.S. Environment Protection Agency**, C.A., 631 F.2d 865, 890. Under a proper analysis, the "substantial evidence" test, and not a "some evidence" review is the appropriate standard.

ALL RELEVANT AND RELIABLE POST-CONVICTION EVIDENCE

MUST BE GIVEN THE REQUIRED CONSIDERATION IN FAVOR

OF PETITIONER IN LIGHT OF THE EVIDENCE PRESENTED

Petitioner submits that the Board bases its reasons for Petitioner's continued incarceration on historical facts that can never change, thus ignoring the uncontradicted evidence of Petitioner's rehabilitation. Petitioner has achieved the very goal that is hailed by our judicial and correctional systems, coming to prison, turning his life around and committing himself wholeheartedly to bettering himself and the world around him. Petitioner asserts there is **no evidence** that Petitioner is **currently** a threat to public safety. At Petitioner's hearing the Board denied Petitioner parole using static factors, despite overwhelming evidence showing Petitioner's rehabilitation. Petitioner asserts he has taken every available step to improve his life, pay his debt to society, and prepare himself for eventual release, as it is required under penal code §3041 for eligible prisoners serving indeterminate sentences. The Board's reliance on the Commitment Offense as satisfying the "some evidence" standard of review is without merit, after removing the facts erroneously relied upon, relied exclusively upon the Commitment Offense and failed to weigh and consider Petitioner's remorse,, positive psychological profile, lack of future dangerousness, and both realistic and positive parole plans including housing, education, and employment. The Board is required to consider all relevant information about a prisoner, not simply his commitment offense. His "risk of danger to society

- 24 -

is to be assessed in light of all relevant information available to the panel. (Cal. Code Regs., tit. 15, §2402(b)).

Under the view of the California parole process, it is clear that the nature of the commitment offense can constitute a basis for denial only to the extent it sheds light on whether a prisoner "now poses a risk of danger to society". Relying on the offense after years in custody and clear evidence of rehabilitation becomes arbitrary. At some point along the parole consideration process, that excuse to refuse to set a parole date enlight of exemplary conduct and behavior becomes arbitrary, and the term, although initially valid, becomes disproportionate and therefore unlawful. As time passes, and as the appropriate uniform term for the offense approaches, the offense itself sheds less and less light on how a prisoner will behave on the outside. His record in prison, his mental health, his conduct and achievements, all shed more light on his readiness to rejoin society. (see Deluna, supra 2005 WL 268045, 6) a defendant's postcommitment institutional behavior is relevant to his suitability for parole [citing §2402, subd. (d)(9)], and has both positive and realistic parole plans (see In re Deluna, supra, 2005 WL 268045, 5- Stable Relationships with others favor parole (15 CCR §2402 subd. (d)(9), All these factors favor his release. There is no evidence Petitioner now poses a risk of danger to society.

The Board's reasons finding petitioner unsuitable is unreasonable and an abuse of discretion enlight of the evidence presented to the Board by petitioner and the Department of Corrections and Rehabilitation Psychological Department and Counselor.

At the hearing, Correctional Counselor I, T. Verdasoto testified as to Petitioner's programming, and his future residence and employment when paroled:

> **Therapy and Self-Help Activities:** Since Plaza's incarceration, he has participated in Alcoholics Anonymous, Inmate Education Advisory Committee, Bible Study, the Impact Program, Narcotics Anonymous, served as a Deacon, and was a member of the Protestant Choir.

> **Postconviction Factors:** Plaza was received CDC on 10/9/91 at Wasco RC and was transferred to CSP Folsom on 12/17/91 and was classified with Close A custody. On 2/22/92, Plaza was transferred to Calipatria where his custody was reduced to Close B. While in Calipatria, he worked in the culinary, pre-voc. and Compute Programming. Plaza was again transfered to CSP-LAC on 2/3/94. He was classified there with Meddium A custody. While at LAC, Plaza worked in the drycleaning, voc electrical shop, and air cond. refrigerator and heating. On 12/16/97 he was transferred to Avenal where he was in Computer Programming. On 3/13/98 he was transfered to CTF Soledad North Facility where he was assigned to the yard crew 4/7/98 to 4/28/98, and then to PIA Textiles. On 12/31/98 Plaza went to CMC East as a medical transfer and returned to CTF on 3/1/99 where he has remained housed. At his initial classification,

Close B was established. Plaza's custody was reduced to Medium A on 3/23/00 and has remained at Medium A. While at CTF Central Facility, Plaza has been assigned to wing porter, culinary, dental assistant and again culinary, where he remains assigned.

**Disciplinay History:** Plaza has reemained disciplinary free throughout his incarceration

**Residence:** Plaza plans on living with his brother, Hector Plaza. Hector's address is 353 Carla Dr., Simi Valley, California 93063. His phone number is (805) 581-6323

**Employment:** Plaza plans on working at Telair International 4175 Gardain Street, Simi Valley, CA 93063, phone (805) 578-7303.

**Assessment:** In review of Plaza's parole plans, this counselor does not foresee any problems, however, it is recommended that Plaza updates his support letters prior to his hearing. (see Exibit "B")

Dr. M. Macomber testified as to Petitioner's his current mental stability and his lack of present and future dangerous:

**Psychiatric and Medical History:** There is no

- 27 -

psychiatric history. There is no history of serious
accidents or head injuries or seizures. His health is
good.

**Current Mental Status/Treatment Needs:** Mr. Plaza
related in a serious, sober, and cooperative manner.
Mental status was within normal limits. He was alert
and well oriented. His thinking was rational, logical
and coherent. His speech was normal, fluent amd goal
oriented. He does speak excellent English  as well as
Spanish. Affect was appropriate. There was no evidence
of anxiety or depression. Eye contact was good. His
memory was intact. His judgment was intact. His insight
and self-awareness were good.

Mr. Plaza has spent a great deal of time in prison
trying to improve himself. He currently is attending
Coastline College, working on his Associate of Arts
Degree. His grades are very good. Also, he has obtained
a certificate as a home inspector from professional
career institute in Georgia by correspondence. In
addition, he has completed several courses toward
self-improvement. He has completed a Prison Fellowship
Course in Parenting, Anger Management, another 12 week
anger management class, Fathers Behind Bars Activity
Group, Family Effectiveness Training and Harmony in the
Home, Anger Manangement Course, Christian Basics Class,
Teddy Bear Drive Benefiting Children in Crisis, a job

success course, Communicable Diseases, Impact Program
focusing on the victim's rights, Christian Living
Course, Laubach Literacy Tutor Program, and the
Salvation Army Bible Correspondence Course.

**Current Diagnostic Impression:**  Axis I- Drug and
alcohol use by history; Axis II- No personality
disorder; Axis III- No physical disorder; Axis IV- Life
term incarceration; Axis V- Current GAF: 95.

**Assessment of Dangerousness:** (A) In considering
potential for dangerous behavior in the institution.
Mr. Plaza has remained entirely disciplinary free. This
is commendable. This is very difficult to do. At this
time in prison, we are having frequent racial riots. It
is very difficult for a Hispanic male to disassociate
himself from this activity, which can spontaneously
occur in front of him, and if he doesn't get involved,
he will receive retaliation. In this case, remaining
disciplinary free is a very difficult and commendable
achievement. There is no evidence that he has ever been
involved in riots, possession of weapons, assaults on
others, or threats of any kind. As a result, it is
evident that his potential for dangerous behavior in
comparison to other inmates is definitely below
average.

Mr. Plaza has a chrono from Captain Guerra, in which it

29

was stated that he had been hand picked to work as a
communicator, working as a mediator between the two
groups in the institution that had been involved in a
riot against esch other. due to his ability to mediate
between the groups and to get them to agree to non
violence towards each other, the riot that occurred at
that time was resolved peacefully, and the result was
that the institution was able to unlock everybody and
proceed with the program.

(B) In considering potential for dangerous behavior in
the community, Mr. Plaza has no prior arrests for
violence before the commitment offense. He did receive
an arrest as an adult in 1983 for spraying a one inch
diameter dot on the wall. He has remained disciplinary
free in the institution. In order to determine his risk
level on parole, the Level of Service Inventory-Revised
was administered. This is an actuarial measure that
assesses criminal history, substance abuse history,
current adjustment, and other factors to determine
current risk level. On this measure he obtained a score
of 3.6 cumulative frequency for prison inmates. This
means that if 100 men were released on parole, he would
do better on parole than 96 of them. This is a very low
risk level. As a result, he poses no more threat to
society than the average citizen in the community, and
probably less threat to society at this point in his
life.

- 30 -

(C) At the time of the offense, drugs and alcohol were a problem; however, at this point in his life this no longer is an issue. Therefore, there are no significant risk factors in this case.

<u>Clinician Observation/Comments/Reccomendations</u>: There are no mental or emotional problems in this case that would interfere with routine parole planning. Mr. Plaza has obtained vocational training in several areas. He is currently working as a meat cutter in culinary. He has skills in vocational dry cleaning, as well as in vocational air conditioning, refrigeration and heating. He also has a job offer waiting for him upon release. He has very strong family support in the community. All these factors are good indicators of positive parole success. He has maintained his marriage, and his wife continues to be supportive and involved in his life. He maintains constant contact with his three children. Due to his study of the Bible and his commitment to the Christian way of life, he no longer has the irresponsible values and lifestyle that he did prior to the commitment offense. All these factors indicate that his prognosis for successful adjustment in the community is excellent. (see Exhibit "C")

Petitioner asserts that the rehabilitative evidence submitted by Petitioner and both the life Evaluation report and Pyschological report is supportive of release contrary to the Board's specious findings. the Biggs court addressed the Boards illegal usage of needed therapy and other illegal reasons to justify a highly illegal denial.

> "The record in this case and the transcripts of Biggs
> hearing before the Board clearly show that many
> conclusions and factors relied on by the Board were
> devoid of evidentiary basis".

Petitioner submits that the record in this case is also devoid of evidentiary basis as to the Board's findings that evidence presented is not supportive of release, which violates due process. Petitioner further submits that despite the overwhelming evidence that Petitioner does not present a current risk to public safety. The Board arbitrarily found petitioner unsuitable for release. Petitioner asserts that the real reason given by the Board indicative of unsuitability is the commitment offense, and if allowed to identify the unchanging circumstances as indicative of unsuitability, this would put Petitioner in an impossible situation, where no matter what he shows in terms of positive behavior, reformation, self-help, work skills, parole plans, on just rehabilitation in general, he would never be able to overcome the unchanging facts of the crime. The only logical application of constitutional due process dictates what the Court in Irons v. Warden, 358 F.supp.2d 936, 947, (E.D.Cal. 2005) held,

,i.e., that any denial requires the presence of some in-prison behavior showing that the inmate **currently** presents an unreasonable risk of danger if paroled.

Here the facts of the crime have been the only real reason for denying parole. yet, those facts have never been tied to **current** behavior showing that Petitioner still presents an unreasonable risk at this time. A rule requiring the presence of in-prison adverse behavior to justify a denial based on the crime simply recognizes what the 9th Circuit in **Biggs** alluded to when it talked of the rehabilitative goals of the system, and the need to take into consideration that a person can rehabilitate themselves. This seems to be missing from the Board's current agenda and policy. This denies to Petitioner the process to which he is constitutionally due.

At this point, Petitioner has been incarcerated over __23__ years (including pre- & post-conviction credit). His programming clearly shows his full rehabilitation. In drawing the line as to when a denial becomes arbitrary, that line has definitely been crossed in this case, as the Board cannot present factual findings showing a continued risk of danger based on the rehabilitative evidence presented. To the contrary, the in-prison facts are exclusively positive.

As **Ramirez** noted (**Ramirez**, 94 Cal.App.4th at 549), the paroling authority must do more than merely commend Petitioner for the hard work done to rehabilitate himself while in prison. They must actually consider these factors "as... circumstance[s] tending to show his suitability for parole." **Ramirez** supra 94 Cal.App.4th at 571-72 [emphasis in original]. Of course, all the

Board did with petitioner's extensive accomplishments was to brush them aside with several terse lines and issue superficial compliments. Obviously, no serious consideration was ever given to Petitioner's outstanding programming. Yet, the Biggs rule is clear that if an inmate "continue[s] to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in parole". Biggs v. Terhune, supra, 334 F.3d at 916. Here, the evidence of actual rehabilitation is beyond dispute.

The Boards inability to find anything in his current programming, demeanor or psychological condition to justify a finding of current dangerousness, the Board continuously falls back on the immutable and unchanging facts, of the crime, to base its findings of unsuitability.

Again as noted above, wherever one draws the line as to when the reliance on the unchanging facts of the commitment offense becomes a violation of due process in the abstract, under the facts here after __17__ years, it clearly has passed here. Thus, the Board must do more than simply commend Petitioner for his efforts and accomplishments, and must consider them as favoring parole in evaluating suitability. Ramirez, supra, at 572. The Board must do this even if the factors of the commitment offense in the abstract can be said to be sufficient to deny petitioner parole.

Petitioner asserts that he has continued to be a model inmate, yet, continues to be deprived the benefits of his exemplary rehabilitation by the California Board of Parole

34

Hearings. The only real issue at a parole hearing is whether the inmate **currently** poses an unreasonable risk of danger to the public if paroled. This must be determined by an inmates post-conviction evidence of rehabilitation. Petitioner has met every prerequisited condition that warrants a finding of suitability. Because there is no evidence to support a finding that Petitioner poses a current threat to public safety of any magnitude, let alone an unreasonable level of threat, the decision denying parole cannot be sustained.

<u>CONCLUSION</u>

For these reasons, Petitioner respectfully submits that this Court grant review to determine that his due process rights continues to be abridged by the California Board of Parole Hearings and upheld by the unreasonable application of clearly established Supreme Court Authority and decision contrary to clearly established law standards of review under the Anti-Effective\Death Penalty Act of 1996.

The granting of review will bring up to date the guidance provided, in <u>Bigg</u>, <u>Ramirez</u> and all other foermentioned cases presented, so as to insure uniformity of decision making in the lower courts on issues frequently litigated, and to settle questions so important that they impact directly upon the rights of a person such as Petitioner to due process of law under the State and Federal Constitutions.

Dated: __NOV. 19, 2007__

Respectfully submitted,

Jesse Plaza, Petitioner

In Pro Per

//
//
//
//
//
//

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015.5)

I, _____ Jesse Plaza _____ , declare:

I am over 18 years of age and I am party to this action.  I am a
resident of CORRECTIONAL TRAINING FACILITY prison, in the County
of Monterrey, State of California.  My prison address is:

Jesse Plaza _____ , CDCR #: H-12371 _____
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689, CELL #: F-328U
SOLEDAD, CA 93960-0689.

On _____ , I served the attached:

---

Petition for Review

---

on the parties herein by placing true and correct copies
thereof, enclosed in a sealed envelope (verified by prison
staff), with postage thereon fully paid, in the United States
Mail in a deposit box so provided at the above-named institution
in which I am presently confined.  The envelope was addressed as
follows:

SUPREME COURT OF CALIFORNIA          OFFICE OF THE ATTORNEY GENERAL
350 McAllister Street                300 S. Spring Street
San Francisco, CA 94102-4797         Los Angeles, CA 90099-9126

I declare under penalty of perjury under the laws of the
State of California that the foregoing is true and correct.
Executed on _____ .

_____

_____
Declarant

California Courts - Appellate Court Case Information                                    Page 1 of 1

# CALIFORNIA APPELLATE COURTS

### Case Information



Welcome

**2nd Appellate District**                                    Change court

Search

Court data last updated: 11/21/2007 03:05 PM

E-mail

**Case Summary   Docket   Scheduled Actions   Briefs**

Calendar

**Disposition   Parties and Attorneys   Trial Court**

Help

## Disposition

Opinions

**Plaza v. The People et al.**
**Division 2**
**Case Number B202665**

C|C
home

| Description: | Petition summarily denied by order |
|---|---|
| Date: | 11/08/2007 |
| Status: | Final<br>B-A-C |
| Publication Status: | |
| Author: | |
| Participants: | |
| Case Citation: | |

**Click here** to request automatic e-mail notifications about this case.

© 2007 Judicial Council of California

S158421

# EXHIBIT A

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )     CDC Number H-12371
                          )
JESUS PLAZA               )
                          )
_____    )

INMATE
COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 1, 2006

PANEL PRESENT:

ARCHIE JOE BIGGERS, Presiding Commissioner
ROLANDO MEJIA, Deputy Commissioner

OTHERS PRESENT:

JESUS PLAZA, Inmate
LAWRENCE MORRISON, Deputy District Attorney
KATERA E. RUTLEDGE, Attorney for Inmate

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No     See Review of Hearing
_____  Yes    Transcript Memorandum

Ruby M. Dougherty, Peters Shorthand Reporting

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 16 |
| Pre-Commitment Factors | 23 |
| Post-Commitment Factors | 33 |
| Parole Plans | 48 |
| Closing Statements | 62 |
| Recess | 88 |
| Decision | 89 |
| Adjournment | 93 |
| Transcriber Certification | 94 |

--oOo--

1

1    P R O C E E D I N G S

2        DEPUTY COMMISSIONER MEJIA: We're on

3    record.

4        PRESIDING COMMISSIONER BIGGERS:  Okay.

5    This is initial parole consideration hearing for

6    Jesus Plaza, P-L-A-Z-A, CDC No. H-12371.  We're

7    located at the Correctional Training Facility in

8    Soledad.  Inmate was received on October 9, 1991

9    from Los Angeles County.  The life term began on

10    October 9, 1991 and the minimum eligible parole

11    date is January 25th, 2007.  The controlling

12    offense for which the inmate has been committed

13    is murder case number -- first-degree murder

14    with a weapon.  Case No. is VA004108.  That's a

15    violation on criminal code PC187.  The inmate

16    received a term of 25 years to life, with a

17    minimum eligible parole date of 1/25/07.  Now

18    this hearing's being tape-recorded and for the

19    purpose of voice-identification each of us will

20    state our first and last name, spelling our last

21    name.  When we get to you Mr. Plaza, if you

22    would please give us your CDC number after you

23    spell your last name.  I will start and move to

24    my left.  My name is Archie Joe Biggers,

25    B-I-G-G-E-R-S, and I'm a Commissioner.

26        DEPUTY COMMISSIONER MEJIA:  Rolando

27    Mejia, M-E-J-I-A, Deputy Commissioner.

2

1          DEPUTY DISTRICT ATTORNEY MORRISON:

2    Lawrence Morrison, M-O-R-R-I-S-O-N, Los Angeles

3    District Attorney.

4          ATTORNEY RUTLEDGE:  Katera E. Rutledge,

5    R-U-T-L-E-D-G-E, attorney for Mr. Plaza.

6          INMATE PLAZA:  My name is Jesus Plaza,

7    last -- CDC number is H-12371.

8    [Recording equipment malfunction, placement of

9      equipment, background noise, and volume of

10   participants resulted in indiscernible content.]

11         PRESIDING COMMISSIONER BIGGERS:  Okay.

12   Thanks to all of you.  Mr. Perez is there an ADA

13   statement that was passed over there to you?  Do

14   you see that?  It should have been right next

15   to--

16         INMATE PLAZA:  (Indiscernible).

17         PRESIDING COMMISSIONER BIGGERS:  -- would

18   you please read that out loud for us?

19         INMATE PLAZA:  "The Americans with

20         Disability Act, ADA, is a law to

21         help people with disabilities.

22         Disabilities are problems that

23         make it harder for some people to

24         see, hear, breathe, talk, walk,

25         learn, think, work, or take care

26         of themselves than it is for

27         others.  Nobody can be kept out of

3

1      public places or activities

2      because of a disability.  If you

3      have a disability you have the

4      right to ask for help to get ready

5      for your BPT hearing, get to the

6      hearing, talk, read forms and

7      papers, and understand the hearing

8      process.  BPT will look at what

9      you ask for to make sure that you

10     have a disability that is covered

11     by the ADA, and that you have

12     asked for the right kind of help.

13     If you do not get help or if you

14     don't think you got the kind of

15     help you need, ask for a BPT 1074

16     Grievance Form.  You can also get

17     help to fill it out."

18     PRESIDING COMMISSIONER BIGGERS:  All

19 right.  Do you understand what that means Mr.

20 Plaza?

21     INMATE PLAZA:  Yes, I do.

22     PRESIDING COMMISSIONER BIGGERS:  And what

23 does it mean in your own words please.

24     INMATE PLAZA:  In my own words I believe

25 it's saying if I have any disability or need

26 help during this hearing I have the right to

27 have those provided for me.

4

1         PRESIDING COMMISSIONER BIGGERS:

2  (Indiscernible) we're talking about things like

3  hearing, eye -- do you wear glasses?

4         INMATE PLAZA:  No.

5         PRESIDING COMMISSIONER BIGGERS:  Okay.

6  Do you have any hearing impairment?

7         INMATE PLAZA:  No, I don't.

8         PRESIDING COMMISSIONER BIGGERS:  And you

9  can walk without any problems?

10         INMATE PLAZA:  Yes.

11         PRESIDING COMMISSIONER BIGGERS:  Okay.

12  Have you ever been included in the Triple CMS or

13  EOP Program?

14         INMATE PLAZA:  Never.

15         PRESIDING COMMISSIONER BIGGERS:  Okay.

16  So you don't suffer from any disability that

17  would prevent you from participating in today's

18  hearing?

19         INMATE PLAZA:  Not at all.

20         PRESIDING COMMISSIONER BIGGERS:  Counsel,

21  do you feel that your client's ADA rights have

22  been met?  Ms. Rutledge?

23         ATTORNEY RUTLEDGE:  Yes, Sir.

24         PRESIDING COMMISSIONER BIGGERS:  Thank

25  you.  This hearing is being conducted pursuant

26  to Penal Code Section 3041 and 3042 and the

27  rules and regulations of the Board of Prison

5

1   Terms governing parole consideration hearings

2   for life inmates.  The purpose of today's

3   hearing is to consider the number and the nature

4   of the crimes you were committed for, your prior

5   criminal and social history, your behavior and

6   programming since your commitment.  We have had

7   the opportunity to review your Central File, and

8   you will be given the opportunity to correct or

9   clarify the record.  We will reach a decision

10  today, and find -- and inform you whether or not

11  we find you suitable for parole and the reasons

12  for our decision.  If you are found suitable for

13  parole, the length of your confinement will be

14  explained to you.  Before we go any further, I

15  want to advise you that we expect you to be

16  fully honest with us today, especially with this

17  being your initial hearing.  So in the event

18  that you don't get a date today, this here will

19  form the foundation for all future hearings.

20        INMATE PLAZA:  I (indiscernible).

21        PRESIDING COMMISSIONER BIGGERS:  Any

22  false statement you make today could have an

23  adverse effect on your ability to get a date at

24  a later time in the event that you don't get a

25  date today.  Nothing that happens here today

26  will change the findings of the Court.  We are

27  not here to retry your case.  We are here to

6

1    determine if you are suitable for parole.  Do

2    you understand that?

3          INMATE PLAZA:  I understand.

4          PRESIDING COMMISSIONER BIGGERS:  The

5    hearing will be conducted in two phases.  I will

6    discuss with you the crime you were committed

7    for, your prior criminal and social history.

8    Deputy Commissioner Mejia will talk to your

9    about parole plans, letters of support and

10   opposition, your counselor's report and your

11   psychological evaluation.  Once that is

12   concluded, both Commissioners, the District

13   Attorney, and your attorney will ask you

14   questions.  Questions from the District Attorney

15   shall be asked through the Panel and your

16   answers should be directed to the Panel.  Before

17   we recess for deliberation, the District

18   Attorney, your attorney, and you will be given

19   the opportunity to make a final statement

20   regarding your suitability, followed by

21   statements -- if we had victims, it would be --

22   (indiscernible) follow with the victims, but

23   since we don't have any we don't worry about

24   that one.  California Code of Regulations states

25   that regardless of time served a life inmate

26   shall be found unsuitable for and denied parole

27   if in the judgment of the Panel the inmate would

7

1    pose an unreasonable risk of danger to society

2    if released from prison.  You have certain

3    rights.  Those rights include the right to a

4    timely notice of this hearing, the right to

5    review your Central File.  Did you review your

6    Central File?

7        INMATE PLAZA:  Yes.

8        PRESIDING COMMISSIONER BIGGERS:  And the

9    right to present relevant documents.  Ms.

10   Rutledge, do you believe that your client's

11   rights have been met.

12       ATTORNEY RUTLEDGE:  Yes.

13       PRESIDING COMMISSIONER BIGGERS:  Okay.

14   Thank you, ma'am.  You have an additional right

15   to be heard by an impartial Panel.  Do you have

16   any objection to the Panel members?

17       INMATE PLAZA:  No, none at all.

18       PRESIDING COMMISSIONER BIGGERS:  Okay.

19   All right.  I'm going to ask Ms. Rutledge, do

20   you have any objections to the Panel

21   (indiscernible)?

22       ATTORNEY RUTLEDGE:  No, Sir.

23       PRESIDING COMMISSIONER BIGGERS:  Thank

24   you.  You will receive a written copy of our

25   tentative decision today.  That decision becomes

26   effective within 120 days.  A copy of the

27   decision and a copy of the transcript will be

8

1  sent to you, and you will have 90 days from that
2  date to appeal if you so desire. Now, I need to
3  let you know that the Board has eliminated its
4  appeals process. If you disagree with anything
5  that happens in today's hearing, you have the
6  right to go directly to the Court with your
7  complaint.

8          INMATE PLAZA:  I understand.

9          PRESIDING COMMISSIONER BIGGERS:  Okay,
10  thank you. You are not required to admit your
11  offense or discuss your offense. However, this
12  Panel does accept the findings of the Court to
13  be true. Do you understand that?

14         INMATE PLAZA:  Yes, I (indiscernible).

15         PRESIDING COMMISSIONER BIGGERS:  Okay,
16  thank you. I'm gonna pass a -- over to your
17  attorney and then to the District Attorney what
18  I've have marked as Exhibit One so that we can
19  make sure that we're all using -- on the same
20  set of documents.

21         DEPUTY DISTRICT ATTORNEY MORRISON:
22  District Attorney has all the documents, thank
23  you.

24         ATTORNEY RUTLEDGE:  The -- Mr. Plaza, the
25  defense has all (indiscernible).

26         PRESIDING COMMISSIONER BIGGERS:  Thank
27  you, ma'am. Thank you, sir. Commissioner

9

1  Mejia, is there any confidential material in the

2  file?

3          DEPUTY COMMISSIONER MEJIA:  No.  No

4  confidential information.

5          PRESIDING COMMISSIONER BIGGERS:  Okay.

6  Are any additional documents to be submitted?

7          ATTORNEY RUTLEDGE:  I (indiscernible) we

8  did submit --

9          PRESIDING COMMISSIONER BIGGERS:  And I

10 read those (indiscernible) read the statement

11 into the record, because I want to make sure it

12 he gets into the record.  I read, I think it was

13 the last two pages that had to do with matrix

14 and all the other stuff in there -- but I -- and

15 I -- but want to get it on record, so -- to

16 make sure that it is in the transcript.

17         ATTORNEY RUTLEDGE:  Do you want me to

18 read it or him to do that?

19         PRESIDING COMMISSIONER BIGGERS:  It

20 doesn't matter, which ever you prefer.

21         ATTORNEY RUTLEDGE:  This was taken from

22 -- Mr. Plaza had submitted to the Board a

23 memorandum of evidence and law in support of

24 parole suitability and this is directed to the

25 Board.

26         "Introduction, the California Code

27         of Regulations Title XV Division

10

1          Two hereafter XV Section 2245,

2     states in part, 'The prisoner is

3     responsible for bringing to the

4     attention of the hearing Panel any

5     issues pertaining to his rights

6     under this article or any failure·

7     to comply with these rules.   A

8     prison may waive any of these

9     rights.   Any such waiver shall be

10    documented.'   I wish to bring to

11    the attention of this Panel at

12    this time that I do have the right

13    to present this document at this

14    hearing to have it entered into

15    the record.   Moreover, the Panel

16    must --"

17   That's moot since the Panel's accepting it.   Is

18   that correct?

19         DEPUTY COMMISSIONER MEJIA:   Yes, it is.

20         ATTORNEY RUTLEDGE:   Okay.   In the third

21   paragraph, my client submits this memorandum

22   because he does not wish to intentionally or

23   unintentionally waive any of his rights under

24   the law, and that he wants that all evidence in

25   support of finding suitability be stated for the

26   records and for purposes of appeal if necessary.

27         PRESIDING COMMISSIONER BIGGERS:   Before

11

1  you go any further.  Normally, everything that

2  we do, that's why it's on record.  So, I just

3  want to make sure that you now understand that

4  we -- our job is to make sure that we do

5  everything under due process and we are aware of

6  everything that happens in Title XV.

7         INMATE PLAZA:  That's right.

8         PRESIDING COMMISSIONER BIGGERS:  Okay?

9  So, go ahead, ma'am, please.

10        ATTORNEY RUTLEDGE:  Moving on to the

11  memorandum incorporates the following -- relies

12  upon the Court rulings.

13        "InRe Rosencrance,

14        (indiscernible); InRe Rosencrance

15        for LA County Superior Court, Case

16        No. AH10298; InRe Caswald,

17        210DJDJR10845; InRe McWillion,

18        U.S. Court of Appeals for the 9th

19        Circuit, Case No. 0055182; InRe

20        Ramirez, 9th Circuit Court of

21        Appeals, Case No. AO092699; InRe

22        Biggs, U. S. Court of Appeals,

23        Case No. VH002016; InRe Deluna,

24        126 Appellate Court, 585; InRe

25        Low, 130 Appellate Court, 1418 --"

26        PRESIDING COMMISSIONER BIGGERS:  Excuse

27  me, what was that?  What was the -- what's the

12

1    relation of the Low case in this hearing?

2            ATTORNEY RUTLEDGE:  How are we applying

3    the Low case to this hearing?  This is being

4    presented by my client; I have not read the Low

5    case.

6            DEPUTY DISTRICT ATTORNEY MORRISON:  Well,

7    I have a -- I have a question (indiscernible) if

8    I may.  The inmate can present anything he

9    wants, but this sounds like legal arguments.

10   The inmate has an attorney -- he's gonna have an

11   attorney -- he can make whatever arguments he

12   wants if he gonna represent himself then he can

13   make legal arguments.  But he doesn't get to

14   make legal arguments and have an attorney.

15           ATTORNEY RUTLEDGE:  Yes, he does.

16   There's nothing -- sometimes he can have an

17   attorney --

18           PRESIDING COMMISSIONER BIGGERS:  Excuse

19   me.  What I'm doing right now is allowing him to

20   read his document into the file.  When we start

21   talking about the opposing statements and

22   getting into all the others, then that's when I

23   will put a stop to that.  But I want to get this

24   in the file, and I have something to say once

25   you finish.

26           ATTORNEY RUTLEDGE:  And I would -- I

27   would remind the Panel that under Title XV the

13

1  people have no standing to object to anything

2  that the inmate does.

3         PRESIDING COMMISSIONER BIGGERS:  Exactly.

4         ATTORNEY RUTLEDGE:  Thank you.  All

5  right.  So -- "InRe Shapudis, 135 Appellate

6  Forth 217 at 227; Irons versus Carey 408 F

7  Third, 1165 9th Circuit."  Now Page Two goes to

8  the commitment offense so --

9         PRESIDING COMMISSIONER BIGGERS:  You can

10  skip that one.  In fact, I think you can skip

11  the last three pages, I just wanted to get those

12  things on the record for you (indiscernible)

13  others because what I wanted to let you know sir

14  is that those cases are a matter of law, and you

15  can use those any times when you appeal if for

16  some reason you don't get a date.  But there are

17  a couple that you forgot to mention.  One of

18  those is Dannenberg, and we'll talk about that a

19  little later on.  I would appreciate -- I think

20  you've done a superb job of putting this package

21  together.  My only comment on that is I think

22  sometimes that you don't who -- by going in

23  there and doing certain things, there's a

24  difference between shall, will, and can't.

25         INMATE PLAZA:  I understand.

26         PRESIDING COMMISSIONER BIGGERS:  Okay.

27  So.  All right.

14

1          ATTORNEY RUTLEDGE:  Can I -- there's an

2   -- I still have to lodge a couple of objections

3   whenever the Panels --

4          PRESIDING COMMISSIONER BIGGERS:  No

5   problem.  So those are the additional documents.

6   Now, you say you have some preliminary

7   objections?  What are they now?

8          ATTORNEY RUTLEDGE:  Well, our first

9   objection would be -- well, we would ask that

10   the Panel --  under 2236 my client will be

11   discussing everything but the commitment offense

12   with the Panel.  We ask that the people not be

13   allowed to refer to him not discussing the case,

14   and that again we're just reiterating that the

15   people don't have standing to object to any of

16   our statements and may not advise the Panel on

17   the law, and that would be all aside from what

18   would be in the package.

19          DEPUTY DISTRICT ATTORNEY MORRISON:

20   (Indiscernible) recommend that (indiscernible)

21   represents the citizen of Los Angeles, it's part

22   of public comment that we're entitled to make on

23   any subject regarding suitability for parole.

24          ATTORNEY RUTLEDGE:  You can during your

25   closing.  Other than that you have no standing.

26          PRESIDING COMMISSIONER BIGGERS:  She's

27   right about that.  You do have the right to do

15

1  that in Closing Statements (indiscernible).  He

2  can in fact though ask questions.  If your

3  client elects not to answer them that's

4  something entirely different, but he does have

5  the right to ask questions as well.

6      ATTORNEY RUTLEDGE:  Of my client,

7  correct.  Yes.  Okay.

8      PRESIDING COMMISSIONER BIGGERS:  Are

9  there any other preliminary objections?

10     ATTORNEY RUTLEDGE:  No, Sir.

11     PRESIDING COMMISSIONER BIGGERS:  Okay.  I

12  assume from what you just told me that the

13  inmate will be speaking to us about everything

14  but the crime?

15     ATTORNEY RUTLEDGE:  Yes.

16     PRESIDING COMMISSIONER BIGGERS:  Okay.

17  Would you raise your right hand please, Mr.

18  Plaza.  Do you solemnly swear or affirm that the

19  testimony you give at this hearing will be the

20  truth and nothing but the truth?

21     INMATE PLAZA:  I do.

22     PRESIDING COMMISSIONER BIGGERS:  Thank

23  you.  I'm gonna read into the record from the

24  Appellate decision the facts of the committing

25  offense.

26     "On May 26, 1990, Mr. Plaza was an

27          active member of the King Cobra

16

1      juvenile gang.  (Indiscernible)

2      Silva, S-I-L-V-A, Mr. Plaza's

3      co-arrestee was also an active

4      member of the King Cobras.

5      Patrick Littlebull,

6      L-I-T-T-L-E-B-U-L-L, the victim,

7      was a member of the Bell Garden

8      (phonetic) --" is that local --

9      INMATE PLAZA:  It's always been

10     miss-spelled, but it's supposed to be locos as

11     in crazy.

12     PRESIDING COMMISSIONER BIGGERS:  Locos.

13     INMATE PLAZA:  Locos.

14     PRESIDING COMMISSIONER BIGGERS:  Locos.

15     INMATE PLAZA:  Yeah.

16     PRESIDING COMMISSIONER BIGGERS:  Okay.

17     "-- a rival juvenile gang.  Fifty-nine hundred

18     block of Loveless (phonetic) Street was a known

19     hangout of the Bell Garden Locos."

20     INMATE PLAZA:  There you go.

21     PRESIDING COMMISSIONER BIGGERS:  "On May

22     26, 1990 at around 10:00 p.m.

23     Rosario Quevedo, Q-U-E-V-E-D-O,

24     and her sister, Martha -- and I'll

25     spell the last name --

26     P-A-L-A-C-I-O-S, returned from

27     church with their children and

17

1    parked their car in front of their

2    apartment at 5940 Loveless Street.

3    Quevedo, Q-U-E-V-E-D-O, noticed

4    some individuals standing and

5    talking to each other on the

6    sidewalk in front of the car. She

7    also saw a car approaching from

8    the opposite direction with its

9    lights off and stop across the

10    street. Rosario and Palatono --

11    P-A-L-A-C-I-O-S -- then heard

12    gunshots. Quevedo panicked and

13    drove away. When they returned a

14    short time later, they saw the

15    victim lying face down in the

16    street in front of the apartment

17    building. Jesus Zamora,

18    Z-A-M-O-R-A, made a pizza delivery

19    for Dominoes Pizza about 10:00

20    p.m. that evening at 5918 Loveless

21    Street. After delivering the

22    pizza he pulled into the driveway

23    at 5918 Loveless Street to write

24    in his delivery book. As he was

25    writing, he heard the sound of

26    gunfire and the sound of a car

27    coming rapidly in his direction.

18

```
 1          He saw a car traveling on Loveless
 2          Street without the headlights on.
 3          The car passed Zamora and turned
 4          the car, straddling the curve.
 5          The lights of the car then came
 6          on, and Zamora saw the number 33
 7          on the license plate.  He also
 8          noted that the car was a gray
 9          Caprice.  He later related his
10          observations to Bell Garden Police
11          Officer Reuben Musquiz,
12          M-U-S-Q-U-I-Z.  Officer Musquiz
13          then broadcast a description of
14          the gray Caprice over the police
15          radio.  Around 10:50 p.m., Bell
16          Police Officer Baley Hooper,
17          H-O-O-P-E-R, observed a silver
18          Caprice with 33 on it as the last
19          two numbers on the license plate."
20  And then I'm going to skip down and say -- well,
21  let me read this in too.
22          "-- proceeded westbound on
23          Florence Avenue near the 710
24          Freeway bridge.  He radioed for
25          assistance and followed the car
26          into a driveway.  Plaza, who was
27          driving, and passenger Danny Silva
```

19

1          exit the vehicle.  They were

2          detained and subsequently

3          arrested.  Brown paper bags were

4          placed on the hands of Plaza and

5          Silva so they -- that they -- be

6          tested for gunshot residue.

7          Analysis residue from a pellet in

8          Silva's hand indicate that Plaza

9          and Silva had either shot a gun,

10          handled a gun, or had been within

11          with two (indiscernible) feet of a

12          gun as it was fired."

13 Okay.  That's enough for the record.  And since

14 you're not gonna be talking about the crime

15 itself -- and counsel if I touch on an area that

16 you want to object to, that's fine, I need to

17 ask a couple of things though.  At one time you

18 denied your involvement.

19          INMATE PLAZA:  Yes.

20          PRESIDING COMMISSIONER BIGGERS:  Okay.

21 When did you change that?

22          INMATE PLAZA:  I'd have to say about an

23 hour into the interrogation.

24          PRESIDING COMMISSIONER BIGGERS:  An hour

25 into the interrogation?

26          INMATE PLAZA:  Yes.

27          PRESIDING COMMISSIONER BIGGERS:  Well, I

20

1   was looking at the Appellate Decision and it

2   indicated -- I thought it looked like it was a

3   little bit longer than that.

4          ATTORNEY RUTLEDGE:  He maintains he was

5   the driver of the vehicle, and they never --

6   there were two people.  Both people found in the

7   car had gunshot residue.  There was a third

8   person that was never tried.

9          PRESIDING COMMISSIONER BIGGERS:  Never

10  tried, but yeah there were two.  The two that

11  had the residue was Mr. Plaza and Mr. Silva; is

12  that correct?

13         INMATE PLAZA:  That's correct.

14         PRESIDING COMMISSIONER BIGGERS:  Okay.

15  Can you tell me how you got the residue on your

16  hands?

17         INMATE PLAZA:  Yes, I handled the gun

18  after it was fired plus I was in the vicinity of

19  the shots being fired.

20         PRESIDING COMMISSIONER BIGGERS:  Within

21  two to four feet is what you're saying?

22         INMATE PLAZA:  Yes, Sir.

23         ATTORNEY RUTLEDGE:  Okay, I think we're

24  getting into the commitment offense --

25         PRESIDING COMMISSIONER BIGGERS:  Okay.

26  At one time you talked about the (indiscernible)

27  you requested it be turned to a manslaughter

21

1    (indiscernible), right?

2            INMATE PLAZA:  My lawyer did, yes.

3            PRESIDING COMMISSIONER BIGGERS:  Yes.

4    And that was shot down by the Appellate

5    Decision.  Are you still a member of that King

6    Cobra gang?

7            INMATE PLAZA:  I was never technically a

8    member, but I was an associate.  I hung around

9    with gang members, to be totally honest.  I hung

10   around with several different gang members.

11   People that I hung around with were from

12   different gangs.

13           ATTORNEY RUTLEDGE:  (Indiscernible).

14           INMATE PLAZA:  Oh, being born and raised

15   in East LA there's gangs all around.

16           PRESIDING COMMISSIONER BIGGERS:  Yeah,

17   there are -- some gangs are not as violent as

18   otters.  There are some gangs that are just

19   locals that hang out, too.

20           INMATE PLAZA:  Not that I know of.

21           PRESIDING COMMISSIONER BIGGERS:  Okay.

22   Well, I'm familiar with LA.  Not all of them are

23   Bloods, Crips, or whatever names that they have.

24   You indicated that you have spent a lot of time

25   hanging around those people.  Were you aware

26   that -- well, that's getting back into the

27   crime.  Were you aware that -- the night in

22

1  question, were you in with some of those known

2  gang members?

3          INMATE PLAZA:  Yes.

4          PRESIDING COMMISSIONER BIGGERS:  Did you

5  have any idea what was going to take place?

6          ATTORNEY RUTLEDGE:  We would -- that

7  would -- sorry, I have to object to --

8          PRESIDING COMMISSIONER BIGGERS:  All

9  right.

10          ATTORNEY RUTLEDGE:  But we would accept

11  the --

12          PRESIDING COMMISSIONER BIGGERS:  Findings

13  of the

14          ATTORNEY RUTLEDGE:  -- Appellate --

15          PRESIDING COMMISSIONER BIGGERS:

16  Appellate Decision.  Okay.

17          ATTORNEY RUTLEDGE:  Yes.

18          PRESIDING COMMISSIONER BIGGERS:  All

19  right.  Then I will go and just look and see

20  what else I think is -- talking about your

21  priors.

22          DEPUTY DISTRICT ATTORNEY MORRISON:

23  Excuse me, Commissioner.  I'm sorry, I may have

24  missed it with all of this discussion.  But did

25  the Chair read the official version of the crime

26  into the --

27          PRESIDING COMMISSIONER BIGGERS:  I read

23

1   it from the Appellate Decision.  Yes, it is.

2        DEPUTY DISTRICT ATTORNEY MORRISON:

3   Because the Appellate Decision is pretty

4   lengthy.

5        PRESIDING COMMISSIONER BIGGERS:   Yeah,

6   and I read that in --

7        DEPUTY DISTRICT ATTORNEY MORRISON:

8   That's right.  Okay.

9        ATTORNEY RUTLEDGE:   It's probably why you

10  fell asleep during that part.

11       PRESIDING COMMISSIONER BIGGERS:   All

12  right -- we're not going to have that now.

13       ATTORNEY RUTLEDGE:   Just teasing.

14       PRESIDING COMMISSIONER BIGGERS:   I know.

15  We're going to keep everything on the up and up

16  here.  Okay.  And did you have a juvenile

17  history, because when I went through this I

18  couldn't find anything.  It says not available

19  to Probation Department as far as five years

20  after that.  Did you have any juvenile history?

21       INMATE PLAZA:   (Indiscernible).

22       PRESIDING COMMISSIONER BIGGERS:   And the

23  only adult history that you had was -- you were

24  given 24 months probation for some vandalism --

25       INMATE PLAZA:   Yes.

26       PRESIDING COMMISSIONER BIGGERS:   What was

27  that about?

24

1          INMATE PLAZA:  I was arrested for

2    vandalizing a store -- store property.

3          PRESIDING COMMISSIONER BIGGERS:  Why did

4    you do that?

5          INMATE PLAZA:  To be honest with you, I

6    was walking down the street, I was intoxicated,

7    I seen the can sitting on the floor, I picked it

8    up, what made we think I wanted to know what

9    color it was I really am not sure today while I

10   did that, but I did spray a one-inch diameter

11   dot on the wall to see what color the can was

12   and that's what I was arrested for -- a one-inch

13   diameter dot on the wall.

14         PRESIDING COMMISSIONER BIGGERS:  And they

15   gave you two-years probation for that?

16         INMATE PLAZA:  Yes.

17         ATTORNEY RUTLEDGE:  It's usually three

18   years under the Penal Code.

19         PRESIDING COMMISSIONER BIGGERS:  Yeah,

20   but that -- there had to be some extenuating

21   circumstances as to priors --

22         DEPUTY DISTRICT ATTORNEY MORRISON:

23   Misdemeanor probation in LA County summary

24   probation is frequently two years.  Sometimes

25   for a (indiscernible) it's only one year.

26         ATTORNEY RUTLEDGE:  But under the Penal

27   Code you don't have to justify three years.  You

25

1    just give three years.

2         PRESIDING COMMISSIONER BIGGERS:  Okay,

3    well, my question to you -- was there anything

4    else that led them to give you only two years?

5         INMATE PLAZA:  I wouldn't know.

6         PRESIDING COMMISSIONER BIGGERS:  Okay.

7    Let's talk a little bit about your drug -- do

8    you have -- do you have a drug history?

9         INMATE PLAZA:  Yes, I do.

10        PRESIDING COMMISSIONER BIGGERS:  Okay.

11   And what was your drug of choice?

12        INMATE PLAZA:  Cocaine.

13        PRESIDING COMMISSIONER BIGGERS:  Cocaine.

14   And it says that you began snorting cocaine

15   three times a week at the age of 16 --

16        INMATE PLAZA:  Yes.

17        PRESIDING COMMISSIONER BIGGERS:  -- and

18   you continued use of this of -- until age 18,

19   and you stopped at age 20.

20        INMATE PLAZA:  Actually that's incorrect.

21   I never actually stopped.  I just decreased for

22   a minute, and then I just elevated up until the

23   time I was arrested.

24        PRESIDING COMMISSIONER BIGGERS:  Were you

25   -- the night you were arrested were you involved

26   in alcohol or cocaine or anything?

27        INMATE PLAZA:  Both.  Alcohol and

26

1   cocaine.

2         PRESIDING COMMISSIONER BIGGERS:   When did

3   you start using alcohol?

4         INMATE PLAZA:   I'd say age 15.

5         PRESIDING COMMISSIONER BIGGERS:   You were

6   still living at home, were you not?

7         INMATE PLAZA:   Yes, I was.

8         PRESIDING COMMISSIONER BIGGERS:   Were

9   your parents aware that you were using cocaine

10   and getting involved in drinking?

11         INMATE PLAZA:   No, not at all?

12         PRESIDING COMMISSIONER BIGGERS:   How

13   could you hide that?

14         INMATE PLAZA:   Well, my father'd been

15   gone since I was about four years old so he's

16   not in the picture.  My mother, due to trying to

17   support me and my other siblings -- she worked

18   -- usually she had -- numerous times she usually

19   had two jobs at a time.  She's work day and

20   night, so by the time she'd get home I'd already

21   be home in bed.

22         PRESIDING COMMISSIONER BIGGERS:   Okay.

23   Did you -- I'll get in your social here

24   (indiscernible) in a few minutes.  But I wanted

25   to find out were you -- let me go back.  You

26   were talking about the cocaine usage.  You

27   started using it at an early age right?

27

1       INMATE PLAZA:  Yes.

2       PRESIDING COMMISSIONER BIGGERS:  How did

3  you support yourself in getting that?

4       INMATE PLAZA:  I had a job.  I used to

5  work after school through the Cedar Program.

6       PRESIDING COMMISSIONER BIGGERS:  Cocaine

7  is a fairly expensive drug, isn't it?

8       INMATE PLAZA:  Yes, it is.

9       PRESIDING COMMISSIONER BIGGERS:  Okay.

10  Were you buying it on the street?

11       INMATE PLAZA:  Yes, I was.

12       PRESIDING COMMISSIONER BIGGERS:  Costing

13  you a pretty penny to do that, wasn't it?

14       INMATE PLAZA:  Yeah, pretty much all my

15  money.

16       PRESIDING COMMISSIONER BIGGERS:  Okay,

17  and you still say that your parents did not know

18  that you were doing this?

19       INMATE PLAZA:  No, they didn't.

20       PRESIDING COMMISSIONER BIGGERS:  How

21  about alcohol?  What was your drink of alcohol

22  that you liked?

23       INMATE PLAZA:  Mainly my drink was

24  Miller.

25       PRESIDING COMMISSIONER BIGGERS:  Miller?

26       INMATE PLAZA:  Yes.

27       PRESIDING COMMISSIONER BIGGERS:  And you

28

1    would take that in conjunction with?

2        INMATE PLAZA:  Well, the alcohol started

3    off as a, you know, what they call a gateway

4    drug.  It was the beginning of alcohol which led

5    me to the cocaine and that was pretty much the

6    two main -- my two main choices of alcohol and

7    drug of choice was cocaine.

8        PRESIDING COMMISSIONER BIGGERS:  Okay.

9    Under Social Factors, you were born on February

10   the 7, 1965 to Caroline and Jessie (phonetic)

11   Plaza.

12       INMATE PLAZA:  I believe there's an

13   addendum behind that -- there's a --

14       PRESIDING COMMISSIONER BIGGERS:  Yeah,

15   that said he was born on 3/7/65.

16       INMATE PLAZA:  That's correct, yes.

17       PRESIDING COMMISSIONER BIGGERS:  Then you

18   got -- the marriage took place on 5/12/84.

19   That's your marriage, right?

20       INMATE PLAZA:  Yes.

21       PRESIDING COMMISSIONER BIGGERS:  Getting

22   back to your -- you've got four brothers -- four

23   sisters and a brother?

24       INMATE PLAZA:  Yes.

25       PRESIDING COMMISSIONER BIGGERS:  Okay.

26   Are they still -- are all of them still living?

27       INMATE PLAZA:  Yes, the are.

29

1          PRESIDING COMMISSIONER BIGGERS:  Is any

2   of them incarcerated?

3          INMATE PLAZA:  No.  And also if I might

4   add, two of -- the two youngest sisters are

5   actually half-sisters.  They're from my dad's

6   second marriage.

7          PRESIDING COMMISSIONER BIGGERS:  Okay.

8   And your wife's name is --

9          INMATE PLAZA:  Guadalupe.

10          PRESIDING COMMISSIONER BIGGERS:

11   Guadalupe Falcon (phonetic)?

12          INMATE PLAZA:  Yes.

13          PRESIDING COMMISSIONER BIGGERS:  And you

14   married on 5/7/84, and you have three children.

15          INMATE PLAZA:  That should be 5/12.

16          PRESIDING COMMISSIONER BIGGERS:  You have

17   12 children?

18          INMATE PLAZA:  No, no, I'm saying the

19   date.  It should be 5/12; you said 5/7.

20          PRESIDING COMMISSIONER BIGGERS:  Five

21   seven, and it should be 5/12.

22          INMATE PLAZA:  It should be 5/12/84.

23          PRESIDING COMMISSIONER BIGGERS:  Okay.

24   We'll make sure that that gets in to your

25   official record regardless of what happens here.

26          INMATE PLAZA:  What was the question --

27   I'm sorry --

30

1        PRESIDING COMMISSIONER BIGGERS:  Do you

2    have three kids?  Three kids?

3        INMATE PLAZA:  Yes, three children.

4        PRESIDING COMMISSIONER BIGGERS:  And, in

5    going through your file I saw that there was a

6    letter from your wife and I'm sure that

7    Commissioner Mejia will get in to.  Any problems

8    with the marriage?

9        INMATE PLAZA:  I'd be lying if I said no.

10   Sure, we have problems.  But I mean nothing that

11   we haven't gotten through.

12       PRESIDING COMMISSIONER BIGGERS:  Well,

13   I'm talking about because of incarceration

14   (indiscernible).

15       INMATE PLAZA:  Oh, yeah, well sure, you

16   know.  It's been hard on her being the single

17   mother herself now.  It was hard on me not being

18   there able to support her.  When I first left, I

19   was the main source of, you know, support for

20   the house so when I first go incarcerated she

21   pretty much had to take everything on and do

22   everything on her own, you know, and she kind

23   of, you know, she felt abandoned, you know, and

24   she had every right to feel that way because she

25   had to just take over the whole household.

26       PRESIDING COMMISSIONER BIGGERS:  Did you

27   think about that when you were associating with

31

1    these known gang members?  That that possibility

2    -- that that could happen?

3        INMATE PLAZA:  At the time, no, because

4    my -- my thought -- my thought process wasn't on

5    responsibility.  To me responsibility was, I had

6    a job, I paid the bills, I put food on the

7    table, there was a roof over their heads, they

8    had clothes on their backs.  I thought that was

9    responsibility.  I didn't realize that it was a

10   lot more to responsibility than that.

11       PRESIDING COMMISSIONER BIGGERS:  But you

12   were still -- you still had your drug habit and

13   everything else --

14       INMATE PLAZA:  And work.  Yeah, I, you

15   know, I functioned, you know, to the -- to

16   everyone else I seemed to function in a normal,

17   you know, capacity, but of course it was, you

18   know, things behind the scenes that nobody knew

19   about.

20       PRESIDING COMMISSIONER BIGGERS:  Okay.

21   Commissioner, do you have any questions on this

22   subject?

23       DEPUTY COMMISSIONER MEJIA:  Yeah, maybe

24   about the remorse (indiscernible).

25       PRESIDING COMMISSIONER BIGGERS:  Go

26   ahead.

27       DEPUTY COMMISSIONER MEJIA:  How do you

32

1  feel about the man who was killed?

2       INMATE PLAZA:  I'm -- in the case of the

3  victim, I take full responsibly for the taking

4  of his life.  I can understand remorse.  I've

5  dealt with, you know, people dying around me in

6  the past.  It's not something that I'm new to.

7  I understand that it not only affected him but

8  it affected his family.  It affected friends of

9  his, society.  I understand that technically we

10  all -- we all have times in our lives when we

11  wish we could turn back the clock but that's not

12  possible.  But I do take full responsibility for

13  my actions.

14       DEPUTY COMMISSIONER MEJIA:  How do you

15  feel about the death of the victim; that's what

16  I asked you.

17       INMATE PLAZA:  The death of the victim?

18       DEPUTY COMMISSIONER MEJIA:  Yeah, the

19  human being that was killed.  How do you feel

20  about him being shot and being killed?  I know

21  all the peripheral that you said -- I

22  (indiscernible) I want (indiscernible) how do

23  you feel about him?

24       INMATE PLAZA:  I'm very remorseful for

25  the victim, for taking his life.  He -- I'm very

26  sorry that it happened.  It was something that

27  should not have happened.  He didn't deserve

33

1    that, and I just can't -- I mean, there are no

2    words that'll make it better or make it go away.

3          DEPUTY COMMISSIONER MEJIA:

4    (Indiscernible) that's it.  I really don't have

5    any questions.

6          PRESIDING COMMISSIONER BIGGERS:  Okay.

7    Then I'll ask you to go into the Post Conviction

8    Factors, please.

9          DEPUTY COMMISSIONER MEJIA:  Okay.  This

10   is your initial parole consideration hearing Mr.

11   Plaza, and your custody history is that you were

12   initially accepted to the Wasco State Prison RC

13   in 1991.  You were transferred to California

14   State Prison Folsom new facility in 1991,

15   December.  You were at Wasco in October, then

16   December in 1991 you went to the Old Folsom

17   (indiscernible).  Then 2/21/1992, you went to

18   CSP Calipatria, North and East.  February of

19   1994 you went to Lancaster, then 12/16/1997

20   Avenal State Prison.  And you went

21   (indiscernible) in 1998 of March, CTF.  You had

22   a brief period of time in CMF for medical issues

23   --

24          INMATE PLAZA:  Correct.

25          DEPUTY COMMISSIONER MEJIA:  And

26   (indiscernible) you have several jobs, and the

27   most recent job is the (indiscernible) Porter?

34

1        INMATE PLAZA:  Yes.

2        DEPUTY COMMISSIONER MEJIA:  And you have

3  an associate (indiscernible).  During your

4  incarceration you went to education

5  (indiscernible) electronics -- vocational

6  Electronics, Air Conditioning Refrigeration, Dry

7  Cleaning, Plumbing.  You were a Porter and also

8  a Teacher's Aide, Infirmary Dental Assistant.

9  And, you have a high school diploma that 1983.

10  You have a 12.0 TABE score.  (Indiscernible) you

11  have completed 32 units out of the Coastline

12  Community College?

13        INMATE PLAZA:  Yes.

14        DEPUTY COMMISSIONER MEJIA:  And, you -- I

15  see that you have really attempted to get some

16  trades -- completion of vocational trades.  You

17  have completed, I think, 19 certification units

18  when it comes to Air Conditioning and

19  Refrigeration?

20        INMATE PLAZA:  I've completed the whole

21  course.

22        DEPUTY COMMISSIONER MEJIA:  You completed

23  that whole course?

24        INMATE PLAZA:  Yes.

25        DEPUTY COMMISSIONER MEJIA:  That's a

26  problem.  I couldn't find a completion.  I saw

27  the Certificate of Completion for the -- each

35

1    unit that's a component to the Refrigeration.

2    So you do have it there?

3         INMATE PLAZA:  I believe --

4         DEPUTY COMMISSIONER MEJIA:  That would be

5    good for the record, because I -- I saw the

6    certifications units been completed

7    (indiscernible) and how about the Data

8    Processing?  I saw that you have completed 22

9    such units also?

10        INMATE PLAZA:  Yeah, that was not a total

11   completion --

12        DEPUTY COMMISSIONER MEJIA:  So,

13   Vocational Air Conditioning and Refrigeration --

14   you completed this?

15        INMATE PLAZA:  Yes.

16        DEPUTY COMMISSIONER MEJIA:  Okay.  That

17   is the documentation.

18        ATTORNEY RUTLEDGE:  (Indiscernible).

19        DEPUTY COMMISSIONER MEJIA:  You know,

20   well you said that you completed two trades but

21   I can't find them in the file.

22        INMATE PLAZA:  Yes, I understand the last

23   -- '95.  On one of my doc hearings -- I think

24   it's right here (indiscernible).  At one of my

25   doc hearings, the Commissioner went through my

26   paperwork and verified finding the --

27        DEPUTY COMMISSIONER MEJIA:  Do you have a

36

1    copy of that --

2        INMATE PLAZA:    -- chrono and the

3    certificate, but it is no longer in the file.

4    No, I do not have a copy.  It's no longer in the

5    file, but the Commissioner did see it at one

6    point in time.

7        DEPUTY COMMISSIONER MEJIA:    I saw that,

8    yeah.  The doc -- was that Patterson --

9    Commissioner Patterson?

10        ATTORNEY RUTLEDGE:    It looks -- Robert

11    Patterson, yeah.  It looks to be his signature.

12        DEPUTY DISTRICT ATTORNEY MORRISON:    This

13    (indiscernible) is that a progress hearing or

14    something?

15        PRESIDING COMMISSIONER BIGGERS:    No --

16    Documentation Hearing.  Before they go through

17    initial they give them (indiscernible).

18        DEPUTY COMMISSIONER MEJIA:    I don't see

19    any in here.  I've checked.  No, I know you

20    counted -- I counted 19 units.  I'm just

21    surprised that you have all these documents; you

22    don't have the -- I'm not saying that you're not

23    telling the truth, but you're so organized about

24    everything else.  But the most important is what

25    you have completed.  All the cert units are

26    there -- are there, and I know what you learned,

27    but the completion certificate is the most

37

1   important because that will count as a --

2         INMATE PLAZA:  I understand.

3         DEPUTY COMMISSIONER MEJIA:   -- check

4   completed.  And, I cannot depend on what the

5   Deputy Commissioner saw.  Maybe he had the

6   mistake of easing certification of it or

7   completion of it.  I look at your file, and it's

8   like I said, you've got everything else but I

9   can't see the completion.  Even on the other,

10  you know your education progress reports.

11  Nothing says (indiscernible) that you completed,

12  but I'm giving you credit for 19 certification

13  units of Air Conditioning and Refrigeration.

14  You also took some vocational Dry Cleaning,

15  which you haven't completed --

16        INMATE PLAZA:  It's also a completion.

17        DEPUTY COMMISSIONER MEJIA:  Oh, yeah?

18  What year did you complete that?

19        INMATE PLAZA:  I believe it's -- it's on

20  that same page or the one before.

21        DEPUTY COMMISSIONER MEJIA:  I guess, I

22  think you should just bring me the completion

23  chrono.

24        INMATE PLAZA:  I don't have them

25        ATTORNEY RUTLEDGE:  Four ten '95 is what

26  he has noted here, 4/10/95.

27        INMATE PLAZA:  The last time I went

38

1  through the Board that -- when Patterson went

2  through the doc hearing -- when I went through

3  the doc hearing with Patterson -- '95.  I had

4  the paperwork with me.  When I hit Avenal I lost

5  half of my property and since then I have not

6  had --

7        DEPUTY COMMISSIONER MEJIA:

8  (Indiscernible) contact the vocational --

9  education where you took it -- the prison where

10  you took it, and ask for a copy of the

11  completion chrono or something to prove that you

12  have completed it.  That's something you can do.

13        ATTORNEY RUTLEDGE:  It says the

14  Refrigeration would have been 10/1/91, so that

15  was --

16        PRESIDING COMMISSIONER BIGGERS:  Excuse

17  me, Commissioner Mejia.  When you went through

18  your C-file, did you not notice that those

19  things were not there?

20        INMATE PLAZA:  I did, but when I had seen

21  that paperwork from the Chairman the --

22  Commissioner, from the doc hearing, I thought it

23  was going to be enough since he seen it and

24  noted it on his record.

25        PRESIDING COMMISSIONER BIGGERS:  Yeah,

26  but (indiscernible) entirely different Panel we

27  have to go by the documentation --

39

1          INMATE PLAZA:  I understand.

2          PRESIDING COMMISSIONER BIGGERS:  So,

3   whenever you review whatever make sure that you

4   have those papers.

5          DEPUTY COMMISSIONER MEJIA:  Did you

6   complete your Vocational Plumbing?

7          INMATE PLAZA:  No, I was never in

8   plumbing.  I don't know where plumbing came

9   from.

10          DEPUTY COMMISSIONER MEJIA:  Well I have

11  your diploma that -- Mr. Plaza has been unable

12  to complete any certification units in

13  vocational plumbing due to his being house in

14  Level IV.  Student left in the plumbing class

15  long enough to be fully evaluated.

16          PRESIDING COMMISSIONER BIGGERS:  What

17  prison was that in?

18          DEPUTY COMMISSIONER MEJIA:  ASP Avenal --

19  Avenal State Prison.

20          INMATE PLAZA:  I was in Wasco for, I

21  think, three months and two weeks.  But I was

22  never in plumbing that I can remember.  Soon as

23  I got there they came out with the new law of

24  the Close Custody -- not being, you know, not

25  being able to be in that facility they

26  transferred me over here.

27          DEPUTY COMMISSIONER MEJIA:  Well, we'll

40

1  just leave it that you're claiming that you have

2  completed Air Conditioning and Refrigeration; is

3  that correct?

4       INMATE PLAZA:  Dry Cleaning, Air

5  Conditioning and Refrigeration.

6       DEPUTY COMMISSIONER MEJIA:  Dry Cleaning

7  you have completed?

8       INMATE PLAZA:  Yes.

9       DEPUTY COMMISSIONER MEJIA:  What year was

10  the dry cleaning, again?

11       INMATE PLAZA:  I believe it was '94 --

12       ATTORNEY RUTLEDGE:  The Dry cleaning was

13  -- I have completed 4/10/95, the Dry Cleaning

14  and then the Air Conditioning, 10/1/99.  What

15  was the other one?

16       DEPUTY COMMISSIONER MEJIA:  Most recent

17  (indiscernible) Home Inspection.

18       INMATE PLAZA:  I got that.

19       DEPUTY COMMISSIONER MEJIA:  Okay.  So,

20  you're saying that you completed Air

21  Conditioning and Vocational Dry Cleaning?

22       INMATE PLAZA:  Yes.

23       DEPUTY COMMISSIONER MEJIA:  And Air

24  Conditioning Refrigeration?  Anything else?

25       INMATE PLAZA:  The Home Inspection, and

26  the --

27       DEPUTY COMMISSIONER MEJIA:  I'll go

# EXHIBIT E
# Part 2 of 2

41

1  through that.  But the actual vocational trade

2  (indiscernible) because I know you took Data

3  Processing, you did --

4        INMATE PLAZA:  No, no --

5        DEPUTY COMMISSIONER MEJIA:  -- assembly

6  --

7        INMATE PLAZA:  Yeah, I was not in the

8  class --

9        DEPUTY COMMISSIONER MEJIA:  Well, these

10 are the two major ones that you're saying that

11 you completed.  Dry Cleaning, and Air

12 Conditioning and Refrigeration.

13       INMATE PLAZA:  Yes.

14       DEPUTY COMMISSIONER MEJIA:  And then you

15 did have -- completed the International

16 (indiscernible) institute course, 8/23/1994.

17       INMATE PLAZA:  That's Dry Cleaning.

18       DEPUTY COMMISSIONER MEJIA:  That's

19 connected to Dry Cleaning?

20       INMATE PLAZA:  Yes.

21       DEPUTY COMMISSIONER MEJIA:  Then you have

22 -- you been in AA since 1994?

23       INMATE PLAZA:  Ninety-three, '93, yeah

24 somewhere around there.  I don't remember the

25 exact date.

26       DEPUTY COMMISSIONER MEJIA:  But the

27 chrono I saw was for '94.

42

1       INMATE PLAZA:  Ninety-four.

2       DEPUTY COMMISSIONER MEJIA:  Okay, that's

3  fine.  And you're still going --

4       INMATE PLAZA:  Yes.

5       DEPUTY COMMISSIONER MEJIA:   -- according

6  to these last chronos, 4/1/2006.  Going to the

7  (indiscernible) Labauche Literacy Program, peer

8  education program, Christian Fellowship, courses

9  in Anger Management 2005, CLN courses, you've

10  been (indiscernible) also Christian basic

11  classes, you been involved in Teddy Bear

12  (indiscernible) Teddy Bear Drive, Softball -- I

13  see all this stuff in there.  But I'm concerned

14  about the major ones; AA, NA, Anger Management,

15  (indiscernible) Impact is good.  Impact

16  programming -- you did some peer education

17  program (indiscernible) sexually transmitted

18  diseases, Hepatitis.  You did some Bible --

19  seven-week Bible Study series Christian Living.

20  Let's see.  Anything else you want to add?

21       ATTORNEY RUTLEDGE:  Can I ask you,

22  Commissioner, would you -- do you have the

23  completion of AA since '94 or we don't?

24       DEPUTY COMMISSIONER MEJIA:  I have the

25  chronos since 1994.  What's the first one --

26       ATTORNEY RUTLEDGE:  Okay, I just wanted

27  to make sure we didn't need to verify --

43

1        DEPUTY COMMISSIONER MEJIA:  Oh, no, it's

2   good --

3        ATTORNEY RUTLEDGE:  Thank you.

4        DEPUTY COMMISSIONER MEJIA:  -- 1994,

5   group therapy in 1994 is the first documentation

6   of him going to AA.  He did make (indiscernible)

7   time positively.  He did some softball.  You

8   been going to softball, playing games and you're

9   part of the team and like I said -- anything

10  else?  Those are the major ones that I have.

11  I've (indiscernible) that you have completed.

12  No 115s and no 128(a)s.  According to the 812

13  you do have affiliation or membership in

14  Southside King Cobra.  I have no other -- other

15  than the 812 that the counselor completes every

16  year when you go to classification I have no

17  other information about him being involved in

18  any gang (indiscernible) in prison,  And, now

19  we're going to go through your psych reports.

20  Of course, there's two.  Since this is your

21  initial, we're gonna do -- I'm gonna read both

22  the -- this was done -- the first one was done

23  in July 21st, 1994, in Lancaster, by Dr. Isaac

24  (indiscernible), and the diagnosis -- Diagnostic

25  Impression at that time is Axis I, Poly

26  Substance Abuse; Axis II, Combat Disorder, group

27  kind; Axis III, to be evaluated by physicians;

44

1   Axis IV, Psycho Social Stressors, from mile to

2   moderate incarceration; Axis V, Global

3   Assessment of Functioning of 70, sentence and

4   incarceration; and according to the doctor that

5   their recommendation is -- he said at that

6   present time,

7        "In 1994 it was difficult to

8        assess the psychopathology that's

9        related to the crime. The inmate

10       does not reveal many details due

11       to the appeal process. However it

12       seems that he was involved in

13       behavior (indiscernible) by lack

14       of regard for others, drugs and

15       alcohol abuse. The inmate has

16       improved while incarcerated. He

17       made a statement 'I grew up. I'm

18       mature.' Quote unquote. It's

19       also an observation of his

20       examiner. The inmate was able to

21       express himself in a manner that

22       indicated (indiscernible)

23       increased maturity. Living in a

24       controlled setting it is too early

25       to make any assessment. However

26       his record indicates that he is

27       able to follow rules and

45

1    regulations and is also doing

2    above average programming.

3    (Indiscernible) recommended that

4    --"

5    [Thereupon the tape was turned over.]

6    DEPUTY COMMISSIONER MEJIA:  --

7    psychological report on Mr. Plaza.  "It is

8    recommended for him to continue his work

9    involving trade and other meaningful

10   activities."  Then we have the most current,

11   which is -- which is dated April 15th, 2006, by

12   Dr. Macomber, M-A-C-O-M-B-E-R, and the

13   Diagnostic Impression is Axis I, Drug and

14   Alcohol Abuse by history; Axis II, no

15   personality disorder; Axis III, no physical

16   disorder; Axis IV, Life Term Incarceration, GAF

17   of 95.  This --

18   "He does speak in excellent

19   English as well as Spanish.

20   Affect was appropriate.  There was

21   no evidence of anxiety or

22   depression.  Eye contact was good.

23   His memory was intact

24   (indiscernible) was intact.  His

25   insight and self-awareness were

26   good.  Assessment of

27   Dangerousness.  In the potential

46

1          -- the prisoner's potential for

2          dangerous behavior in the

3          institution.  Mr. Plaza has

4          remained entirely

5          disciplinary-free.  This is

6          commendable."

7   And the Causative Factors,

8          "He said that he has disassociated

9          himself from the activity of

10         Hispanic (indiscernible).  No

11         evidence that he had ever been

12         involved in riots, possession of

13         weapons, assaults and other --

14         threats of any kind.  At this time

15         in this prison we have been --

16         there has been frequent riots, and

17         it is very difficult for a

18         Hispanic male to disassociate

19         himself from this activity which

20         can spontaneously occur in front

21         of him and if he doesn't get

22         involved he will receive

23         retaliation.  In this case

24         remaining disciplinary-free is a

25         very difficult and commendable

26         achievement.  But because of his

27         being disciplinary-free

47

1    (indiscernible) finds him

2    definitely below average in

3    comparison to other inmates.

4    (Indiscernible) considering his

5    dangerous behavior in the

6    community -- potential for

7    dangerous behavior in the

8    community, Mr. Plaza has no prior

9    arrest for violence before the

10   commitment offense.  He did

11   receive an arrest as an adult

12   making a (indiscernible) spraying

13   a one-inch diameter dot on the

14   wall.  He remains

15   disciplinary-free in the

16   instituting.  In order to examine

17   this prisoner's level on parole,

18   the level of (indiscernible) was

19   administered and it's indicated

20   the 12 measures that assess

21   criminal history, substance abuse

22   history, current adjustment, and

23   other factors to determine risk

24   level -- this measure he obtained

25   a score of 3.6 (indiscernible)

26   frequencies for prison for prison

27   inmates.  This means that if 100

48

1    men were released on parole, he

2    would be (indiscernible) better on

3    parole that 96 of them.  This is a

4    very low risk level; as a result

5    he poses no more threat to society

6    than the average citizen in the

7    community, and probably less

8    threat to society at this point in

9    his life.  At the time of his

10    offense, drugs and alcohol were a

11    problem.  However, at this point

12    in his life it is no longer an

13    issue therefore there are no

14    significant risk factors for this

15    case."

16  Any addition to my presentation, counsel, that I

17  missed -- you want to --

18      ATTORNEY RUTLEDGE:  Did you mention how

19  he's helped other -- he's been like a mediator

20  for other gangs?

21      PRESIDING COMMISSIONER BIGGERS:  Yeah, he

22  mentioned that.

23      ATTORNEY RUTLEDGE:  Okay (indiscernible).

24  That covers everything that we had including

25  what we submitted.

26      PRESIDING COMMISSIONER BIGGERS:  Okay,

27  we're going to parole plans.  Residence plans;

49

1    you're living with your brother Hector Plaza.

2    Hector's residence is 353 Carla Drive, Simi

3    Valley, California, 93063, and it's got a phone

4    number here. Employment; Plaza plans on working

5    Italia International, 4175 Dragon Street, Simi

6    Valley California. I saw the letter of -- that

7    documents that. Also your brother's letter.

8    Assessment in re of Plaza's parole plans. "This

9    counselor does not foresee any problems.

10   However, it's recommended that Plaza updates his

11   parole letters prior to this hearing." I have

12   -- this letter's here (indiscernible) Dale Air

13   International from Nick Gillichbauer,

14   G-I-L-L-I-C-H-B- as in Boy A-U-E-R. It's

15   indicated that he's the General Manager of the

16   organization and he's willing to give him

17   employment in the company and he will make $9.00

18   per hour as an assembler, working in assembly

19   with the basic hours of 7 o'clock to 3:30 p.m.

20   He will have (indiscernible) basic benefits of

21   medical and dental. And there -- some of your

22   support letters now. Jessica Plaza, dated

23   February 20, 2006, a support letter indicating

24   that -- lots of support from all the family and

25   we need to (indiscernible) his mind and heart

26   set to accomplish all the right things and not

27   wrong things, for taking time to read this

50

1    letter of support.  She (indiscernible) says

2    that she will -- Isabelle Plaza.  Your sister

3    also wrote a letter February 5, 2006.  It

4    doesn't say that you can -- yeah, it's

5    supporting your release, but -- so Jessie --

6    Jesus Plaza is some brother that you're going to

7    be staying with --

8         INMATE PLAZA:  No -- my dad is Jesus.

9         DEPUTY COMMISSIONER MEJIA:  Your dad --

10   your dad is Jesus Plaza?  There's another

11   letter, February 5, 2006.  It says that you're

12   ready to go back to society.  There is Hector

13   Plaza, November 12, 2005.  He should be granted

14   parole.  He said that you should be granted

15   parole and of course you have become a positive

16   role model for everyone.  He said that you will

17   always have a home here with his wife and

18   children, and I also plan on supporting him

19   financially with whatever it takes to help you

20   get on your feet.

21        INMATE PLAZA:  Correct.

22        DEPUTY COMMISSIONER MEJIA:

23   (Indiscernible) Ministry (indiscernible) these

24   are your aunts and uncles --

25        INMATE PLAZA:  Yes.

26        DEPUTY COMMISSIONER MEJIA:  Yolanda Plaza

27   and Arto (Phonetic) Plaza.  He's a Pastor in a

51

1   church?

2         INMATE PLAZA:  Yes, he is.

3         DEPUTY COMMISSIONER MEJIA:  They will

4   provide you counseling, and will be able to

5   provide you mentors and he's also owner of a

6   construction business and would be services --

7   if he needs employment -- if you need employment

8   he will be able to give you employment.

9         INMATE PLAZA:  He's also offering me to

10  stay in his home.  He gave me -- it's actually

11  in this other packet -- has his phone number,

12  cell number, anything you might need to ask him

13  any further questions.

14        DEPUTY COMMISSIONER MEJIA:  Helen Plaza

15  is your mother?

16        INMATE PLAZA:  Yes.

17        DEPUTY COMMISSIONER MEJIA:  And I have a

18  support letter here, asking that you should be

19  -- asking for your release.  She also said that

20  you'll have a house to come home -- when you

21  come home.  Rachel Plaza, I think is your

22  sister?

23        INMATE PLAZA:  Yes, correct.

24        DEPUTY COMMISSIONER MEJIA:

25  (Indiscernible) you have her total support,

26  either financially -- financial support.

27  Christina Plaza, this is your daughter.

52

1          INMATE PLAZA:   Yes.

2          DEPUTY COMMISSIONER MEJIA:   Asking that.

3  -- how old is she?

4          INMATE PLAZA:   She is 19.

5          DEPUTY COMMISSIONER MEJIA:   Oh.   You have

6  -- she indicates that you have supported her by

7  teaching (indiscernible) classes.   Thinks you

8  should be -- she's going to college.   She's

9  looking for work to help (indiscernible) you,

10  any way possible.   And we have Guadalupe Plaza,

11  your wife?

12          INMATE PLAZA:   Yes.

13          DEPUTY COMMISSIONER MEJIA:   Another

14  support letter.   She says I will support him in

15  ever way that he needed for him to meet his

16  parole conditions.   Isaiah Plaza, your son?

17          INMATE PLAZA:   Yes.

18          DEPUTY COMMISSIONER MEJIA:   He -- how old

19  is he?

20          INMATE PLAZA:   He's ten.

21          DEPUTY COMMISSIONER MEJIA:   Ten.   And

22  there's another one, Ramona Plaza, your -- your

23  daughter, too?

24          INMATE PLAZA:   That's correct.

25          DEPUTY COMMISSIONER MEJIA:   Letter of

26  support.   Annette Gizmalla (phonetic).   That's

27  your sister?

53

1          INMATE PLAZA:  Yes.

2          DEPUTY COMMISSIONER MEJIA:  Another

3   letter of support.  She says she owns her own

4   and will provide a place for you to live, help

5   you financially and help you enter your programs

6   with counseling to help you deal with everyday

7   life's events for as long as it takes.  And

8   Alicia Desente Islanded (phonetic), who is this?

9   Oh, this is -- this looks like it's a different

10  one.  Who's Juan Jose (indiscernible)?

11         INMATE PLAZA:  Excuse me.

12         ATTORNEY RUTLEDGE:  One from Mexico?

13         DEPUTY COMMISSIONER MEJIA:  You have -- I

14  couldn't read this.  9805 Jessie Plaza, okay,

15  H12371 that's you.  And, for M. Espinoza -- this

16  is a friend?

17         INMATE PLAZA:  Yes, it is.

18         DEPUTY COMMISSIONER MEJIA:  Okay.  It's

19  another letter of support.  And, Chaplain

20  (indiscernible) Lindsey -- this is the Chaplain

21  here in the prison --

22         INMATE PLAZA:  Yes, it is.

23         DEPUTY COMMISSIONER MEJIA:  Okay.  Letter

24  of support and he said that you have been an

25  outstanding gentleman since his observation of

26  you since 1998.  He was appointed Music Deacon

27  in 2003.  You a musician?  You play music?

54

1        INMATE PLAZA:  No.  No.  I just direct

2    the choir.

3        DEPUTY COMMISSIONER MEJIA:  Oh.  He said

4    that you have -- he has seen phenomenal changes

5    in your life during these years and he's a

6    wonderful role model, conscious of people's

7    needs, feelings and (indiscernible).  He's truly

8    an asset to our religious program here at CTF.

9    And he highly recommends consideration of the

10   Board of Prison Terms and this gentleman has --

11   he feels that you will be an outstanding asset

12   in the community.  Nabia Anegias (phonetic),

13   cousin?

14       INMATE PLAZA:  Say the name again?

15       ATTORNEY RUTLEDGE:  Yeah, it's his

16   cousin, Nadia Anegus (phonetic).

17       DEPUTY COMMISSIONER MEJIA:  Nadia Anegus,

18   another support letter.

19       ATTORNEY RUTLEDGE:  Oh, well, you know

20   what -- it's from the Juan (indiscernible)

21   files.  Poor Juan Reevus, (indiscernible) find

22   these letters.

23       DEPUTY COMMISSIONER MEJIA:  Okay, Jessie

24   Plaza and that this is from an (indiscernible)

25   from Glenbrook, Philadelphia?

26       INMATE PLAZA:  Yes.  That's actually --

27   that's my sister --

.55

1          DEPUTY COMMISSIONER MEJIA:  Your sister?

2          INMATE PLAZA:  Yes.  She married -- her

3  name changed to Guerum (phonetic) but --

4          DEPUTY COMMISSIONER MEJIA:  She said that

5  she will continue to support you after release

6  until you get back on your feet.  She also

7  offers her home.

8          INMATE PLAZA:  Yeah.

9          DEPUTY COMMISSIONER MEJIA:  Guadalupe

10  Plaza, that's your wife.  You said 2000 -- I

11  don't know what year was this one, but I read

12  (indiscernible) I know she's going to support

13  you.  January 7th, 2005, Jesus Plaza -- your

14  father.  Right?

15          INMATE PLAZA:  Yes, that's correct.

16          DEPUTY COMMISSIONER MEJIA:  Okay.  Ramona

17  Plaza -- .

18          INMATE PLAZA:  My daughter.

19          DEPUTY COMMISSIONER MEJIA:  Your

20  daughter.  Isaiah Plaza -- I read that.

21          PRESIDING COMMISSIONER BIGGERS:  Some of

22  them are duplicates, some are from 2005 and some

23  are 2006.

24          DEPUTY COMMISSIONER MEJIA:  Anything else

25  (indiscernible)?

26          ATTORNEY RUTLEDGE:  I think you've

27  covered every letter and more and even those

56

1    that didn't belong to us.  So, thank you.

2          DEPUTY COMMISSIONER MEJIA:  And let me

3    turn this back to the Commissioner.

4          PRESIDING COMMISSIONER BIGGERS:  Okay,

5    thank you.  I just have one question there.  I

6    see that you want to parole to your brother.

7    Why aren't you paroling back to your wife?

8          INMATE PLAZA:  Oh, yes, my wife moved in

9    with her sister two years ago.  Her mother'd

10   been fighting cancer.  Unfortunately her mother

11   passed away November of last year, and currently,

12   she's still living with her sister.  But upon my

13   release, hopefully within the next, you know,

14   within three to six months, between the both of

15   us we'll have the money to put a first and last

16   down payment, you know, that you need for your

17   -- our own place so that we can live together.

18.  But currently she's with her sister.

19         PRESIDING COMMISSIONER BIGGERS:  Did I

20   miss anything -- talking about the, what little

21   we could talk about the crime --

22         ATTORNEY RUTLEDGE:  You know, I meant to

23   point out to you -- it's up to your discretion.

24   He did provide a version in the Board Report.

25         PRESIDING COMMISSIONER BIGGERS:  Yeah, I

26   saw that.

27         ATTORNEY RUTLEDGE:  Other than that,

57

1  except for Closing Statement, we have nothing

2  else to --

3          PRESIDING COMMISSIONER BIGGERS:  To talk

4  about -- okay.  At this point then I'm gonna ask

5  the District Attorney if he has any questions

6  for the -- Mr. Plaza.

7          DEPUTY DISTRICT ATTORNEY MORRISON:  Okay.

8  Did I hear the inmate say that he accepted

9  responsibility for the crime an hour into the

10 law enforcement interview?

11         INMATE PLAZA:  Correct.

12         PRESIDING COMMISSIONER BIGGERS:  Please

13 direct your answers to (indiscernible).

14         DEPUTY DISTRICT ATTORNEY MORRISON:  Just

15 a moment, please.  So at the time of his trial,

16 the inmate accepted full responsibility for the

17 crime.

18         INMATE PLAZA:  Correct.

19         DEPUTY DISTRICT ATTORNEY MORRISON:  Thank

20 you.  I have no further questions.  Oh, wait a

21 minute.  Does the inmate know what the matrix

22 for this crime is?

23         INMATE PLAZA:  I believe it's 27, 28

24 years.

25         DEPUTY DISTRICT ATTORNEY MORRISON:  Thank

26 you.  Nothing further.

27         PRESIDING COMMISSIONER BIGGERS:  Okay,

58

1    thank you, sir.  Ms. Rutledge.

2         ATTORNEY RUTLEDGE:  Thank you.  In

3    looking through some of your information I came

4    across a letter that's -- I wanted to ask you

5    about this letter.  It's addressed to all family

6    members, loved ones, and friends of Patrick

7    Littlebull.  You made an attempt to submit an

8    apology letter to his family or to the District

9    Attorney?

10        INMATE PLAZA:  I mailed that to the

11   address indicated on the (indiscernible).

12        ATTORNEY RUTLEDGE:  All right.  And what

13   was -- I didn't see the -- what was the address?

14        INMATE PLAZA:  Is it not on the

15   letterhead of the --

16        ATTORNEY RUTLEDGE:  Oh, the

17   Correspondence Division in Sacramento.

18        INMATE PLAZA:  Yes.  Sacramento, yes.

19        ATTORNEY RUTLEDGE:  Okay, and that was

20   dated June 15th, 2004.  It -- I'll go ahead and

21   leave it if the Board wishes to review it, but I

22   think you wrote it on the prompting of Impact?

23        INMATE PLAZA:  Yes, correct.

24        ATTORNEY RUTLEDGE:  Anyway, I just wanted

25   to note that this letter -- he had written a

26   letter to the family, and what did you learn in

27   Impact?

59

1      INMATE PLAZA:  Do you want to be

2   specific, or do you want me to tell you

3   everything that I learned in Impact?

4      ATTORNEY RUTLEDGE:  Well, what changed

5   your life about Impact?

6      INMATE PLAZA:  I'd have to say the thing

7   that was a drastic blow to me more than anything

8   was there was an individual by the name of Angie

9   Torres, her son was killed in a drive-by here in

10   Salinas and I had the opportunity to sit down

11   with her and discuss with her some of the

12   specifics of my crime and in sharing with her --

13   she had not shared with me but I shared with

14   her, and upon finishing my, you know, my talk

15   with her I introduced her -- I am a facilitator

16   of Impact -- I introduced her and I went and sat

17   down with the audience in the pews and then she

18   had her opportunity to get up and give a

19   presentation, and when she gave the presentation

20   the similarities of what happened to her son was

21   just -- it was eerie because they were just so

22   close, and afterwards we had the opportunity to

23   talk and she told me, you know, that -- she

24   said, yeah you don't know what you did when you

25   were talking to me.  She says, you know, and you

26   didn't even know my story and the same for me.

27   I didn't know her story, but yet I shared with

60.

1   her, and then upon learning her story it just --

2   it blew me away because I just realized what it

3   must have felt like to be on the other side.

4   Because in Impact that's one of the things that

5   we teach. We teach victim awareness. We teach,

6   you know, so many people are used to being on

7   the side of the crime -- on the side of, you

8   know, being the wrong one, and they never know

9   what it's like to be on the other side. Most

10  guys come out of that program with a totally

11  different vision of crime. A lot of them come

12  out and they say, wow, I never knew that I had

13  that impact on my victims. So it -- it really

14  -- it had -- it gave me a greater view, you

15  know. It wasn't just that focus on one person

16  or one individual. It opened my understanding

17  of how many -- how great an effect it had.

18          ATTORNEY RUTLEDGE: What about the people

19  in this room? Do you think this offense affects

20  us?

21          INMATE PLAZA: Oh, definitely,

22  definitely. I believe it does because -- again,

23  speaking on the ripple effect, not only did it

24  effect him, his family, his friends or his loved

25  ones, but it effected society and I realize that

26  it all trickles down and what happens is taxes,

27  money, time spent, you know, it all, you know,

61

1    it's a ripple effect that never reaches the

2    banks of the water.

3         ATTORNEY RUTLEDGE:  All right.  And,

4    there's a statement in the Probation Report

5    that's pretty negative about you.  I mean,

6    you're in a car with gang-bangers and someone is

7    shot and killed and left to die on the street.

8    How do you go from that to the person that you

9    are today?  What happened?

10        INMATE PLAZA:  I would have to say even

11   though I chose that -- to hang around with them

12   type of people, you know, chose to be around

13   that lifestyle, in all honesty I never expected

14   to end up in prison and upon --

15        ATTORNEY RUTLEDGE:  (Indiscernible).

16        INMATE PLAZA:  -- honestly I didn't.  But

17   upon me actually making it to prison due to bad

18   choices, it was just a slap in the face, you

19   know.  It was just reality and when it hit me I

20   realized that, you know, everything that I had

21   been doing, you know, reality was what I got,

22   you know, being in prison and it wasn't

23   something that -- it just didn't sit right with

24   me, and I knew that this wasn't me, you know.  I

25   didn't -- I didn't want to -- I didn't want to

26   be in prison or be one of them persons that go

27   in and out of prison, so it was a -- it was a,

62

1  you know, it was a rude awakening.

2        ATTORNEY RUTLEDGE:  No further questions.

3        PRESIDING COMMISSIONER BIGGERS:  Okay.

4  Thank you.  At this point I'm going to ask Mr.

5  Morrison for his closing.

6        DEPUTY DISTRICT ATTORNEY MORRISON:  The

7  District Attorney opposes parole for this

8  outrageous heinous and premeditated, vicious

9  gang attack.  The inmate aided and abetted by

10  driving his vehicle over to the location of the

11  murder, parking it without its lights in what

12  the Appellate opinion described as almost lying

13  a wait attack.  And Mr. Littlejohn (sic) a rival

14  gang member was shot and killed.  He was not the

15  only victim.  The Bell Garden's Police Report

16  which had been submitted along with the

17  Sheriff's Homicide Report note that the

18  supplemental report Officer Winfrey,

19  W-I-N-F-R-E-Y, Bell Garden PD was staffed to the

20  home of witness Collins who found a hole in his

21  south kitchen window and an adjacent hole in the

22  wallboard next to the window.  The officer

23  observed a hole, approximately one inch in

24  diameter, in the lower portion of the south

25  kitchen window.  Glass fragments were present on

26  the interior window sill.  Another little hole

27  was present in the interior vertical portion of

63

1   the inside of the window frame, and the reason
2   this is significant is because the inmate with
3   his gang mentalities and his crime partner
4   sprayed bullets in a residential neighborhood.
5   One was recovered from victim Littlejohn which
6   was matched to the murder weapon which was found
7   secreted in the inmate's car.  The witnesses
8   which described in the reports, noted numerous
9   shots being fired and any one of those bullets
10  could have gone through the house like it did
11  Mr. Collins home and killed another innocent
12  person in their home, minding their own
13  business.  This is the kind of gang that's
14  plagued Los Angeles and all communities around
15  the state and country, senseless gang violence.
16  The motive was a retaliatory shooting because
17  the Bell Garden Locos had fired on King Cobra
18  earlier that night.  The inmate should be
19  commended; he's programmed well.  Not many
20  people come this long without a 115.  He is on
21  the way to turn his life around, as evidenced by
22  his programming.  However, the inmate still I
23  don't believe has come to grips with the crime
24  because he's still not candid with the Board.
25          ATTORNEY RUTLEDGE:  Objection.
26          PRESIDING COMMISSIONER BIGGERS:
27  (Indiscernible) statement.  Please continue.

64

1          DEPUTY DISTRICT ATTORNEY MORRISON:   The

2    inmate said he took responsibility into the

3    Sheriff's interview, and this was documented at

4    length in the Appellate Opinion as well as the

5    statements contained in the police report.  This

6    is in the Appellate Opinion, Page Four and Five,

7    which has not been read into the record yet.

8    "Deputy Sheriff Woods Danoff, D-A-N-O-F-F,

9    interviewed appellant on May 27th, 1990."

10         ATTORNEY RUTLEDGE:   We would object to

11   the reading of the police report, just because

12   it's submitted there's still not adequate

13   foundation for it to be read into the record.

14         DEPUTY DISTRICT ATTORNEY MORRISON:   This

15   is the Appellate Opinion summarizing the

16   evidence at trial.

17         ATTORNEY RUTLEDGE:   I'm sorry, I thought

18   you said a Sheriff's Report.

19         PRESIDING COMMISSIONER BIGGERS:   Go

20   (indiscernible).

21         DEPUTY DISTRICT ATTORNEY MORRISON:   Page

22   Four in the Appellate Opinion, Deputy Sheriff

23   Woods Danoff, who is one of the two LA SD

24   homicide investigators in the case who

25   interviewed the inmate.

26         "He interviewed appellant inmate

27         on May 27th, 1990.  Appellant at

65

```
 1          first denied any knowledge of the

 2          shooting, maintaining he had been

 3          at a party at the time of the

 4          shooting.  After being informed

 5          that his car had been identified

 6          as being used in the homicide and

 7          that the gun had been recovered

 8          from the car, appellant admitted

 9          that he drove the car that was

10          used in the shooting -- "

11          DEPUTY COMMISSIONER MEJIA:  Excuse me --

12          PRESIDING COMMISSIONER BIGGERS:

13   Continue, Sir.

14          DEPUTY DISTRICT ATTORNEY MORRISON:   I'll

15   repeat the last sentence, since it was --

16          "After being informed that his car

17          had been identified as being used

18          in the homicide and that the gun

19          had been recovered from the car,

20          appellant admitted that he drove

21          the car that was used in the

22          shooting and (indiscernible)

23          supplied the weapon and the car.

24          Appellant claimed that the shooter

25          was named someone -- someone named

26          Oso, O-S-O, and that he neither

27          slowed the car down nor stopped
```

66

1           the car and never turned off his

2           headlights.  He claimed Oso later

3           left the car and that he later

4           picked up Silva and was giving him

5           a ride to Silva's sister's house

6           when they were stopped and

7           arrested."

8    Now, the inmate apparently is saying that's when

9    he accepted responsibility.  I asked the inmate

10   specifically if he had accepted responsibility

11   in the testimony at his trial, and that is not

12   correct according to the Appellate report

13   summary of the inmate's testimony.  The inmate's

14   testimony, under oath, at trial was a denial.

15   The Appellate Report continues on the same page.

16           "Appellant testified he gave a

17           ride to a man named Oso who was

18           seeking to purchase cocaine.  Oso

19           told the appellant that he could

20           not use his own car because it was

21           hot.  While looking for the

22           cocaine to sell, the appellant saw

23           seven to ten men running at his

24           car.  The appellant accelerated

25           and hear Oso shout punks at the

26           men.  Oso then pulled out a

27           revolver and fired.  Appellant

67

1  drove away. Appellant did not

2  know that Oso had a gun until he

3  fired it. His car lights were not

4  turned off, and he slowed down

5  only for the purpose of finding

6  the cocaine dealer. Oso tried to

7  hand appellant the revolver after

8  he fired it, but appellant pushed

9  it away and it fell into the part

10  of the car where the radio was

11  missing. Appellant refused to

12  disclose the identity of Oso

13  saying he would be killed if he

14  did."

15  I submit that that is not accepting

16  responsibility for being the aider and abeter,

17  driving a fellow gang member over to the

18  location, parking with your lights out in what

19  the Appellate Court labeled almost lying in

20  wait, and allowing your crime partner to go up

21  and shoot a rival gang member motive being gang

22  retaliation, and as I had said spraying bullets

23  all around. The defendant's testimony at trial

24  was a rejection of responsibility, a denial of a

25  commission of the file, and is absolutely not

26  what he told the Panel today that he accepted

27  responsibility in the trial. He's basically

68

1    says, oh, I gave some dude a ride to go buy some
2    coke and then all of a sudden he pulls out a gun
3    and starts shooting somebody.  I had no idea.
4    That is not responsibility.  The inmate was
5    attempting to be exonerated of the crime.  The
6    Appellate Report Opinion goes into great length,
7    and I won't read it all, but on Page Six it
8    describes all the evidence testified by other
9    witnesses supporting of pre-meditated murder.
10          "The appellant's driving slowly
11          with his lights off, thus
12          eliminating attention to his
13          approaching car is strong evidence
14          of prior planning.  The approach
15          without lights is factually
16          similar to lying in wait and
17          illustrates a deliberate plan by
18          the occupants of the car to
19          approach to victim unnoticed so
20          that the killing could be
21          accomplished from a position of
22          surprise and advantage.  The
23          relationship between appellant and
24          the victim, each belonging to
25          rival gangs between which there
26          was bad blood provided evidence of
27          the appellant's motive for the

69

1       shooting.  The manner of the

2       shooting, one person shooting and

3       another driving so as to

4       facilitate an easy and rapid

5       escape especially when coupled

6       with appellant's slow approach to

7       the scene with his lights off

8       reflects that the killing resulted

9       from a pre-conceived desire."

10  This is about as callous, cold-blooded and

11  calculated murder as you can have.  The only

12  thing was the appellant apparently did not pull

13  the trigger.  But he did everything short of

14  that.  The psych report in 1994, said well he

15  didn't really want to go into the details of it

16  because it was still on appeal.  Current psych

17  report just glosses over the apparent lack of

18  insight and says because of his good behavior he

19  is a low risk.  I submit that until he

20  demonstrates more credibility with the Panel and

21  more insight into his actual role and

22  participation, he has not taken responsibility

23  for it and therefore his statements of remorse

24  and the psych report are not actually supportive

25  because they really didn't delve into it.  The

26  fact that he hadn't been caught in other crimes,

27  had a minimal criminal record is commendable.

70

1   It's not really an escalating pattern of

2   violence.  He did have summary probation, but

3   the inmate told the psychologist in 1994, which

4   was also kind of troubling, that he had the

5   mentality of a 15 year old.  He indicated that

6   this tragic event, being convicted of murder,

7   was a quote "wake up call" --

8          ATTORNEY RUTLEDGE:  Objection.  It

9   doesn't say being convicted of murder.

10          PRESIDING COMMISSIONER BIGGERS:  What

11  page are you on, sir?

12          DEPUTY DISTRICT ATTORNEY MORRISON:  I

13  just -- it doesn't.  I am commenting on his

14  psych report.  He's -- the inmate indicated --

15          PRESIDING COMMISSIONER BIGGERS:  Just a

16  second, sir.  Okay.  Let's keep this civil and

17  it's not written -- are you reading directly

18  from the psychologist's report?

19          DEPUTY DISTRICT ATTORNEY MORRISON:  I

20  read it and then I made a parenthetical comment.

21          PRESIDING COMMISSIONER BIGGERS:  Okay.

22  Then perhaps you should paraphrase it saying

23  your opinion.  Continue.

24          DEPUTY COMMISSIONER MEJIA:  What is

25  interesting is talking about that the immature

26  behavior at the time -- that's on Page One of

27  the report, and he stated I had the mentality of

71

1   a 15 year old.  The official version read

2   described a juvenile man.  The inmate was 25 at

3   the time of his crime.  This is not a youthful

4   offender, unsophisticated (indiscernible).  This

5   isn't a 15 or 16 year old gang banger.  This is

6   a 25 year old out on a mission of revenge.

7           ATTORNEY RUTLEDGE:  Objection.  Mission

8   of revenge?  Where's that from?  You're supposed

9   to -- excuse me.  I just want to note that the

10  DA's supposed to -- your comments are supposed

11  to be supported by documentation.

12          PRESIDING COMMISSIONER BIGGERS:

13  (Indiscernible).

14          DEPUTY COMMISSIONER MEJIA:  The Appellate

15  Decision -- talking about a retaliatory gang

16  opinion -- member for a --

17          PRESIDING COMMISSIONER BIGGERS:  Let's --

18  let's -- okay.  Let's -- whenever --

19          DEPUTY DISTRICT ATTORNEY MORRISON:  this

20  is within the range of proper comment.

21          PRESIDING COMMISSIONER BIGGERS:  Then Mr.

22  Morrison, if we're gonna speculate I think we

23  need to make sure that we say and we make

24  (indiscernible) in your opinion or -- I don't

25  think that we should speculate on something of

26  this nature.

27          DEPUTY DISTRICT ATTORNEY MORRISON:

72

1    Commissioner, excuse me, but I'm permitted to

2    make public comment.  I'm not asking you to

3    speculate.  The Appellate Decision describes --

4          PRESIDING COMMISSIONER BIGGERS:   I

5    understand --

6          DEPUTY DISTRICT ATTORNEY MORRISON:   --

7    any motivation --

8          PRESIDING COMMISSIONER BIGGERS:   I

9    understand that.

10          ATTORNEY RUTLEDGE:  From another --

11          DEPUTY DISTRICT ATTORNEY MORRISON:  There

12    was a rival shooting.  There was a rival

13    shooting --

14          PRESIDING COMMISSIONER BIGGERS:   I

15    understand that.

16          DEPUTY DISTRICT ATTORNEY MORRISON:  Now,

17    if the gang goes out to retaliate --

18          PRESIDING COMMISSIONER BIGGERS:   Then

19    that's the way you should phrase it -- that

20    based on --

21          DEPUTY DISTRICT ATTORNEY MORRISON:  That

22    is what gang members refer to as getting

23    revenge.

24          PRESIDING COMMISSIONER BIGGERS:   I

25    understand that, sir.

26          DEPUTY DISTRICT ATTORNEY MORRISON:  And

27    my comment is that he was out on a mission of

73

1  revenge that resulted in the death and a shot up

2  neighborhood.  And therefore, a particularly

3  egregious crime under Dannenberg, as the Chair

4  noted the case the inmate submitted, and he is

5  unsuitable for parole and we ask for a three

6  year denial.  Thank you.

7      DEPUTY COMMISSIONER MEJIA:  Let's --

8  before you do your -- let me just put on the

9  record that he does have the completion

10  paperwork, because it was very confusing -- you

11  had to really look at it.  He did have Air

12  Conditioning completion in October 1997.  It's

13  just confusing.  It doesn't say he completed it.

14  It says his assignment (indiscernible) and Mr.

15  Plaza has completed 15 certification units, 100%

16  of the class.  Maybe that how we --

17      INMATE PLAZA:  A hundred percent of what?

18      DEPUTY COMMISSIONER MEJIA:  Of the class.

19  I don't know what it means, sir, but it does say

20  that he has completed -- units completed.  This

21  is the Education Progress Report.  Normally they

22  put here completed completion, but it just say

23  completed some of the curriculum -- that's when

24  he was a Clerk.  And then when he became a

25  student he completed 15 certification units,

26  100% of the class.  So I would say that is

27  completion.

74

1        PRESIDING COMMISSIONER BIGGERS:    All

2   right thank you.

3        DEPUTY COMMISSIONER MEJIA:    And then

4   another one is October 28, 2000 -- October 28th

5   -- April 28th, 1995, he completed his Vocational

6   Dry Cleaning.    Another confusing chrono here.

7   We may have to look at it again.    A handwritten

8   (indiscernible) Teacher's Aide and

9   (indiscernible) he was a key person assisting in

10   (indiscernible) Dry Cleaning program, all areas

11   in training and development of other students.

12   He has learned all aspects of this Dry Cleaning

13   business.    And it's noted here, reason for the

14   termination, his job change -- Job change

15   completed.    So which means I would say

16   (indiscernible) in 1994, (indiscernible) 1995 he

17   has completed the Dry Cleaning business.

18        PRESIDING COMMISSIONER BIGGERS:    So

19   basically you're saying the chrono's in support

20   of completion; just don't have the --

21        DEPUTY COMMISSIONER MEJIA:    Yeah, the

22   actual completions.

23        PRESIDING COMMISSIONER BIGGERS:    The

24   actual completions.    Ms. Rutledge, closing

25   please.

26        ATTORNEY RUTLEDGE:    Thank you for

27   verifying that for us, Commissioner.    While I'd

75

1    like to go off of the suitability factors, I
2    think that's most appropriate.  We're here today
3    because we -- well you know why we're here, the
4    legislature sets an open term for a crime such
5    as this and -- meaning that there is a belief
6    that persons committed for first-degree murder
7    may at some point become suitable members of
8    society, people who have paid their debt to
9    society, bettered themselves, and we can all
10   feel reasonably safe that they're out among us.
11   Had this commitment offense been of the -- had
12   it been truly lying in wait -- which is a
13   special circumstance of first-degree murder
14   punishable by death, we may not be sitting here
15   today.  The commitment offense itself, my client
16   has taken responsibility for it.  What was said,
17   his testimony to the Court, matches what he has
18   said in earlier reports.  And, under Dannenberg,
19   specifically Dannenberg, I think is supportive
20   of when you have to -- and I know you have to
21   weigh the commitment offense but weighing that
22   in, Dannenberg says if it doesn't take more than
23   it was necessary to complete the murder.  This
24   victim was shot and died within minutes.
25   There's no evidence of mutilation, there's no --
26   there were no other targeted victims.  We found
27   a bullet -- but we don't even know if anybody

76

1   was home.  There's no evidence that there were

2   other people that were actually at harm at the

3   time of the shooting.  In moving on to my

4   client's remorse for this offense.  He has --

5   he's expressed today his remorse for this crime,

6   but I think more importantly his determination

7   to turn himself around.  Had he been such a hard

8   core gang member, he'd never had made it this

9   far.  We know that.  We know how it is to enter

10  a prison on a Level IV and what it takes to

11  survive.  And it takes a lot of determination.

12  It takes somebody who truly does realize that,

13  you know, there's a better way to live.  And, I

14  think to his, you know -- the prison Chaplain

15  (indiscernible) he doesn't write letters for

16  very many inmates.  This is the first one I've

17  seen.  And he wrote something really important

18  because I think -- I think this really says it

19  all about my client as far as remorse would go,

20  I think that that I would speculate and submit

21  that that's -- he could be programming doing

22  everything he's supposed to do and not go to

23  church.  There's got to be some -- I would

24  submit or speculate that perhaps he's got some

25  insight and a conscience to where he feels the

26  need to associate with the church.  And, there

27  was a paragraph that wasn't read during the

77

1   letters that I just wanted to say and it was

2   written by Chaplain Lindsay.  And it says,

3           "People often ask me what kind of

4           results I see in my work here in

5           the prison.  I will hold up one

6           hand showing the number five, and

7           they will say those odds aren't

8           very good since there are more

9           than 7,000 plus inmates in your

10          facility.  To which I'll reply,

11          you're right, except I look at it

12          as mining for diamonds and when

13          you find one you have some -- when

14          you find one you have something of

15          value."

16  Well, inmate Plaza is one of those diamonds.

17  You know, I'm not going to sit her and

18  regurgitate all of his accomplishments and the

19  binder he provided to the Board -- we've gone

20  over them.  In every area of programming he's

21  met -- he's met self-help, he admits his

22  substance abuse, he's been treating that

23  substance abuse, he's done Impact, he's done

24  Anger Management, he's participating in sports,

25  he has an excellent job record.  He's actually

26  got a chrono from his supervisor in Culinary

27  who's recommending him for a job, I mean,

78

1   anticipating that an employer on the outside
2   where the public has access to the restaurant
3   that he's going to present that in a public
4   place and ask for employment.  He has, you know,
5   taken other health courses and has not had a 115
6   or anything in 15 years, which is extremely
7   commendable.  And again, that more expresses, I
8   think, his insight in to literally reversing his
9   life.  He said he was leading an irresponsible
10  life at that time; however he did work and
11  support his wife and children.  Did you have one
12  child at that time or --
13          INMATE PLAZA:  Two.
14          ATTORNEY RUTLEDGE:  He had two that he
15  supported.  So he did -- it was like he said, he
16  was kind of a -- he was a dysfunctional person
17  over all, but able to maintain a job and take
18  care of his family which indicates that there
19  are pro social qualities in this man.  He's not
20  just some thug out there, you know, blowing
21  people away.  He has a very stable social
22  history as far as being with his family, being
23  married.  He's still married to the same woman;
24  still has three children.  Appreciates the
25  impetus he put on her when he entered the
26  institution and forced her into being a single
27  parent.  He's got letters from his children that

79

1    he's attempting to father from prison, cousins,

2    other assortment of persons, and also he has at

3    least two job offers.  One from Mr. Rentaria

4    (phonetic) and then one from his previous

5    employer -- was it --

6           INMATE PLAZA:  Yes.

7           ATTORNEY RUTLEDGE:  -- where he worked.

8    He had a good job record there before he entered

9    the institution.  And aside from all the great

10   things he's done which I think all point to

11   suitability and the fact that he has expressed

12   his remorse and does, by his actions not just

13   his comments, have insight into how much trouble

14   he created with this offense and saw what he

15   needed to do to turn it around.  But I think we

16   do -- I think oftentimes in these types of cases

17   there's the white elephant in the room, which is

18   time.  This is his first hearing and it's almost

19   a given that nobody gets paroled their first

20   hearing.  I think the jargon is always he needs

21   to maintain his gains or you point to the

22   commitment offense, but I think that the

23   suitability --

24          DEPUTY COMMISSIONER MEJIA:  -- hold it.

25     [Thereupon the tape was changed to Tape Two.]

26          DEPUTY COMMISSIONER MEJIA:  Okay, go

27   ahead, continue.  Second side, second set of

80

1    tapes for Mr. Plaza.

2            ATTORNEY RUTLEDGE:  I do believe that

3    this man meets every single suitability factor.

4    He has completed his programming -- I mean, he

5    remains active in his programming and he's done

6    all those things necessary to show us that he's

7    serious about release and I think the only

8    question that would linger would be time,

9    because often we don't see people paroled by

10   their first hearing but I would say this man is

11   one of the few cases that we see where he's

12   suitable at his first hearing.  He's suitable.

13   He's prepared to enter the outside.  He's got a

14   plan and the information he submitted to the

15   Board wherein he's going to -- exactly what he's

16   going to do when he walks out the doors.  I

17   would just ask this Board -- I know it's a

18   difficult job for you and I know you've gotta

19   consider the person paying their debt to society

20   because that's part of our justice system, but I

21   would ask you to -- to give this man a different

22   look as somebody who is suitable, who has served

23   enough years according to what the Legislature

24   said and please grant him a parole date, or if

25   you find him suitable set a term for him today.

26   Thank you.

27           PRESIDING COMMISSIONER BIGGERS:  Thank

81

1    you, very much, Ms. Rutledge.  Now Mr. Plaza you

2    have the opportunity to tell this Panel why you

3    feel that you are suitable for parole.

4         INMATE PLAZA:  Sorry.  A little nervous.

5    I believe first of all if I could I'd like to --

6    I'd like to explain a couple of things.  One

7    thing that I have heard a lot of times being

8    incarcerated that I didn't know 16 years ago --

9    I had no knowledge of what personal disorders

10   were because I was so caught up in my drug and

11   alcohol habit.  I didn't look at -- I didn't

12   look at things as I should have, not normally

13   anyways.  I realize that being anti social at

14   the time, you know, had me do things that any

15   normal personal would not do.  It wasn't due --

16   I'm not making excuses.  I never say that, you

17   know, some people do -- but I don't say that the

18   drugs or the alcohol committed the crime.  I

19   understand that I was the one that made the

20   choice, and I take full responsibility for that.

21   But I do -- I also want to say that being anti

22   social, you know, my problems started at about

23   15 years old, basically.  Fifteen years old, I

24   hit high school started hanging out with the

25   wrong crowd.  Running with the guys, you know,

26   that I shouldn't have -- had no business hanging

27   around.  But because they all were in the same

82

1   predicament, whether they were raised by a

2   single parent or, you know, were also seeking

3   some kind of, you know, some kind of family.

4   Some kind of acceptance.  And, being that I was

5   in that same category looking for acceptance,

6   like I said earlier, I chose to hang around with

7   people that had a lot of similarities to me.

8   And because I chose to hang around with those

9   people I was around things that, you know, I

10  shouldn't have been around and drugs and alcohol

11  became my biggest problem.  And I understand

12  that, you know, again a personal disorder border

13  line, I crossed a lot of border lines but laws

14  specifically because by purchasing drugs and

15  alcohol I was naturally breaking laws, you know,

16  to purchase these products.  Again, you know,

17  narcissistic because I hung around with this

18  group I kind of got the feeling that I was, you

19  know, I should have respect or I should have

20  things coming just because of who I was or who I

21  hung around with.  But upon coming to prison I

22  can honestly say that the very first thing that

23  helped me out was being incarcerated, of course,

24  but going to AA.  When I first went to AA I

25  started realizing when I got to Step Four

26  especially because you have to take that moral

27  inventory, I started realizing and seeing

83

1    things. And the sponsor at that time he taught
2    us to look at things and to -- and to just, you
3    know, call them what they are. If you're lying,
4    then you're a liar. If you're stealing, then
5    you're a thief. If you're doing -- whatever the
6    circumstances might be. And so I did that, and
7    I started looking at things and, you know, to be
8    honest initially it was ugly and I -- some
9    things you know you kinda don't want to accept
10   because you want to think that, you know, you're
11   not like that or you're better than that. I
12   never wanted to accept to that, you know, that I
13   had these problems, you know, because I thought,
14   you know, hey I'm normal. There's nothing
15   different about me than the next guy. But upon
16   learning these things I started working on
17   making that change, changing my life. AA led me
18   to church. When I started going to church again
19   that was a big help because the church started
20   helping me again look at myself, and get an
21   understanding. And, once I started to get that
22   understanding I really began to make more
23   change. And, as time went on -- I mean, I
24   always got something out of the self-help
25   groups. Every group had at least something to
26   offer but as I went along I started learning, I
27   started getting the insight of my crime of

84

1  myself and I started realizing as well the

2  severity of my crime, you know, that it wasn't

3  just, you know, something that happened, you

4  know. It was way deeper than that. So, I

5  started looking into these things. Upon looking

6  into these things and really getting that

7  understanding, Impact -- like I said earlier,

8  the Impact was a great help to me. I started

9  learning different things from Impact as well.

10  Started getting a different perspective and

11  getting more of a panoramic vision on life, you

12  know, on everything that I'm involved in. What

13  I do. It was a Captain who -- Captain Gega

14  (phonetic), Unit Three Captain, she was the one

15  who kind of, you know, gave me that opportunity

16  as well to get into doing more than just the

17  average guy that was in there. So, I started,

18  you know, working with her. Working with her

19  you see the problems in the paperwork. I was

20  able when that riot broke out in the wing

21  between the Nationals and the Bull Dogs, which

22  is two different groups that are here -- even

23  though I'm not a part of any of the groups I

24  have a rapport because now people see me and

25  they know that I'm the opposite of them. I'm

26  constantly talking to people, trying to

27  encourage them to be their own man, to make

85

1   their decisions, to not follow that peer

2   pressure and the crowd and do those things.  And

3   so they -- they tell me, you know, they see

4   integrity in me, and it's something that you

5   don't see in just everybody or anybody.  So

6   having that has helped me a lot.  I believe that

7   through them programs -- you also -- there was

8   another letter in the packet.  It was from

9   Victory Out Reach out of here in San Jose.  They

10  have a program also.  Not just here in San Jose.

11  They have it in every County.  It doesn't

12  matter.  I talked to Ed Morales who's the

13  Director there.  He says it doesn't matter what

14  County you go to, they have a program that's

15  called Cease Fire and because of the education

16  and the insight that I've gotten through the

17  program he's told me, wherever you go, I want to

18  use you because you can get to these people.

19  You can reach out and talk to these people so

20  that there's never -- again there doesn't' have

21  to be another Mr. Littlebull.  There doesn't

22  have to be somebody in my position, you know.

23  So that's what I look to do now, is to stop them

24  kind of things.  Deter people, you know, doing

25  them kind of things.  I know it's in the

26  Appellate version as well, even though no one

27  read it here today, but you know that upon my

86

1  reaching the County Jail, you know, I was

2  approached. Because, see, I was not -- I was

3  not an active member but I hung around with the

4  crowd. So I was approached in the County Jail

5  and, you know, was threatened. That was the

6  County Jail. Upon reaching prison -- and it

7  actually turned out to be one of the biggest

8  favors they could do for me. I was approached

9  in prison, and they told me, you're on your own.

10  You don't run with us. We don't claim you. You

11  don't claim us. Which was like I said, the

12  biggest favor they could have done for me at

13  that time. Because that was -- that was what

14  got me started as well to make that change and

15  not continue to try to pursue that road that I

16  was on prior to that point. So, being that I

17  was excommunicated -- it was good for me,

18  because then, even though they told me you're on

19  your own, and I know that in here not just

20  anybody can be out on their own. You usually

21  have to find a crowd or find a race or, you

22  know, someone. You usually gotta, you know,

23  hang out with somebody. But I was able to do

24  it. I was able to go on my own. And I started

25  to take the attitude too that, you know what,

26  I'm not gonna pay attention what other people

27  say. I don't care what, you know, what they say

87

1  or do because I want to be that person that I
2  know I can be.  And even my own mother told me
3  that one time on visit six, seven years ago.
4  She said, you know, you've turned into that man
5  that I always wanted you to grow up to be, you
6  know.  I understand that today I have an
7  opportunity to get out, come before you, and to
8  put all these things in practice.  As my
9  attorney said, not just talk the talk but walk
10  the walk.  And, I have things in place.  I have
11  things, you know, set up where I can go and be a
12  part of society and I can go and make a
13  difference and hopefully like I said before get
14  at, you know, not just youngsters, anybody.
15  Whether they're young or old, and be able to
16  share with them and explain to them, you know,
17  educate them.  You know, I'm all for
18  intervention.  Intervention is good.  But,
19  prevention is even better.  You know,
20  intervention the problem's already there.  But
21  prevention, the problems' not there yet or
22  hasn't got to that point where, you know, it's
23  too the extreme.  So, I hope that today, you
24  know, the Panel would surely take a look and
25  consider me because I believe with the things
26  that I have, with all the support system that I
27  have, with the plans and the goals that I have

88

1   -- and it's not something that I did all my
2   life, but I do have plans and goals.  And I
3   believe those plans and goals that I have now
4   are going to be the things that help me to
5   succeed, and I have no problem with any kind of
6   parole to the extreme conditions.  Testing, you
7   know.  Whatever I need to do.  I have no problem
8   whatsoever.  And so I -- I just ask if, you
9   know, you Panel members today would consider me
10  as being suitable and I thank you and I do want
11  also would like to say that this packet here was
12  not a personal attack on you.  It was not meant
13  to be, you know, in any way personal.  I do have
14  to say it's my first one and being unfamiliar I
15  did allow other people to kind of give me a
16  little helping hand, and if there was anything
17  that, you know, was not necessary or was an
18  overkill it was not done intentionally and once
19  my final statement because I want to make sure
20  that you know is that, again, I take full
21  responsibility for the taking of the life of Mr.
22  Littlebull and I thank you.
23          PRESIDING COMMISSIONER BIGGERS:  We will
24  recess at this point.
25                  R E C E S S
26                  --oOo--
27

89

CALIFORNIA BOARD OF PAROLE HEARINGS

D E C I S I O N

DEPUTY COMMISSIONER MEJIA:    We're back on record for our decision -- on tape.

PRESIDING COMMISSIONER BIGGERS:    Let the record reflect that everyone that was in the room prior to us recessing for deliberations are now back in the room.    The Panel has reviewed all information received from the public and relied on the following circumstances in concluding the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.    The offense was carried out in an especially cruel and callous manner in that this was a drive-by shooting where a Mr. Patrick Littlebull, the victim, was shot and killed as a retaliatory type crime based on what was in the Appellate Decision. This offense was carried out in a calculated manner, and I'll read from the -- that the -- decision that Mr. Plaza was

"-- driving slowly with his lights out thus eliminating attention to his approaching car was strong evidence of prior planning.    The

JESUS PLAZA    H-12371 DECISION PAGE 1      05/01/06

90

1    approach without lights is

2    factually similar to lying in

3    waiting and illustrates a

4    deliberate plan by the occupants

5    of the car to approach to victim

6    unnoticed so that the killing

7    could be accomplished from a

8    position of surprise and

9    advantage."

10   The motive for the crime was very trivial in

11   that it was a gang related shooting, and these

12   conclusions was drawn from the Statement of

13   Facts from the Appellate Decision.  You have no

14   -- your criminal record was of no significance

15   to us because you had very little if any.  You

16   have programmed extremely well.  You should be

17   commended for no disciplinary actions.  Your

18   psychiatric evaluation was favorable.  Your

19   parole plans were favorable.  Your 3042 response

20   from the District Attorney was opposed to your

21   -- a finding of parole suitability, and you have

22   numerous letters of support.  The Panel

23   struggled with this for quite some time,

24   basically because of a couple things that I will

25   go over with you right now.  First of all, the

26   signs of remorse for the victim.  You say you

27   JESUS PLAZA  H-12371 DECISION PAGE 2    05/01/06

91

1  take full responsibility for the crime, but when

2  Deputy Commissioner Mejia started talking to you

3  about the crime and what you took from the

4  victim, you went off and you started talking

5  about collateral effects of the families and all

6  the others but you never mentioned about the

7  victim. You need to -- and with that, that

8  gives us an indication that you really haven't

9  taken -- you're minimizing your involvement in

10  the crime by not knowing exactly what happened

11  to the victim. You need to get that out. We

12  -- as I said, we talked about it for quite some

13  time because we just feel that you're not --

14  it's -- you're just taking responsibility for

15  the crime is superficial, and we need to get

16  genuine remorse. So, the big thing is remorse

17  for the victim. We also feel that your gains

18  are recent, as illustrated by when we talked to

19  your earlier and the District Attorney even

20  brought this up and I went back and went over

21  the Appellate Decision as well as the sentencing

22  thing for -- you indicated initially that you

23  were not involved with the shooting. Then you

24  say you were when they told you about your

25  vehicle, and that's when you mentioned about the

26  gun. They found the gun within (indiscernible).

27  JESUS PLAZA  H-12371 DECISION PAGE 3   05/01/06

92

1  We note that you are doing extremely well
2  programming, but we just feel that you need to
3  have more time. You should be commended for
4  your program that you have been involved with,
5  your Vocational Dry Cleaning, your Air
6  Conditioner Refrigerator, AA and NA, and the
7  Impact and Anger Management courses that you are
8  working with right now. In a separate decision,
9  the hearing Panel thought it's not reasonable to
10  expect that parole will be granted in a hearing
11  in the following two years. Again, the crime
12  itself was just especially cruel and callous in
13  that you (indiscernible) on an individual who
14  was vulnerable. He didn't have a weapon; he's
15  walking down the street, and you and your
16  co-defendant shot him. And, we realize that you
17  only drive the vehicle, but the mere fact that
18  you were there with your lights off is a strong
19  indication that you knew what was going to take
20  place. The -- and the motive for the crime as
21  we talked about earlier, was very trivial in
22  that this was a gang retaliation. All
23  indications point to this was a gang
24  retaliation. Once you've become -- once you've
25  come to grips with what transpired, allow
26  yourself to not minimize the involvement of what
27  JESUS PLAZA  H-12371 DECISION PAGE 4    05/01/06

93

1    think you'll be okay, because you're definitely

2    on the road to getting a date.  But you've got

3    to take that remorse to the victim; you can't

4    generalize.  You said I take full

5    responsibility.  You got to take it from not the

6    family.  You've got to take responsibility for

7    Patrick.

8          INMATE PLAZA:  I understand.

9          PRESIDING COMMISSIONER BIGGERS:   Mr.

10   Mejia?

11         DEPUTY COMMISSIONER MEJIA:  No further

12   comments from me.

13         PRESIDING COMMISSIONER BIGGERS:   Okay.

14   Good luck to you.  That concludes the hearing.

15   The time is now ten minutes to --

16

17

18

19

20

21

22

23   PAROLE DENIED TWO YEARS                AUG 2 9 2006

24   THIS DECISION WILL BE FINAL ON:_____

25   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   JESUS PLAZA  H-12371 DECISION PAGE 5     05/01/06

94

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, RUBY M. DOUGHERTY, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total TWO in number and

cover a total of pages numbered 1 - 93, and which

recording was duly recorded at CORRECTIONAL

TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the

matter of the INITIAL PAROLE CONSIDERATION HEARING for

JESUS PLAZA, CDC NO. H-12371, on MAY 1, 2006, and that

the foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated MAY 30, 2006, at Sacramento, California.


RUBY M. DOUGHERTY
TRANSCRIBER
PETERS SHORTHAND REPORTING

# EXHIBIT B

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR
ADDENDUM

PLAZA, JESUS                                                    H12371

This addendum is being submitted as a correction to some inaccuracies that were found in the Board Report for Plaza's Initial Parole Consideration Hearing.

On Page 2 of the report under <u>Aggravating Circumstances:</u> it says use of weapon: Gun, 9mm. That information was taken from the POR pg. 2. In the Court Transcripts for the Court of Appeal of the State of California Second Appellate District Division Two Page 3, it states that a .38 revolver was found in a hollow space underneath the dashboard of the suspects. A ballistic test indicated that an expended bullet found at the scene on Loveland Street was fired from the gun that was recovered.

Under the <u>Preconviction Factors: C. Personal Factors:</u> The Board Report states that Plaza was born 2/7/65 to Caroline and Jessie Plaza. This should be corrected as follows: Plaza was born 3/7/65 to Caroline and Jesus Plaza. Plaza also said that his marriage took place on 5/12/84 and not 5/7/84.

<u>Postconviction Factors:</u> Should read as follows; Plaza was received CDC on 10/9/91 at Wasco RC and was transferred to CSP Folsom on 12/17/91 and was classified with Close A custody. On 2/21/92, Plaza was transferred to Calipatria where his custody was reduced to Close B. While at Calipatria, he worked in the culinary, pre-voc. and Computer Programming. Plaza was again transferred to CSP-LAC on 2/3/94. He was classified there with Medium A custody. While at LAC, Plaza worked in the drycleaning, voc electrical shop, and air cond. refrigerator and heating. On 12/16/97 he was transferred to Avenal where he was in Computer Programming. On 3/13/98 he was transferred to CTF Soledad North Facility where he was assigned to the yard crew 4/7/98 to 4/28/98, and then to PIA Textiles. On 12/31/98 Plaza went to CMC East as a medical transfer and returned to CTF on 3/1/99 where he has remained housed. At his initial classification, Close B custody was established. Plaza's custody was reduced to Medium A on 3/23/00 and has remained at Medium A. While at CTF Central Facility, Plaza has been assigned to wing porter, culinary, dental assistant and again culinary, where he remains assigned.

# Inmate Copy

Sent to Inmate on _11/29/05_

.PLAZA                        H12371                        CTF-SOLEDAD

LIFE PRISONER EVALUAT    REPORT                                    2
PAROLE CONSIDERATION HEARING
2006 CALENDAR


_J. Verdesoto_ _11-16-05_
T. Verdesoto                    Date
Correctional Counselor I


_D. Carnazzo_ _CCII_ _11-16-05_
D. Carnazzo                    Date
Correctional Counselor II


_T. Guerra_ _FC(A)_ _11-16-05_
T. Guerra                    Date
Facility Captain


_D. S. Levorse_ _C&PR_ _11-18-05_
D. S. Levorse                    Date
Classification and Parole Representative


PLAZA                    H12371                    CTF-SOLEDAD

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR

PLAZA, JESUS                                                            H12371

I.    COMMITMENT FACTORS:

A.    <u>Life Crime:</u>  Murder 1st, (PC 187), Los Angeles County Case #VA004108..
Sentenced: 25 years to Life. Weapon: Gun. MEPD: 1/25/07. Received in
CDC: October 9, 1991. Victim: Patrick Littlebull, age: unknown.

1.    <u>Summary of Crime:</u>  The defendant, Jesus Plaza, and another subject
were seen driving a vehicle near the victim, Patrick Littlebull. A witness
heard a series of shots and saw the victim Patrick collapse onto the floor.
Officers arrived at the scene of a residential street in Bell Gardens and
found Patrick lying on the floor in a puddle of blood. Paramedics arrived
shortly after and pronounced him dead at the scene. Victim's autopsy
indicated that his death resulted from a single gunshot wound to the right
lateral side of his chest.

Several witnesses gave officers information about the suspects vehicle,
and approximately 1 hour later, police saw the vehicle and detained the
defendant along with a second suspect. Officers observed a .9mm casing
on the floor board of the vehicle in front of the passenger. Both Plaza and
his companion were arrested and later evaluated for evidence of gunshot
residue. (Source: POR pg 2, 3 &4).

2.    <u>Prisoner's Version:</u>  First and foremost to each family member and friend
of Mr. Littlebull. Knowing that there are no special, no specific, nor any
amount of words that could right the wrong I did. Nor can any words
equal or be greater than the crime in a good way, I wholeheartedly
apologize yet due to multiple counseling programs and self help programs
that I have seeked out throughout my incarceration. I've gained
knowledge and an understanding of my crime and true remorse, and so I
take full responsibility for my choices and actions in the commitment of
this crime and also stipulate to the P.O.R. as being true and accurate.

3.    <u>Aggravating/Mitigating Circumstances:</u>

a.    <u>Aggravating Factors:</u>

INMATE COPY

PLAZA, JESUS            H12371            CTF-SOLEDAD            DEC/2005

SENT TO I/M ON  9/22/05

LIFE PRISONER EVALUAT       REPORT                                           2
PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR

        ❖ Victim was particularly vulnerable.
        ❖ Prisoner had opportunity to cease but continued with crime.
        ❖ Murder was senseless and served no purpose in completing the crime.
        ❖ Use of weapon: Gun, .9mm.
        ❖ Nature of crime exhibited viciousness, cruelty or callousness.

    b.    <u>Mitigating Factors</u>:

        ❖ Prisoner has minimal or no history of criminal behavior.

**B.**    <u>Multiple Crime(s)</u>: N/A.

    1.    <u>Summary of Crime</u>: NA.

    2.    <u>Prisoner's Version</u>: NA

**II.**    <u>PRECONVICTION FACTORS</u>:

**A.**    <u>Juvenile Record</u>: None noted in Central File.

**B.**    <u>Adult Convictions and Arrests</u>:

    ❖ 07/16/83 PC 594 (a) Vandalism.
    ❖ 09/17/83 PC 187 Attempted Murder (no disposition).
    ❖ 04/02/84 PC 594 Malicious Mischief/Vandalism.

**C.**    <u>Personal Factors</u>: Plaza was born 2/7/65 to Caroline and Jessie Plaza. He has four sisters and a brother. Plaza graduated from high school 5/17/83 from Vail High in Montebello, CA, and then married Guadalupe Falcon on 5/7/84 and they have three children, Ramona, and Justina, and Izaiah.

**III.**    <u>POSTCONVICTION FACTORS</u>:

**A.**    <u>Special Programming/Accommodations</u>: N/A.

**B.**    <u>Custody History</u>: Plaza was received CDC on 10/9/91 at Wasco RC and was transferred to CSP Folsom on 12/17/91 and was classified with Close A custody. On 2/21/92 Plaza was transferred to Calipatria where his custody was reduced to Close B. While at Calipatria, he worked in the culinary and pre-voc. Plaza was again transferred to CSP LAC on 2/3/94. He was classified there with Medium A custody. While at LAC, Plaza worked in the dry cleaning and voc electrical shop. On 12/16/97 he was transferred to Avenal, and on 3/13/98 he was transferred to

LIFE PRISONER EVALUATIO  REPORT                                    3
PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR

      CTF Soledad. While at CTF, Plaza was assigned to PIA Textiles. On 12/31/98
Plaza went to CMC-E as a medical transfer and returned to CTF on 3/1/99 where
he has remained housed. At his initial classification, Close B custody was
established. Plaza's custody was reduced to Medium A on 3/23/00 and has
remained at Medium A. While at CTF, Plaza has been assigned as a porter, a
dental assistant and has worked in the culinary.

  C.    Therapy and Self-Help Activities: Since Plaza's incarceration, he has
participated in Alcoholics Anonymous, Inmate Education Advisory Committee,
Bible Study, the Impact Program, Narcotics Anonymous, served as a Deacon, and
was a member of the Protestant Choir. Refer to Post Conviction Progress Reports
for more details.

  D.    Disciplinary History: Plaza has remained disciplinary free throughout his
incarceration.

  E.    Other: N/A.

## IV.   FUTURE PLANS:

  A.    Residence: Plaza plans on living with his brother, Hector Plaza. Hector's
address is 353 Carla Dr. Simi Valley, California 93063. His phone number is
(805) 581-6323

  B.    Employment: Plaza plans on working at Telair International 4175 Gardain
Street, Simi Valley, CA 93063, phone #(805) 578-7303.

  C.    Assessment: In review of Plaza's parole plans, this counselor does not foresee
any problems, however, it is recommended that Plaza updates his support letters
prior to his hearing.

## V.   USINS STATUS: NA.

## VI.   SUMMARY:

  A.    Prior to release the prisoner could benefit from:

      1.    Continuing to be disciplinary free.
      2.    Participation in self-help and therapy programs.
      3.    Upgrading vocationally and educationally.

LIFE PRISONER EVALUATION REPORT                                                    4
PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR

B.    This report is based upon an interview with the prisoner on 9/1/05 lasting
      approximately 1 hour(s) and a complete review of the Central File lasting 3
      hours(s).

C.    Per the Olson Decision, Plaza was afforded an opportunity to examine his Central
      File on 9/1/05, Plaza did examined his Central File. (Refer to CDC 128-B dated
      9/1/05 in the General Chrono Section of the Central File.)

D.    No accommodation was required per the Armstrong vs. Davis BPT Parole
      Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
DECEMBER 2005 CALENDAR

5

_(signature)_      9-20-05
T. Verdesoto           Date
Correctional Counselor I


_(signature)_      9/21/05
J. Soares           Date
Correctional Counselor II


_(signature)_      9/21/05
T. Guerra           Date
Facility Captain


_(signature)_ C PPR 9-22-05
D. S. Levorse           Date
Classification and Parole Representative


PLAZA, JESUS           H12371           CTF-SOLEDAD           DEC/2005

# EXHIBIT  C

*1/M copy*

## MENTAL HEALTH EVALUATION FOR
### THE BOARD OF PRISON HEARINGS
#### May, 2006 Lifer Calendar

## CORRECTIONAL TRAINING FACILITY SOLEDAD
### APRIL, 2006

| | |
|---|---|
| NAME: | PLAZA, JESUS |
| CDC#: | H-12371 |
| DOB: | 3/7/65 |
| OFFENSE: | PC 187 MURDER, FIRST DEGREE |
| DATE OF OFFENSE: | 5/26/90 |
| SENTENCE: | 25 YEARS TO LIFE |
| EVALUATION DATE: | 4/16/06 |
| MEPD: | 1/25/07 |

### I.   IDENTIFYING INFORMATION:

Mr. Jesus Plaza is a 41 year old, first term, Hispanic, married male from Los Angeles County. He is an active Christian. He has served 16 years on his sentence.

### SOURCES OF INFORMATION:

This report is based upon a single 90 minute interview, plus review of the central and medical files.

### II.   DEVELOPMENTAL HISTORY:

When questioned about prenatal and perinatal issues, he stated that he was born at General Hospital, and his birth was normal. He progressed through developmental milestones in a normal manner. He is the second of four children. There is no history of cruelty to animals, enuresis or arson. He was never abused as a child, either sexually, physically or emotionally. He did have accidents as a child. One time he fell off of a pipe, injuring his leg on a fish tank. At the age of eleven he was involved in a car accident and injured his left knee which had recently been fixed through surgery.

| | | | |
|---|---|---|---|
| Plaza | H-12371 | CTF-Soledad | 4/15/06 |

PLAZA, JESUS
H-12371
4/15/06
PAGE 2

### III.   EDUCATION:

He attended public school and graduated from Vail High School in Montebello. He was never suspended or expelled. He has continued his education by attending college classes. He is attending Coastline Junior College at this time by correspondence, working towards his AA degree. He has 15 more credits until he gets his AA degree.

### IV.   FAMILY HISTORY:

Mr. Plaza's biological parents separated when he was about four years of age. He was raised primarily by his mother and maternal grandparents. His mother is currently employed by St. Francis Hospital, and his father worked for years as a mechanic and an auto body repairman. He is now 66 years of age and has retired. He has one older sister that works for General Electric in Pennsylvania, a younger sister who is mainly retarded who lives with his mother, and one younger brother who is married and working as a sales manager of a container corporation. There is no family history of mental illness, of drug abuse, of alcoholism, or of legal problems.

### V.   PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Mr. Plaza is heterosexual. There is no history of high risk behavior or of problems.

### VI.   MARITAL HISTORY:

He has been married one time. He was married on 5/12/84 to Guadalupe who lives in Whittier. There are three children. Ramona, 21 years of age, is working as a R.N. at St. Francis Hospital. Justina is 19 and is attending Cerritos College. Isaiah is 10 years of age. His marriage is intact, and his wife is supportive. He indicated that he has a very close relationship with his wife and children. They keep in close contact by correspondence, phone calls and several visits a year.

### VII.   MILITARY HISTORY:

There is no military history.

PLAZA, JESUS
H-12371
4/15/06
PAGE 3

## VIII.   EMPLOYMENT/INCOME HISTORY:

Right after he graduated from high school at the age of 18, he went to work for Century Plastics, where he worked for 4 ½ years. This company made fiberglass products for airplanes. He was the lead man there. In 1987, he went next door to work for Century Arrow doing the same kind of work. These two companies are owned by the same people. One year before the commitment offense, he began working for an asbestos abatement company as a laborer.

In the institution, he has obtained several trades. He has completed Vocational Dry Cleaning, Vocational Air Conditioning, Refrigeration and Heating, Vocational Meat Cutter, and he also has completed a correspondence course as a home inspector. Currently he is working as a meat cutter in culinary.

## IX.   SUBSTANCE ABUSE HISTORY:

Mr. Plaza stated that he did have an alcohol and drug problem from the ages of 15 to 25. He would drink alcohol primarily on weekends, because he had to work during the week. He smoked some marijuana. He also snorted cocaine about three times a week at the age of 16. At the age of 20, he began using cocaine every other day. He attends Alcoholics Anonymous and Narcotics Anonymous. He attends as often as he can, and he has been going steadily to these programs for the last 13 or 14 years.

## X.   PSYCHIATRIC AND MEDICAL HISTORY:

There is no psychiatric history. There is no history of serious hospitalizations, other than his surgery on his left knee. There is no history of serious accidents or of head injuries or seizures. His health is good.

## XI.   PLANS IF GRANTED RELEASE:

Mr. Plaza plans to return to his old employer in Simi Valley. He also will be able to live with his brother in that area. He will be compliant with all parole rules and regulations. He does have strong family support in the community. The prognosis for successful community living in this case is excellent.

PLAZA, JESUS
H-12371
4/15/06
PAGE 4

## CLINICAL ASSESSMENT

### XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Plaza related in a serious, sober, and cooperative manner. Mental status was
within normal limits. He was alert and well oriented. His thinking was rational,
logical and coherent. His speech was normal, fluent and goal oriented. He does
speak excellent English as well as Spanish. Affect was appropriate. There was
no evidence of anxiety or depression. Eye contact was good. His memory was
intact. His judgment was intact. His insight and self-awareness were good.

Mr. Plaza has spent a great deal of time in prison trying to improve himself. He
currently is attending Coastline College, working on his Associate of Arts degree.
His grades are very good. Also, he has obtained a certificate as a home inspector
from a professional career development institute in Georgia by correspondence.
In addition, he has completed several courses towards self-improvement. He has
completed a Prison Fellowship Course in Parenting, Anger Management, another
12 week anger management class, Fathers Behind Bars Activity Group, Family
Effectiveness Training and Harmony in the Home, Anger Management Course,
Christian Basics Class, Teddy Bear Drive Benefiting Children in Crisis, a job
success course, Communicable Diseases, Impact Program focusing on the
victim's rights, Christian Living Course, Laubach Literacy Tutor Program, and
the Salvation Army Bible Correspondence Course.

### CURRENT DIAGNOSTIC IMPRESSION

Axis I:       Drug and alcohol use by history
Axis II:      No personality disorder
Axis III:     No physical disorder
Axis IV:      Life term incarceration
Axis V:       Current GAF: 95

### XIII.   REVIEW OF LIFE CRIME

Mr. Plaza discussed the details of the commitment offense. He accepts full
responsibility for this offense. He feels very badly that the victim died. He is
fully aware that the victim's family has suffered greatly at the loss of their father
and husband. The fact that gunshots were fired was a total surprise to Mr. Plaza.
He had no idea that this was going to happen, and there certainly was no intent on
his part. He is very aware of the repercussions of this offense. Even today his
wife, children and mother are being watched and approached about this situation

PLAZA, JESUS
H-12371
4/15/06
PAGE 5

by gang members. He is very concerned about their welfare. All of these situations are a result of the commitment offense. Needless to say Mr. Plaza feels deep feelings of sorrow, remorse and grief over this situation.

At the time of the commitment offense, Mr. Plaza had been using cocaine and alcohol. His judgment at that time was impaired by his use of these substances. At the time of the commitment offense he was actually under the influence. However, after 16 years there is no evidence of any involvement in drugs or in alcohol. He has continuously attended Alcoholics Anonymous and Narcotics Anonymous over the years. Since he has become Christian, he has strong values against the use of drugs or alcohol at this time in his life. He is certainly familiar with the destructive effects of this involvement. As a result, he has determined to never become involved in drugs or alcohol again in his life. This information is of historical importance only because it is not currently a diagnostic problem.

## XIV. ASSESSMENT OF DANGEROUSNESS

A. In considering potential for dangerous behavior in the institution, Mr. Plaza has remained entirely disciplinary free. This is commendable. This is very difficult to do. At this time at this prison, we are having frequent racial riots. It is very difficult for a Hispanic male to disassociate himself from this activity, which can spontaneously occur in front of him, and if he doesn't get involved, he will receive retaliation. In this case, remaining disciplinary free is a very difficult and commendable achievement. There is no evidence that he has ever been involved in riots, possession of weapons, assaults on others, or threats of any kind. As a result, it is evident that his potential for dangerous behavior in comparison to other inmates is definitely below average.

Mr. Plaza has a chrono from Captain Guerra, in which it was stated that he had been hand picked to work as a communicator, working as a mediator between the two groups in the institution that had been involved in a riot against each other. Due to his ability to mediate between the groups and to get them to agree to non violence towards each other, the riot that occurred at that time was resolved peacefully, and the result was that the institution was able to unlock everybody and proceed with the program.

B. In considering potential for dangerous behavior in the community, Mr. Plaza has no prior arrests for violence before the commitment offense. He did receive an arrest as an adult in 1983 for spraying a one inch diameter dot on the wall. He has remained disciplinary free in the institution. In order to determine his risk level on parole, the Level of Service Inventory-

Plaza          H-12371          CTF-Soledad          4/15/06

PLAZA, JESUS
H-12371
4/15/06
PAGE 6

Revised was administered. This is an actuarial measure that assesses criminal history, substance abuse history, current adjustment, and other factors to determine current risk level. On this measure he obtained a score of 3.6 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better on parole than 96 of them. This is a very low risk level. As a result, he poses no more threat to society than the average citizen in the community, and probably less threat to society at this point in his life.

C. At the time of the offense, drugs and alcohol were a problem; however, at this point in his life this is no longer an issue. Therefore, there are no significant risk factors in this case.

## XV.   CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with routine parole planning. Mr. Plaza has obtained vocational training in several areas. He is currently working as a meat cutter in culinary. He has skills in vocational dry cleaning, as well as in vocational air conditioning, refrigeration and heating. He also has a job offer waiting for him upon his release. He has very strong family support in the community. All of these factors are good indicators of positive parole success. He has maintained his marriage, and his wife continues to be supportive and involved in his life. He maintains constant contact with his three children. Due to his study of the Bible and his commitment to the Christian way of life, he no longer has the irresponsible values and lifestyle that he did prior to the commitment offense. All of these factors indicate that his prognosis for successful adjustment in the community is excellent.

*M. Macomber, Ph.D.*

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

*B. Zika, Ph.D.*

B. ZIKA, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

D:    4/15/06
T:    4/19/06

# EXHIBIT D

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | SEPTEMBER 6, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004502
In re,
JESSE PLAZA,
    Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

    The Court has read and considered the Petition for Writ of Habeas Corpus filed on February 23, 2007 by the Petitioner. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the determination that the Petitioner presents an unreasonable risk of danger to society and is, therefore, not suitable for release on parole. See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667.

    The Petitioner was received in the Department of Corrections on October 9, 1991 after a conviction for murder in the first degree with a firearm. He was sentenced to 25 years to life. His minimum parole eligibility date was January 25, 2007. The record reflects that on May 26, 1990, the Petitioner was driving with fellow gang members on a street known to be the territory of a rival gang. The Petitioner drove slowly, with the headlights turned off, as he approached the victim, a rival gang member, who was standing in front of a house. As the Petitioner drove by, his accomplice fired several shots at the victim. The victim was shot and killed. The Petitioner then sped away. A witness heard the gunshots and saw the Petitioner's car speed away called the police and the Petitioner and his accomplices were pulled over and arrested.

    The Board found the Petitioner unsuitable for parole after his first parole consideration hearing held on August 29, 2006. The Petitioner was denied parole for two years. The Board concluded that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision primarily upon his commitment offense.

    The Court finds that there is some evidence to support the Board's finding that the Petitioner's offense was carried out in a calculated and dispassionate manner. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(B). The Petitioner drove slowly with his headlights turned off, so as to avoid detection as he approached the victim. This demonstrates that the shooting was planned and that the Petitioner was deliberately driving toward the victim for that purpose. Additionally, the Petitioner's accomplice was armed with a gun for the purpose of shooting the victim. Regardless of whether the Petitioner himself shot the victim, he was acting in concert with his accomplice and, therefore, the shooting is imputed to him.

Minutes Entered
09-06-07
County Clerk

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | SEPTEMBER 6, 2007 | | | | |
|---|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | JOSEPH M. PULIDO | | Deputy Clerk |
| | NONE | Bailiff | NONE | | Reporter |

(Parties and Counsel checked if present)

BH004502
In re,
JESSE PLAZA,
  Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

  The Court also finds that there is some evidence to support the Board's finding that the Petitioner's motive was very trivial in relation to the offense. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(B). The Petitioner and his accomplice shot the victim merely because he was a rival gang member. There is no evidence that the victim had threatened or harmed the Petitioner in any way. Gang rivalry is a very trivial motive for killing a man.

  Additionally, the Court finds that the Board did not err in denying the Petitioner parole for a period of two years. The Board must articulate reasons that justify a postponement, but those reasons need not be completely different from those justifying the denial of parole. See *In re Jackson* (1985) 39 Cal.3d 464, 479. The Board indicated that the Petitioner was denied parole for two years because his commitment offense was calculated and dispassionate and against a particularly vulnerable victim; his motive was trivial; and he failed to show adequate remorse for the victim. These reasons were sufficient to justify a two-year denial.

  Accordingly, the petition is denied.

  The court order is signed and filed this date. The clerk is directed to give notice.

  A true copy of this minute order is sent via U.S. Mail to the following parties:

Jesse Plaza
H-12371
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689

Department of Justice- State of California
Office of the Attorney General
300 South Spring Street
Los Angeles, California 90013

2

| Minutes Entered |
|---|
| 09-06-07 |
| County Clerk |

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA  90012 | CONFORMED COPY<br><br>SEP 0 7 2007<br><br>LOS ANGELES<br>SUPERIOR COURT<br><br>Joseph M. Pulido |
| PLAINTIFF/PETITIONER:<br><br>JESSE PLAZA | |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004502 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

- ☐ Order Extending Time
- ☐ Order to Show Cause
- ☐ Order for Informal Response
- ☐ Order for Supplemental Pleading

- ☒ Order re: Writ of Habeas Corpus
- ☐ Order
- ☐ Order re:
- ☐ Copy of Petition for Writ of Habeas Corpus for the Attorney General

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to the cause.  I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

September 7, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _Joseph M. Pulido_ , Clerk
          Joseph M. Pulido

Jesse Plaza
H-12371
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689

Department of Justice- State of California
Office of the Attorney General
300 South Spring Street
Los Angeles, California 90013

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JESSE PLAZA,<br><br>On Habeas Corpus. | B202665<br><br>(Super. Ct. No. VA004108)<br><br>**ORDER** |

THE COURT:

The court has read and considered the petition for writ of habeas corpus filed October 9, 2007. The petition is summarily denied.

COURT OF APPEAL - SECOND DIST.

# F I L E D

NOV 8 - 2007

JOSEPH A. LANE ..................................... Clerk

J. GUZMAN ..................... Deputy Clerk

_____          _____          _____
BOREN, P.J.                      ASHMANN-GERST, J.                 CHAVEZ, J.

CLERK'S OFFICE
Court of Appeal
SECOND APPELLATE DISTRICT
300 SOUTH SPRING STREET
SECOND FLOOR • NORTH TOWER
LOS ANGELES, CA 90013-1204

PRISONER RECEIVED THIS
LETTER ON
DATE: 11.13.07



02 1M
0004234077
MAILED FROM ZIP CODE 90013

UNITED STATES POSTAGE
$00.410
NOV 08 2007

# EXHIBIT F

Court of Appeal, Second Appellate District, Div. 2 - No. B202665
S158421

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re JESSE PLAZA on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

JAN 2 3 2008

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
_____
Chief Justice